UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x        Civil Action No.: 11-CV5457 (BMC)
UNITED STATES
*Ex Rel* John Doe 11-CV-5457-2
*Ex Rel* John Doe 11-CV-5457-1, *et al.*,

                              Plaintiffs,


                      -against-                        SECOND AMENDED
                                                       COMPLAINT


RICHARD ROE,

                              Defendants.
-------------------------------------------------------x



                    FILED IN CAMERA AND UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x Civil Action: 11-CV5457 (BMC)

UNITED STATES ex rel. ROBERT KRAUS
and PAUL BISHOP; STATE OF NEW YORK ex rel.
ROBERT KRAUS and PAUL BISHOP; STATE OF
CALIFORNIA ex rel. ROBERT KRAUS and PAUL
BISHOP; STATE OF DELAWARE ex rel. ROBERT
KRAUS and PAUL BISHOP; THE DISTRICT OF
COLUMBIA ex rel. ROBERT KRAUS and PAUL
BISHOP; STATE OF FLORIDA ex rel. ROBERT
KRAUS and PAUL BISHOP; STATE OF HAWAII
ex rel. ROBERT KRAUS and PAUL BISHOP;
STATE OF ILLINOIS ex rel. ROBERT KRAUS and
PAUL BISHOP; STATE OF INDIANA ex rel.
ROBERT KRAUS and     PAUL BISHOP;
COMMONWEALTH OF MASSACHUSETTS ex
rel. ROBERT KRAUS and PAUL BISHOP; STATE
OF MINNESOTA ex rel. ROBERT KRAUS and
PAUL BISHOP; STATE OF MONTANA ex rel.
ROBERT KRAUS and PAUL BISHOP; STATE OF
NEVADA ex rel. ROBERT KRAUS and PAUL
BISHOP; STATE OF NEW HAMPSHIRE ex rel.
ROBERT KRAUS and PAUL BISHOP; STATE OF
NEW JERSEY ex rel. ROBERT KRAUS and PAUL
BISHOP; STATE OF NEW MEXICO ex rel.
ROBERT KRAUS and PAUL BISHOP; STATE OF
NORTH CAROLINA ex rel. ROBERT KRAUS and
PAUL BISHOP; STATE OF OKLAHOMA ex rel.
ROBERT KRAUS and PAUL BISHOP; STATE OF
RHODE ISLAND ex. rel. ROBERT KRAUS and
PAUL BISHOP; STATE OF TENNESSEE ex rel.
ROBERT   KRAUS   and   PAUL   BISHOP;
COMMONWEALTH   OF   VIRGINIA   ex   rel.
ROBERT   KRAUS   and   PAUL   BISHOP,   and
ROBERT KRAUS and PAUL BISHOP, individually,

Plaintiffs,

-against-                          SECOND AMENDED COMPLAINT

WELLS FARGO & COMPANY, WELLS FARGO
BANK, N.A., and its and their subsidiaries and
affiliates,

Defendants.
-------------------------------------------------------------------x

## SECOND AMENDED COMPLAINT

Plaintiff Relators ROBERT KRAUS and PAUL BISHOP (together, the "Relators"), by and through their undersigned counsel, allege for their Second Amended Complaint in respect of themselves and on behalf of the United States of America and the States identified herein against Defendants WELLS FARGO & COMPANY ("WFC"), WELLS FARGO BANK, NATIONAL ASSOCIATION ("WFBNA"), and its and their subsidiaries and affiliates (together, the "Defendants" or "Wells Fargo"), as follows:

## INTRODUCTION

### The Federal Claims

1.     This is an action brought by the Relators on behalf of the United States of America to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* (the "FCA"), arising from the Defendants' fraud on the U.S. Department of the Treasury (the "Treasury Department"), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of Richmond and/or one or more other Federal Reserve Banks (together, the "Federal Reserve System"), the Federal Deposit Insurance Corporation (the "FDIC") and one or more Federal Home Loan Banks (the "FHLBs", and, together with the Treasury Department, the Federal Reserve System, and the FDIC, the "Federal Entities") arising out of the Defendants' participation in one or more Federal funding programs, including, *inter alia*, the Federal Reserve Discount Window (the "Discount Window"), the Federal Reserve Term Auction Facility (the "TAF"), the FDIC Temporary Liquidity Guarantee Program (the "TLGP"), the FDIC deposit insurance coverage program (the "Deposit Insurance Program"), the FDIC Transaction Account Guarantee Program (the "TAGP") and the FHLB funding

programs (the "FHLB Programs", and together with the Discount Window, the TAF, the TLGP, the Deposit Insurance Program and the TAGP, the "Federal Programs").

2.     Each of the Federal Entities, through one or more of the Federal Programs, provided domestic and foreign financial institutions with extensive financial support before and during the on-going financial crisis.   Under these programs, certain participating institutions were able to obtain significant credit and liquidity support at a time when funding through the capital markets – the traditional method of funding – was either too expensive to obtain or simply unavailable.

3.     Wachovia Corporation ("WC"), Wachovia Bank, N.A. ("WBNA") and one or more other WC-affiliated entities (together with WC, WBNA, Wachovia Capital Markets LLC ("WCM") and Wachovia Securities LLC ("WS"), "Wachovia") participated in one or more of the Federal Programs to the date of their merger into the Wells Fargo group of companies on December 31, 2008 (the "Wachovia-Wells Merger Date") and, thereafter, the Wells Fargo group of companies have continued to do so to the present date (referred to herein as the "Wachovia Period").

4.     Golden West Financial Corporation ("GWF"), World Savings Bank, FSB ("WSB"), World Savings, Inc. ("WSI") and one or more GWF-affiliated entities (together with GWF, WSB and WSI, "World Savings") participated in one or more of the Federal Programs to the date of their merger into the Wachovia group of companies on or around October 2, 2006 (the "World-Wachovia Merger Date"), and, thereafter, the Wachovia group of companies continued to do so to the date of their merger into the Wells Fargo group of companies on or around the Wachovia-Wells Merger Date, and, thereafter, the Wells Fargo group of companies have continued to do so to the present

date (referred to herein as the "World Savings Period" and, together with the Wachovia Period, the "Relevant Period").

5.      Because the Federal Entities provided financial support to financial institutions during a period of intense market stress and instability, each Federal Entity assumed the risk that a participating institution would fail while it participated in a Federal Program.  Accordingly, each Federal Entity required a participating institution to certify, through documentation relating to each Federal Program, that it had not violated certain laws and regulations applicable to it, including, among other things, various "safety and soundness" laws and regulations, laws and regulations requiring it to provide certifications as to the adequacy of its financial reporting and internal controls, and other laws and regulations requiring it to provide certifications as to its general compliance with laws and regulations.

6.      During the Relevant Period, each of Wachovia, World Savings and Wells Fargo was subject to various "safety and soundness" laws and regulations (including, *inter alia*, 12 C.F.R. part 30, 12 C.F.R. part 263, 12 C.F.R. part 570 and 12 C.F.R. part 308, Subpart R) (together, the "Safety and Soundness Laws and Regulations") requiring it to (i) have appropriate internal controls and information systems; (ii) have an appropriate internal audit system; (iii) establish and maintain loan documentation practices that enabled it to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loans and sources for repayment, (D) assess the ability of borrowers to repay indebtedness in a timely manner, (E) ensure that claims against borrowers were enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of loans; (iv) establish and maintain prudent credit underwriting practices; (v) have prudent asset growth; and (vi)

establish and maintain an appropriate system commensurate with its size to identify problem assets and prevent deterioration of those assets.

7.      In addition, during the Relevant Period, each of Wachovia, World Savings and Wells Fargo was subject to laws and regulations requiring it to (i) provide various certifications in respect of the adequacy of its financial reporting and internal controls and its compliance with laws or regulations (including, *inter alia*, 12 C.F.R. 363), (ii) satisfy the reporting and certification requirements of the Sarbanes-Oxley Act of 2002, as amended ("Sarbanes-Oxley"), including Sections 302, 806 and 906 thereof, and (iii) comply with the statutory requirements of 18 U.S.C. § 1005 and 18 U.S.C. §1001 (such laws and regulations and the Safety and Soundness Laws and Regulations being the "Applicable Laws and Regulations").

8.      As Relator Kraus and Relator Bishop witnessed first-hand, none of Wachovia, World Savings or Wells Fargo could have certified to the Federal Entities that they were in compliance with the Applicable Laws and Regulations because they flagrantly engaged in unsafe and unsound banking practices in violation of the Safety and Soundness Laws and Regulations and fraudulently misstated and manipulated their balance sheets in violation of applicable laws and regulations, failed to maintain adequate internal controls, made false certifications regarding their financial reporting and internal controls, failed to comply with the obligations of Sarbanes-Oxley, and misled and deceived Federal regulators throughout the Relevant Period about the true state of their financial health, in each case in violation of the Applicable Laws and Regulations.

9.      Each of Wachovia, World Savings and Wells Fargo was intimately aware of and knew of each of these violations of law and regulations at senior levels of

management and knowingly submitted false claims to the Federal Entities to participate in the Federal Programs.

10.     Wachovia's, World Savings' and Wells Fargo's elaborate scheme of engaging in unsound and unsafe banking practices, making false certifications regarding their financial reporting and/or internal controls, disregarding the reporting and certification requirements of Sarbanes-Oxley, and hiding and concealing such scheme from Federal regulators has caused numerous false claims for payment to be paid by the U.S. Government.  Each claim for payment in respect of each of the Federal Programs constitutes a false claim presented to the U.S. Government because it was made by each of Wachovia, World Savings and Wells Fargo, as applicable, with knowledge and on the basis of intentionally misleading certifications to the applicable Federal Entities in connection with their participation in one or more of the Federal Programs.

11.     The Relators seek, through this action, to recover damages and civil penalties from the Defendants for making, or causing to be made, false or fraudulent records, statements and/or claims in connection with their knowing violation of the Applicable Laws and Regulations.  The Defendants knew, and continue to know, that their false and fraudulent scheme for obtaining funding under the Federal Programs has cost the U.S. Government billions of dollars, both through direct support and through subsidies that were provided to them through the Federal Programs.

**The State Claims**

12.     This is also an action brought by the Relators on behalf of the State of New York, the State of California, the State of Delaware, the District of Columbia, the State of Florida, the State of Hawaii, the State of Illinois, the State of Indiana, the Commonwealth of Massachusetts, the State of Minnesota, the State of Montana, the State

of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of North Carolina, the State of Oklahoma, the State of Rhode Island and Providence Plantations (the "State of Rhode Island"), the State of Tennessee and the Commonwealth of Virginia (together, the "States") to recover treble damages and civil penalties under the corresponding false claims statutes of each such State, as identified herein, arising from the Defendants' fraud on each such State in connection with the Defendants' sale of its securities to pension funds located in or relating to each such State, because each of Wachovia, World Savings and Wells Fargo knowingly failed to disclose to such State pension funds the Defendants' elaborate scheme of engaging in unsound and unsafe banking practices, making false certifications regarding their financial reporting and/or internal controls, disregarding the reporting and certification requirements of Sarbanes-Oxley, and hiding and concealing such scheme from Federal regulators and each State.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3730.  Relators establish subject matter jurisdiction under 28 U.S.C. § 3730(b).  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint for which one or both Relators are not an "original source."

14.     The State claims are specifically authorized by each of the following State statutes, each as amended and *et seq.* (together, the "State False Claims Acts"): (The State of New York) New York Finance Law, Article 13, §189(1); (The State of

California) Ca. Gov't Code §12651(a); (State of Delaware) Del. Code Tit. VI. §1201(a);
(The District of Columbia) D.C. Code §2-308.14(a); (The State of Florida) Fl. Stat.
§68.082(2); (The State of Hawaii) Haw. Rev. Stat. §661-21(a); (The State of Illinois) 740
ILCS 175/3(a)(1); (The State of Indiana) Ind. Code §5-11-5.5-2(b); (The Commonwealth
of Massachusetts) Mass. Gen. Laws ch. 12 §5B; (The State of Minnesota) Minn. Stat. §
15C.02(a); (The State of Montana) Mont. Code Ann. 17-8-403(1); (The State of Nevada)
Nev. Rev. Stat. §357.040(1); (The State of New Hampshire) N.H. Rev. Stat. § 167:61-
b(I); (The State of New Jersey) N.J. Stat. Ann. § 2A:32C-3; (The State of New Mexico)
NMSA § 44-9-3(A); (The State of North Carolina) N.C. Gen Stat. § 1-607(a); (The State
of Oklahoma) Okla. Stat. Title 63 § 5053.1(B); (The State of Rhode Island) R.I. Gen.
Laws § 9-1.1-3(a); (The State of Tennessee) Tenn. Code. § 4-18-103(a); and (The
Commonwealth of Virginia) Va. Code §8.01-216.3(A).  They are so related to the
Federal claims within this Court's original jurisdiction as to be within the supplemental
jurisdiction of this Court pursuant to 28 U.S.C. § 1367.  This Court also has jurisdiction
under 31 U.S.C. § 3732(b), as the State claims arise from the same transaction or
occurrence as the Federal claims presented herein.

15.     The Defendants are deemed to be residents of the Eastern District pursuant
to 28 U.S.C. § 1391(c).  Venue is therefore properly in this District pursuant to 28 U.S.C.
§ 1391(b) and 31 U.S.C. § 3732, because the Defendants can be found in and transact or
have transacted business in the Eastern District of New York.  At all times relevant to this
Complaint, the Defendants regularly conduct or have conducted substantial business
within the Eastern District of New York and made or make significant sales within the
Eastern District of New York.

**PARTIES**

16.     Relator Kraus is a resident of Marvin, North Carolina.  From June 2005 to September 2006, Relator Kraus was employed by WCM in the capacity of Vice President, Controller for the Real Estate Capital Markets ("RECM") group and the Corporate and Investment Bank ("CIB") Finance group.  Relator Kraus was hired by WCM on the basis of his commercial real estate ("CRE") experience and was responsible for reviewing and monitoring CRE activities across Wachovia, including WCM, WC, WBNA, WS and other Wachovia affiliates.  In his capacity as a controller, Relator Kraus had direct exposure to Wachovia's CRE activities and its failure to comply with the Applicable Laws and Regulations.  The Defendants made false statements, records and/or claims concerning its compliance with the Applicable Laws and Regulations to obtain funding through one or more Federal Programs for which the Defendants did not qualify.

17.     Relator Bishop is a resident of Millbrae, California.  From November 2002 to May 2006, Relator Bishop was employed by WSI in the capacity of a retail salesperson for residential mortgages.  In such capacity, Relator Bishop had direct contact with borrowers of World Savings mortgage products and World Savings underwriting, appraisal and wholesale brokerage personnel.  Relator Bishop had direct exposure to World Savings' residential mortgage activities and its failure to comply with the Applicable Laws and Regulations.  The Defendants made false statements, records and/or claims concerning its compliance with the Applicable Laws and Regulations to obtain funding through one or more Federal Programs for which the Defendants did not qualify.

18.     Defendant Wells Fargo & Company is a Delaware corporation and a bank holding company registered under the Bank Holding Company Act of 1956, as amended (the "BHC Act").  It was at all relevant times the publicly-traded parent and holding company of the Wells Fargo group of companies, which have their principal place of

business and national headquarters at 420 Montgomery Street, San Francisco, CA 94163. Upon information and belief, it is the successor entity to WC and GWF following the Wachovia-Wells Merger Date.

19.     Wells Fargo Bank, National Association is a California corporation, the significant banking subsidiary of Wells Fargo & Company and regulated by the U.S. Office of the Comptroller of the Currency.   Upon information and belief, it is the successor entity to WBNA and WSB following the Wachovia-Wells Merger Date.

## SUBSTANTIVE ALLEGATIONS

### The Federal Programs

20.     Each of the Federal Entities, through one or more of the Federal Programs, provided domestic and foreign financial institutions with extensive financial support, in the form of credit and liquidity support, throughout the Relevant Period.  Although the Federal Programs were intended to provide support to financial institutions when market-originated funding was either too expensive to obtain or simply unavailable, the Federal Programs were never intended to provide extended financial support, much less a bailout or a subsidy, to ailing financial institutions that were violating the Applicable Laws and Regulations.

21.     Indeed, participating institutions were required to make or to have made certain certifications to the Federal Entities in respect of their compliance with the Applicable Laws and Regulations to be able to participate in the Federal Programs.  A description of each of the Federal Programs, and the certifications required to be delivered in order to participate therein, follows:

*The Federal Reserve Discount Window*

22.     The Federal Reserve System provides access to the Discount Window to certain financial and other institutions to enable them to borrow money from the Federal Reserve System, usually on a short-term basis, to address temporary shortages of liquidity.  Funds are lent under the Discount Window on the basis of the soundness of the participating borrower, with a cheaper "primary credit" rate being provided to sound institutions and a more expensive "secondary credit" rate being provided to institutions unable to borrow under "primary credit" rate rules.  Accordingly, the rate of funding available from the Discount Window depends on the financial health of the borrowing institution.

23.     Wachovia, World Savings and Wells Fargo drew funds from the Discount Window a number of times during the Relevant Period at the "primary credit" rate.   To draw these funds, each of Wachovia, World Savings and Wells Fargo was required to execute lending agreements and corporate resolutions conforming with Operating Circular No. 10, Lending, effective October 15, 2006 (the "Circular"), issued by the Federal Reserve System pursuant to Federal law.

24.     In accordance with Section 9.1(b) of the Circular, each of Wachovia, World Savings and Wells Fargo represented and warranted to a Federal Reserve Bank in the Federal Reserve System each time it borrowed funds that "it is not in violation of *any* laws or regulations *in any respect* which *could* have *any adverse effect whatsoever* upon the…performance…of any of the terms of the [Circular]" (emphasis added) (the "Section 9.1(b) Representation").

25.     In accordance with Section 9.1(i) of the Circular, each of Wachovia, World Savings and Wells Fargo represented and warranted to a Federal Reserve Bank in the Federal Reserve System that "no Event of Default [with respect to it] has occurred or

is continuing" (the "Section 9.1(i) Representation").  An "Event of Default" is defined in Section 2.1 of the Circular as "…any representation or warranty made or deemed to be made by [the borrower] under or in connection with the [Circular], or that is contained in any certificate, document or financial or other statement delivered by it or in connection with [the Circular], is inaccurate in any material respect on or as of the date made or deemed made."

26.     Pursuant to Section 9.2 of the Circular, each of Wachovia, World Savings and Wells Fargo made each representation and warranty each time it requested an advance from the Discount Window, incurred any indebtedness through the Discount Window, or granted a security interest in any collateral in connection with a draw on the Discount Window, in each case on and as of the date of such advance, the extension of such indebtedness or the grant of such security.

27.     Each of Wachovia, World Savings and Wells Fargo also covenanted in Section 9.2 of the Circular that such representations and warranties would "remain true and correct so long as the [Circular] remains in effect, any [obligation] remains outstanding, or any other amount is owing to the [Federal Reserve System]."

28.     Because Wachovia, World Savings and Wells Fargo and its or their officers and employees intentionally and flagrantly violated the Applicable Laws and Regulations, each of Wachovia, World Savings and Wells Fargo knowingly submitted false claims to the Federal Entities in respect of Sections 9.1(b), 9.1(i) and 9.2 of the Circular each time it or they drew funds from the Discount Window.

*The Federal Reserve TAF*

29.     Under the TAF, the Federal Reserve System auctioned term funds to

-13-

participating institutions against a wide variety of collateral.  The Federal Reserve System implemented the TAF as part of a global support program to address elevated pressures in the short-term funding markets, with similar programs being adopted by the Bank of Canada, the Bank of England, the European Central Bank and the Swiss National Bank for their respective jurisdictions.

30.     Wachovia, World Savings and Wells Fargo participated in the TAF a number of times during the Relevant Period.

31.     Participation in the TAF was governed by the terms of the Circular, and each of Wachovia, World Savings and Wells Fargo was required to execute lending agreements and corporate resolutions conforming with the Circular to be able to participate in TAF auctions.  Each of Wachovia, World Savings and Wells Fargo made the Section 9.1(b) Representation and the Section 9.1(i) Representation to a Federal Reserve Bank in the Federal Reserve System each time it participated in a TAF auction.

32.     Pursuant to Section 9.2 of the Circular, each of Wachovia, World Savings and Wells Fargo made each representation and warranty each time it participated in a TAF auction, incurred any indebtedness through a TAF auction, or granted a security interest in any collateral in connection with its participation in a TAF auction, in each case on and as of the date of such advance, the extension of such indebtedness or the grant of such security.

33.     Each of Wachovia, World Savings and Wells Fargo also covenanted under Section 9.2 of the Circular that such representations and warranties would "remain true and correct so long as the [Circular] remains in effect, any [obligation] remains outstanding, or any other amount is owing to the [Federal Reserve System]."

34.     Upon information and belief, Wachovia borrowed, on a blended, aggregate basis, approximately $6.9 billion for 449 days from the Federal Reserve System under both the Discount Window and TAF funding programs, receiving a direct financing subsidy from the U.S. Government from 4% to 9% (and possibly more) of the principal balance of the funding throughout the term of such funding.

35.     Because Wachovia, World Savings and Wells Fargo and its or their officers and employees intentionally and flagrantly violated the Applicable Laws and Regulations, each of Wachovia, World Savings and Wells Fargo knowingly submitted false claims to the Federal Entities in respect of Sections 9.1(b), 9.1(i) and 9.2 of the Circular each time it or they participated in a TAF auction.

### The FDIC TLGP

36.     Under the FDIC's TLGP, the FDIC guaranteed the issuance of term debt of certain participating entities, including Wachovia and Wells Fargo, effectively providing such entities with a subsidized rate of funding for a limited period of time (*i.e.*, because the FDIC was willing to guarantee the debt of the participating institution, the participating institution could issue debt and raise funds in the market more cheaply based on the FDIC's external credit support).

37.     The Master Agreement, Federal Deposit Insurance Corporation, Temporary Liquidity Guarantee Program – Debt Guarantee Program, dated November 24, 2008 (the "Master Agreement"), sets forth the terms and conditions for participation in the TLGP.

38.     All insured depositary institutions, including Wachovia's, World Savings' and Wells Fargo's insured depositary institutions, were deemed to participate unless they

specifically "opted-out" of the program.   Wachovia' and World Savings' insured depositary institutions did not "opt-out" of the TLGP prior to the Wachovia-Wells Fargo Merger Date, and Wells Fargo's insured depositary institutions only opted out of the TLGP effective January 1, 2010.  Each of Wachovia, Wells Fargo and, upon information and belief, World Savings, issued debt guaranteed by the FDIC under the TLGP.

39.     In accordance with Section 3.03 of the Master Agreement, each of Wachovia, World Savings and Wells Fargo represented and warranted that "[a]s of their respective dates of filing, the Issuer Reports [(as defined below)] complied in all material respects with all statutes and applicable rules and regulations of all applicable governmental entities."

40.     In the same section, each of Wachovia, World Savings and Wells Fargo represented and warranted that, "[i]n the case of each such Issuer Report filed with or furnished to the [Securities and Exchange Commission], if any, such Issuer Report: (a) did not, as of its date…contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; (b) complied as to form in all material respects with all applicable requirements of [the Securities Act of 1933, as amended, and the Securities and Exchange Act of 1934, as amended]; and (c) no executive officer of the Issuer or any subsidiary of the Issuer has failed in any respect to make the certifications required by [such officer] under Section 302 or 906 of [Sarbanes-Oxley]."

41.     Each of Wachovia, World Savings and Wells Fargo further represented and warranted in Section 3.03 of the Master Agreement that "with respect to all other Issuer Reports, the Issuer Reports were complete and accurate in all material respects as

of their respective dates."

42.     "Issuer Reports" is defined in the Master Agreement as "reports, registrations, documents, filings, statements and submissions, together with any amendments thereto, that the Issuer or any subsidiary of the Issuer is required to file with any governmental entity."

43.     Because Wachovia, World Savings and Wells Fargo and its or their officers and employees intentionally and flagrantly violated the Applicable Laws and Regulations, each of Wachovia, World Savings and Wells Fargo knowingly submitted false claims to the Federal Entities in respect of Section 3.03 of the Master Agreement each time it or they issued debt guaranteed by the FDIC under the TLGP.

*The FDIC Deposit Insurance Program, the TAGP and the FHLB Programs*

44.     Under the FDIC's Deposit Insurance Program, the FDIC guarantees the safety of a certain deposits held with participating insured depositary institutions, including Wachovia's, World Savings' and Wells Fargo's insured depositary institutions.

45.     In response to the financial crisis, the FDIC created the TAGP on October 13, 2008 to fully guarantee deposits held in non-interest bearing transaction accounts with participating insured depositary institutions, including Wachovia's, World Savings' and Wells Fargo's insured depositary institutions.  The TAGP was extended to December 31, 2010, at which time it was incorporated into law under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended (the "Dodd-Frank Act").

46.     Each of Wachovia's, World Savings' and Wells Fargo's insured depositary institutions participated in the Deposit Insurance Program throughout the Relevant Period.  Each of Wachovia's, World Savings' and Wells Fargo's insured

depositary institutions participated in the TAGP from its creation to its incorporation into law under the Dodd-Frank Act.  Each of Wachovia, World Savings and Wells Fargo drew funds under the FHLB Programs a number of times during the Relevant Period.

47.     To qualify for participation in the Deposit Insurance Program and the TAGP, each of Wachovia's, World Savings' and Wells Fargo's insured depositary institutions were required to adhere to certain liquidity and reserve requirements mandated by law and regulation, to make certain certifications available to the FDIC concerning each such entity's safety and soundness, and to comply with the Applicable Laws and Regulations.

48.     Upon information and belief, to qualify for participation in the FHLB Programs, each of Wachovia, World Savings and Wells Fargo were required to make certain certifications to the FHLBs concerning each such entity's safety and soundness and its or their compliance with the Applicable Laws and Regulations.  Wachovia and World Savings borrowed approximately $53 billion in 2008 from the FHLB, receiving a direct financing subsidy from the U.S. Government throughout the term of such funding.

49.     Premium payments for the FDIC Deposit Insurance Program and TAGP coverage were charged to participating institutions, including Wachovia's, World Savings' and Wells Fargo's insured depositary institutions, on the basis of the financial health of such participating institutions.  Upon information and belief, in respect of the FHLB Programs, draws were provided and interest was charged to participating institutions, including Wachovia, World Savings and Wells Fargo, on the basis of the financial health of such participating institutions.

50.     Because Wachovia, World Savings and Wells Fargo and its or their

officers and employees intentionally and flagrantly violated the Applicable Laws and Regulations, each of Wachovia, World Savings and Wells Fargo knowingly submitted false claims to the Federal Entities in respect of its or their participation in the Deposit Insurance Program, the TAGP and the FHLB Programs.

### The State Funds

51.     Each of the State pension funds identified herein invested in each of Wachovia's, World Savings' and Wells Fargo's securities because Wachovia, World Savings and Wells Fargo failed to disclose their elaborate scheme of engaging in unsound and unsafe banking practices, making false certifications regarding their financial reporting and/or internal controls, disregarding the reporting and certification requirements of Sarbanes-Oxley, and hiding and concealing such scheme from Federal regulators and each such State.

52.     Upon information and belief, each of Wachovia, World Savings and Wells Fargo knowingly made false certifications and claims in respect of its financial health to each such State pension fund to induce each such State pension fund to invest in its securities.

53.     Had each of the State pension funds known of the false certifications and claims, each such fund would not have invested in each of Wachovia's, World Savings' and Wells Fargo's securities.

54.     Upon information and belief, the following pension funds in the State of New York invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the State of New York Consolidated Retirement Funds, the New York City Employee's Retirement System, the Teachers' Retirement System of the City of

New York, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, the New York City Board of Education Retirement System, the New York City Police Officers' Variable Supplements Fund, the New York City Police Superior Officers' Variable Supplements Fund, the New York City Firefighters' Variable Supplements Fund, the New York City Fire Officers' Variable Supplements Fund, Teachers' Retirement System of the City of New York Variable Annuity Funds, the City of New York Group Trust, the New York City Deferred Compensation Plan and its or their affiliated funds.

55.     Upon information and belief, the following pension funds in the State of California invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: CalPERS, the California State Teachers' Retirement System, the Department of Personnel Administration – State Savings Plus Program, the University of California Retirement Plan, California PERF, California Teachers, the San Diego County Pension Fund and its or their affiliated funds.

56.     Upon information and belief, the following pension funds in the State of Delaware invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Delaware Public Employees' Retirement System, which consists of nine retirement plans for various public employees, and its or their affiliated funds.

57.     Upon information and belief, the following pension funds in the District of Columbia invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the District of Columbia Police & Fire Fund, the District of Columbia Teachers Pension Fund and its or their affiliated funds.

58.     Upon information and belief, the following pension funds in the State of

Florida invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Florida Division of Retirement, the Florida Retirement System and its or their affiliated funds.

59.     Upon information and belief, the following pension funds in the State of Hawaii invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Hawaii Employees' Retirement System and its affiliated funds.

60.     Upon information and belief, the following pension funds in the State of Illinois invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the State Retirement Systems of Illinois, the State Universities Retirement System of Illinois, the Chicago Teachers Fund, the Illinois Municipal employees' fund, the Illinois SERS, the Illinois Teachers Retirement Fund, the Illinois Public Employees' Retirement Fund, the Illinois Universities' Fund and its or their affiliated funds.

61.     Upon information and belief, the following pension funds in the State of Indiana invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Indiana Public Employees' Retirement Fund, the Indiana Teachers' Retirement Fund and its or their affiliated funds.

62.     Upon information and belief, the following pension funds in the Commonwealth of Massachusetts invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Pension Reserves Investment Trust Fund, the Massachusetts Teachers' Retirement Board, Massachusetts SERS and its or their affiliated funds.

63.     Upon information and belief, the following pension funds in the State of

Minnesota invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Minnesota Public Employee Retirement Association, the Minnesota Teachers' Retirement Association, the Minneapolis ERF, the Minnesota PERF, the Minnesota State Employees' Fund, the Minnesota Teachers' Fund, and its or their affiliated funds.

64.     Upon information and belief, the following pension funds in the State of Montana invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Montana State Fund Insurance Fund and its or their affiliated funds.

65.     Upon information and belief, the following pension funds in the State of Nevada invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Nevada Public Employees Retirement System, the Nevada Police Officer and Firefighter Fund, the Nevada Regular Employees' Fund and its or their affiliated funds.

66.     Upon information and belief, the following pension funds in the State of New Hampshire invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the New Hampshire Retirement System and its affiliated funds.

67.     Upon information and belief, the following pension funds in the State of New Jersey invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the New Jersey Division of Pensions and Benefits, New Jersey PERS PUC, New Jersey Police and Fire Fund, the New Jersey Teachers' Fund, and its or their affiliated funds.

68.     Upon information and belief, the following pension funds in the State of New Mexico invested in each of Wachovia, World Savings and Wells Fargo during the

Relevant Period: the New Mexico Education Retirement Board, the Public Employees Retirement Association of New Mexico, the New Mexico Teachers Fund and its or their affiliated funds.

69.     Upon information and belief, the following pension funds in the State of North Carolina invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the North Carolina Local Government's Pension Fund, the North Carolina Teachers and State Employees Fund and its or their affiliated funds.

70.     Upon information and belief, the following pension funds in the State of Oklahoma invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Oklahoma City Public Employees Retirement System, the Oklahoma Teachers Retirement System and its or their affiliated funds.

71.     Upon information and belief, the following pension funds in the State of Rhode Island invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Employees' Retirement System, Rhode Island Municipal Fund, and its or their affiliated funds.

72.     Upon information and belief, the following pension funds in the State of Tennessee invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Tennessee Pension Funds, the Consolidated Retirement System, Tennessee Political, Tennessee State and Teachers Funds, and its or their affiliated funds.

73.     Upon information and belief, the following pension funds in the Commonwealth of Virginia invested in each of Wachovia, World Savings and Wells Fargo during the Relevant Period: the Virginia Retirement System and its affiliated funds.

## HOW WACHOVIA VIOLATED APPLICABLE LAWS AND REGULATIONS

### Profitability in the Corporate and Investment Bank

74.     The gem of Wachovia was the CIB, a division of Wachovia led by Steve
Cummings ("Cummings"), a Senior Executive Vice President and Executive Officer of
WC.   According to WC's 2006 annual report, the CIB had "70% of revenues in 2006
coming from capital markets activity – heavily weighted to fixed income and focusing on
high-margin, non-commodity businesses" and the CIB "doubled its market share and
grew faster than [Wachovia's] major investment banking competitors over [a five-year
period] while reducing the capital needed to support the business."

75.     To achieve these impressive results, the CIB knowingly disregarded the
Applicable Laws and Regulations to satisfy Wachovia senior management's unrestrained
pursuit of short-term profitability, a pursuit that benefitted senior management and certain
Wachovia personnel (who earned large bonuses) at the expense of the long-term financial
health of Wachovia.

76.     Senior management in the CIB included (i) Cummings, (ii) Tom Wickwire
("Wickwire"), the Head of Structured Products; (iii) Bill Green ("Green"), Managing
Director of the RECM group; (iv) Sam Solie ("Solie"), the Chief Operating Officer of
RECM; (v) Robert Verrone ("Verrone"), head of the CIB's Large Loan Group (*i.e.*, CRE
loans in excess of $50 million principal amount); (vi) Frank Tippett ("Tippett"), a
Director and Head of Hedging at WS, (vii) Keith Schliecher ("Schleicher"), Managing
Director and the Head of Credit Risk Management; (viii) Royer Culp ("Culp"), Head of
Wachovia's Structuring Department; (ix) Stephen Nelson ("Nelson"), the Product

Controller for RECM; and (x) Ira Malter ("Malter"), the Controller for Structured Products. Appendix I appended hereto illustrates CIB reporting lines.

77.    Wachovia increased business line autonomy and selectively disregarded internal controls because internal controls affected bottom-line profitability. Certain internal control processes were in place prior to 2004. However, with the blessing of Wachovia's senior management, Wickwire, Green and Solie took deliberate steps to circumvent or dismantle these processes to enhance profitability at the CIB.

78.    Management also prioritized business line profitability over safe and sound banking practices by making middle- and back-office personnel – including controllers – report to and follow the direction of business line heads, notwithstanding the obvious risks to the safety and soundness of Wachovia as a whole.

79.    Management granted business lines *de facto* autonomy from management supervision based on the level of profitability of such business lines, turning a blind-eye to the additional risk assumed by Wachovia as a result of this policy. Put simply, rules that were established to protect Wachovia did not apply to profitable business lines. For example, Wachovia did not perform "value at risk" ("VaR") analyses on CRE loans originated by Verrone, simply because Verrone's department was extremely profitable. VaR analyses, which are almost universally used throughout the banking industry on a wide range of assets (including CRE loans), are used to measure the risk of loss on a specific portfolio of assets over a particular time horizon.

80.    Verrone's group was also exempted from having to track unfunded commitments, advance obligations or forward commitments (*i.e.*, funding commitments of Wachovia that are enforceable against Wachovia as of deal closing but in respect of

which additional funding by Wachovia only takes place after the satisfaction of additional conditions precedent in the future).  Of course, because Wachovia would have to fund these additional amounts if the conditions precedent were satisfied, prudent banking practice would dictate that Wachovia track such commitments on a going-forward basis to determine and plan for prospective liabilities.  Wachovia chose not to do so because it would hamper its profitability.

81.      Moreover, Wachovia's senior management discouraged incorporation of market-standard risk mitigation techniques simply because such techniques would hamper Wachovia's ability to generate profits.  For example, Wachovia did not perform "specific risk" analyses or utilize borrower grading systems in respect of CRE products because, according to senior management, they were too expensive and burdensome to implement.

82.      Similarly, Wachovia's senior management did not require business lines to input financial data in its centralized computer tracking systems, "CREW" and "Calypso".  Rather, Wachovia's management allowed profitable CIB business lines to operate autonomously from one another and the rest of Wachovia, thereby increasing business line independence and reducing the ability of Wachovia's senior management and Wachovia's accounting, compliance and legal departments to check individual business line activities.  For example, Tippett maintained a hedging model (the "HAWG Model") separate and apart from any of Wachovia's other systems.   In addition, according to another Wachovia employee, Culp kept structuring data "in his head" and refused to provide such critical data to other Wachovia employees.  Both Tippett and Culp were not required by Wachovia to provide information on their models to other Wachovia employees – including controller personnel – or to input information relating

to such models on its centralized computer systems.

83.     Further, to avoid having to recognize profit and loss volatility relating to "synthetic" trades that Tippett entered into on behalf of WS (which could affect bottom line profitability at year end for the CIB (*e.g.*, such as in 2006, by approximately $8 million)), Tippett simply did not report such trades and kept a segregated record of such trades on a spreadsheet at Wachovia's hedging desk.   However, notwithstanding Tippett's relaxed treatment of tracking such exposures, synthetic positions were legally created and enforceable among Wachovia desks resulting in actual, recognizable liabilities for Tippett's desk that were not reported to Wachovia generally but were borne by the institution.

84.     Wachovia's management used its power of hiring, firing and paying bonuses to encourage employees to embrace management's short-term pursuit of profitability.   For example, Green determined bonuses for middle- and back-office Wachovia CIB and RECM personnel solely on the basis of front-office management's input, a shocking conflict of interest.

85.     Wachovia's management fostered a corporate culture that operated through fear and intimidation and encouraged silence about issues relating to internal controls, internal audit, loan documentation, credit underwriting, asset and risk assessment and financial reporting.   For example, Nelson and Malter, both direct supervisors of Relator Kraus, threatened Relator Kraus on numerous occasions to not raise issues or concerns regarding CRE products to them or to others at Wachovia. Indeed, in one disturbing conversation, Nelson even told Relator Kraus that he did not want to know about such concerns because he would then have to "fix" them.

86.     Wachovia's management expressly discouraged Wachovia employees from speaking with Wachovia's compliance department and/or legal department about problems they experienced at Wachovia concerning internal controls, internal audit, loan documentation, credit underwriting, asset and risk assessment and financial reporting. Relator Kraus was directly threatened for doing so on numerous occasions by several members of senior management, including Solie, Nelson and Malter.

87.     Wachovia's management also encouraged personnel to conceal violations of Applicable Laws and Regulations from Federal regulators.   For example, Relator Kraus was directed by Green, Malter and Nelson to not discuss the existence of a certain College Street Master Funding Trust financing vehicle (also known as the "Black Box") with Federal regulators or other Wachovia employees.   Relator Kraus also observed Wachovia employees using adjusted securities trading and manipulated repo trading to hide asset quality issues and market value risks relating to CRE loans from Federal regulators and other Wachovia employees.   Relator Kraus was also expressly instructed by Wachovia's management to "confuse" Federal regulators during an on-site examination by overwhelming them with an unmanageable amount of unprocessed and unorganized data, information and documents.

### Wachovia's CRE Operations

88.     Wachovia's unrestrained pursuit of profitability infected its CRE operations, from the origination of CRE deals, to the distribution of CRE products (including through securitizations), to the concealment of the retained CRE loan risks.

89.     Relator Kraus discovered that Wachovia, through its CIB division's CRE operations, flagrantly disregarded the Applicable Laws and Regulations by: (i) not having appropriate internal controls and information systems; (ii) not having an appropriate

-28-

internal audit system; (iii) not establishing and maintaining loan documentation practices that enabled Wachovia to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loan and sources for repayment, (D) assess the ability of the borrower to repay indebtedness in a timely manner, (E) ensure that claims against the borrower would be enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of a loan; (iv) not establishing and maintaining prudent credit underwriting practices; (v) not having prudent asset growth; and (vi) not establishing and maintaining an appropriate system commensurate with Wachovia's size to identify problem assets and prevent deterioration of those assets, by violating the certification requirements regarding financial reporting, internal control and compliance with laws and regulations under 12 C.F.R. 363, by making false entries with an intent to deceive other officers of Wachovia in violation of 18 U.S.C. §1005, by making false statements in a matter within the jurisdiction of a Federal department or agency in violation of 18 U.S.C. §1001 and by violating Sarbanes-Oxley, including Sections 302, 806 and 906 thereof.

## Origination of CRE Loans

90.     One reason the CIB was so successful in the market was because it was willing and able to provide prospective customers with financing at or above the value of the property being financed on CRE deals that presented significant credit risks. Wachovia could increase its short-term profitability by entering into these deals because it would earn fees on the CRE loans and the eventual securitizations of such CRE loans. However, by doing so, it jeopardized its long-term health and assumed significant residual risks.

91.     Wachovia would also "beat" the competition by making these types of

loans when the competition would not.  Indeed, Wachovia's competitors lost numerous CRE deals to Wachovia because they would not similarly violate the Applicable Laws and Regulations in order to provide excessive financing on deals that were fraught with credit risk.

92.     Wachovia secured such excessive financing for its customers in the following ways, among others:

### Structuring Around Loan to Value Limits

93.     Under applicable regulations, Wachovia's CRE loans could not exceed certain supervisory loan-to-value ("LTV") limits.  An LTV is calculated by dividing the principal balance of the loan secured by the related property by the "value" of such property.  For most of the CRE loans that Wachovia extended, the supervisory LTV limit was 80% (*i.e.*, the LTVs for these CRE loans had to be at 80% or less).

94.     To attract more business from customers and to lock out the competition, however, Wachovia had to provide prospective customers with funds in excess of the supervisory LTV limits.  To do this, Wachovia extended a "senior loan" and multiple "subordinate loans" to borrowers, with (i) the "senior loan" being secured by the value of the property (and Wachovia referencing it as evidence of its "satisfaction" of supervisory LTV limits) and (ii) "subordinate loans" being extended to the same borrower on an unsecured basis (and therefore not referenced for LTV calculation purposes).

### Manipulating "Value"

95.     Because the senior loan's LTV had to be at or under 80% for regulatory purposes, Wachovia willingly and knowingly used misleading and inaccurate data to increase the "value" of the property.  Alternatively, Wachovia would reverse-engineer the

"value" of the property through aggressive appraisals to obtain a senior loan LTV of 80% or less.

96.     For example, Wachovia made an extension of credit to One Oliver Associates Limited Partnership (the "One Oliver Transaction") in connection with the borrower's purchase of an office complex property.  The funding was structured as a $40 million senior loan, with an additional $12 million being provided by Wachovia through two subordinated loans, and an additional $8 million being provided by a Lehman Brothers Inc. entity ("Lehman Brothers") that already had amounts owed to it in respect of the property.  In an e-mail written by Verrone *less than two months after closing,* Verrone acknowledged that there were too few leases on the property to substantiate Wachovia's valuation of the property for LTV purposes and that the "true" value of the property was only $40 million (which, of course, was the size of the *entire* senior loan). Another Wachovia employee, Carolyn Hubach ("Hubach"), confirmed that the value of the property was only $40 million and that Wachovia had lent $52 million against it.  In effect, Wachovia provided the borrower in the One Oliver Transaction with well over 100% financing, notwithstanding the 80% LTV supervisory limit.

97.     In a separate financing relating to malls located in Macon, Georgia and Burlington, North Carolina (the "Macon-Burlington Loans"), Hubach acknowledged that the Macon-Burlington Loan had an actual LTV of at least 90%.

98.     Wachovia also intentionally used outdated financial data to increase the value of the property even though Wachovia had more recent, albeit less helpful, financial data that supported a lower valuation.  For example, Wachovia provided funding to seven Double Tree Hotels on or around June 30, 2005, including one property in Phoenix, Arizona and another in Tyson, Virginia.  When two of these properties were

"non-performing" within six months of closing, Relator Kraus questioned Schliecher to find out why.  Schleicher informed Relator Kraus that Wachovia's credit department intentionally used outdated financial data relating to these properties to increase the value of the properties for LTV purposes and to enable the transaction to be funded, even though it had more recent, but less "helpful", financial data in respect of these properties that could not support such an extension of credit.

*Limiting Customer and Borrower Recourse*

99.    Where the actual value of a property could not possibly support the repayment of the related subordinate CRE loans (and, quite possibly, the related senior CRE loans), no rational customer would be willing to assume an obligation to repay Wachovia for the extension of such subordinate CRE loans.  Accordingly, in transactions like the One Oliver Transaction and a transaction involving Dobie Austin LP (the "Dobie Center Transaction"), Wachovia offered customers "recourse-free" loans by extending the subordinate loans to newly-created and minimally-capitalized special purpose vehicles ("SPVs") created and controlled by the customers themselves.  In effect, Wachovia would have to seek repayment from a shell entity in the event of a default of a subordinate loan.

100.    Moreover, to sweeten the deal even further for its customers, Wachovia limited its recourse to the SPV to only specific circumstances, such as intentional misapplication by the SPV of loan or casualty insurance proceeds.  Wachovia's credit documentation failed to explain how the SPV could repay the subordinated CRE loans (which were ignored for LTV calculations) other than through income generated from the property, given that the SPV did not have any cash or any recourse to a credit worthy line of credit or guarantee.

*Paying Loyal Customers a Kickback*

101.    On several occasions, Wachovia paid loyal customers kickbacks for doing business with Wachovia, through payment of brokerage fees, placement fees and other fees or amounts, when no related services were provided.  For example, in the Dobie Center Transaction, Wachovia paid a brokerage fee of $365,250 to an affiliate of the customer, Carlton Advisory Services, Inc., when no true brokerage services were provided.  As another example, Verrone released half a million dollars from a "holdback reserve" to the borrower of the One Oliver Transaction after the deal closed in direct violation of loan transaction documentation and express credit department requirements. Even though Verrone was separately questioned about the appropriateness of such release of funds by both Relator Kraus and another Wachovia employee, Robert Uhlin ("Uhlin"), Verrone ordered the release of funds and had senior management silence Relator Kraus and Uhlin about the issue.

*Concealing Unsupportable Credit Decisions in Poor Loan Documentation*

102.    On several occasions, Wachovia provided funding for CRE loans that it knew it could not and should not have funded had it complied with the Applicable Laws and Regulations and its own policies.  To facilitate extensions of credit for such loans, Wachovia significantly relaxed its loan documentation practices and credit underwriting practices, effectively burying the obviously unsupportable credit decisions in inaccurate, confusing and misleading loan documentation.

103.    Wachovia's credit department executed a completed "1146" credit document prior to an extension of credit of a CRE loan to a prospective borrower. However, on clearly questionable extensions of credit – many of which were originated

through Verrone's Large Loan Group – Wachovia intentionally abandoned loan documentation and credit underwriting practices because adherence to such practices would result in the CRE loans being denied.

104.    For example, in the Dobie Center Transaction, Wachovia's 1146, among other things: (i) misidentified the property as a "multi-family residential property" (thereby concealing from the credit department that it needed to consider risks particular to student housing); (ii) failed to account for losses attributable to it being student housing that would necessarily affect the value of the property (had the 1146 done so accurately, the borrower would have failed to meet the credit department's debt service coverage requirements at closing, resulting in a denial of the loan); (iii) showed that Wachovia's credit department only authorized $60,875,000 of funding but that Wachovia had actually funded $62,330,000 to the borrower; and (iv) acknowledged that Wachovia only earned $5,000 in fees for a $60,875,000 extension of credit, without any explanation as to why (Wachovia typically earned fees for large loan CRE deals in excess of $1 million). Indeed, the loan documentation for the Dobie Center Transaction was so poor that Schleicher acknowledged to Relator Kraus *just two days after closing* that he did not even know that the CRE loan was backed by a student housing center.

105.    Wachovia was careful to "fix" documentation discrepancies when it knew that such discrepancies would be discovered, such as when Wachovia marketed CRE loans to third parties during related securitizations. In a securitization, contractual debt (such as the CRE loans) is pooled together into a vehicle that then sells the consolidated debt to investors through one or more debt securities, typically on a "tranched" basis. To make informed credit decisions relating to a securitization, a prospective investor will typically request material information relating to the contractual debt forming the asset

base of the securitization debt.  In effect, the investor evaluates the likelihood that he will continue to be paid based on the underlying contractual debt.  In the Dobie Center Transaction, Wachovia corrected a number of credit discrepancies when it prepared its securitization document two weeks after the related CRE loan closing because it knew that investors in the related securitization would clearly pick up on the obvious discrepancies.

106.    As another example of Wachovia's intentional use of poor loan documentation, Wachovia extended a $650 million financing to the Alliance Group for the recapitalization of an asset pool of 38 garden-style apartment units (the "Alliance Loan").  The financing was secured by two pools of properties:  "Pool A" properties comprised of 7,712 units and "Pool B" properties comprised of 3,831 units.  Wachovia's internal documentation acknowledges that the borrower of the Alliance Loan was expected to repay its debt by: (i) improving the Pool B properties; (ii) selling them at a profit; (iii) using some of the proceeds of such sales to pay down the debt for Pool A properties; (iv) using the remaining proceeds to improve Pool A properties; and (v) selling the Pool A properties at a profit to repay the Alliance Loan.

107.    However, based on Wachovia's Alliance Loan credit documentation, Wachovia's credit department reached the incredible (and improbable) conclusion that with only $1,729 of Pool B property enhancements, the Alliance Loan borrower would increase the property value of Pool B units from $59,343 per unit to $90,574 per unit – which, coincidentally, was the increase that was necessary for the borrower to meet its repayment obligations under the Alliance Loan.

108.    Verrone's Large Loan Group earned $15,220,000 in fees for closing the Alliance Loan, which resulted in a large profit that would reflect positively on Verrone's

"profit and loss" allocation, which would be used to determine year-end bonuses for Verrone and other individuals in senior management.  When recognizing a loss on the sale of the Alliance Loan subordinate loans (as described in further detail below), Nelson wrote: "the profitability of the Alliance portfolio didn't lend itself to take such a large profit at deal closing…Of course, back then it was all good, 'attaboys' for everyone. Now, we have another [$1.8 million] mark to consider."

## Off-Loading or Concealing CRE Loan Risks

109.    After closing a CRE loan that provided a borrower with excessive financing, Wachovia faced a significant problem: Wachovia had on its books a senior CRE loan backed by a property with an inflated property value and one or more subordinate CRE loans backed by a shell vehicle with no ability to repay such loans other than through income generated by the over-valued property.  To address this problem, Wachovia found creative ways to off-load the risks to the market or, alternatively, to conceal the risks that it ultimately assumed.

## Dealing with Subordinate CRE Loan Risk

110.    Not surprisingly, Wachovia had problems selling many subordinate CRE loans into the market because no reasonable purchaser would buy the subordinate loans based on the credit quality of such loans.  Indeed, in the One Oliver Transaction, Verrone acknowledged *six days prior to closing the deal* that no less than twenty-two purchasers refused to buy any of the subordinate notes on that deal.  Notwithstanding the clear signal that the market considered the transaction to be significantly over leveraged, Wachovia closed the deal anyway.

111.    Wachovia had a number of selling tactics in its arsenal that it freely used

to sell subordinate CRE loans into the market, including the ones that follow:

*Forcing Buyers to Buy Them*

112.     Wachovia sometimes forced its customers to buy subordinate CRE loans by threatening them that if they did not buy such loans, they would not have access to other services provided by Wachovia.   Verrone himself acknowledged to Jason Schweigerath ("Schweigerath"), a CMBS Product Controller, and Relator Kraus that he forced a customer to purchase a One Oliver Transaction subordinate loan by threatening that customer that Wachovia would not provide a separate line of credit to the customer if the customer did not purchase the subordinate loan.

*Financing the Purchase of Subordinate Loans through Repos*

113.     On numerous occasions, Wachovia incentivized customers to purchase subordinate CRE loans by providing them with 90% financing to do so.  In this way, Wachovia limited the risk assumed by the customers, making it more likely that the customers would arrange for the purchase of the subordinate CRE loans.  Wachovia and the customer created an SPV "purchaser" that received 90% financing from Wachovia and 10% financing from the customer.  The SPV would purchase the subordinate loans from Wachovia through a repurchase (or "repo") transaction.  Under the repo transaction, Wachovia was obligated to repurchase the subordinate loan from the SPV on a pre-determined date in the future at a pre-determined higher price (which would be a profit for the SPV).

114.     So long as Wachovia repurchased the subordinate loans in accordance with the repo terms, the customer would receive the SPV's profits after deducting the SPV's expenses.  However, if Wachovia failed to repurchase the subordinate loan and the

subordinate loan defaulted, Wachovia would either assume 100% of the loss for not honoring its repurchase obligation or 90% of the loss given its extension of credit to the SPV. Wachovia off-loaded its subordinate positions in the Alliance Loan in this manner, after taking a loss of $1.8 million on one subordinate loan to incentivize SL Green to purchase such subordinate loan.

115.   For internal purposes, Wachovia no longer tracked, monitored or considered the risks relating to subordinate loans subject to repo agreements, even though Wachovia knew that such loans had little to no value and that Wachovia was obligated to repurchase them.

116.   Further, Wachovia booked the purchase price of the repo transaction (which was invariably equal to the outstanding principal amount of the subordinate loan (*i.e.*, its "par value")) as the "market value" of the subordinate CRE loan, even though Wachovia knew that the true market value of the subordinate loan had to be lower. After all, Wachovia was unable to sell the subordinate loan in an arms' length transaction at par value, and it also knew of the inherent defects of the subordinate loan.

117.   Wachovia continued to repo a subordinate loan until it was securitized through a collateralized debt obligation (a "CDO") transaction it arranged through WCM's CDO desk.

118.   Like other financial institutions, Wachovia had extensive guidelines relating to entering into and maintaining repo transactions, including asset valuation requirements. If these guidelines had been applied to the repo transactions relating to the subordinate loans, Wachovia would have been forced to acknowledge the inherent defects of the subordinate loans. However, Wachovia conveniently did not apply any of

its repo guidelines to subordinate loans it intended to securitize.

*Selling the Subordinate CRE Loan at a Discount*

119.    On a number of occasions, Wachovia simply sold the subordinate CRE loans to purchasers at a significant discount.  Purchasers would be willing to pay a discounted price for subordinate CRE loans because they would realize a windfall if the subordinate CRE loans were repaid (*e.g.*, through a refinancing of debt).  Wachovia was willing to realize the loss in this manner because it could off-load the subordinate CRE loan, but hide the related losses until it had an offsetting profit from a commercial mortgage-backed securities ("CMBS") or CDO securitization transaction (if one could be effected).

120.    As an example of one such deal, Wachovia extended a $265 million financing to a borrower in respect of a property located at 620 6th Avenue in the City of New York (the "620 Transaction"), structured as a $205 million senior loan, a $30 million subordinate loan and a $30 million mezzanine loan (*i.e.*, a loan that was subordinate to both the senior loan *and* the subordinate loan).  Wachovia earned a $1.325 million underwriting fee for doing the deal, which would reflect positively in Verrone's "profit and loss" calculation for bonus purposes.

121.    At the time of closing of the 620 Transaction, Wachovia assigned a 6.28% interest rate to each of the senior loan, the subordinate loan and the mezzanine loan – an absurd and ridiculous economic proposition because the senior loan (which had less risk than the subordinate loan and the mezzanine loan), the subordinate loan (which had less risk than the mezzanine loan) and the mezzanine loan all carried the *same* return on risk, as reflected in the assigned interest rate.

122.    Accordingly, Wachovia had to know at the time of closing that (i) it would

have to write-down its loans relating to the 620 Transaction – because a purchaser of the subordinate loan or the mezzanine loan would only buy such a loan at a discount (*i.e.*, to get a return above 6.28%) – or (ii) alternatively, it would have to keep the subordinate loan and the mezzanine loan on its books and account for the significant credit risks it was taking on both positions.

123.    *One day after closing*, Wachovia recognized a $8,188,151.45 loss on the subordinate loan and mezzanine loan when it sold the loans to third-parties; however, Schweigerath acknowledged that the "loss related to the sale of the [subordinate loan and the mezzanine loan]" would be deferred and "netted against the deferred fees and gains on the sale of the [senior loan] when it is securitized with either the C-23 or C-24 [CMBS] deal[s]."

124.    Wachovia also took a $1.1 million loss when it sold subordinate loans relating to the Macon-Burlington Loan (with Verrone acknowledging that that even this loss was "probably too light").

**Dealing with Senior CRE Loan Risk**

125.    Although not as risky as the subordinate CRE loans, Wachovia needed to dispose of its senior CRE loans as well.  Wachovia disposed of its senior CRE loans through CMBS securitization transactions. (Wachovia also disposed of some of its subordinate CRE loans through CMBS securitization transactions.)

*Utilization of the Black Box*

126.    Wachovia held such CRE loans in its "CREF" warehousing facility until such time as they could be securitized.  Because of regulatory limits and internal controls, the CREF warehousing facility had a maximum funding limit, so there was a cap on the

number of CRE loans that could be warehoused at any given time for securitization purposes.

127. However, certain members of Wachovia's senior management knew that they could substantially increase Wachovia's short-term profitability if they could somehow bypass the CREF funding capacity limit. Accordingly, Wickwire, Green, Solie and other members of Wachovia's senior management created the Black Box to enable Wachovia to "warehouse" loans notwithstanding the funding limits applicable to CREF.

128. The Black Box was created as a scheme under which ABN Amro took a first loss position to effect off-balance sheet treatment of the Black Box for Wachovia's accounting purposes. However, Wachovia used the Black Box to provide itself with additional CRE loan warehousing capacity in violation of applicable regulations and internal controls, selling CRE loans into the Black Box and purchasing commercial paper issued by the Black Box. When CREF warehousing capacity returned (*e.g.*, after a CMBS securitization closed), Wachovia would buy back the CRE loans in order to securitize them, with the Black Box retiring the outstanding commercial paper.

129. Green routinely adjusted funding level numbers in a highly variable and subjective way, enabling him to artificially establish the first loss position taken by ABN Amro (which was necessary to enable Wachovia to maintain off-balance sheet treatment of the vehicle).

130. Green also used the Black Box trades to falsely establish a "market value" for the CRE loans transferred into, and then out of, the Black Box (*i.e.*, Wachovia used the value of the commercial paper bought from the Black Box as a proxy for the value of the CRE loans that it would repurchase).

131.   These transactions were carried out surreptitiously by certain members of Wachovia's senior management because the transactions were illegal and not authorized by Wachovia.

*Concealing Residual CMBS Risk Through Adjusted Trading*

132.   Given the poor credit quality of many of the CRE loans Wachovia indiscriminately dumped into its CMBS transactions, Wachovia was, on numerous occasions, unable to sell certain subordinated tranches of CMBS, resulting in such subordinate CMBS positions remaining on Wachovia's balance sheet.   To the extent subordinate CMBS positions remained with Wachovia's "syndication desk," Wachovia was required to set aside regulatory capital to cover the risks relating to the retained subordinate CMBS positions.

133.   To avoid having to hold regulatory capital for such positions, Wachovia sold the subordinate CMBS positions to Lehman Brothers as part of an adjusted securities trading scheme, wherein the subordinate CMBS position was sold at its par value (even though Wachovia had been unable to sell the subordinate CMBS position at par value in an arms' length trade) and Lehman Brothers sold the same subordinate CMBS position back to WS – in many cases *on the same day and at the same price.*

134.   WS, being a part of the bank holding company structure of Wachovia but not subject to regulatory capital requirements, retained the subordinate CMBS position at the "market price" established through the adjusted trading scheme, without holding regulatory capital against it – even though it knew that the Lehman Brothers sale price could not possibly reflect such position's true market value.

**TURNING A BLIND EYE TO ITS SUBSTANTIVE PROBLEMS**

135.    Concerned about his job and his family and the fact that senior management had failed to address any of the issues he raised internally, Relator Kraus approached Cummings on April 3, 2006 to discuss the issues set forth herein and other substantive issues.  The meeting lasted approximately one and a half hours, and Cummings thanked Relator Kraus for reporting the information to him.

136.    Months later, because Relator Kraus continued to uncover schemes and intentional efforts to circumvent Applicable Laws and Regulations, Relator Kraus again returned to Cummings' office to speak with Cummings, but he was instead escorted from Wachovia and immediately placed on administrative leave.

137.    On or about July 2006, while on administrative leave, Relator Kraus was asked by Wachovia to attend a "Board of Inquiry" meeting with Brett Holmes and Lars Carlston of Wachovia's legal department, Amy Jacobson of Wachovia's compliance department and Kris Rao of Wachovia's internal audit department to discuss the problems he observed at Wachovia (the "July 2006 Meeting").  The July 2006 Meeting lasted approximately three and a half hours.

138.    Wachovia did not contact Relator Kraus again until Deanna Lindquist ("Lindquist"), a lawyer at Wachovia, notified him that he was being terminated as an employee at Wachovia.  Lindquist informed Relator Kraus that a report (the "Wachovia Report") had been written by Wachovia personnel as a result of the July 2006 Meeting, but that: (i) Relator Kraus was not entitled to see the Wachovia Report; and (ii) if Relator Kraus asked to see the Wachovia Report, he would not receive any severance pay upon termination of his employment and he would be 'blacklisted' from finding employment at another bank.  On September 15, 2006, Relator Kraus signed a separation agreement with Wachovia, without asking for the Wachovia Report, and he received the severance pay.

139.    Affirming threats made to him by Lindquist and others, Relator Kraus soon learned that he was blacklisted by Wachovia from obtaining a controller-type position at other financial institutions in Charlotte, North Carolina.

140.    On or about July 2010, after the Wachovia-Wells Merger Date, Relator Kraus reached out to Wells Fargo to refinance the mortgage on his house as he was having trouble meeting his financial commitments on his mortgage after approximately four years of unemployment at a controller-equivalent salary.  In response, Sarah Thayer, a representative from Wells Fargo's president's office, informed Relator Kraus that: (i) he had been unlawfully discharged by Wachovia; (ii) the Wachovia Report was, in fact, never prepared; and (iii) he was eligible for an extremely flexible residential mortgage at terms far more favorable then what was currently available in the market (which Relator Kraus subsequently accepted).

141.    Relator Kraus also provided information relating to the events described herein to Wachovia's Chief Executive Officer Robert Steele and Wells Fargo's Chief Executive Officer John Stumpf.  In addition, upon information and belief, Wells Fargo learned or should have learned about the events described herein when performing its due diligence in connection with the purchase of Wachovia.

142.    Relator Kraus voluntarily disclosed and provided to the Federal Bureau of Investigation and the Securities and Exchange Commission (the "SEC") the information concerning Wachovia's and, after the Wachovia-Wells Merger Date, Wells Fargo's CRE operations, upon which the allegations or transactions set forth in this claim are based, both prior to any public disclosure and the filing of the complaint to which this Second Amended complaint relates.  Relator Kraus also has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions relating hereto.

## HOW WORLD SAVINGS' VIOLATED APPLICABLE LAWS AND

## REGULATIONS

### Management's Philosophy at the World Savings

143.    In 2005-2006, World Savings had a significant presence in the Western United States, with a particularly active business in the State of California.    Ken Thompson, the Chief Executive Officer of Wachovia in 2006, described World Savings as a "crown jewel", with approximately $60 billion in deposits and 600 branches.

144.    However, like the CIB, World Savings knowingly disregarded the Applicable Laws and Regulations to satisfy World Savings' senior management's unrestrained pursuit of short-term profitability, a pursuit that benefitted certain World Savings' executives at the expense of not only the long-term financial health of World Savings but also many of the residential homeowners that obtained loans from World Savings.

145.    World Savings' senior management used its wholesale distribution model to encourage prospective borrowers to obtain loans that they simply could not pay. World Savings' senior management also encouraged its employees to take whatever steps were necessary (including, for example, predatory lending and falsification of loan documentation) to get residential mortgage applications approved, thereby increasing the volume of residential mortgages processed by and through World Savings.    World Savings' senior management encouraged silence about issues relating to its lending practices even though they were aware of the issues facing World Savings.

### World Savings' Residential Mortgage Operations

146.    Relator Bishop discovered that World Savings, through its residential

mortgage operations, flagrantly disregarded the Applicable Laws and Regulations by: (i) not having appropriate internal controls and information systems; (ii) not having an appropriate internal audit system; (iii) not establishing and maintaining loan documentation practices that enabled World Savings to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loan and sources for repayment, (D) assess the ability of the borrower to repay indebtedness in a timely manner, (E) demonstrate appropriate administration and monitoring of loans and (F) take account of the size and complexity of a loan; (iv) not establishing and maintaining prudent credit underwriting practices; (v) not having prudent asset growth; and (vi) not establishing and maintaining an appropriate system commensurate with World Savings' size to identify problem assets and prevent deterioration of those assets, by violating the certification requirements regarding financial reporting, internal control and compliance with laws and regulations under 12 C.F.R. 363, by making false entries with an intent to deceive other officers of World Savings in violation of 18 U.S.C. §1005, by making false statements in a matter within the jurisdiction of a Federal department or agency in violation of 18 U.S.C. §1001 and by violating Sections 302, 806 and 906 of Sarbanes-Oxley.

147.   World Savings specialized in providing residential borrowers with adjustable rate mortgages with special payment options, which World Savings marketed as "Pick-A-Pay" mortgages.  Under the Pick-A-Pay mortgages, borrowers were able to select the amount of interest they wanted to pay in respect of the mortgage.

148.   However, borrowers were not adequately informed that the monthly interest amount that was not paid by the borrowers would be capitalized against the outstanding principal amount of the related loans.  As a result, numerous borrowers under Pick-A-Pay mortgages were surprised to learn that, over time, their Pick-A-Pay mortgage

balances had increased and that the interest payments they owed had similarly increased. The increase in the principal amount of the loan as a result of the partial repayment of interest and the capitalization of the remainder of interest is referred to as "negative amortization".

149.    Relator Bishop, in his capacity as a retail residential mortgage salesperson, had extensive exposure to World Savings' underwriting practices and loan documentation practices and its underwriting personnel.

150.    Relator Bishop observed World Savings' wholesale residential mortgage salespersons "pushing" residential mortgages on ethnic and other minorities in a concerted and predatory manner, so Relator Bishop reported his concerns in respect of such practices to World Savings' senior management.

151.    Relator Bishop also observed World Savings' wholesale residential mortgage salespersons being instructed by World Savings to take whatever steps were necessary to have residential loan applications approved, including, for example, falsifying borrower certifications regarding employment status and/or income levels.  As a result, Relator Bishop similarly reported his concerns in respect of such practices to World Savings' senior management.

152.    Relator Bishop also warned senior managers, including Maria Guadamuz and Tim Wilson, that World Savings was venturing into dangerous financial territory because World Savings' balance sheet was increasing at an alarming rate, mostly as a result of the negative amortization on its Pick-A-Pay loans.

153.    World Savings senior management dismissed each of Relator Bishop's concerns outright without investigation.

154.    Although World Savings knew that the negative amortization of its Pick-A-Pay loans was not beneficial for the long-term health of World Savings, senior management continued to push such products because the loan volume resulted in an extremely profitable business.  Indeed, World Savings even booked the interest on the capitalized interest as additional profit.

155.    On May 24, 2006, sixteen days after Relator Bishop learned that Wachovia intended to purchase World Savings, Relator Bishop asked his supervisors to speak with a senior executive at Wachovia to express his concerns that the portfolio of World Savings was "toxic".  In response, on May 30, 2006, Michelle Gadker terminated Relator Bishop's employment with World Savings, on the unsubstantiated ground that Relator Bishop violated a one-time warning for having had a heated discussion with a World Savings senior vice president over a loan that was being processed.

156.    Relator Bishop voluntarily disclosed and provided to the SEC the information concerning World Savings' and, after the World-Wachovia Merger Date, Wachovia's and, after the Wachovia-Wells Merger Date, Wells Fargo's residential mortgage operations, upon which the allegations or transactions set forth in this claim are in part based, prior to the filing of the complaint to which this Second Amended complaint relates.  Relator Bishop has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions relating hereto.

## COUNT ONE

### False Claims Act, 31 U.S.C. §3729 (a)(1)(A)
### (Presenting or Causing to Be Presented False or Fraudulent Claims)

157.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 156 of this Second Amended Complaint as if fully set forth herein.

158.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

159.    Through the acts described above and otherwise, the Defendants knowingly presented or caused to be presented false or fraudulent claims, records and statements for payment or approval to the United States.

160.    Each time the Defendants applied to, participated in, drew funds or benefits from or received funds or benefits from a Federal Program, the Defendants caused the presentation of a false or fraudulent claim for payment or approval.

161.    The United States, unaware of the falsity and fraudulent nature of the claims, records and statements presented by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' false or fraudulent claims.

162.    By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for false and fraudulent claims made by the Defendants.

## COUNT TWO

**False Claims Act, 31 U.S.C. §3729 (a)(1)(B)**
**(Making or Using or Causing to be Made or Used False Records and Statements**
**Material to a False Claim)**

163.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 162 of this Second Amended Complaint as if fully set forth herein.

164.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

165.    Through the acts described above, the Defendants knowingly made, used, or caused to be made or used, false records and statements material to a false or fraudulent claim.

166.    Each time the Defendants applied to, participated in, drew funds or benefits from or received funds or benefits from a Federal Program, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

167.    The United States, unaware of the making, the use, or the causing to be made or used, of a false record or statement material to a false or fraudulent claim by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' making, using or causing to be made or used, such false record or statement.

168.    By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for such false records and statements.

**COUNT THREE**

**False Claims Act, 31 U.S.C. §3729 (a)(1)(C)**
**(Conspiracy)**

169.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 168 of this Second Amended Complaint as if fully set forth herein.

170.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

171.    Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States by presenting, or causing to be presented, a false or fraudulent claim for payment or approval and making, using or causing to be made or used, false records or statements material to a false or fraudulent claim.  The Defendants have taken substantial steps in furtherance of the conspiracies, including, *inter alia*, working together and coordinating with each other to flagrantly engage in unsafe and unsound banking practices, fraudulently misstate and manipulate its and their balance sheets in violation of applicable laws and regulations, fail to maintain adequate internal controls, make false certifications regarding its or their financial reporting and internal controls, fail to comply with the obligations of Sarbanes-Oxley, and mislead and deceive Federal regulators throughout the Relevant Period about the true state of Wachovia's financial health, in each case in violation of the Applicable Laws and Regulations.

172.    The United States, unaware of the Defendants' conspiracies or the falsity of the claims, records or statements of the Defendants, have paid and continues to pay claims that would not be paid but for the Defendants' conspiracies and false claims, records and statements relating to such conspiracies.

173.    By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States has provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for such conspiracies and the related false and fraudulent claim, records and statements.

**COUNT FOUR**

**State False Claims Acts**
**(Presenting or Causing to Be Presented False or Fraudulent Claims)**

174.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 173 of this Second Amended Complaint as if fully set forth herein.

175.    This is a claim for treble damages and penalties under each of the State False Claims Acts, specified as follows: (The State of New York) New York Finance Law, Article 13, §189(1)(a); (The State of California) Ca. Gov't Code §12651(a)(1); (State of Delaware) Del. Code Tit. VI. §1201(a)(1); (The District of Columbia) D.C. Code §2-308.14(a)(1); (The State of Florida) Fl. Stat. §68.082(2)(a); (The State of Hawaii) Haw. Rev. Stat. §661-21(a)(1); (The State of Illinois) 740 ILCS 175/3(a)(1)(A); (The State of Indiana) Ind. Code §5-11-5.5-2(b)(1); (The Commonwealth of Massachusetts) Mass. Gen. Laws ch. 12 §5B(1); (The State of Minnesota) Minn. Stat. § 15C.02(a)(1); (The State of Montana) Mont. Code Ann. 17-8-403(1)(a); (The State of Nevada) Nev. Rev. Stat. §357.040(1)(a); (The State of New Hampshire) N.H. Rev. Stat. § 167:61-b(I)(a); (The State of New Jersey) N.J. Stat. Ann. § 2A:32C-3(a); (The State of New Mexico) NMSA § 44-9-3(A)(1); (The State of North Carolina) N.C. Gen Stat. § 1-607(a)(1); (The State of Oklahoma) Okla. Stat. Title 63 § 5053.1(B)(1); (The State of Rhode Island) R.I. Gen. Laws § 9-1.1-3(a)(1); (The State of Tennessee) Tenn. Code. § 4-18-103(a)(1); and (The Commonwealth of Virginia) Va. Code §8.01-216.3(A)(1).

176.    Through the acts described above and otherwise, the Defendants knowingly presented or caused to be presented false or fraudulent claims, records and statements for payment or approval to each State through one or more of its pension funds.

177.    Each time the Defendants drew or received funds from a pension fund of a

State, the Defendants caused the presentation of a false or fraudulent claim for payment or approval.

178.    Each State, unaware of the falsity and fraudulent nature of the claims, records and statements presented by the Defendants, paid claims that would not be paid but for the Defendants' false or fraudulent claims.

179.    By reasons of the Defendants' acts, each State has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through its pension funds, each State provided significant funding and subsidies to the Defendants, amounting to at least hundreds of millions of dollars, for false and fraudulent claims made by the Defendants.

## COUNT FIVE

### State False Claims Acts
### (Making or Using or Causing to be Made or Used False Records and Statements Material to a False Claim)

180.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 179 of this Second Amended Complaint as if fully set forth herein.

181.    This is a claim for treble damages and penalties under each of the State False Claims Acts, specified as follows: (The State of New York) New York Finance Law, Article 13, §189(1)(b); (The State of California) Ca. Gov't Code §12651(a)(2); (The State of Delaware) Del. Code Tit. VI. §1201(a)(2); (The District of Columbia) D.C. Code §2-308.14(a)(2); (The State of Florida) Fl. Stat. §68.082(2)(b); (The State of Hawaii) Haw. Rev. Stat. §661-21(a)(2); (The State of Illinois) 740 ILCS 175/3(a)(1)(B); (The State of Indiana) Ind. Code §5-11-5.5-2(b)(2); (The Commonwealth of Massachusetts) Mass. Gen. Laws ch. 12 §5B(2); (The State of Minnesota) Minn. Stat. §

15C.02(a)(2); (The State of Montana) Mont. Code Ann. 17-8-403(2)(b); (The State of Nevada) Nev. Rev. Stat. §357.040(1)(b); (The State of New Hampshire) N.H. Rev. Stat. § 167:61-b(I)(b); (The State of New Jersey) N.J. Stat. Ann. § 2A:32C-3(b); (The State of New Mexico) NMSA § 44-9-3(A)(2); (The State of North Carolina) N.C. Gen Stat. § 1-607(a)(2); (The State of Oklahoma) Okla. Stat. Title 63 § 5053.1(B)(2); (The State of Rhode Island) R.I. Gen. Laws § 9-1.1-3(a)(2); (The State of Tennessee) Tenn. Code. § 4-18-103(a)(2); and (The State of Virginia) Va. Code §8.01-216.3(A)(2).

182.    Through the acts described above, the Defendants knowingly made, used, or caused to be made or used, false records and statements material to a false or fraudulent claim to get a false or fraudulent claim paid or approved by the State.

183.    Each time the Defendants drew or received funds from a pension fund of a State, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to get a false or fraudulent claim paid or approved by the State.

184.    Each State, unaware of the making, the use, or the causing to be made or used, of a false record or statement material to a false or fraudulent claim by the Defendants, paid claims that would not be paid but for the Defendants' making, using or causing to be made or used, such false record or statement.

185.    By reasons of the Defendants' acts, each State has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through its pension funds, each State provided significant funding and subsidies to the Defendants, amounting to at least hundreds of millions of dollars, for such false records and statements.

**COUNT SIX**
**State False Claims Acts**
**(Conspiracy)**

186.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 185 of this Second Amended Complaint as if fully set forth herein.

187.    This is a claim for treble damages and penalties under each of the State False Claims Acts, specified as follows:  (The State of New York) New York Finance Law, Article 13, §189(1)(c); (The State of California) Ca. Gov't Code §12651(a)(3); (The State of Delaware) Del. Code Tit. VI. §1201(a)(3); (The District of Columbia) D.C. Code §2-308.14(a)(3); (The State of Florida) Fl. Stat. §68.082(2)(c); (The State of Hawaii) Haw. Rev. Stat. §661-21(a)(3); (The State of Illinois) 740 ILCS 175/3(a)(1)(C); (The State of Indiana) Ind. Code §5-11-5.5-2(b)(7); (The Commonwealth of Massachusetts) Mass. Gen. Laws ch. 12 §5B(3); (The State of Minnesota) Minn. Stat. § 15C.02(a)(3); (The State of Montana) Mont. Code Ann. 17-8-403(1)(c); (The State of Nevada) Nev. Rev. Stat. §357.040(1)(c); (The State of New Hampshire) N.H. Rev. Stat. § 167:61-b(I)(c); (The State of New Jersey) N.J. Stat. Ann. § 2A:32C-3(c); (The State of New Mexico) NMSA § 44-9-3(A)(3); (The State of North Carolina) N.C. Gen Stat. § 1-607(a)(3); (The State of Oklahoma) Okla. Stat. Title 63 § 5053.1(B)(3); (The State of Rhode Island) R.I. Gen. Laws § 9-1.1-3(a)(3); (The State of Tennessee) Tenn. Code. § 4-18-103(a)(3); and (The Commonwealth of Virginia) Va. Code §8.01-216.3(A)(3).

188.    Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud each State by getting false or fraudulent claims allowed or paid or making, using or causing to be made or used, false records or statements material to a false or fraudulent claim to get a false or fraudulent claim paid or approved by the State.  The Defendants

have taken substantial steps in furtherance of the conspiracies, including, *inter alia*, working together and coordinating with each other to flagrantly engage in unsafe and unsound banking practices, fraudulently misstate and manipulate its and their balance sheets in violation of applicable laws and regulations, fail to maintain adequate internal controls, make false certifications regarding its or their financial reporting and internal controls, fail to comply with the obligations of Sarbanes-Oxley, and mislead and deceive Federal regulators and each State throughout the Relevant Period about the true state of Wachovia's financial health, in each case in violation of the Applicable Laws and Regulations.

189.    Each State, unaware of the Defendants' conspiracies or the falsity of the claims, records or statements of the Defendants, have paid claims that would not be paid but for the Defendants' conspiracies and false claims, records and statements relating to such conspiracies.

190.    By reasons of the Defendants' acts, each State has been damaged, and continues to be damaged, in substantial amounts to be determined at trial. Through its pension funds, each State has provided significant funding and subsidies to the Defendants, amounting to at least hundreds of millions of dollars, for such conspiracies and the related false and fraudulent claim, records and statements.

### COUNT SEVEN

**State False Claims Acts**
**(Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or any political subdivision)**

191.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 190 of this Second Amended Complaint as if fully set forth herein.

192.    This is a claim for treble damages and penalties under each of the State False Claims Acts, specified as follows:  (The State of New York) New York Finance Law, Article 13, §189(1)(g); (The State of California) Ca. Gov't Code §12651(a)(7); (The State of Delaware) Del. Code Tit. VI. §1201(a)(7); (The District of Columbia) D.C. Code §2-308.14(a)(7); (The State of Florida) Fl. Stat. §68.082(2)(g); (The State of Hawaii) Haw. Rev. Stat. §661-21(a)(7); (The State of Illinois) 740 ILCS 175/3(a)(1)(G); (The State of Indiana) Ind. Code §5-11-5.5-2(b)(6); (The Commonwealth of Massachusetts) Mass. Gen. Laws ch. 12 §5B(8); (The State of Minnesota) Minn. Stat. § 15C.02(a)(7); (The State of Montana) Mont. Code Ann. 17-8-403(1)(g); (The State of Nevada) Nev. Rev. Stat. §357.040(1)(g); (The State of New Hampshire) N.H. Rev. Stat. § 167:61-b(I)(e); (The State of New Jersey) N.J. Stat. Ann. § 2A:32C-3(g); (The State of New Mexico) NMSA § 44-9-3(A)(8); (The State of North Carolina) N.C. Gen Stat. § 1-607(a)(7); (The State of Oklahoma) Okla. Stat. Title 63 § 5053.1(B)(7); (The State of Rhode Island) R.I. Gen. Laws § 9-1.1-3(a)(7); (The State of Tennessee) Tenn. Code. § 4-18-103(a)(7); and (The Commonwealth of Virginia) Va. Code §8.01-216.3(A)(7).

193.    Through the acts described above, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to each State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to such State.

194.    Each time the Defendants drew or received funds from a pension fund of a State, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to each State's pension fund and knowingly concealed and knowingly and improperly avoided

and decreased an obligation to pay or transmit money or property to each State's pension fund.

195.    Each State, unaware of the making, the use, or the causing to be made or used, of a false record or statement material to an obligation to pay or transmit money to each State's pension fund and the knowing concealment, avoidance and decrease of an obligation to pay or transmit money or property to each State's pension fund, did not receive money or property it should have received but for the Defendants' making, using or causing to be made or used, such false record or statement.

196.    By reasons of the Defendants' acts, each State has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through its pension funds, each State provided significant funding and subsidies to the Defendants, amounting to at least hundreds of millions of dollars, for such false records and statements.

## PRAYER FOR RELIEF

WHEREFORE, Relators Kraus and Bishop pray for judgment against the Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.* and each of the State False Claims Acts;

2. That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages each State has sustained because of the Defendants' actions, plus civil penalties for each violation of each as proscribed by each State False Claims Act;

4. That the Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and each State False Claims Act;

5. That the Relators be awarded all costs of this action, including attorneys' fees, costs and expenses, pursuant to 31 U.S.C. § 3730(d) and each State False Claims Act; and

6. That the United States, each State and each Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby

demand a trial by jury.

Dated:  August 14, 2012

THE LAW OFFICES OF SHARAD A. SAMY LLC

By: _____

Sharad A. Samy
The Law Offices of Sharad A. Samy LLC
21 Nickerson Lane
Darien, CT 06820
Telephone: (917) 673-0804

Attorneys for Plaintiff-Relators
Paul Bishop and Robert Kraus

## APPENDIX I

## CIB REPORTING LINES

