UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x Civil Action: 11-CV5457 (BMC)
UNITED STATES ex rel. ROBERT KRAUS
and PAUL BISHOP;

                            Plaintiffs,

                    -against-         THIRD AMENDED COMPLAINT

WELLS FARGO & COMPANY,          **<u>JURY TRIAL DEMANDED</u>**
WELLS FARGO BANK, N.A., and its and
their subsidiaries and affiliates;

                    Defendants.
-----------------------------------------------------------------x

# Table of Contents

I.    INTRODUCTION ................................................................................................... 4

II.   JURISDICTION AND VENUE ............................................................................ 10

III.  PARTIES ............................................................................................................... 11

IV.   RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY............................ 14

V.    SUBSTANTIVE ALLEGATIONS ...................................................................... 14

   A.   About the Federal Programs ......................................................................... 14

      i.    The Federal Reserve Discount Window ................................................. 15

      ii.   The Federal Reserve TAF........................................................................ 22

      iii.  The FDIC TLGP ...................................................................................... 25

      iv.   The FDIC Deposit Insurance Program and the TAGP .......................... 29

      v.    The FHLB Programs................................................................................ 30

      vi.   The Limited Scope of the Federal Programs .......................................... 34

   B.   Why Wachovia's Certifications were Patently False and Fraudulent ................ 35

      i.  How Wachovia Should Have Grown its Securitization Business And How Wachovia
      Actually Grew It ............................................................................................... 41

      ii. Securitization and Wachovia's Commercial Real Estate Finance Division....................... 43

      iii. The Raison d'Être for Wachovia's "Black Box" and its Repo SPVs: Using Fraudulent Off-
      Balance Sheet Accounting to Leverage a Securitization Business...................................... 45

         a.The Black Box ....................................................................................... 47

         b. The Repo SPVs..................................................................................... 59

      iv.   Wachovia's Non-Existent Credit Grading System:  Extending its Fraud On-Balance
      Sheet........................................................................................................... 64

      v.    Using Untested and Unvalidated Models to Fabricate its Financial Results.................. 71

      vi.   Originating Loans of Poorer and Poorer Quality............................................ 79

         a. Structuring Around Loan to Value Limits ................................................. 80

        b. Manipulating "Value" .................................................................................. 81

        c. Limiting Customer and Borrower Recourse ................................................ 83

        d. Paying Customers Kickbacks for Business ................................................. 84

        e. Concealing Unsupportable Credit Decisions in Poor Loan Documentation ............... 84

    vii.   Concealing Retained CRE Loan Risks .......................................................... 88

    viii.  Concealing Retained CMBS Risks ............................................................... 90

    ix.    Employing Other Unsafe and Unsound Practices.......................................... 91

    x.     Rushing Headlong to Financial Ruin and the Wachovia-Wells Fargo Cover-Up .......... 95

  C.    Why World Savings' Certifications were Patently False and Fraudulent ........................ 108

    i.     Management's Philosophy at the World Savings .......................................... 109

    ii.    World Savings' Residential Mortgage Operations ....................................... 110

VI.     CAUSES OF ACTION ............................................................................................ 113

  A.    False Claims Act .................................................................................................... 113

  B.    Count I - False Claims Act, 31 U.S.C. §3729(a)(1)/31 U.S.C. §3729 (a)(1)(A)—(Presenting or Causing to Be Presented False or Fraudulent Claims) ........................................ 115

  C.    Count II - False Claims Act, 31 U.S.C. §3729 (a)(2)/31 U.S.C. §3729 (a)(1)(B)—Making or Using or Causing to be Made or Used False Records and Statements Material to a False Claim) ................................................................................................................ 116

  D.    Count III - False Claims Act, 31 U.S.C. §3729 (a)(1)(C)—(Conspiracy)........................ 117

PRAYER FOR RELIEF ........................................................................................................ 118

DEMAND FOR JURY TRIAL .............................................................................................. 119

## THIRD AMENDED COMPLAINT

Plaintiff Relators ROBERT KRAUS and PAUL BISHOP (together, the "***Relators***"), by and through their undersigned counsel, allege for this their Third Amended Complaint on behalf of the United States of America (the "***United States***" or the "***U.S.***") against Defendants WELLS FARGO & COMPANY ("***WFC***"), WELLS FARGO BANK, NATIONAL ASSOCIATION ("***WFBNA***"), and its and their subsidiaries and affiliates (together, the "***Defendants***" or "***Wells Fargo***"), as follows:

## I.      INTRODUCTION

1.      This is an action brought by the Relators on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* (the "***False Claims Act***"), arising from the Defendants' fraud on the U.S. Department of the Treasury (the "***Treasury Department***"), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, the Federal Reserve Bank of Richmond and/or one or more other Federal Reserve Banks (together, the "***Federal Reserve System***" or the "***Federal Reserve***"), the Federal Deposit Insurance Corporation (the "***FDIC***") and one or more U.S. Federal Home Loan Banks (the "***FHLBs***", and, together with the Treasury Department, the Federal Reserve System and the FDIC, in each of their respective capacities as, *inter alia*, agencies of the United States, agents, fiscal agents and/or depositories of the United States and recipients of monies spent on the United States' behalf and to advance U.S. government (the "***U.S. Government***") programs or interests, the "***Federal Entities***") arising out of the Defendants' utilization of one or more Federal funding programs, including, *inter alia*, the Federal Reserve Discount Window (the "***Discount Window***"), the Federal Reserve

Term Auction Facility (the "*TAF*"), the FDIC Temporary Liquidity Guarantee Program (the "*TLGP*"), the FDIC deposit insurance coverage program (the "*Deposit Insurance Program*"), the FDIC Transaction Account Guarantee Program (the "*TAGP*") and the FHLB advance programs (the "*FHLB Programs*" and, together with the Discount Window, the TAF, the TLGP, the Deposit Insurance Program and the TAGP, the "*Federal Programs*").  For ease of reading, Appendix I appended hereto sets forth the defined terms used in this Third Amended Complaint.

2.     Each of the Federal Entities, through one or more of the Federal Programs, provided certain domestic and foreign financial institutions with extensive financial support before and during the financial crisis.  Under these programs, these institutions were able to obtain significant credit and liquidity support at a time when funding through the capital markets – the traditional method of funding – was either too expensive to obtain or simply unavailable.

3.     Wachovia Corporation ("*WC*"), Wachovia Bank, N.A. ("*WBNA*") and its and their subsidiaries and affiliates (together with Wachovia Capital Markets LLC ("*WCM*") and Wachovia Securities LLC ("*WS*"), "*Wachovia*") received payments from the Federal Entities by drawing advances and/or obtaining guarantees in connection with one or more of the Federal Programs from in or around 2007 to the date of their merger into the Wells Fargo group of companies on or around December 31, 2008 (the "*Wachovia-Wells Merger Date*") and, thereafter, they continued to do so, both directly and through the Wells Fargo group of companies, to the present date.  (The period from in or around 2007 to the present date is referred to herein as the "*Relevant Period*".)

4.     Golden West Financial Corporation ("*GWF*"), World Savings Bank, FSB ("*WSB*"), World Savings, Inc. ("*WSI*") and its and their subsidiaries and affiliates

(together, "**World Savings**") merged into the Wachovia group of companies on or around October 2, 2006 (the "**World-Wachovia Merger Date**"). Thereafter, during the Relevant Period up to and including the Wachovia-Wells Merger Date, World Savings, both directly and through the Wachovia group of companies, received payments from the Federal Entities by drawing advances and/or obtaining guarantees in connection with one or more of the Federal Programs and, thereafter, they continued to do so, directly and through the Wachovia group of companies and the Wells Fargo group of companies, to the present date.

5.      The Federal Entities required an institution receiving a payment under a Federal Program to certify as a precondition to each such payment, whether as a funding, borrowing or drawing of an advance or an issuance of a guarantee, as applicable, that, *inter alia*: (i) it had not violated, or it had complied with, certain laws and regulations applicable to it; (ii) no event of default (as defined for some of the programs) had occurred or was continuing in respect of it; and/or (iii) certain reports, registrations, documents and filings submitted to various Federal agencies did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

6.      Prior to and throughout the Relevant Period, each of Wachovia, World Savings and Wells Fargo was subject to various "safety and soundness" laws and regulations (including, *inter alia*, 12 C.F.R. part 30, 12 C.F.R. part 263, 12 C.F.R. part 570 and 12 C.F.R. part 308, Subpart R) (together, the "**Safety and Soundness Laws and Regulations**") requiring each to: (i) have appropriate internal controls and information systems; (ii) have an appropriate internal audit system; (iii) establish and maintain loan

documentation practices that enabled it to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loans and sources for repayment, (D) assess the ability of borrowers to repay indebtedness in a timely manner, (E) ensure that claims against borrowers were enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of loans; (iv) establish and maintain prudent credit underwriting practices; (v) have prudent asset growth; and (vi) establish and maintain an appropriate system commensurate with its size to identify problem assets and prevent deterioration of those assets.

7.     Prior to and throughout the Relevant Period, each of Wachovia, World Savings and Wells Fargo was also subject to laws and regulations requiring each to, among other things: (i) provide various certifications in respect of the adequacy of its financial reporting and internal controls and its compliance with laws or regulations (including, *inter alia*, 12 C.F.R. 363); (ii) satisfy the reporting and certification requirements of the Sarbanes-Oxley Act of 2002, as amended ("***Sarbanes-Oxley***"), including Sections 302, 806 and 906 thereof; (iii) comply with the statutory requirements of 18 U.S.C. § 1005 and 18 U.S.C. §1001; and (iv) file financial reports and statements in accordance with generally accepted accounting principles ("***GAAP***") pursuant to 12 U.S.C. § 1831(n)(a)(2)(A) (such laws and regulations and the Safety and Soundness Laws and Regulations being the "***Applicable Laws and Regulations***").

8.     Neither Wachovia, World Savings nor Wells Fargo could have or should have certified to the Federal Entities at the time of each request for a payment: (i) that it had not violated, or that it had complied with, the Applicable Laws and Regulations; (ii) that an event of default (as defined for some of the programs) had not occurred and was not then continuing in respect of it; and/or (iii) that certain reports, registrations,

documents and filings submitted to various Federal agencies by it did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading. The truth is that senior management at Wachovia and World Savings had actively engaged in control fraud since at least 2001, including prior to and throughout the Relevant Period up to and including the Wachovia-Wells Merger Date and beyond, intentionally subverting institutional checks and balances to commit fraud on a massive scale for their own personal gain – all under the purportedly "legitimate" names of those institutions. And because Wells Fargo did not disclose, post-merger, that these known frauds had occurred, that these frauds had a material financial impact on its own balance sheet at and post-merger (which, *inter alia*, would have required it to make numerous financial disclosures in accordance with Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP concerning its discovery of the frauds and the extent to which these frauds impacted its own financial controls, reports and statements), and that these known frauds required Wells Fargo to take costly and extensive remedial measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at the combined institutions post-merger to ensure their compliance with the Applicable Laws and Regulations on a going-forward basis (assuming, of course, that Wells Fargo took such remedial measures), Wells Fargo concealed and perpetuated the frauds long after the Wachovia-Wells Merger Date, including up to today.

9.     Each of Wachovia, World Savings and, post-merger, Wells Fargo was intimately aware of and knew of each of the violations of the Applicable Laws and Regulations at senior levels of management and knowingly submitted false and fraudulent claims, statements and records to the Federal Entities each and every time they

obtained payments from the Federal Entities by borrowing or drawing advances or obtaining a guarantee under the Federal Programs. When Wachovia, World Savings and, post-merger, Wells Fargo made the express certifications required to be made by them, each of them was already actively and extensively engaging in unsafe and unsound banking practices, fraudulently misstating and manipulating its balance sheets, failing to maintain adequate internal controls, making false certifications regarding its financial reporting and internal controls, failing to comply with the obligations of Sarbanes-Oxley, and misleading and deceiving Federal regulators throughout the Relevant Period about the true state of its financial health, in each case in violation of the Applicable Laws and Regulations. Because of the extensive control frauds that were perpetrated at Wachovia, World Savings and, post-merger, Wells Fargo, none of Wachovia, World Savings or, post-merger, Wells Fargo could have honestly, accurately, reasonably or fairly made the requisite express certifications required to be made to the Federal Entities in respect of the Federal Programs as and when they obtained the payments from the Federal Entities under the Federal Programs.

10.     Indeed, these institutions had knowingly and willingly engaged in unsound and unsafe banking practices, made false certifications regarding their financial reporting and/or internal controls, disregarded the reporting and certification requirements of Sarbanes-Oxley, materially violated GAAP, and hidden and concealed their mismanagement and fraudulent practices from Federal regulators, causing numerous false claims for payment to be paid by the United States. Each such claim for payment in respect of each of the Federal Programs constitutes a false claim presented to the United States because it was made by each of Wachovia, World Savings and, post-merger, Wells Fargo, with knowledge and on the basis of intentionally misleading certifications to the

applicable Federal Entities each time they received payments from the Federal Entities under the Federal Programs.

11.     The Relators seek, through this action, to recover damages and civil penalties from the Defendants for making, or causing to be made, false or fraudulent records, statements and/or claims to receive payments from the Federal Entities in connection with Wachovia's, World Savings' and, post-merger, Wells Fargo's knowing violation of the Applicable Laws and Regulations and its and their material misstatements and omissions in its and their financial and other statements, reports, registrations, documents, filings and certificates.  The Defendants knew, and continue to know, that Wachovia's, World Savings' and, post-merger, Wells Fargo's false and fraudulent scheme for obtaining payments from the Federal Entities under the Federal Programs has cost the United States *billions of dollars*, both through direct support and through subsidies that were provided to them through the Federal Programs under false and fraudulent pretenses.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.  There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, each Relator is an "original source", as defined therein.  Each Relator has direct and independent knowledge of the information on which the allegations are based.  To the extent that any allegations or transactions herein have been publicly disclosed, each Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.

As required pursuant to 31 U.S.C. § 3730(b) and (e), the Relators have voluntarily provided information, oral and/or written, and sent disclosure statement(s) describing all material evidence, and information, related to their Original Complaint, the First Amended Complaint, the Second Amended Complaint and this Third Amended Complaint before filing their Original Complaint, the First Amended Complaint, the Second Amended Complaint and this Third Amended Complaint, to the U.S. Government and the agencies of the U.S. Government, including, but not limited to, the Attorney General of the United States and the U.S. Attorney for the Eastern District of New York.

13.     This Third Amended Complaint details the Relators' discovery and investigation of Wachovia's, World Savings' and Wells Fargo's fraudulent schemes and is supported by documentary evidence.

14.     The Defendants are deemed to be residents of the Eastern District of New York pursuant to 28 U.S.C. § 1391(c).  Venue is therefore properly in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732, because the Defendants can be found in and transact or have transacted business in the Eastern District of New York.  At all times relevant to this Third Amended Complaint, the Defendants regularly conduct or have conducted substantial business within the Eastern District of New York and made or make significant sales within the Eastern District of New York.

### III.     PARTIES

15.     Relator Kraus is a resident of Marvin, North Carolina.  From in or around June 2005 to in or around September 2006, Relator Kraus was employed by WCM in the capacity of Vice President, Controller for the Real Estate Capital Markets ("***RECM***")

group and the Corporate and Investment Bank Finance group.  Relator Kraus was hired by WCM on the basis of his commercial real estate experience and was responsible for reviewing and monitoring commercial real estate activities across Wachovia, including WCM, WC, WBNA, WS and other Wachovia affiliates.  In his capacity as a controller, Relator Kraus had direct exposure to Wachovia's commercial real estate activities and its failure to comply with the Applicable Laws and Regulations.  Relator Kraus alleges that Wachovia and, post-merger, Wells Fargo made false statements, records and/or claims at the time of request for a payment from the Federal Entities in respect of the Federal Programs, having falsely and fraudulently certified that there was no violation of, or that they had complied with, the Applicable Laws and Regulations, that no event of default (as defined for some of the programs) had occurred or was then continuing with respect to them and/or that certain reports, registrations, documents and filings submitted to various Federal agencies did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading, in each case to falsely and fraudulently obtain payments from the Federal Entities through one or more Federal Programs for which they did not qualify.

16.     Relator Bishop is a resident of Millbrae, California.  From in or around November 2002 to in or around May 2006, Relator Bishop was employed by WSI in the capacity of a retail salesperson for residential mortgages.  In such capacity, Relator Bishop had direct contact with borrowers of World Savings mortgage products and World Savings underwriting, appraisal and wholesale brokerage personnel.  Relator Bishop had direct exposure to World Savings' residential mortgage activities and its failure to comply with the Applicable Laws and Regulations.  Relator Bishop alleges that

World Savings and, post-merger with World Savings, Wachovia, and, post-merger with Wachovia, Wells Fargo made false statements, records and/or claims at the time of request for a payment from the Federal Entities in respect of the Federal Programs, having falsely and fraudulently certified that there was no violation of, or that they had complied with, the Applicable Laws and Regulations, that no event of default (as defined for some of the programs) had occurred or was then continuing with respect to them and/or that certain reports, registrations, documents and filings submitted to various Federal agencies did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading, in each case to falsely and fraudulently obtain payments from the Federal Entities through one or more Federal Programs for which they did not qualify.

17.     The U.S. Government is the government plaintiff in this case.

18.     Defendant Wells Fargo & Company is a Delaware corporation and a bank holding company registered under the Bank Holding Company Act of 1956, as amended. It was at all relevant times the publicly-traded parent and holding company of the Wells Fargo group of companies, which have their principal place of business and national headquarters at 420 Montgomery Street, San Francisco, CA 94163.  It is the successor entity to WC and GWF on or around and after the Wachovia-Wells Merger Date. Wells Fargo & Company may be served through its registered agent Corporation Service Company, 111 Sutter St., 18th Floor, San Francisco, CA 94163.

19.     Wells Fargo Bank, National Association is a California corporation, the significant banking subsidiary of Wells Fargo & Company and regulated by the U.S. Office of the Comptroller of the Currency (the "*OCC*").  It is the successor entity to

WBNA and WSB on or around and after the Wachovia-Wells Merger Date.  Wells Fargo Bank, National Association may be served through its registered agent, Corporation Service Company, 10 E South Temple Ste 850, Salt Lake City, Utah 84133.

### IV.     RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

20.     Any and all acts alleged herein to have been committed by the Defendants were committed by said Defendants' officers, directors, employees, representatives, or agents who at all times acted on behalf of their respective companies for the purpose of benefiting the Defendants and within the course and scope of their employment.

21.     The Defendants, as identified in Paragraphs 18 and 19, *supra*, are related entities sharing common employees, offices and business names such that they are joint and severally liable under legal theories of respondeat superior. Further, the past, present, and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

### V.     SUBSTANTIVE ALLEGATIONS

#### A. About the Federal Programs

22.     Each of the Federal Entities, through one or more of the Federal Programs, provided domestic and foreign financial institutions with extensive financial support in the form of credit and liquidity support throughout the Relevant Period.  Although the Federal Programs were intended to provide such support to law-abiding financial institutions when market-originated funding was either too expensive to obtain or simply unavailable, the Federal Programs were never intended to provide extended financial support – much less a bailout or a subsidy – to ailing financial institutions that were

brazenly violating the Applicable Laws and Regulations.

23.     Indeed, each institution receiving a payment under a Federal Program was required to make certain express certifications to the Federal Entities at the time of each request for, and as a precondition to, each payment from the Federal Entities, whether as a funding, borrowing or drawing of an advance or an issuance of a guarantee, as applicable, including certifying that there was no violation of, or that it had complied with, the Applicable Laws and Regulations, that no event of default (as defined for some of the programs) had occurred or was then continuing with respect to it and/or that certain reports, registrations, documents and filings submitted to various Federal agencies by it did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

24.     A description of each of the Federal Programs, and the express certifications required to be delivered in connection therewith, follows:

### i.     The Federal Reserve Discount Window

25.     The Federal Reserve System provides access to the Discount Window to certain financial and other institutions to enable them to borrow money from the Federal Reserve System, usually on a short-term basis, to address temporary shortages of liquidity.  Payments are advanced under the Discount Window at a low, subsidized "primary credit" rate to borrowing institutions that can satisfy primary credit rate eligibility criteria at the time of advance.  A higher, more expensive (but still highly subsidized) "secondary credit" rate can, in the Federal Reserve's sole discretion, be provided to institutions that are not eligible to borrow under the primary credit rate

criteria.  The availability and rate of advances from the Discount Window depends on the creditworthiness and soundness of the borrowing institution based on its ability to make the express certifications required of it prior to and at the time of each particular advance.

26.    Wachovia, World Savings and, post-merger, Wells Fargo received payments from the Discount Window at the primary credit rate numerous times during the Relevant Period.  *See* Appendix II appended hereto for information relating to some of those payments.  To be able to draw these funds at this optimal rate, as required by the Federal Reserve, each of Wachovia, World Savings and Wells Fargo executed a lending agreement and corporate resolutions conforming with Operating Circular No. 10, Lending, effective October 15, 2006 (the "*Circular*"), issued by the Federal Reserve System.  As also required by the Federal Reserve, each of them executed a letter agreement with the Federal Reserve agreeing to the terms of the Circular (including its express certifications) in consideration of "being able to request advances from and incur indebtedness to the Federal Reserve" and in consideration of "the Federal Reserve making advances to it."

27.    In accordance with Section 9.1(b) of the Circular, each of Wachovia, World Savings and Wells Fargo made the express certification to the Federal Reserve that it "is not in violation of *any* laws or regulations *in any respect* which *could* have *any adverse effect whatsoever* upon the…performance…of any of the terms of the [Circular and the documents executed in connection with the Circular]" (emphasis added) (the "*Section 9.1(b) Certification*") each time it borrowed or drew an advance from the Discount Window's primary credit program.

28.    In accordance with Section 9.1(g) of the Circular, each of Wachovia, World Savings and Wells Fargo made the express certification to the Federal Reserve

that "no statement or information contained in the [Circular and the documents executed in connection with the Circular] or any other document, certificate, or statement furnished [by it] to the [Federal Reserve] for use in connection with the transactions contemplated by the [Circular and the documents executed in connection with the Circular], on and as of the date when furnished, is untrue as to any material fact or omits any material fact necessary to make the same not misleading, and the representations and warranties in the [Circular and the documents executed in connection with the Circular] are true and correct in all material respects" (the "***Section 9.1(g) Certification***") each time it borrowed or drew an advance from the Discount Window's primary credit program.

29.     In accordance with Section 9.1(i) of the Circular, each of Wachovia, World Savings and Wells Fargo also made the express certification to the Federal Reserve that "no Event of Default [with respect to it] has occurred or is continuing" (the "***Section 9.1(i) Certification***" and, together with the Section 9.1(b) Certification and the Section 9.1(g) Certification, the "***Section 9.1 Certifications***") each time it borrowed or drew an advance from the Discount Window's primary credit program, with an "Event of Default" being defined in Section 2.1 of the Circular to include: (i) the borrower failing "to perform or observe ***any*** of its obligations or agreements under the [Circular and the documents executed in connection with the Circular] or under any other instrument or agreement delivered or executed in connection with the [Circular and the documents executed in connection with the Circular] or under any other agreement with the [Federal Reserve System]" (emphasis added); and (ii) "…***any representation or warranty made or deemed to be made*** by [the borrower] under or in connection with the [Circular and the documents executed in connection with the Circular], or that is contained in ***any certificate, document or financial or other statement delivered by it*** or in connection

-17-

with the [Circular and the documents executed in connection with the Circular], is *inaccurate in any material respect* on or as of the date made or deemed made" (emphasis added).

30.     As is typical in any market lending arrangement, each of Wachovia, World Savings and Wells Fargo was also required pursuant to Section 9.2 of the Circular to make each express certification (including, without limitation, each of the express Section 9.1 Certifications) to the Federal Reserve *each time* it requested an advance from the Discount Window, incurred any indebtedness through the Discount Window, or granted a security interest in any collateral in connection with a draw on the Discount Window, in each case on and as of the date of such advance, the extension of such indebtedness or the grant of such security.  Each of Wachovia, World Savings and Wells Fargo also covenanted in Section 9.2 of the Circular that such certifications would "remain true and correct so long as the [Circular] remains in effect, any [obligation] remains outstanding, or any other amount is owing to the [Federal Reserve System]." Because of Section 9.2 of the Circular, each of the express Section 9.1 Certifications was required to be made to the Federal Reserve as a precondition to and for the duration of every single advance under the primary credit program, as is typical in any market lending arrangement.  The express Section 9.1 Certifications were not mere certifications for participation in the Discount Window's primary credit program; rather, they were required to be delivered as a precondition to *each* payment to ensure that there was no change in the contextual circumstances surrounding that payment (as would be evidenced by the redelivery of each such express certification at the actual time of funding, consistent with market practice).  *See* Exhibit I for the relevant language from the Circular.

31.     Also, the drafters of the language wanted these express certifications to be
"air-tight" with no room for ambiguity – the relevant provisions were intentionally
drafted both broadly and comprehensively to shift the burden of due diligence under the
primary credit program at the time of each request for an advance *from* the Federal
Reserve *to* the borrowing institution, consistent with published Federal Reserve policy.
Delivery of the express certifications contained in the Section 9.1 Certifications and
Section 9.2 of the Circular was therefore certainly material and critical to the Federal
Reserve as a precondition for each advance under the Discount Window's primary credit
program.

32.     Looking at the history of the Circular, the Federal Reserve adopted the
current Circular (which includes the express Section 9.1 Certifications) to replace prior
Operating Circular No. 10, effective January 2, 1998 (the "***Prior Circular***") (*which does
not include the Section 9.1 Certifications (including the representation and warranty that
no "Event of Default" has occurred or is continuing) or the more comprehensive
definition of "Event of Default" contained in the current Circular*) on October 15, 2006,
stating specifically that the express certifications contained in the revised Section 9 of the
Circular and the new definition of "Event of Default" of the current Circular were drafted
to make them "more comprehensive."  *See* the Federal Reserve's Notice to Institutions
Regarding Operating Circular No. 10, dated September 15, 2006, on page 2.   These
revisions were implemented, in part, to address the Federal Reserve's revision to
Regulation A that became effective on January 9, 2003, which both created the primary
credit and secondary credit programs and fundamentally shifted the due diligence burden
at the time of a request for an advance under the primary credit program from the Federal
Reserve to the borrowing institution.  *See* Exhibit II for the older language contained in

the Prior Circular.

33.     Under the earlier Discount Window programs, the Federal Reserve required a borrowing institution to affirmatively explain to the Federal Reserve its need for funding and to demonstrate that it had exhausted all other sources of funding prior to obtaining funding from the Federal Reserve.  The Federal Reserve then evaluated the financial situation of the borrowing institution at the time of advance to determine both the reason for the drawing and whether such institution's use of borrowed funds was appropriate.

34.     Under the new primary credit program, the Federal Reserve intentionally shifted the due diligence burden from the Federal Reserve to the borrowing institution, creating a funding facility under the primary credit program similar to that of a "letter of credit" type of funding arrangement, expressly stating that credit extensions under the new primary credit program would be "significantly less" burdensome administratively on the Federal Reserve System than extensions under the earlier Discount Window programs and that, "except in unusual circumstances," Federal Reserve Banks would not question depositary institutions about their reasons for borrowing under the primary credit program.  *See* the Interagency Advisory on the Use of the Federal Reserve's Primary Credit Program in Effective Liquidity Management (the "***Primary Credit Interagency Advisory***") issued jointly by the Federal Reserve, the OCC, the FDIC, the U.S. Office of Thrift Supervision (the "***OTS***") and the National Credit Union Administration, dated July 23, 2003, on page 2**.**

35.     The Federal Reserve accordingly limited funding under the primary credit program to only "generally sound" financial institutions that could satisfy a Federal Reserve System-wide set of eligibility criteria for borrowing under the primary credit

program, based on both supervisory and "other relevant information," which would be used to determine whether an institution was in "generally sound" financial condition and thus eligible for primary credit advances. *See generally,* 12 C.F.R. Part 201, Regulation A; Docket No. R-1123, "Extension of Credit by Federal Reserve Banks" (the "***Regulation A Final Rule***").   In the Regulation A Final Rule, the Federal Reserve expressly rejected a comment from the public that funding under the primary credit program should be provided *solely* on the basis of an institution's supervisory ratings concerning soundness, so, in keeping with the Federal Reserve's position, the Primary Credit Interagency Advisory advised borrowing institutions on page 2 that they must have "***the necessary collateral arrangements and documentation in place*** with the appropriate Reserve Bank in order to utilize the primary credit program" (emphasis added).   Notably, the documentation makes it clear that the borrowing institution must make the express certifications set forth in the Section 9.1 Certifications and in Section 9.2 of the Circular *each* time of advance and for the *duration* of each such advance (as is typical in any market lending arrangement).

36.   Simply put, had each of Wachovia, World Savings and, post-merger, Wells Fargo – like an honest and law-abiding citizen – told the Federal Reserve that it could not make the express Section 9.1 Certifications in accordance with Section 9.2 of the Circular each time it requested an advance under the primary credit program (or, alternatively, provided the Federal Reserve with an accurate and more forthcoming certification each such time that it *was* in violation of laws or regulations which *could* have an adverse effect upon its performance of the repayment terms of the Circular and that an Event of Default *had* occurred and *was* continuing because the certifications made or deemed to be made by it under or in connection with the Circular, or contained in

certificates, documents or financial or other statements delivered by it *were* inaccurate in material respects on or as of the date made or deemed made), their inability to make such express certifications would have undoubtedly constituted an "unusual circumstance" that would have naturally influenced (and certainly have been capable of influencing) a Federal Reserve decision as to whether to make a payment under those circumstances or not.

37.     Because Wachovia, World Savings and, post-merger, Wells Fargo, its or their senior management, and certain of its or their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations prior to and at the time of each payment, each of Wachovia, World Savings and, post-merger, Wells Fargo could not make the express Section 9.1 Certifications and the express certifications of Section 9.2 of the Circular each time it or they obtained payments from the Discount Window.  They therefore knowingly submitted false and fraudulent claims to the Federal Entities in respect of the express Section 9.1 Certifications and express certifications of Section 9.2 of the Circular each time it or they obtained payments from the Discount Window's primary credit program.

### ii.     The Federal Reserve TAF

38.     Under the TAF, the Federal Reserve System auctioned term funds to certain institutions against a wide variety of collateral.  The Federal Reserve System implemented the TAF as part of a global support program to address elevated pressures in the short-term funding markets.  Similar programs were adopted by the Bank of Canada, the Bank of England, the European Central Bank and the Swiss National Bank for their respective jurisdictions.

39.     Wachovia, World Savings and, post-merger, Wells Fargo received payments under the TAF numerous times during the Relevant Period.  *See* Appendix II appended hereto for information relating to some of those payments.  To be able to draw funds under the TAF, as required by the Federal Reserve, each of Wachovia, World Savings and Wells Fargo executed a lending agreement and corporate resolutions conforming with the Circular (*i.e.*, the same documents used for the Discount Window's primary credit program, as noted in Paragraph 26, *supra*).  As also required by the Federal Reserve, each of them executed a letter agreement with the Federal Reserve agreeing to the terms of the Circular (including its express certifications) in consideration of "being able to request advances from and incur indebtedness to the Federal Reserve" and in consideration of "the Federal Reserve making advances to it."

40.     Each of Wachovia, World Savings and Wells Fargo made each of the express Section 9.1 Certifications to the Federal Reserve each time it obtained an advance in respect of a TAF auction.

41.     As is typical in any market lending arrangement, pursuant to Section 9.2 of the Circular, each of Wachovia, World Savings and Wells Fargo was also required to make each express certification (including, without limitation, each of the express Section 9.1 Certifications) to the Federal Reserve *each time* it requested an advance under a TAF auction, incurred any indebtedness through a TAF auction, or granted a security interest in any collateral in connection with an advance under a TAF auction, in each case on and as of the date of such advance, the extension of such indebtedness or the grant of such security.

42.     Each of Wachovia, World Savings and Wells Fargo also covenanted under Section 9.2 of the Circular that such express certifications would "remain true and correct

so long as the [Circular] remains in effect, any [obligation] remains outstanding, or any other amount is owing to the [Federal Reserve System]."  Because of Section 9.2 of the Circular, each of the express Section 9.1 Certifications was required to be made to the Federal Reserve as a precondition to and for the duration of every single advance under a TAF auction, as is typical in any market lending arrangement.  The express Section 9.1 Certifications were not mere certifications for participation in the TAF; rather, they were required to be delivered as a precondition to *each* payment to ensure that there was no change in the contextual circumstances surrounding that payment (as would be evidenced by the redelivery of each such express certification at the actual time of funding, consistent with market practice).

43.    As set forth in Paragraphs 31-35, *supra*, delivery of the express certifications contained in the Section 9.1 Certifications and Section 9.2 of the Circular was certainly material and critical to the Federal Reserve as a precondition for each advance under the TAF.  Consistent with published Federal Reserve policy, the relevant provisions were intentionally drafted both broadly and comprehensively to shift the burden of due diligence at the time of a request for an advance *from* the Federal Reserve *to* the borrowing institution, and, consistent with published Federal Reserve policy specific to the TAF, the Federal Reserve expressly wanted advances under the TAF to be treated (as a contractual matter) as "advances" under the Circular.

44.    Simply put, had each of Wachovia, World Savings and, post-merger, Wells Fargo – like an honest and law-abiding citizen – told the Federal Reserve that it could not make the express Section 9.1 Certifications in accordance with Section 9.2 of the Circular each time it requested an advance under the TAF (or, alternatively, provided the Federal Reserve with an accurate and more forthcoming certification each such time

that it *was* in violation of laws or regulations which *could* have an adverse effect upon its performance of the repayment terms of the Circular and that an Event of Default *had* occurred and *was* continuing because the certifications made or deemed to be made by it under or in connection with the Circular, or contained in certificates, documents or financial or other statements delivered by it *were* inaccurate in material respects on or as of the date made or deemed made), their inability to make such express certifications would have undoubtedly constituted an "unusual circumstance" that would have naturally influenced (and certainly have been capable of influencing) a Federal Reserve decision as to whether to make a payment under those circumstances or not.

45.     Because Wachovia, World Savings and, post-merger, Wells Fargo, its or their senior management, and certain of its or their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations prior to and at the time of each payment, each of Wachovia, World Savings and, post-merger, Wells Fargo could not make the express Section 9.1 Certifications and the express certifications of Section 9.2 of the Circular each time it or they obtained payments under a TAF auction.  They therefore knowingly submitted false and fraudulent claims to the Federal Entities in respect of the express Section 9.1 Certifications and the express certifications of Section 9.2 of the Circular each time it or they obtained payments under a TAF auction.

### iii.     *The FDIC TLGP*

46.     Under the FDIC's TLGP, the FDIC guaranteed the issuance of term debt of certain entities, including Wachovia, World Savings and Wells Fargo, effectively providing such entities with a subsidized rate of funding for a limited period of time (*i.e.*,

because the FDIC was willing to guarantee the debt of such entities, they could issue debt and raise funds in the market more cheaply based on the FDIC's external credit support).

47.     The Master Agreement, Federal Deposit Insurance Corporation, Temporary Liquidity Guarantee Program – Debt Guarantee Program, dated November 24, 2008 (the "***Master Agreement***"), sets forth the terms and conditions for obtaining guarantees under the TLGP.

48.     All insured depositary institutions, including those of Wachovia, World Savings and Wells Fargo, were deemed to participate in the TLGP unless they specifically "opted-out" of this program.   Wachovia's and World Savings' insured depositary institutions did not "opt-out" of the TLGP prior to the Wachovia-Wells Fargo Merger Date, and Wells Fargo's insured depositary institutions only opted out of the TLGP effective January 1, 2010, well after the Wachovia-Wells Merger Date.   Each of Wachovia and Wells Fargo issued debt guaranteed by the FDIC under the TLGP.   *See* Appendix II appended hereto for information relating to some of those payments.

49.     In accordance with Section 3.03 of the Master Agreement, each of Wachovia, World Savings and Wells Fargo made the express certification to the FDIC that "[a]s of their respective dates of filing, the Issuer Reports [(as defined below)] complied in all material respects with all statutes and applicable rules and regulations of all applicable governmental entities" each time it obtained a guarantee under the TLGP.

50.     In the same section, each of Wachovia, World Savings and Wells Fargo made the express certification to the FDIC that "[i]n the case of each such Issuer Report filed with or furnished to the Securities and Exchange Commission, if any, such Issuer Report: (a) did not, as of its date…contain an untrue statement of a material fact or omit

to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; (b) complied as to form in all material respects with all applicable requirements of the Securities Act of 1933, as amended, and the Securities and Exchange Act of 1934, as amended; and (c) no executive officer of the Issuer or any subsidiary of the Issuer has failed **in any respect** to make the certifications required by [such officer] under Section 302 or 906 of [Sarbanes-Oxley]" (emphasis added) each time it obtained a guarantee under the TLGP.

51.     In Section 3.03 of the Master Agreement, each of Wachovia, World Savings and Wells Fargo further made the express certification to the FDIC that "[w]ith respect to all other Issuer Reports, the Issuer Reports were complete and accurate in all material respects as of their respective dates" each time it obtained a guarantee under the TLGP, with "Issuer Reports" being defined in the Master Agreement to include "reports, registrations, documents, filings, statements and submissions, together with any amendments thereto, that the Issuer or any subsidiary of the Issuer is required to file with **any** governmental entity" (emphasis added).  *See* Exhibit III for the relevant language from the Master Agreement.

52.     Simply put, had each of Wachovia, World Savings and, post-merger, Wells Fargo – like an honest and law-abiding citizen – told the FDIC that it could not make the express certifications set forth in Section 3.03 of the Master Agreement each time it obtained a guarantee (or, alternatively, provided the FDIC with an accurate and more forthcoming certification each such time that (i) as of their respective dates of filing, their Issuer Reports did *not* comply in all material respects with all statutes and applicable rules and regulations of all applicable governmental entities; (ii) in the case of each such Issuer Report filed with or furnished to the Securities and Exchange

-27-

Commission, such Issuer Report: (a) *contained* as of its date an untrue statement of a material fact and omitted to state material facts necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; (b) did *not* comply as to form in all material respects with all applicable requirements of the Securities Act of 1933, as amended, and the Securities and Exchange Act of 1934, as amended; and (c) their executive officers *had* failed to appropriately make the certifications required by them under Section 302 or 906 of Sarbanes-Oxley; and (iii) with respect to all other Issuer Reports, they were *not* complete and accurate in all material respects as of their respective dates), their inability to make such express certifications would have naturally influenced (and certainly have been capable of influencing) a FDIC decision as to whether to provide a guarantee under those circumstances or not.

53.     Because Wachovia's, World Savings' and Wells Fargo's insured depositary institutions were deemed to participate in the TLGP until at least January 1, 2010, none of the express certifications set forth in the Master Agreement were conditions for participation in the TLGP; rather, they were required to be delivered by these institutions as a precondition to the issuance of a guarantee.

54.     Because Wachovia, World Savings and, post-merger, Wells Fargo, its or their senior management, and certain of its or their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations prior to and at the time of issuance of debt covered by the TLGP, each of Wachovia, World Savings and, post-merger, Wells Fargo could not make the express certifications contained in Section 3.03 of the Master Agreement each time it or they issued debt guaranteed by the FDIC under the TLGP.  They therefore knowingly submitted false and fraudulent claims

to the Federal Entities in respect of Section 3.03 of the Master Agreement each time it or they issued debt guaranteed by the FDIC under the TLGP.

### iv.  The FDIC Deposit Insurance Program and the TAGP

55.     Under the FDIC's Deposit Insurance Program, the FDIC guarantees the safety of certain deposits held with certain insured depositary institutions, including those of Wachovia, World Savings and Wells Fargo.

56.     In response to the financial crisis, the FDIC created the TAGP on October 13, 2008 to fully guarantee deposits held in non-interest bearing transaction accounts with certain insured depositary institutions, including those of Wachovia, World Savings and Wells Fargo.  The TAGP was extended to December 31, 2010, at which time it was incorporated into law under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended (the "***Dodd-Frank Act***").

57.     Each of Wachovia's, World Savings' and Wells Fargo's insured depositary institutions utilized the Deposit Insurance Program throughout the Relevant Period.  Each of Wachovia's, World Savings' and Wells Fargo's insured depositary institutions also utilized the TAGP from its creation to its incorporation into law under the Dodd-Frank Act.

58.     To qualify for coverage under the Deposit Insurance Program and the TAGP with respect to its accounts, each of Wachovia's, World Savings' and Wells Fargo's insured depositary institutions were required to adhere to certain liquidity and reserve requirements mandated by law and regulation and to make express certifications available to the FDIC concerning each such entity's safety and soundness and its compliance with the Applicable Laws and Regulations.

59.    Premium payments for the Deposit Insurance Program and TAGP coverage were charged to institutions utilizing the programs, including Wachovia's, World Savings' and Wells Fargo's insured depositary institutions, on the basis of the financial health of such institutions, with higher fees charged for insured depositary institutions bearing greater credit risk.

60.    Because Wachovia, World Savings and, post-merger, Wells Fargo, its or their senior management, and certain of its or their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations, each of Wachovia, World Savings and, post-merger, Wells Fargo could not have made the certifications required of it under each of the Deposit Insurance Program and the TAGP. They therefore knowingly submitted false and fraudulent claims to the Federal Entities in respect of its or their utilization of each of the Deposit Insurance Program and the TAGP.

### v.    The FHLB Programs

61.    The FHLBs form a large and complex U.S. Government-sponsored enterprise system that provides support to various domestic financial institutions in times of reduced liquidity.  Created during the Great Depression for the domestic savings and loan industry by way of the Federal Home Loan Bank Act of 1932, as amended, the FHLB system was expanded in and around 1989 to include commercial banks and credit unions, including each of Wachovia, World Savings and Wells Fargo.  Given the FHLBs' significance in the functioning of our capital markets, the Federal government regulates the FHLB through the U.S. Federal Housing Finance Agency, who establishes capital standards for FHLBs, conducts examinations of FHLBs and/or takes certain enforcement actions relating to the FHLBs.  Because of certain privileges that each FHLB has with the Federal government (including, *inter alia*, the right of the Treasury Department to

purchase the securities of an FHLB (creating a statutory back-stop of United States funded liquidity for the FHLBs), the ability of an FHLB to use a Federal Reserve Bank of the Federal Reserve System as its fiscal agent, the classification of the securities of an FHLB as "government securities" under the Securities and Exchange Act of 1934, as amended, and the treatment of an FHLB as a "Federal instrumentality" for purposes of the U.S. Bankruptcy Code), the obligations of FHLBs are considered to be guaranteed by the United States.  An FHLB is also empowered to advance funds to its member institutions, who are obliged to pledge mortgage securities, commercial and residential loans and other collateral to the FHLB pursuant to related advance documentation for each such advance (*i.e.*, effectively make collateralized loans to its member institutions).

62.     Each of Wachovia, World Savings and Wells Fargo were member institutions of one or more FHLBs, and Wachovia and World Savings received payments from the FHLBs, in the form of advances, a number of times during the Relevant Period. Indeed, as of first quarter end in 2008, Wachovia increased its advances from two particular FHLBs, the U.S. Federal Home Loan Bank of Dallas (the "***Dallas FHLB***") and the U.S. Federal Home Loan Bank of San Francisco (through ties left in place following Wachovia's merger with World Savings) (the "***San Francisco FHLB***"), from *$41.4 billion* to *$53.2 billion*, thereby receiving a financing subsidy from the United States throughout the term of such funding.  At that time, Wachovia had the second largest borrowings from the FHLBs, with the much-larger Citibank holding a first place position at $88.53 billion and an equally distressed Washington Mutual Inc. holding a close third place at $51.95 billion.

63.     To obtain payments under the FHLB Programs, each of Wachovia, World Savings and Wells Fargo was required to make express certifications to the FHLBs each

time it received such payments, as would be typical in any lending arrangement, concerning each such entity's safety and soundness and its compliance with the Applicable Laws and Regulations. In addition, the FHLBs were authorized to review any regulatory reports submitted to the Federal Entities by any of Wachovia, World Savings or Wells Fargo when considering whether any particular advance should be provided to it by an FHLB. Institutions like Wachovia, World Savings and Wells Fargo that received payments from the FHLBs under the FHLB Programs were charged highly subsidized rates of interest for advances drawn from them.

64.    For example, under an Advances and Security Agreement that Wachovia executed with the Dallas FHLB, Wachovia made the express certification to the Dallas FHLB that it was not, and the execution and performance of the transactions contemplated under an advance would not cause it to be, "in violation of its charter or articles of incorporation, bylaws, [the Federal Home Loan Bank Act, as amended], [the regulations of the Federal Housing Finance Board or] any other law or administrative regulation or order, or any court decree" each time it drew an advance from the Dallas FHLB. Under that agreement, Wachovia also made the express certification to the Dallas FHLB that "the information given by [it] in any document provided, or in any oral statement made, in connection with an application or request for an [advance]" was "true, accurate and complete in all material respects" each time it drew an advance from the Dallas FHLB. Finally, Wachovia also made under that agreement an express certification to the Dallas FHLB (with respect to the collateral it pledged in connection with an advance) that "all of the [collateral pledged to the Dallas FHLB] meets the standards and requirements with respect thereto from time to time established by the [Dallas FHLB], [the Federal Home Loan Bank Act, as amended] and [the regulations of the Federal

Housing Finance Board]" each time it drew an advance from the Dallas FHLB (together, the "***Dallas FHLB Certifications***").  *See* Exhibit IV for relevant language from the Dallas FHLB Advances and Security Agreement.

65.    Each of the Dallas FHLB Certifications was made as of the date of execution of the Advances and Security Agreement and as of the date of each advance thereunder.  Wachovia would have made similar express FHLB certifications to the San Francisco FHLB each time it drew an advance from that FHLB during the Relevant Period, as would have been required by the San Francisco FHLB documentation that was required to be executed in connection with advances from it.

66.    Simply put, had each of Wachovia, World Savings and, post-merger, Wells Fargo – like an honest and law-abiding citizen – told the FHLBs that it could not make the express Dallas FHLB Certifications or other similar express certifications required of it by other FHLBs each time it obtained an advance (or, alternatively, provided the FHLB with an accurate and more forthcoming certification each such time that (i) it *was* in violation of laws or administrative regulations, (ii) the information given by it in documents provided, or in oral statements made, in connection with an application or request for an advance was untrue, inaccurate or incomplete in material respects and (iii) with respect to the collateral it pledged in connection with an advance to an FHLB, such collateral did not meet the standards and requirements with respect thereto from time to time established by that FHLB, the Federal Home Loan Bank Act, as amended, and the regulations of the Federal Housing Finance Board, their inability to make such express certifications would have naturally influenced (and certainly have been capable of influencing) an FHLB decision as to whether to provide an advance under those circumstances or not.

67.     Because Wachovia, World Savings and, post-merger, Wells Fargo, its or their senior management, and certain of its or their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations, each of Wachovia, World Savings and, post-merger, Wells Fargo could not have made the express Dallas FHLB Certifications and other express FHLB certifications required of it under the FHLB Programs.  They therefore knowingly submitted false and fraudulent claims to the Federal Entities in respect of its or their obtaining of advances in respect of an FHLB Program.

### vi.     *The Limited Scope of the Federal Programs*

68.     To be clear, the Federal Programs were not established under Federal law or regulation to allow the Federal Entities to simply fund and support institutions that could not make the express certifications required of them under the programs.  Indeed, if the Federal Entities wanted or needed to fund any of Wachovia, World Savings or, post-merger, Wells Fargo in order to mitigate a systemic risk affecting the United States economy – notwithstanding the inability of these institutions to provide the express certifications required of them under the Federal Programs – the Federal Entities had *other programs* available to them that were specifically crafted under Federal law and regulation to facilitate the funding of those institutions in such circumstances, such as declaring a systemic risk and funding the entities accordingly (*e.g.*, 12 U.S.C. § 343(3)(A)).  The need for liquidity – no matter how great – does not excuse the submission of a false or fraudulent claim to the U.S. Government for money.

69.     Indeed, by failing to enforce what the False Claims Act and each of the Federal Programs' express terms clearly envision, the U.S. Government would inadvertently encourage future recipients of Federal funds under programs like the

-34-

Federal Programs to simply ignore the express certifications mandated by the Federal Entities when drawing upon such or similar programs in the future, thereby creating a new systemic risk in the banking industry with which future generations will have to contend.  The perversity of this result is perhaps best seen in the context of the Discount Window's primary credit program and the TAF – because of the intentional shift of the due diligence burden from the Federal Reserve to the borrowing institutions under Regulation A (*c.f.,* Paragraphs 31 to 35, *supra*), an effective "waiver" of the need to deliver the express certifications required of those programs would convert the programs into *de facto* guarantees of financing for any reason – and for any fraud.

**B.      Why Wachovia's Certifications were Patently False and Fraudulent**

70.      Wachovia could not and should not have made the referenced certifications to the Federal Entities in respect of the Federal Programs because Wachovia had brazenly violated the Applicable Laws and Regulations from at least 2001 to on or around the Wachovia-Wells Merger Date in 2008 and beyond in order to satisfy Wachovia's senior management's unrestrained pursuit of short-term profitability – a pursuit that benefitted senior management and certain Wachovia personnel (who earned large bonuses) at the expense of Wachovia's long-term financial health and the financial well-being of the vast majority of its shareholders and employees.  And because Wells Fargo did not disclose, post-merger, that this known fraud had occurred, that this fraud had a material financial impact on its own balance sheet at and post-merger (which, *inter alia*, would have required it to make numerous financial disclosures in accordance with Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP concerning its discovery of the fraud and the extent to which that this fraud impacted its own financial

controls, reports and statements), and that this known fraud required Wells Fargo to take costly and extensive remedial measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at the combined institutions post-merger to ensure its compliance with the Applicable Laws and Regulations on a going-forward basis (assuming, of course, that Wells Fargo took such remedial measures), Wells Fargo concealed and perpetuated the fraud long after the Wachovia-Wells Merger Date, including up to today.

71.    Through a classic and almost formulaic application of "control fraud,"[1] Wachovia's senior management cleverly subverted and dismantled the checks and balances existing at Wachovia to commit fraud on an astounding scale for their own pecuniary benefit, recklessly and dangerously using Wachovia's purportedly "legitimate" Corporate and Investment Bank (the "**CIB**") securitization business as a front for their fraud.  To establish, grow and run this securitization business, Wachovia knowingly and willingly disregarded the Applicable Laws and Regulations to, *inter alia*: (i) originate loans of poorer and poorer credit quality in violation of the Safety and Soundness Laws and Regulations, with the uncertain hope that they could off-load these risky loans into the securitization markets and the hopeless certainty that they would suffer substantial

---

[1]  A control fraud occurs when trusted persons in high positions of responsibility at an institution subvert the organization's checks and balances (*e.g.*, through the use of selective hiring and firing) to engage in extensive fraud for personal gain.  According to the noted professor and former bank regulator William K. Black, "the way that you do it is to make really bad loans, because they pay better.  Then you grow extremely rapidly, in other words, you're a Ponzi-like scheme.  And the third thing you do is we call it leverage.  That just means borrowing a lot of money, and the combination creates a situation where you have guaranteed record profits in the early years.  That makes you rich, through the bonuses that modern executive compensation has produced.  It also makes it inevitable that there's going to be a disaster down the road."  In his book, The Best Way to Rob a Bank is to Own One, Professor Black writes on page 3 thereof, "Accounting frauds are ideal for control fraud.  They inflate income and hide losses of even deeply insolvent companies.  This allows the control fraud to convert company funds to…personal use through seemingly normal, legitimate means [through salaries, bonuses, stock options and luxurious perks].  Control frauds almost always report fabulous profits, and top-tier audit firms bless those financial statements."

losses if they could not; (ii) rely on sizeable illegal on- and off-balance sheet sham transactions to bury the risks it necessarily assumed in its reckless pursuit of profitability and to help it fabricate higher profit margins in spite of those risks; (iii) improperly reduce profit-moderating loss reserves that might have helped Wachovia withstand the terrible financial shocks it would inescapably experience; and (iv) commit unabashed accounting fraud in brazen violation of the Applicable Laws and Regulations to conceal its fraudulent activities from its shareholders, depositors and regulators alike.

72.     Indeed, Wachovia knowingly and willingly violated the Applicable Laws and Regulations to, *inter alia*:

•     falsify and fail to correct financial reports and statements (including call reports submitted to certain Federal Entities) for a period of at least nine years to concoct a fictional picture of its "sound" financial health for that period and for subsequent financial reporting periods as well;

•     falsely report higher and higher returns on equity capital (when, in fact, no such returns existed) and improperly maintain lower and lower reserves of balance sheet capital leaving Wachovia increasingly susceptible to collapse;

•     render its risk management, internal control and accounting processes meaningless by recklessly disregarding GAAP – in violation of Federal law – regarding on- and off-balance sheet accounting and fair market valuations of assets.   In so doing, senior management disregarded the legal and regulatory framework established by Congress and the Federal Entities to protect American banking institutions like Wachovia from unsafe and unsound banking practices, rendering these laws and rules ineffective and impotent;

- use unrealistic, simplistic, untested and unvalidated internal financial models to perpetrate and perpetuate its complex and staggering financial and control fraud, thereby deceiving shareholders, depositors and regulators alike; and

- as it was imploding, make clearly false and fraudulent certifications to the United States that it simply could not and should not have made in order to draw upon public funds and resources to stay afloat.

73.    Before the onset of the financial crisis, the fraud worked like a charm – the CIB, led by Steve Cummings ("*Cummings*"), a Senior Executive Vice President and Executive Officer of WC, quickly became Wachovia's gem and profit center.  According to G. Kennedy Thompson ("*Ken Thompson*"), Chairman, President and Chief Executive Officer of WC, in WC's 2006 annual report, the CIB had "70% of revenues in 2006 coming from capital markets activity – heavily weighted to fixed income and focusing on high-margin, non-commodity businesses" and the CIB "*doubled its market share* and *grew faster than [Wachovia's] major investment banking competitors* over [a five-year period] while *reducing the capital needed to support the business*" (emphasis added). But the CIB's impressive growth and profits cannot be attributed to the quality of Wachovia's financial transactions or the caliber or wisdom of its senior management (Wachovia did fail, after all); rather, it can be attributed to management's mastery of the art of control fraud and Wachovia's wanton disregard for the Applicable Laws and Regulations as it grew its securitization business by any means necessary.

74.    Specifically, Wachovia flagrantly disregarded the Applicable Laws and Regulations by (i) not having appropriate internal controls and information systems; (ii) not having an appropriate internal audit system; (iii) not establishing and maintaining loan documentation practices that enabled Wachovia to (A) make informed lending

decisions, (B) assess risks, (C) identify the purposes of loans and sources for repayment, (D) assess the ability of the borrower to repay indebtedness in a timely manner, (E) ensure that claims against the borrower would be enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of loans; (iv) not establishing and maintaining prudent credit underwriting practices; (v) not having prudent asset growth; and (vi) not establishing and maintaining an appropriate system commensurate with Wachovia's size to identify problem assets and prevent deterioration of those assets; by violating the certification requirements regarding financial reporting, internal control and compliance with laws and regulations under 12 C.F.R. 363; by making false entries with an intent to deceive other officers of Wachovia in violation of 18 U.S.C. §1005; by making false statements in a matter within the jurisdiction of a Federal department or agency in violation of 18 U.S.C. §1001; by violating Sarbanes-Oxley, including Sections 302, 806 and 906 thereof; and by not filing financial reports and statements with the Federal Entities in accordance with GAAP pursuant to 12 U.S.C. §1831(n)(a)(2)(A).

75.     The control fraud effected at Wachovia is distressingly reminiscent of the control fraud that took down some savings and loans institutions ("*S&Ls*") in the 1980s and Enron Corporation ("***Enron***") in 2001.  But the comparison fails to do justice to the allegations set forth in this Third Amended Complaint.  Horrific as those scandals were, the unconscionable control fraud perpetrated here is, in many ways, of significantly greater importance: A *U.S.-chartered bank* of significant national and international prominence was the instrument of this control fraud, and it knowingly and willingly adopted highly deceptive accounting practices that were *almost identical* to the fraudulent accounting practices of the S&Ls and Enron – all while brazenly scorning the very laws

and regulations that were enacted after the S&L and Enron crises to specifically prevent those types of financial frauds from ever happening again.

76.     And when cracks started to show in Wachovia's fragile financial façade during the financial crisis, Wachovia, in its arrogance, committed fraud against the United States to secure critical liquidity lifelines to keep it afloat, materially and overtly lying to our Government just to save its skin from an imminent insolvency that was brought about by its own criminal recklessness.  At no time did Wachovia (or, post-merger, Wells Fargo) do what an honest, repentant and law-abiding corporate citizen would do:  Come clean to the United States about this massive unconscionable fraud. Rather, it was business as usual as Wachovia and, post-merger, Wells Fargo took the money provided to it under false and fraudulent pretenses by the United States taxpayer and stayed silent about their egregious financial misdeeds.

77.     Sadly, unlike in the S&L and Enron contexts, Wachovia and, post-merger, Wells Fargo appear to have acted with impunity: Wachovia's shareholders and the United States taxpayer have borne the brunt of Wachovia's fall, and, remarkably, with the exception of the present lawsuit, neither Wachovia, Wells Fargo nor anyone in its or their senior management has faced criminal or civil liability to date for the blatant and astounding financial fraud that took place there – a fraud that represents the worst of what can happen on Wall Street, Main Street or any other street in America.  Only the size and complexity of this fraud distinguishes Wachovia and, post-merger, Wells Fargo from any other common fraudster, and the United States should do right by the U.S. taxpayer and recover monies from Wachovia and Wells Fargo under the False Claims Act for having bailed them out under outrageously false and fraudulent pretenses.

78.     Senior management in the CIB included: (i) Ken Thompson; (ii)

Cummings; (iii) Tom Wickwire, the Head of Structured Products; (iv) Bill Green, Managing Director of the RECM group; (v) Sam Solie, the Chief Operating Officer of RECM; (vi) Robert Verrone, head of the CIB's Large Loan Group (*i.e.,* commercial real estate loans in excess of $50 million principal amount); (vii) Frank Tippett, a Director and Head of Hedging at WS, (viii) Keith Schleicher, Managing Director and the Head of Credit Risk Management; (ix) Royer Culp, Head of Wachovia's Structuring Department; (x) Robert Rottmann, the Product Controller Group Head; (xi) Stephen Nelson, the Product Controller for RECM; and (xii) Ira Malter, the Controller for Structured Products. *See* Appendix III appended hereto, which illustrates the CIB reporting lines.

### i.  *How Wachovia Should Have Grown its Securitization Business… And How Wachovia Actually Grew It*

79.     The Treasury Department, the Federal Reserve, the FDIC, the OCC and the OTS (together, the "***Agencies***") certainly wanted regulated institutions like Wachovia to exercise care in growing their securitization businesses in a safe and sound manner. As early as 1997, the OCC expressed its concern about the "unmitigated dependence [of a bank] on securitization markets to absorb new asset-backed security issues – a mistake that banks originating assets specifically for securitization are more likely to make." *See* the OCC's Asset Securitization Comptroller's Handbook (the "***Asset Securitization Handbook***") published in November 1997 on page 47.  Such an institution might, according to the OCC, allocate only "enough capital to support a 'flow' of assets to the securitization market," which might cause funding problems for the institution "if circumstances in the markets or at the bank were to force the institution to hold assets on its books."  In other words, the OCC warned banks – *in 1997* – that they should not originate loans intended for securitization without having sufficient capital in reserve

because the banks might actually get stuck with the loans on-balance sheet if, for some reason, the loans were not, or were not able to be, securitized.  This is precisely what happened to Wachovia when the securitization markets failed only a decade later in 2007.

80.     The Agencies also issued regulatory guidance *in 1999* that cautioned against the development of an asset securitization line of business at the expense of risk management, internal control and accounting best practices.  *See generally,* the Interagency Guidance on Asset Securitization Activities (the "***Asset Securitization Interagency Guidelines***") issued on December 13, 1999.  In this guidance, the Agencies reminded financial institution managers "of the importance of fundamental risk management practices governing asset securitization activities" and noted that "[o]f particular concern are institutions…whose senior management and directors do not have the requisite knowledge of the effect of securitization on the risk profile of the institution or are not fully aware of the accounting, legal and risk-based capital nuances of this activity."  A banking institution engaged in a securitization business might, according to that guidance, "inappropriately generate 'paper profits'" or "mask actual losses" without appropriate internal controls and independent oversight, and an institution's use of "liberal and unsubstantiated assumptions" could also result in material inaccuracies in its financial statements and substantial write-downs of retained interests that could lead to "the demise of the sponsoring institution."  Accordingly, the Agencies instructed senior managers and directors in that guidance to "ensure that independent risk management processes are in place to monitor securitization pool performance on an aggregate and individual transaction level" and, more generally, to have "appropriate information systems to monitor securitization activities."

81.     Wachovia treated the law, the Agencies' regulations and the Agencies'

guidance with equal disregard and contempt.   Rather than encouraging a careful, measured growth of its securitization business, Wachovia instead relaxed its credit underwriting standards to extend and securitize commercial real estate ("***CRE***") loans that were highly toxic but highly profitable if one ignored the risks associated with such loans.  And when Wachovia could not somehow dump these CRE loans into the market, it employed illegal S&L- and Enron-like accounting techniques to deliberately and cleverly conceal the financial risks it had necessarily assumed because of its highly imprudent lending activities.

### ii.      *Securitization and Wachovia's Commercial Real Estate Finance Division*

82.     Wachovia's Commercial Real Estate Finance division, which was part of the CIB, originated CRE loans secured by commercial real estate properties located throughout the United States and funded them through its banking arm, WBNA.  After accumulating a sufficient number of CRE loans, Wachovia routinely securitized them in commercial mortgage-backed securities ("***CMBS***") transactions, earning lucrative fees for originating the CRE loans, structuring, arranging and underwriting the CMBS transactions and servicing the CRE loans that supported the related CMBS after securitization.

83.     In connection with each securitization, WBNA would sell some CRE loans to the special purpose vehicle (an "***SPV***") that issued the CMBS (*e.g.*, the Wachovia Bank Commercial Mortgage Trust), and then WBNA would "derecognize" those CRE loans from its balance sheet (*i.e.*, the CRE loans were removed from WBNA's balance sheet) and "recognize" the proceeds it received and the fees it earned in connection with the closing of the CMBS transaction.  *See* Appendix IV for a graphic representation of a typical Wachovia CMBS securitization transaction structure.

84.     However, for an interim period of time between the origination or purchase of a CRE loan and its related CMBS securitization (which could be a very long or even an indefinite period of time), WBNA would have to hold the CRE loans it had not sold (or could not sell) on its balance sheet; during this period, WBNA was required to set aside regulatory capital for those CRE loans based on the credit and/or market risk attributed to each such loan.  (For the CRE loans it hoped to securitize, this interim period of time is typically referred to as such loan's "warehousing period," and Wachovia's on-balance sheet warehousing/holding facility was referred to internally as the "***CREF facility***".)  *See* Appendix V for a graphic representation of the CREF facility.

85.     Because of regulatory limits and internal controls, the CREF facility had an effective maximum funding limit, meaning there was also an effective cap on the dollar amount of CRE loans that could be warehoused at any given time for securitization purposes or otherwise held on-balance sheet pending some other sort of disposition (*e.g.*, sale, write-off).  This cap was intended to keep Wachovia safe by limiting the amount of exposure it could take on its portfolio of CRE loans – as a corollary, though, the cap also severely limited Wachovia's ability to exponentially leverage and increase its securitization volume to achieve record profits.

86.     In addition, as part of its credit underwriting process and credit grading system, Wachovia was required to assign credit grades to the CRE loans to help it effectively track the credit risk embedded in its balance sheet.  These credit grades helped Wachovia know what credit and other risks it was assuming for each individual CRE loan it held on its balance sheet (*i.e.*, in its CREF facility) – no matter how briefly that loan was held – and the grades were to be made available to the bank's risk management, finance, internal audit and other personnel for surveillance, tracking and other purposes

on a macro- and a micro-scale.  If it had been doing this correctly, Wachovia would be in a position to ensure that the growth of its CRE loan portfolio kept pace with its legal and regulatory obligations to avoid excessive risk-taking and to operate in a safe and sound manner consistent with the Safety and Soundness Laws and Regulations and the other Applicable Laws and Regulations.

87.     Wachovia would have none of this – in total disregard for the Applicable Laws and Regulations, Wachovia: (i) used purportedly off-balance sheet SPVs in violation of GAAP to recklessly and exponentially leverage and grow its securitization business, to circumvent regulatory capital constraints that would have restricted such growth, and to bury toxic CRE loans it originated but was unable to sell into the market; (ii) simply did not grade the CRE loans it held on-balance sheet in its CREF facility, leaving its risk management, internal control and accounting processes in the dark and preventing them from uncovering, identifying and addressing Wachovia's unsafe and unsound CRE loan origination and holding practices; and (iii) used untested and unvalidated models to fabricate the market values of its assets in violation of GAAP so it could fraudulently report record profits.  And once this unhealthy arrangement was firmly in place, Wachovia leveraged its precarious financial position even further to increase its securitization volume, originating *even more* CRE loans of poorer and poorer credit quality, in further violation of the Safety and Soundness Laws and Regulations and the other Applicable Laws and Regulations.  In essence, Wachovia's failure became a self-fulfilling prophecy.

### iii.     The Raison d'Être for Wachovia's "Black Box" and its Repo SPVs: Using Fraudulent Off-Balance Sheet Accounting to Leverage a Securitization Business

88.     A financial institution must, of course, strictly adhere to applicable accounting rules and standards if it expects to publish accurate and timely financial reports and statements.  Federal law requires entities like Wachovia and Wells Fargo to file financial reports and statements with the Agencies consistent with GAAP. *See* 12 U.S.C. § 1831n(a)(2)(A), which was incorporated into law by Section 121 of the Federal Deposit Insurance Corporation of 1991.   According to the Federal Reserve, the accounting rules serve as a necessary tool for efficient market discipline and bank supervision, providing a "foundation for credible and comparable financial statements and other financial reports." *See* Section 2120.1, "Accounting" in the Federal Reserve's "Trading and Capital-Markets Activities Manual" (the "***Federal Reserve 2120.1 Guidance***") dated April 2002 on page 1.  Indeed, the Federal Reserve noted that the effectiveness of market discipline itself rests, to a very considerable degree, "on the quality and timeliness of reported financial information" and that proper financial reporting enhances "the ability of [the Agencies] to monitor and supervise effectively." The Federal Reserve stated (obviously consistent with Federal law) that "GAAP must be followed for financial-reporting purposes – that is, for annual and quarterly published financial statements."

89.     Notwithstanding 12 U.S.C. § 1831n(a)(2)(A) and the clear regulatory guidance on this subject, Wachovia routinely parked loans in violation of Federal law and GAAP in a massive SPV called the College Street Funding Master Trust (and known internally as the Black Box (the "***Black Box***")) and in numerous other smaller off-balance sheet SPVs (the "***Repo SPVs***"), in each case to skirt regulatory constraints that limited the number of loans Wachovia could hold on-balance sheet (*i.e.*, in the CREF facility) and to conceal credit issues relating to the many toxic CRE loans that it had

originated.  If on-balance sheet warehousing in the CREF facility reached its funding capacity (because of regulatory capital or other constraints) or Wachovia wanted to hide certain loans from internal or regulatory review, Wachovia conveniently "sold" them to the Black Box or to a Repo SPV in a purportedly "off-balance sheet" transaction until the loans could (hopefully) be securitized out of WBNA at some later date.  (By holding assets "off-balance sheet" – at least in a legitimate transaction – the transferor would not have to book or directly hold regulatory capital against those assets.)

90.    As shown in Paragraphs 91 to 118, *infra*, Wachovia knew that it should have actually accounted for the CRE loans it purportedly held off-balance sheet in the Black Box or the Repo SPVs on-balance sheet, subjecting those loans to granular review by Wachovia's risk management, internal control and accounting processes and requiring Wachovia to hold regulatory capital against them based on the credit risk that each such loan individually posed.  But Wachovia did not – rather, it used the Black Box and the Repo SPVs as warehousing facilities through which it could fraudulently hold billions of dollars of CRE loans "off-balance sheet" (and outside the prying and meddling eyes of its regulators, shareholders, and risk management, internal control and accounting personnel) and leverage off of its minimal capital reserves to recklessly grow its securitization business even more.

### a.    The Black Box

91.    To put the extent of the Black Box accounting fraud in perspective, the Black Box facility fraudulently held as of August 1, 2005 some *$6 billion* in loans and other assets that should have been on WBNA's balance sheet.  (On that day, Ira Malter ("***Malter***"), the Controller for Structured Products, wrote in an e-mail (the "***August 1 Malter E-mail***") that the Black Box facility was, at that time, the "largest ever," at $4

billion in funded loans and $6 billion after including rate-locked loans and related hedging.)  Around that time, this was roughly the equivalent of an astounding *12.75%* of the total equity capital of WBNA.  (This calculation is based on (i) WBNA's call report submitted to certain Federal Entities for the quarter ended September 30, 2005, citing a total equity capital for WBNA at that time of $47.052 billion, and (ii) the $6 billion figure from the August 1 Malter E-Mail.)

92.      Wachovia's accounting treatment of the Black Box therefore had a material impact on its financial reports and statements for the entire period during which the Black Box was used as an off-balance sheet financing vehicle.  Moreover, because it was accounted for improperly without any correction (*i.e.*, all of the Black Box's assets should have been on-balance sheet for the entire time the Black Box was used), this is the case for subsequent financial reporting periods as well, including from the Wachovia-Wells Merger Date and beyond.  Needless to say, material misstatements in WBNA's financial reports and statements (and financial reports and statements issued by WBNA's publicly-traded bank holding company, WC, and, post-merger, WFC) constitute violations of both civil and criminal laws, including, *inter alia*, 12 U.S.C. § 161(a), 18 U.S.C. § 1001, 18 U.S.C. § 1005, Sections 302, 402, 806 and 906 of Sarbanes-Oxley, 12 U.S.C. § 1831n(a)(2)(A) and applicable Federal and state securities laws.

93.      Pursuant to Paragraph 46 of the Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("*FAS 140*"), issued in September 2000, a "qualifying special purpose entity" (a "*QSPE*") is not consolidated in the financial statements of a transferor or its affiliates (*i.e.*, it was considered to be off-balance sheet) if it is, *inter alia*, "demonstrably distinct" from the transferor of the loans.  According to Paragraph 36 of

FAS 140, an entity is "demonstrably distinct" from a transferor if it cannot be unilaterally dissolved by any transferor, its affiliates or its agents *and* at least 10% of the fair value of its beneficial interest is held by parties other than the transferor, its affiliates or its agents. (Note that Financial Accounting Standards No. 166, "Accounting for Transfers of Financial Assets" ("**FAS 166**"), issued in June 2009, significantly amended FAS 140. This Third Amended Complaint uses and quotes FAS 140's original text (*i.e.*, does not give effect to the FAS 166 amendments) because the events described herein precede the date of issuance of FAS 166.))

94.     So to manipulate its accounting treatment of a sizeable portion of its CRE loans, Wachovia created the Black Box, whereby it parked those CRE loans into the Black Box via a "sale" of the loans to the Black Box, with the Black Box selling an interest in itself to a third party and another interest in itself back to Wachovia. *See* Appendix VI for a graphic representation of the Black Box.  Based on information contained in Wachovia's own Corporate & Investment Bank Accounting Policy ("**Wachovia's 2003 Black Box Accounting Policy**") dated June 2003 and its internal undated Purchase of College Street Funding A Certificate summary (the "**Purchase Summary**"), Wachovia was clearly aware that GAAP required the Black Box to issue a beneficial interest of *at least* 10% to an unaffiliated third party (represented by a Class A Certificate) and a beneficial interest of *at most* 90% to WBNA (represented by a Class B Certificate) to maintain the Black Box's QSPE status.

95.     WBNA made up a Class A Certificate/Class B Certificate ratio that conveniently "satisfied" the GAAP requirement, with WBNA then treating the Black Box under the accounting rules as an off-balance sheet QSPE in fraudulent reliance on Paragraph 36 of the FAS 140.  According to a Wachovia Sarbanes-Oxley Team –

Confidential – Process Narrative – CRES (the "**Wachovia SOX Process Narrative**") dated June 18, 2005 and other related Wachovia documentation because, as fraudulently documented, at least 10% of the fair value of the Black Box's beneficial interests were held by parties other than WBNA, its affiliates or its agents (the Class A Certificate was held by Amsterdam Funding Corporation, a commercial paper conduit arranged by ABN Amro), Wachovia took the accounting position that the Black Box was a "demonstrably distinct" QSPE from WBNA for GAAP purposes.   Wachovia therefore did not consolidate the Black Box on its balance sheet, in fraudulent reliance on Paragraph 46 of FAS 140 at FAS 140-40.  When WBNA "sold" a CRE loan to the Black Box, WBNA then derecognized the loan from its balance sheet for accounting purposes (*i.e.*, on the basis that the Black Box was a QSPE) – and by doing so, no longer tracked the CRE loan individually for risk management, internal control and accounting purposes.

96.    This accounting treatment was a sham because Wachovia's Finance department took steps – in total disregard of GAAP – to fabricate the market value of the Black Box's assets and/or the values of the Class A Certificate and the Class B Certificate to fraudulently "establish" that the Class A Certificate did not represent less than a 10% beneficial interest in those assets (*i.e.*, Wachovia manipulated the market value of the Black Box portfolio and/or reassigned the related values of the certificates in order to preserve the Black Box's "demonstrably distinct" QSPE status for Wachovia's self-serving accounting purposes.)   This was nothing short of fraudulent, reverse-engineered, results-driven accounting, where market values of portfolios and/or securities are calculated as needed to achieve a desired accounting outcome.  And this scheme was espoused – unbelievably – by Wachovia's own *financial control* department.

97.    As Relator Kraus witnessed first-hand, Wachovia's Finance department

performed a monthly, manual reconciliation of the aggregate market value of the CRE loans held in the Black Box for that month to line them up as necessary against the outstanding amounts of the outstanding Class A Certificate and/or the Class B Certificate, a highly manipulative and fraudulent approach to accounting in blatant violation of GAAP.  Indeed, Wachovia falsified documentation to make sure that the Class A Certificate never represented less than *11%* of the fair market value of the Black Box portfolio (apparently to maintain a "cushion") and Wachovia never deviated from that ratio (*i.e.*, to fraudulently preserve the Black Box's QSPE status).  If the fair market value of the Black Box and/or the sizes of the Class A Certificate and Class B Certificate did not line up correctly at any particular point in time, Wachovia would make manual entries in its records to actually get the numbers to line up appropriately for accounting purposes.  Wachovia would then, as needed, revise the Black Box's loan level schedules to dupe even Amsterdam Funding Corporation as to what it, in fact, owned.

98.     In respect of the Class B Certificate, pursuant to Paragraph 10 of FAS 140 at FAS 140-12, Wachovia had to "continue to carry in its statement of financial position any interest it continue[d] to hold in the transferred [CRE loans], including . . . beneficial interests in assets transferred to a QSPE in a securitization" upon the completion of the transfer of such assets; WBNA therefore recognized its holding of the Class B Certificate on its balance sheet.  By doing so, Wachovia managed to skirt GAAP rules once again – instead of booking the underlying CRE loans on-balance sheet as individual loans (as it should have), WBNA fraudulently relied on Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("*FAS 115*") to treat the Class B Certificate itself as a "debt security" in its trading account.  WBNA thereafter tracked the value of the Class B Certificate on a fabricated

mark-to-market basis (as substantiated in the August 1 Malter E-mail, Wachovia's 2003 Black Box Accounting Policy and a Wachovia RECM Finance Memorandum to December Close Files (the "**Wachovia RECM Finance Memorandum**") dated January 6, 2006) rather than tracking each individual loan as a separate, individual asset on its balance sheet.

99.     To be sure, Wachovia preferred this accounting treatment because it facilitated and enhanced the control fraud taking place at Wachovia:

•     Wachovia could now flagrantly and fraudulently originate CRE loans well in excess of the regulatory capital limitations that would apply if it had originated CRE loans and held them on-balance sheet in its CREF facility in accordance with the Applicable Laws and Regulations and GAAP.

•     WBNA now no longer individually tracked CRE loans warehoused in the Black Box for risk management, internal control and accounting purposes because WBNA fraudulently derecognized the CRE loans from its balance sheet when it purportedly "sold" them to the Black Box.

•     By booking the Class B Certificate as a security on-balance sheet in its "trading book" (as opposed to booking the individual CRE loans on-balance sheet in its "banking book") and tracking the Class B Certificate on a mark-to-market basis, Wachovia could fraudulently boost its financial reports and statements using an artificial and (to the extent possible given the need to maintain an appropriate Class A Certificate/Class B Certificate ratio) inflated market value for the Class B Certificate.  Had it held the CRE loans individually on-balance sheet in its "banking book," Wachovia would have been required to use a "lower of cost

or market" ("*LOCOM*") accounting treatment that would have to be determined on a per loan basis commencing at loan origination or purchase under GAAP, which would have led to drastically reduced valuations of the entire CRE loan portfolio. Moreover, WBNA now fraudulently treated the Class B Certificate "trading security" as a proxy for the individual CRE loans for risk management, internal control and accounting purposes, resulting in no granular review of the associated CRE loan risks.

• WBNA was able to immediately reduce its regulatory capital exposure by booking its holding of the Class B Certificate (*i.e.,* a trading book security) and not booking a warehoused CRE loan portfolio. (WBNA's regulatory capital exposure was reduced by at least 10% because the Class B Certificate represented, as manipulated, at most a 90% beneficial interest in the Black Box. For example, if the Black Box was approximately $6 billion in size on August 1, 2005, as noted in the August 1 Malter E-mail, WBNA's risk capital would have been calculated against only the $5.4 billion Class B Certificate (*i.e.*, only 90% of the $6 billion portfolio exposure of the Black Box). However, Wachovia attained through fraud a significantly greater regulatory capital reduction by treating the Class B Certificate as a "covered position" (*i.e.*, a "trading book" asset). By doing so, WBNA could deduct the *entire* covered position (*i.e.*, $5.4 billion) from its risk-weighted assets calculation (resulting in a substantially lower adjusted risk-weighted assets calculation) and hold only risk capital for the "market risk" that it ultimately *made up* in respect of the Class B Certificate, using its untested and unvalidated Trading Desk Model (*see* Paragraphs 135-152, *infra*.)

100. Even putting aside the manipulation of the Class A Certificate/Class B

Certificate valuations to improperly preserve the Black Box's QSPE status (which obviously violated GAAP), Wachovia also fundamentally violated *another* basic GAAP principle to make its fraudulent accounting treatment work – *none* of the CRE loans "sold" to the Black Box should have ever been derecognized from its balance sheet in the first place because WBNA never satisfied FAS 140's "true sale" requirements.

101.    Under GAAP, WBNA had to effect a "true sale" of the loans to the Black Box to be able to derecognize the loans.   When adopting FAS 140, the Financial Accounting Standards Board stated in Paragraph 5 of FAS 140 at FAS 140-8, "[A]n objective in accounting for transfers of financial assets is for each entity that is a party to the transaction to recognize only assets it controls [and] to derecognize assets only when control has been surrendered."  According to Paragraph 9(c) of FAS 140 at FAS 140-11, a transferor (in this case, WBNA) only surrenders control if it "does not maintain effective control over the transferred assets through…the ability to unilaterally cause the holder to return specific assets…"  *See also* FAS 140's commentary on control, which is extensive, in Paragraphs 32 and 33 and in Paragraphs 50 to 54 of FAS 140, which are quite instructive.

102.    The Federal Reserve explicitly acknowledged this long-standing fundamental principle of structured finance transactions in the Federal Reserve 2120.1 Guidance on page 6: "[FAS 140] requires that an entity surrender control to 'derecognize' the assets or take the assets off its balance sheet" and that control is surrendered only if "the transferor does not maintain control over the transferred assets through…an agreement that entitles the transferor to repurchase or redeem transferred assets that are not readily obtainable."

103.    In this case, WBNA used the Black Box as a holding facility and

selectively took back CRE loans in order to securitize them.  Simply put, WBNA never intended or attempted to surrender "effective control" over the CRE loans it purportedly "sold" to the Black Box.  Rather, WBNA unquestionably retained effective control over the CRE loans through its unilateral ability to cause the Black Box to return specific CRE loans to it for future CMBS deals.  In doing so, it violated the clear directive of FAS 140 when it derecognized the CRE loans upon their purported "sale" to the Black Box.

104.    Wachovia admitted the same in its June 2005 internal Wachovia Sarbanes-Oxley narrative concerning Black Box procedures, stating:

> After accumulating sufficient collateral to offer into a deal, the front office…engages the equity buyers…commonly referred to the "B-piece buyers" [of a CMBS transaction]….Once the B-piece buyers have selected the collateral they will allow into the securitization and the rating agencies have set the subordination levels[,] the front office conducts a "road show" to gauge market interest.  Concurrent with this, Finance, Wholesale Operations and the Servicing group communicate the loan level detail to the College Street Funding conduit.  These notes must be removed from the "black box" because they will need to be sold by Wachovia.  ***This is effected via failing a condition of sale under USGAAP that governs securitizations.***  This information is communicated typically at the same time as the normal monthly meeting for new notes to be included into the black box (emphasis added).

105.    Wachovia therefore materially misstated its financials for the entire period that it used the Black Box as an off-balance sheet financing facility – a period of no less than five years.  Wachovia's FAS 115 treatment of the Class B Certificate as a "debt security" was also clearly improper for both accounting and risk capital calculation purposes.  The Federal Reserve itself stated in no uncertain terms in the Federal Reserve 2120.1 Guidance on page 3 that "FAS 115 does not apply to loans, including mortgage loans, that have not been securitized" and, on page 5 thereof, that the "traditional model still applies to assets that are not within the scope of FAS 115" (*i.e.*, loans held in an asset held for sale account on-balance sheet must be accounted for under GAAP on a LOCOM

basis, as noted in the third bullet point of Paragraph 99, *supra*).

106.    WBNA should have valued each individual CRE loan on a LOCOM basis under GAAP (thereby necessarily limiting any inappropriate market value inflation that might arise in respect of the CRE loans, both individually and in the aggregate).  Yet Relator Kraus witnessed first-hand that personnel at Wachovia routinely inflated the market value of Wachovia's CRE loans to manipulate financial results in violation of GAAP.    Wachovia's senior management knew this was the case – in e-mail correspondence between Steve Young ("***Young***"), the Head of the Credit and Counterparty Risk Analytics Group for the CIB, and Frank Tippett ("***Tippett***"), a Director and Head of Hedging at WS, Young told Tippett that "[t]he spread in the spreadsheet that is circulated, I am told, is overstated and reflects our pricing and not where we would sell a loan."  Young also told another colleague that "we have loans on our books that have some market spread associated with them…I understand that the spread we see in the spreadsheet that comes around may be high and not reflect the spread at which the desk could sell a loan."

107.    Equally important, Wachovia failed to satisfy risk management protocols, internal controls and accounting rules in respect of the CRE loans that it parked in the Black Box, which included both originated CRE loans that it wanted to securitize *and* CRE loans that it could not get rid of and needed to hide from the light of day.  WBNA should have booked each CRE loan as an individual asset on its balance sheet, subjecting each individual loan to risk management, internal control and accounting scrutiny.  As a result of this failure, Wachovia also violated a myriad of other applicable regulations (*e.g.*, credit grading rules, limitations on exposure to single borrowers, etc.) that are premised on an institution actually being GAAP-compliant in accordance with Federal

law.

108.    In short, if each CRE loan had been booked on WBNA's balance sheet as an individual asset, Wachovia would have been *forced* to conduct granular reviews of each CRE loan for risk management, internal control and accounting purposes – something that Wachovia wanted to avoid at all costs.

109.    Given the impropriety of the accounting treatment of the Black Box, it comes as no surprise that Wachovia shrouded it in mystery and secrecy.  According to Relator Kraus, senior Wachovia personnel had many emergency closed-door meetings around December 2005 to address the on-going accounting issues relating to the Black Box, and in this context, Nelson was even heard shouting loudly on the floor, "Someone is going to go to jail and it's not going to be me!"   In connection with a pending accounting reclassification of the Black Box's loans, Malter went so far as to admit to Robert Rottmann ("**Rottmann**"), the Product Controller Group Head, in a December 1, 2005 e-mail (the "**Malter-Rottmann E-mail**") that "[y]ou must remember that the current [accounting] process is being held together with band-aids, spit and gum.  A 'strong wind' will cause the entire process to keel over and die."

110.    Wachovia abruptly shut down the Black Box in December 2005.  To effect a hurried closure of the Black Box, WBNA purchased the Class A Certificate on December 22, 2005 at its par value plus its cost of funding.  WBNA off-loaded whatever CRE loans it could into a CMBS transaction that closed around that time (*i.e.*, the Wachovia Bank Commercial Mortgage Trust Series 2005-C22 deal) so that Wachovia could try to avoid having a significant balance sheet event that would attract regulatory, shareholder and public attention.  Wachovia also concluded for GAAP purposes that the Black Box was no longer "demonstrably distinct" from WBNA because of its purchase of

the Class A Certificate; accordingly, as noted in Wachovia's RECM Finance Memorandum, WBNA recognized on-balance sheet the remaining CRE loans at their fabricated "fair market value" *as of December 28, 2005*.

111.    They say that the greatest trick the Devil ever played was convincing the world that he did not exist.   By making the Black Box simply vanish overnight, Wachovia cleverly convinced the world that this accounting fraud never took place, even though the damage caused by the Black Box was already done and now deeply imbedded in WBNA's balance sheet.   Rather than restating its previous financial reports and statements to reflect the fact that none of the CRE loans warehoused in the Black Box had, in fact, ever been actually sold to the Black Box (as a responsible, honest and law-abiding corporate citizen would do), WBNA instead treated its purchase of the Class A Certificate as the "accounting event" that brought the CRE loans back on its balance sheet.   In so doing, Wachovia conveniently and fraudulently reset the cost basis of the CRE loans to the inflated "fair value" of the loans as of December 28, 2005.   As detailed in the Purchase Summary, this means that Wachovia effectively locked in its inflated gains because LOCOM calculations going forward would be based on the lower of (i) the then-current market value of such loans and (ii) *the market value of the loans fixed as of December 28, 2005* (*i.e.*, the new, fabricated cost basis).

112.    Unfortunately, shutting down the Black Box in this convenient and expedited manner did not address the material problem that Wachovia and, post-merger, Wells Fargo would still have to face: the material, lasting and undisclosed negative impact that the fraud had on Wachovia's, and, post-merger, Wells Fargo's financial statements and financial health.   Wachovia had used the Black Box for five years to leverage and grow its risky CMBS business platform, and had taken on tens of billions of

dollars of additional CRE loan exposures without having sufficient regulatory capital set aside to account for such risks, having hidden them on-balance sheet in its CREF facility (*c.f.*, Paragraphs 119 to 134, *infra*) and off-balance sheet in the Black Box and in the Repo SPVs (*c.f.*, Paragraphs 113-118, *infra*).  Further, upon the closure of the Black Box, Wachovia took on-balance sheet billions more dollars of CRE loan exposures that had not been tracked from a risk management, internal control or accounting perspective for years, meaning Wachovia had absolutely no idea about what it was bringing on-balance sheet.  The only way that Wachovia and, post-merger, Wells Fargo could truly cure the ills that the Black Box had caused would be to significantly deleverage their financial positions in a very public way, which, of course, neither wanted to do.

### b.       The Repo SPVs

113.    Wachovia also entered into repo transactions with numerous smaller purportedly off-balance sheet Repo SPVs to keep an *additional* $4 billion to $6 billion of CRE loans off of its books in violation of GAAP and to bypass regulatory constraints that would have hampered Wachovia's unsafe and unsound leveraging of its securitization business.

114.    In a typical repo transaction, Party A sells an asset to Party B at a designated purchase price, and Party A agrees to repurchase that asset from Party B at a slightly higher price at some designated date in the future.  Both parties to the repo transaction agree at the start of the repo that until Party A's eventual repurchase of the asset, they will agree to a discount (or "haircut") to be applied to the value of the asset so that Party B is sufficiently "collateralized" for the period in which it owns the asset.  The asset is typically revalued daily on a mark-to-market basis, and if there is too little collateral on hand at any point in time given the then-current mark on the asset and the

designated haircut applied to that asset, Party A is required to provide some sort of additional collateral (*e.g.*, cash, U.S. Treasuries, etc.) to Party B to make up for the shortfall (thereby leaving Party B with sufficient collateral in the repo).  If, as a result of such valuation, there is too much collateral on hand at any point of time, Party B is required to provide liquid assets (*e.g.*, cash, U.S. Treasuries, etc.) back to Party A to reduce the amount of collateral on hand to the agreed upon level.  Repo transactions constitute a significant part of capital markets activity, and the mechanics, procedures, documentation and controls relating to repo transactions are very familiar to financial institutions, including, of course, Wachovia.

115.   Wachovia freely used repos in violation of the Applicable Laws and Regulations and GAAP to exponentially increase and leverage its securitization volume (and thereby increase its short-term profitability at the expense of its long-term financial health) and to hide toxic CRE loans from regulatory, risk management, internal control and accounting purview.  To effectively "create" a brand new repo market for its CRE loans where none existed, Wachovia incentivized customers with which it had a strong business relationship to create new Repo SPV "purchasers" for its CRE loans, with the customer putting up 10% of the funding of the SPV and Wachovia putting up the remaining 90% of the funding of the SPV (*i.e.*, if the SPV had $100, the customer would put up $10 and Wachovia would put up $90), thereby funding the Repo SPV to enable it to purchase CRE loans from WBNA.  The Repo SPV would "roll" repo transactions (*i.e.*, enter into back-to-back repo transactions) until Wachovia could either securitize CRE loans in a CMBS or collateralized debt obligation (CDO) transaction or otherwise sell such loans to third-party buyers.  (Using the example above, the Repo SPV would purchase a $100 CRE loan from WBNA on a specified date with an agreement from

WBNA that WBNA would repurchase that CRE loan from the Repo SPV for $101 on a date in the future.  They would enter into back to back repo trades until WBNA could find an outlet for its CRE loan, with the SPV effectively making $1 on each repo transaction roll.  This example does not incorporate a valuation/haircut concept because, contrary to normal repo practice and Wachovia's own internal repo guidelines, Wachovia did not perform any valuations on CRE loans that it sold to Repo SPVs.  In a normal repo transaction, the parties would perform a daily (or at least frequent) mark-to-market valuation of the asset subject to the repo and, depending on the valuation of that asset, one party might be required to pay the other party additional liquid funds if there was a market fluctuation in the value of the asset.  Because Wachovia knew its CRE loans had low market values given the lack of market appetite for the credit risk attributable to these loans, Wachovia did not want true, arms'-length mark-to-market valuations to take place in respect of its CRE loans.  Further, if Wachovia had to provide additional *liquid* collateral to the Repo SPVs in respect of the CRE loans because of actual mark-to-market valuations of the CRE loans – as would be typical in a market repo transaction – Wachovia's risk management and internal control personnel might raise troublesome questions in the context of Wachovia's liquidity management when Wachovia had to deliver liquid collateral to its Repo SPVs.)  *See* Appendix VII for a graphic representation of the Repo SPVs.

116.    Looking at the repo transactions from a purely economic perspective, they were win-win transactions for the customer and lose-lose transactions for Wachovia. Under the terms of each repo, Wachovia would agree to repurchase the "sold" CRE loans from the Repo SPV purchaser on a pre-determined date at a pre-determined higher price (*i.e.*, which would result in a "profit" to the Repo SPV which would be retained by the

Repo SPV and paid out to the customer).  However, in the event of a loss or a default on a CRE loan subject to a repo, Wachovia was always left holding the bag – Wachovia had three choices: (i) it could honor its repurchase commitment to the Repo SPV and repurchase the defaulting CRE loan upon termination of the repo (and thereby bear 100% of the CRE loan losses, assuming Wachovia did not just roll the repo again anyway); (ii) it could fail to honor its repurchase commitment and face suit by the Repo SPV on the terms of the repo (and thereby likely assume 100% of the loss on the CRE loan, pleasing the customer); or (iii) it could fail to honor its repurchase commitment, ensure that the Repo SPV (which it effectively controlled) would not sue under the repo transaction, and bear 90% of the loss on the CRE loan through its financing of the Repo SPV (with a now unhappy customer bearing 10% of the loss).

117.    From a control fraud and accounting fraud perspective, though, the repo trades were a clear win-win for Wachovia – using these repo transactions, Wachovia actually off-loaded $4 to $6 billion of retained CRE loan positions, keeping these loans effectively off of its books and away from regulatory, risk management, internal control and accounting purview.

118.    Like the Black Box, Wachovia's use of the Repo SPVs greatly facilitated the control fraud taking place at Wachovia:

•       Wachovia could now flagrantly and fraudulently originate CRE loans well in excess of the regulatory capital limitations that would apply if it had originated CRE loans and held them on-balance sheet in its CREF facility in accordance with the Applicable Laws and Regulations and GAAP.  Even though Wachovia *de facto* created, supported and controlled the Repo SPVs and knowingly retained the risks in the CRE loans it purportedly "sold" to the Repo SPVs, Wachovia

treated each Repo SPV as an off-balance sheet vehicle in violation of GAAP.

•       WBNA now fraudulently treated the repo trades as "trading book" assets and (like the Black Box's Class B Certificate) used the repo trades as proxies for the underlying CRE loans for risk management, internal control and accounting purposes, resulting, again, in no granular review of the CRE loans it "sold" to the Repo SPVs.  Wachovia also waived its own internal repo guidelines for repo transactions involving its CRE loans so that Wachovia's repo department would not somehow inadvertently re-apply risk management, internal control and accounting protocols to the CRE loans in the context of the repo transactions.

•       Because WBNA should have booked each CRE loan as an individual asset on its balance sheet, subjecting each individual loan to risk management, internal control and accounting scrutiny, Wachovia therefore also violated a myriad of other applicable regulations (*e.g.*, credit grading rules, limitations on exposure to single borrowers, etc.) that are premised on an institution actually being GAAP-compliant in accordance with Federal law.

•       Of course, Wachovia's knowing failure to apply repo trading standards, including market valuation and haircuts, to its repo trades with the Repo SPVs, enabled Wachovia to leverage its reckless securitization business even further. WBNA should have valued each individual CRE loan on-balance sheet on a LOCOM basis under GAAP (thereby necessarily limiting any inappropriate market value inflation that might arise in respect of the CRE loans, both individually and in the aggregate).  Instead, Wachovia routinely inflated the market value of its CRE loans by using the fictional repo purchase and repurchase price as a "market" price that was, of course, validated by the repo market that

Wachovia had created and effectively controlled.

### iv.    *Wachovia's Non-Existent Credit Grading System:  Extending its Fraud On-Balance Sheet*

119.    Wachovia also flouted the Applicable Laws and Regulations that required it to assign credit grades to its CRE loans (which had to be done no matter how long or how briefly they were held on-balance sheet) and to maintain a bank-integrated credit grading system in respect of those loans.  That Wachovia did so also comes as no surprise.  Had Wachovia complied with the Applicable Laws and Regulations in this regard, Wachovia's risk management, internal control and accounting processes would have exposed Wachovia's flawed CRE loan origination and valuation practices for what they were – practices that helped facilitate Wachovia's highly profitable but self-destructive "originate to distribute" model.

120.    Credit grading is critical to the risk management function of any bank. The Agencies noted in the Asset Securitization Guidelines on page 4 in 1999 that "[i]t is essential that the risk management function monitor origination, collection, and default management practices…[t]his includes regular evaluations of the quality of underwriting, soundness of the appraisal process…and the appropriateness of loss recognition practices."  Senior management and risk management staff were expected to be on the alert for "any pressures on line managers to originate abnormally large volumes or higher risk assets in order to sustain ongoing income needs."  Specifically, the Agencies wrote that the risk management function should "ensure that appropriate management information systems [("*MIS*")] exist to monitor securitization activities" because such pressures "can lead to a compromise of credit underwriting standards," which may "accelerate credit losses in future periods, impair the value of retained interests and

potentially lead to funding problems."

121.    The OCC also noted in its Rating Credit Risk Comptroller's Handbook (the "***Rating Credit Risk Handbook***") published in April 2001 on page 1 that "[h]ow a bank selects and manages its credit risk is critically important to its performance over time; indeed, capital depletion through loan losses has been the proximate cause of most institution failures."   Credit grades provide bank management and staff with primary source data that enables them to evaluate both loan-level and portfolio-level credit risk and, more generally, to assess whether the bank is employing safe and sound underwriting practices.   Well-managed credit grading systems generally promote bank safety and soundness by enabling bank management to make informed decisions. Through the credit grading system, a bank is able to measure its credit risk and, according to the OCC, "differentiate individual credits and groups of credits by the risk they pose," which, in turn, allows the bank (and its regulators) to "monitor changes and trends in risk levels."   Indeed, as noted by the OCC, credit risk ratings are essential to a number of important banking functions beyond just credit approval and underwriting; credit grading is necessary for, *inter alia*, loan pricing functions, allowance for loan and lease losses ("***ALLL***") calculations, capital adequacy calculations, and MIS integrity and effectiveness.

122.    The Agencies therefore required regulated institutions like Wachovia to implement a credit grading system that both assessed the credit quality of its loans and identified problem loans.   Under the credit grading system, originated or purchased loans were supposed to be assigned credit grades that reflected the risk of defaults and credit losses on such loans.   The OCC said in the Rating Credit Risk Handbook that "***all*** credit exposures should be rated" (emphasis added), that "the risk rating system should assign

an adequate number of ratings…to ensure that risks among pass credits…are adequately differentiated," and that "risk ratings must be accurate and timely."  *See also,* the Agencies' Interagency Policy Statement on the Allowance for Loan and Lease Losses (the "***Interagency ALLL Policy***") dated December 13, 2006 on pages 6 and 17 and, more generally, Attachment 1 thereto.

123.    A regulated institution like Wachovia was required to maintain written descriptions explaining why particular credit grades were assigned to particular loans and a discussion of the factors used when assigning the credit grades to such loans.  The Rating Credit Risk Handbook explicitly stated on page 4 that "the rating assigned to a credit should be well supported and documented in the credit file."  Of course, as also noted in the Rating Credit Risk Handbook, a credit grading system is only useful if it is integrated into the bank's overall MIS and available to its risk management operations, forming a foundation for credit risk measurement, monitoring and reporting.  Even Wachovia's Policy/Guidelines/Procedures relating to Credit Grades ("***Wachovia's Credit Grade Guidelines***") dated June 2005 gave lip service to the applicable regulations, noting that a credit grading exercise must be performed in connection with CRE loan origination.

124.    Yet Wachovia intentionally and knowingly violated the Applicable Laws and Regulations and its own written policies by failing to assign credit grades to the CRE loans it held on-balance sheet in its CREF facility and not maintaining a bank-integrated credit grading system.  Young inadvertently documented this fact when he initiated an important internal discussion about how Wachovia tracked specific risk and value-at-risk ("***VaR***") for CRE loans held on-balance sheet.

125.    On July 29, 2005, Young commenced the discussion by writing an e-mail

to a colleague, stating that "in trying to capture all CMBS Jing Tang also gets a file from Cref [sic] (I am guessing that this stand [sic] for commercial real estate finance or something along these lines) which is another system that houses 'CMBS.' In speaking with a trader about Cref, [sic] Alex was told that these positions are not really 'CMBS' but rather loans." Young continued, "I am merely guessing but are these loans where the underlying assets are commercial real estate and the trader manages the risk (i.e. hedges) and we also at some point pool these and sell them or create true CMBS?" Young concludes his e-mail with a suggestion that credit grades may not exist for these CRE loans. He asked, "*if they are loans* is there any logical way to place a rating on them as the default is BBB which results in a large move in the specific risk value and the loans may be of better quality?" (emphasis added)

126.   Young was clearly unable to find credit grades for the CRE loans Wachovia held in the CREF facility because he forwarded his July 29th e-mail to Keith Schleicher ("*Schleicher*"), Managing Director and the Head of Credit Risk Management, on August 1, 2005 to see if Schleicher could provide him with the credit grades for the loans in the CREF facility. He told Schleicher, "[F]or specific risk (this is a VaR type calculation) we need to know what the portfolio ratings look like and these ratings can be either internal gradings or 3rd party (i.e. S&P or Moody's). This is extremely important as we have been told to include all CMBS in the calculation of specific risk and cannot currently map these loans. For non-mapped assets the specific risk model assumes BBB…"

127.   As the Head of Credit Risk Management ("*CRM*"), Schleicher was responsible for signing off on all of the credit grades for the CRE loans originated or purchased by Wachovia's Commercial Real Estate Finance division. He was also

responsible for ensuring that the CRM department attached grading worksheets to finalized credit documentation relating to such loans in accordance with the Applicable Laws and Regulations and Wachovia's Credit Grade Guidelines.  Schleicher was certainly in the best position to know how each CRE loan held by Wachovia was graded and where Wachovia maintained such information.  (Malter himself told Young in the August 1 Malter E-mail that "either CRM [*i.e.*, Schleicher's department] or our external Rating Agencies performs underwriting/risk rating ***for each loan*** and should be able to provide you with the rating of ***each loan*** in the reference pool," in part because "CRM needs to approve the funding of the loan (via the 1146 process)" (emphasis added).)

128.    Rather than simply telling Young where the credit grades assigned to the CRE loans could be found, Schleicher told Young to assess credit risk in respect of individual CRE loans as if they were part of a "hypothetical" CMBS transaction in which 87.5% of the loan pool was rated AAA by the rating agencies.  Of course, the loans were not part of any securitization at that time – they were individual CRE loans held on WBNA's balance sheet *prior to securitization* and there was no guarantee that a securitization could even be effected with these loans, some of which Wachovia could not off-load into the market.  Treating 87.5% of each loan as if such part of such loan represented a AAA-equivalent level of credit risk defies all logic, especially from any heightened credit risk management perspective.   Yet Schleicher memorialized this conversation in an e-mail he wrote to Young on August 1, 2005 (the "***August 1 Schleicher E-mail***"), and even Schleicher implicitly admitted the artifice of this approach by stating he hoped he "shed a little bit of light" on the current "CREF loan/CMBS warehouse" and the typical CMBS capital structure *at execution*.

129.    Young received the same analysis from Tippett in a contemporaneous e-

mail exchange.   Like Schleicher, Tippett did not provide Young with the credit grades assigned to the CRE loans; rather, he similarly told Young to treat 87% of each CRE loan as AAA-level credit risk because each CRE loan in the portfolio, on a hypothetical aggregated portfolio basis, reflected that level of credit risk (using data obtained from Wachovia's latest CMBS transaction).  Of course, the percentage of AAA-rated risk in a completely separate securitization with entirely different CRE loans bore no direct relationship to the individual CRE loans at issue (some of which might *never* be securitized) or even a CMBS transaction that might be consummated in the future when the markets changed.  He even suggested in this e-mail that Young have Wachovia "build a model that replicates the rating agency process" to determine the "credit ratings on loans."

130.   The reason both Schleicher and Tippett suggested that Young use this inaccurate, shorthand, unsafe and unsound approach to credit assessment is simple: Wachovia simply did not assign credit grades to its CRE loans.   While Tippett's comment to Young that he "build a model" may have been a dismissive brush-off, Christine Li ("*Li*"), who worked in Wachovia's market risk group, was far more blunt in her assessment, stating that Wachovia "need[ed] to estimate rating[s] for each loan position before securitization" because "these loans are not rated."   Young even concluded at the end of his inquiry that "these [loans] are not all internally rated likely because of the short-term holding period prior to securitization."  Of course, the *duration* for which an asset is held on-balance sheet is not determinative of whether an internal credit rating should be assigned to that asset; rather, under GAAP, an institution must assign credit ratings to a loan *if* it is on-balance sheet (*i.e.*, irrespective of the time on-balance sheet).

131.    At one point, Relator Kraus and Jason Schweigerath ("*Schweigerath*"), a colleague of Relator Kraus in the Finance division, even requested schedules detailing 1146 and credit memo credit scoring for CRE loans held on-balance sheet as well as rationales for borrower default grades, facility default grades, and loss given default grades – and they were told no such information was available.    Relator Kraus, Schweigerath and yet another Finance department colleague, Wes Thompson ("*Wes Thompson*"), actually sat down with Schleicher to discuss loan level specific risk scoring and portfolio credit risk aggregation methodology, and Schleicher explained that he – *the Head of CRM* – had no experience with specific risk scoring and that Wachovia did not apply *any* loan level credit scoring procedures or credit support pricing methodology within its approval and deal pricing processes.

132.    Relator Kraus summed up the problem rather eloquently (albeit technically) when he told Malter in a November 1, 2005 e-mail:

> [I] spoke with Steve Young earlier today about this exact item.  I raised this question with you last week over whether or [n]ot you saw the scope of my role as including a valid concern and interest in how our business units' approach and [m]easure specific risk & credit exposure.  ***How we integrate the relationship between pricing methodology and [c]redit scoring processes determines our capacity to systematically perform mark to market drill down assessments [a]nd establish proactive marks within our held balance sheet and off balance sheet warehoused positions*** (emphasis added).

Of course, Relator Kraus was told by senior Finance department personnel to no longer concern himself with this issue.

133.    Wachovia's failure to assign credit grades to its warehoused CRE loans is certainly not a trivial matter; in fact, it helps explain why the institution was doomed to fail long before the advent of the financial crisis.  Without the credit grades, Wachovia's risk management personnel had no possible way of determining the credit risk attributed

to the CRE loans it held on-balance sheet in its CREF facility, which, according to Wachovia's Structured Products CREF Monthly Review dated August 31, 2005, equaled approximately *$4.141 billion* at that time. (This is *in addition* to the $6 billion CRE loan portfolio fraudulently held off-balance sheet in the Black Box *and* the $4 to $6 billion of CRE loans fraudulently held off-balance sheet in the Repo SPVs around that same time.) As a result, there was no conceivable way for Wachovia to accurately price its warehoused loans, assess credit and market risks relating to those loans, or even correctly calculate ALLL and other capital reserves for such loans (which clearly violates regulatory guidance contained the Rating Credit Risk Handbook that states that "[e]very credit's inherent loss should be factored into its assigned risk rating with an allowance provided either individually or on a pooled basis. The ALLL must be directly correlated with the level of risk indicated by risk ratings. Ratings are also useful in determining the appropriate amount of capital to absorb extraordinary, unexpected credit losses.") Simply put, Wachovia had no idea of what it was holding on-balance sheet.

134.    Because Wachovia did not assign credit grades to its CRE loans, earning substantial profits through its self-destructive "originate to distribute" model was truly child's play. The credit department could fund poorly underwritten but highly profitable loans without even having to satisfy a blush test, and it would not have to explain any of its bad credit decisions because none were ever documented. However, in so doing, Wachovia also reduced its risk management, internal control and accounting functions to the equivalent of another children's game – Wachovia clapped its hands over its ears, eyes and mouth until it was rudely awakened by its dramatic fall in 2008.

   *v.*    ***Using Untested and Unvalidated Models to Fabricate its Financial Results***

135.   The OCC issued OCC Bulletin 2000-16 entitled "Risk Modeling" (the "**OCC Modeling Guidance**") on May 30, 2000 to Chief Executive Officers and Compliance Officers of all National Banks, Department and Division Heads and All Examining Personnel (including WBNA) concerning a bank's use and validation of models to estimate risk exposures, analyze business strategies and estimate fair values of financial instruments.   The objective of this guidance was, according to the OCC, to "help financial institutions mitigate potential risks arising from reliance on computer-based financial models that are improperly validated or tested."   The OCC warned national banks on page 2 of that guidance that developing a model is "a complex and error-prone process" requiring "considerable judgment and expertise to apply model results outside of the narrow context under which they are derived."   The OCC recognized that when a bank's management relies on erroneous price or exposure estimates, or on an overly broad interpretation of model results, there is a potential for large losses that could have serious consequences for the bank's reputation and profitability.

136.   As part of that guidance, the OCC defined models as "abstract representations of the various relationships among events and values in the real world…used in banking to estimate risk exposure, analyze various business strategies, and estimate fair values of financial instruments and acquisitions."   A model consists of three specific components: (i) an information input component, which delivers assumptions and data into the model; (ii) a processing component, which contains the theoretical model and transforms inputs into estimates via the computer instructions (*i.e.*, the code); and (iii) a reporting component, which translates the mathematical estimates into useful business information.

137.    The OCC required banks to mitigate the risks associated with using models by engaging in "sound model building" and adopting rigorous procedures for "model validation" that addressed all three components of a bank's model.  The OCC also acknowledged on page 8 of the OCC Modeling Guidance that a bank's use of an unvalidated model to manage risk could constitute an unsafe and unsound banking practice.

138.    According to the OCC Modeling Guidance, to validate a model, reviewers would have to independently verify the model's logical and conceptual soundness, with (i) comparisons being made against other models and (ii) actual model predictions being compared to subsequent real-world events.  Reviewers of the model also had to be as independent as possible from the persons who constructed the model and, before the model could "enter production" (*i.e.*, be used to provide outputs), the reviewer of the model was required to: (i) document that model validation tests had been performed; and (ii) state the reasons for concluding that the model was valid.  The bank's internal audit personnel were also required to verify that no models entered production at the bank without formal approval by a reviewer.

139.    In addition, after the model produced outputs, model developers and validators were expected to compare the model's results against those of comparable models, market prices, or other available benchmarks, and model estimates needed to be continually compared to actual results through "back testing", "out-of-sample testing" and other similar procedures.  The importance of model validation and testing in the context of fair market valuations is perhaps best expressed by a statement in the Asset Securitization Interagency Guidelines on page 3: "a fair value estimate must be based on the best information available in the circumstances and an estimate of fair value must be

supported by reasonable and current assumptions. *If a best estimate of fair value is not practicable, the asset is to be recorded at zero in financial and regulatory reports*" (emphasis added).

140.    Wachovia knowingly and flagrantly violated the OCC model directive when it used Tippett's models (collectively, the "***Trading Desk Model***") to calculate the fair value of, *inter alia*: (i) the funded and rate locked CRE loans warehoused in the CREF facility and (ii) the Class B Certificate of the Black Box, and to estimate risk exposures and analyze business strategies in respect of such assets.  Wachovia's senior management took great pains to ensure that the Trading Desk Model did not undergo the rigorous validation procedures needed to satisfy the OCC directive because they knew the Trading Desk Model – which was also instrumental to the control fraud taking place at Wachovia – would invariably fail validation.  Further, Wachovia did not bother verifying the financial outputs produced by its Trading Desk Model – had it done so, Wachovia could not have perpetuated the lie that its securitization business was operating in a truly profitable manner.

141.    The Trading Desk Model comprised a securitization model component and a hedging model component.  As substantiated in: (i) e-mails among various Wachovia personnel, including Nelson, Schweigerath, Cortney McComiskey and Pete Carlson ("***Carlson***"); (ii) a Wachovia RECM Finance memorandum to Accounting Policy ("***Wachovia's RECM Accounting Policy Memorandum***"), dated February 10, 2005; and (iii) the Malter-Rottmann E-mail, Wachovia used the securitization model component to determine (and essentially fabricate) the mark-to-market value of the funded and rate-locked CRE loans warehoused in the CREF facility and the mark-to-market value of the Black Box's Class B Certificate.  According to the Malter-Rottmann E-mail and

Wachovia's RECM Accounting Policy Memorandum, Wachovia loaded funded and rate-locked loan data into the securitization model along with various market parameter values that Wachovia derived from previous securitization deals (*e.g.*, subordination levels, interest rate curves, credit and swap spreads and servicing costs).

142.    The Trading Desk Model therefore worked off of three highly unrealistic assumptions that were even identified by Malter in the Malter-Rottmann E-mail: (i) that a securitization of the related CRE loans would occur immediately, having the exact same market parameters that were used in prior deals; (ii) that no variance pool loans were included in the portfolio; and (iii) that no price concessions were provided in respect of the loans.

143.    According to the Malter-Rottmann E-mail and Wachovia's 2003 Black Box Accounting Policy, after processing the inputs in the Trading Desk Model, Wachovia posted the outputs (*i.e.*, the mark-to-market valuations of the funded and rate locked CRE loans in the CREF facility and the Class B Certificate) in WBNA's general ledger for financial reporting purposes.  Also according to the Malter-Rottmann E-mail, the hedging model component calculated Wachovia's market risk exposure to the funded and rate locked CRE loans in the CREF facility and the Black Box's Class B Certificate. Wachovia used the outputs derived from the hedging model component to hedge its market risk exposure, and Wachovia similarly posted its profit and loss calculations relating to its hedging activities on WBNA's general ledger for its financial reporting purposes.

144.    Wachovia knew that its Trading Desk Model was gravely deficient. Malter wrote in the Malter-Rottmann E-mail that "[the Trading Desk Model] is weak and full of simplifying assumptions.  For instance, I believe that it is flawed because the

model assumes a well diversified portfolio.  Subordination levels are not adjusted for lumpy portfolio with borrower or property type concentrations.  In addition, it is not clear how rate locked loans are valued; it appears that all loans are valued on the same spot basis…CIB Finance has lived with this process due to the high velocity in the warehouse and the strict variance pool policy."   (However, as Relator Kraus also witnessed firsthand, CRE loans that should have been in the variance pool "per the strict variance pool policy" referenced by Malter were routinely kept in the CREF facility because moving them would raise internal red flags.)  Based on correspondence among Nelson, Carlson, Tippett and Li, both Nelson and Tippett were also clearly aware that the Trading Desk Model was deficient for use in financial reporting.

145.   But despite these known and material deficiencies and OCC guidance issued as early as 2000, Wachovia used the Trading Desk Model from at least 2003 to at least mid-2006 because it helped Wachovia create a financial fiction that it was operating a highly profitable securitization business.

146.   Not surprisingly, Wachovia's risk management and internal audit departments never validated the defective Trading Desk Model – in direct contravention of the OCC model directive.  Wachovia implemented the Trading Desk Model on or before June 2003, but Wachovia's internal audit department only notified Nelson and Schweigerath that the Finance department was "expected to have initiated the process of having the [Trading Desk Model] meet the model risk policy" almost a year later in May 2004 (*i.e.*, *four years* after the OCC guidance was issued).

147.   Nelson (who, incredibly, had never heard of a model review committee) informed Malter on May 7, 2004 via e-mail that the Trading Desk Model had to be reviewed.  Malter passed the buck on the inquiry to Talal Hamadah ("***Hamadah***"),

stating in another May 7, 2004 e-mail that "we need to have the pricing models reviewed [and] [t]o the best of my knowledge, you're [sic] quantitative team is the only group which review [sic] models within Wachovia." In response, Hamadah declined to validate the Trading Desk Model because the quantitative team "only validate[d] and approve[d] models used for marking-to-model" (a confusing response, as the Trading Desk Model was, in fact, a model used to mark to model the modeled portfolio of funded and rate-locked CRE loans in the CREF warehouse and the Class B Certificate) and did not validate "securitization models" (possibly meaning spreadsheets used by the bank for the purpose of structuring actual securitization transactions, which is not what the Trading Desk Model did). Hamadah said he would inquire in May 2004 as to whether the Trading Desk Model was "material" to Wachovia, but acknowledged on May 18, 2004 that the model risk committee ran out of time to consider the Trading Desk Model that month.

148.   Several more months would pass before anyone at Wachovia paid attention to the Trading Desk Model again. Finally, Douglas Gardner ("**Gardner**") of Wachovia's market risk department picked up the ball in December 2004 when he sought documentation on the Trading Desk Model in an e-mail to Malter. This time, Malter referred Gardner back to Nelson and Tippett for further details. This discussion appears to have been a dead-end, too, given that Wachovia danced around the issue of whether the Trading Desk Model required validation for another *year and a half* before finally "deciding" that it needed validation consistent with Agency guidelines that were issued almost *six years* earlier in 2000. This was a pretty significant (and helpful) oversight: using the numbers cited in the August 1 Malter E-mail, this means Wachovia's untested and unvalidated Trading Desk Model calculated the fair market value of approximately

*$10.141 billion* of CRE loans (*i.e.*, the $4.141 billion of CRE loans in the CREF facility and the $6 billion CRE loan exposure in the Black Box) – or roughly the equivalent of a massive *21.5%* of the total equity capital of WBNA around that time.  In truth, the Trading Desk Model was actually used to calculate the fair market value of *billions more* dollars of assets (*c.f.*, Paragraph 194, *infra*).

149.   Management conveniently and cleverly downplayed the significance of the Trading Desk Model to facilitate its continued inappropriate use in financial reporting.  Tippett and others at Wachovia characterized the Trading Desk Model in e-mails as only a "spreadsheet" or "Excel file" that was not a "model" for OCC purposes.  Nelson even had the audacity to tell one employee, Carlson, that that the Trading Desk Model's "primary use [was] for internal tracking metrics," even though e-mails clearly show that he knew full well that the outputs of the Trading Desk Model were actually posted in WBNA's general ledger and used for financial reporting purposes.  Wachovia had an easy enough time facilitating the use of the Trading Desk Model without validation because of the intentional lack of communication between its trading desk and Wachovia's risk management group (*c.f.*, Paragraph 193, *infra*).

150.   In a March 23, 2006 e-mail, Wachovia's risk management group finally acknowledged that the Trading Desk Model was a model that required validation in accordance with the OCC directive because Wachovia used it for financial reporting purposes.   Steve Friedman ("***Friedman***") asked a working group, "[d]oes this 'model' need to be validated by [Market Risk Management]…to allow Finance to attest to the quarterly financial results?" to which Adam Litke ("***Litke***"), the Head of Risk Management, responded, "yes – please contact Doug Gardner for details on validation."

151.   But according to Relator Kraus, the Trading Desk Model was not

validated even after Litke, Gardner and the risk management group got involved because Sam Solie ("*Solie*"), the Chief Operating Officer of RECM, took charge of the working group and effectively prevented any substantive changes to the Trading Desk Model in January 2006. Solie was successful in his efforts – the Trading Desk Model continued to be used *without validation* as late as May 31, 2006, when Relator Kraus was placed on administrative leave.

152.   Although a model by any other name is still a model, Wachovia played a clever semantic game with respect to the Trading Desk Model to facilitate the control fraud. Wachovia originated CRE loans of lower and lower credit quality but continued to report record profits, using inflated Trading Desk Model valuations to ride the crest of the soon-to-fail securitization markets.  When the securitization markets finally crashed, Wachovia's financial reports and statements, full of sound and fury, signified nothing, and Wachovia knowingly made false and fraudulent certifications to the Federal government for critical liquidity lifelines claiming that it, too, had succumbed to market forces beyond its control.  Nothing could be further from the truth – Wachovia's downfall was a direct result of unbridled hubris, a lack of functioning risk management, internal control and accounting processes, and outright control fraud.

### vi.   *Originating Loans of Poorer and Poorer Quality*

153.   To leverage off of its massive accounting fraud further to increase its securitization volume and short-term profitability even more, Wachovia continued to extend more and more CRE loans of lower and lower credit quality, with the hope that it would dump these toxic CRE loans into securitization transactions.  If it could not dump them, Wachovia knew it could somehow bury them on- or off-balance sheet (*e.g.*,

through the Black Box, via a repo transaction with a Repo SPV or even hiding them on-balance sheet in the CREF facility without any credit grades).  Despite these games, however, Wachovia also knew it could never escape the toxic risks associated with the origination of these CRE loans, and, as such, with each extension of a new CRE loan in this manner, Wachovia moved one step closer to its collapse.

154.    Wachovia therefore happily cornered a market share that no other competitor ever wanted – providing prospective customers with financing at or above the value of the property being financed, even on CRE deals fraught with significant credit risk.  In this manner, Wachovia could exponentially increase its short-term profitability through the high fees it generally earned on risky extensions of credit and the even higher fees it earned when it dumped CRE loans into the securitization markets.

155.    Wachovia routinely "beat" the competition by making these types of loans when the competition, considering the risks, would not – word of mouth on Wall Street was that Wachovia was the place to go if you wanted advantageous financing terms for your CRE deal.   Where Wachovia's competitors turned away CRE deals because extending those loans would violate the Applicable Laws and Regulations, Wachovia funded them – even providing generous financing terms to boot.

156.     Wachovia extended questionable CRE loans in the following ways, among others:

### a.        *Structuring Around Loan to Value Limits*

157.    Under applicable regulations, Wachovia's CRE loans could not exceed certain specified "supervisory" loan-to-value ("***LTV***") limits.  An LTV is calculated by dividing the principal balance of the loan secured by the related property by the "value"

of such property.  For the CRE loans that Wachovia extended, the supervisory LTV limit was no more than 80% (*i.e.*, the LTVs for these CRE loans had to be at 80% or less).

158.    To attract more business from customers and to lock out the competition, however, Wachovia provided prospective customers with funds in excess of the supervisory LTV limits.  To do this, Wachovia extended a "senior loan" and multiple "subordinate loans" to borrowers, with (i) the "senior loan" being secured by the value of the property (and Wachovia referencing it as evidence of its "satisfaction" of supervisory LTV limits) and (ii) "subordinate loans" being extended to the same borrower on an unsecured basis (and therefore not referencing them for LTV calculation purposes).  (Of course, billions of dollars of subordinate CRE loans were held off-balance sheet in the Black Box and the Repo SPVs.)

### b.    *Manipulating "Value"*

159.    Because the senior loan's LTV had to be at or under 80% for regulatory purposes, Wachovia knowingly and willingly used misleading and inaccurate data to increase the "value" of the property.  Alternatively, Wachovia would reverse-engineer the "value" of the property through aggressive appraisals to obtain a senior loan LTV of 80% or less.

160.    For example, Wachovia made an extension of credit to One Oliver Associates Limited Partnership (the "***One Oliver Transaction***") in connection with the borrower's purchase of an office complex property.  The funding was structured as a $40 million senior loan, with an additional $12 million being provided by Wachovia through two subordinated loans, and an additional $8 million being provided by a Lehman Brothers Inc. entity (together with its affiliates, parents and subsidiaries, "***Lehman***

***Brothers***") that already had amounts owed to it in respect of the property.  In an e-mail written by Robert Verrone ("***Verrone***"), head of the CIB's Large Loan Group, *less than two months after closing in a stable market*, Verrone acknowledged that there were too few leases on the property to substantiate Wachovia's valuation of the property for LTV purposes and that the "true" value of the property was only $40 million (which, of course, was the size of the *entire* senior loan (*i.e.*, a 100% LTV)).  One of Wachovia's more honest, diligent and responsible employees, Carolyn Hubach ("***Hubach***"), confirmed in another e-mail that the value of the property was actually only $40 million and that Wachovia had lent $52 million against it.  In effect, according to Hubach's analysis, Wachovia provided the borrower in the One Oliver Transaction with well over 100% financing through its senior note, notwithstanding the 80% LTV supervisory limit.  As another example, in a separate financing relating to malls located in Macon, Georgia and Burlington, North Carolina (the "***Macon-Burlington Loans***"), Hubach acknowledged in an e-mail that the Macon-Burlington Loans had an actual LTV of at least 90%.

161.    Wachovia also intentionally used outdated financial data to increase the value of the property even though Wachovia had more recent, albeit less helpful, financial data that supported a lower valuation.  For example, Wachovia provided funding to seven Double Tree Hotels on or around June 30, 2005, including one property in Phoenix, Arizona and another in Tyson, Virginia.  When two of these properties were "non-performing" *within six months of closing in a stable market*, Relator Kraus questioned Schleicher to find out why.  Schleicher informed Relator Kraus that Wachovia's credit department intentionally used outdated financial data from rent rolls relating to these two properties to increase the value of the properties for LTV purposes to enable the transaction to be funded, even though it had more recent rent rolls that were

less "helpful" and did not support such an extension of credit.  In other words, of the current rent rolls Wachovia had for each of the seven Double Tree Hotel properties in that deal, Wachovia's credit department selectively used the most recent "helpful" rent rolls for five of the properties, discarded the two most recent "unhelpful" rent rolls for the Phoenix and Tyson properties, and used instead two *outdated* "helpful" rent rolls for those properties, to document internal credit approval for that deal.

### c.    Limiting Customer and Borrower Recourse

162.    Where the actual value of a property could not possibly support the repayment of a related subordinate CRE loan (and, quite possibly, even the related senior CRE loans), no rational customer would be willing to assume an obligation to repay Wachovia for the extension of such subordinate CRE loans.  Accordingly, in transactions like the One Oliver Transaction and a transaction involving Dobie Austin LP, a private dormitory next to the campus of University of Texas at Austin, (the "***Dobie Center Transaction***"), Wachovia offered customers "recourse-free" loans by extending the subordinate loans to newly-created and minimally-capitalized SPVs created and controlled by the customers themselves.  In effect, Wachovia would have to seek repayment from a shell entity in the event of a default of a subordinate CRE loan.

163.    Moreover, to sweeten the deal for its customers, Wachovia incredibly limited its recourse to the SPV to only specific circumstances, such as intentional misapplication by the SPV of loan or casualty insurance proceeds (*e.g.*, severely limiting Wachovia's recourse to *only* damages Wachovia sustained arising out of the SPV's possible fraud in using loan proceeds (*i.e.*, failing to buy the commercial property or to properly apply holdback reserves) or to moneys the SPV might collect from an insurance

carrier for fire or other casualty damage on the underlying commercial real estate property). Wachovia's credit documentation failed to explain how the SPV could repay the subordinated CRE loans (which were ignored for LTV calculations) other than through income generated from the property, given that the SPV did not have any cash or any recourse to a credit worthy line of credit or guarantee.

### d. Paying Customers Kickbacks for Business

164. On several occasions, Wachovia paid loyal customers kickbacks for doing business with Wachovia, through improper and unnecessary payment of brokerage fees, placement fees and other fees or amounts, when no related services were provided. For example, in the Dobie Center Transaction, Wachovia paid a brokerage fee of $365,250 to an affiliate of the borrower, Carlton Advisory Services, Inc., when no true brokerage services were provided (*i.e.*, Wachovia effectively paid the borrower a "broker's fee" for arranging a loan for itself). As another example, Verrone released half a million dollars from a "holdback reserve" to the borrower of the One Oliver Transaction after that deal closed, in direct violation of Wachovia's own loan transaction documentation and express credit department requirements. Even though Verrone was separately questioned about the appropriateness of such release of funds by both Relator Kraus and another Wachovia employee, Robert Uhlin ("**Uhlin**"), Verrone ordered the release of funds and had senior management silence Relator Kraus and Uhlin about the issue.

### e. Concealing Unsupportable Credit Decisions in Poor Loan Documentation

165. On several occasions, Wachovia provided funding for CRE loans that it knew it could not and should not have funded if it wanted to comply with the Applicable Laws and Regulations and its own policies. To facilitate extensions of credit for such

loans, Wachovia significantly relaxed its loan documentation practices and credit underwriting practices, effectively burying the obviously unsupportable credit decisions in inaccurate, confusing and misleading loan documentation.

166.    Wachovia's credit department executed a completed "1146" credit document prior to an extension of credit of a CRE loan to a prospective borrower. However, on clearly questionable extensions of credit – many of which were originated through Verrone's Large Loan Group because they generated the largest fees when securitized – Wachovia intentionally abandoned loan documentation and credit underwriting practices because adherence to such practices would result in the CRE loans not being made (and short-term profits not being earned).

167.    For example, in the Dobie Center Transaction, Wachovia's 1146, among other things: (i) misidentified the student dormitory property as a "multi-family residential property" (thereby concealing from the credit department that it needed to consider risks particular to student housing); (ii) failed to account for losses attributable to it being student housing that would necessarily affect the value of the property (had the 1146 done so accurately, the borrower would have failed to meet the credit department's debt service coverage requirements at closing, resulting in a denial of the loan); (iii) showed that Wachovia's credit department only authorized $60,875,000 of funding, but that Wachovia had actually funded $62,330,000 to the borrower (*i.e.*, Wachovia effectively made a "gift" of $1.455 million to the borrower that was not discussed in the loan documents or the credit approval package); and (iv) acknowledged that in this particular transaction, Wachovia would earn only $5,000 in fees for a $60,875,000 extension of credit, without any explanation as to why this was the case.  (The fees charged for this loan are a good indication that something was amiss about this loan – the

Large Loan Group typically earned millions of dollars in fees for the loans it extended. In this deal, there is no credit explanation whatsoever in the related 1146 as to why Wachovia extended $62,330,000 on a loan that was authorized for only $60,875,000 for a *de minimis* underwriting fee that probably did not even cover Wachovia's own internal cost to extend that loan.   Indeed, the loan documentation for the Dobie Center Transaction was so poor that Schleicher – again, the Head of CRM – acknowledged to Relator Kraus *just two days after closing* that he did not even know that the CRE loan was backed by a student housing center.   Putting aside the larger question of why Wachovia made this loan, there is no basis whatsoever from a credit perspective for Wachovia's credit department to have approved this loan.)

168.   Yet, as part of its fraud, Wachovia was careful to "fix" documentation discrepancies after extending a CRE loan if it knew that such discrepancies would be discovered when the loans were marketed to third parties for related securitizations.  (To make informed credit decisions relating to a securitization, a prospective securitization investor typically receives material information relating to the contractual debt forming the asset base of the securitization, with the investor evaluating the likelihood that he will continue to be paid from the securitization based on the characteristics of the underlying contractual debt.)  For instance, in the Dobie Center Transaction, only two weeks after closing, Wachovia prepared a securitization document for prospective securitization investors to review, at which time Wachovia corrected numerous credit deficiencies in the securitization document that remain in its original credit underwriting file.  Wachovia knew that although sub-standard credit analysis, review and diligence was sufficient for its own credit committee and, therefore, its own balance sheet, at least *some* reasonable credit due diligence needed to be fabricated when it wanted to pawn off such CRE loans

into the market.

169.    As another example of Wachovia's intentional use of poor loan documentation to approve questionable loans, Wachovia extended a $650 million financing to the Alliance Group for the recapitalization of an asset pool of 38 garden-style apartment units (the "***Alliance Loan***").  The financing was secured by two pools of properties: "Pool A" properties comprised of 7,712 units and "Pool B" properties comprised of 3,831 units.  Wachovia's internal documentation acknowledges that the borrower of the Alliance Loan was expected to repay its debt solely by: (i) improving the Pool B properties; (ii) selling them at a profit; (iii) using some of the proceeds of such sales to pay down the debt for Pool A properties; (iv) using the remaining proceeds to improve Pool A properties; and (v) selling the Pool A properties at a profit to repay the Alliance Loan.

170.    However, based on Wachovia's Alliance Loan credit documentation, Wachovia's credit department reached the incredible (and improbable) conclusion that with only $1,729 of Pool B property enhancements, the Alliance Loan borrower could increase the property value of Pool B units from $59,343 per unit to $90,574 per unit – which, coincidentally, was the increase needed for that borrower to meet its repayment obligations.

171.    Verrone's Large Loan Group earned $15,220,000 in fees for closing the Alliance Loan, which resulted in a large profit that would reflect positively on Verrone's "profit and loss" allocation, which would be used to determine year-end bonuses for Verrone and other individuals in senior management.  However, when recognizing yet another loss on the sale of the Alliance Loan subordinate loans in a stable market, Nelson wrote, "[T]he profitability of the Alliance portfolio didn't lend itself to take such a large

profit at deal closing…Of course, back then it was all good, 'attaboys' for everyone. Now, we have another [$1.8 million] mark to consider."

### vii.   Concealing Retained CRE Loan Risks

172.   Not surprisingly, Wachovia had problems selling many subordinate CRE loans into the market because no reasonable purchaser would buy the subordinate loans based on the credit quality of such loans.  Indeed, in the One Oliver Transaction, Verrone acknowledged *six days prior to closing the deal in a stable market* that no less than *twenty-two* of its "regular" purchasers refused to buy any of the subordinate notes on that deal.  Notwithstanding the clear signal from the market that the subordinate CRE notes for that deal represented a laughable investment, Wachovia extended those loans anyway at great risk to WBNA.

173.   When Wachovia did not hide such loans on- or off-balance sheet (*e.g.*, in the CREF facility, the Black Box or a Repo SPV), it had a number of selling tactics in its arsenal that it freely used to dump subordinate CRE loans into the market.

174.   Wachovia sometimes forced its customers to buy subordinate CRE loans by threatening them that if they did not buy such loans, they would not have access to other services provided by Wachovia.  Verrone himself acknowledged to Relator Kraus and Schweigerath that he forced a customer to purchase a One Oliver Transaction subordinate loan (referenced in Paragraph 172, *supra*) by threatening that customer that Wachovia would not provide a separate line of credit to that customer if it did not purchase that subordinate CRE loan.  (In so doing, Verrone obviously violated basic anti-tying regulations that are applicable to banking institutions like WBNA.)

175.   Wachovia also sometimes sold subordinate CRE loans to purchasers at a

significant discount just to get the CRE loan positions off of its books before questions were asked.  In some cases, purchasers would be willing to pay a significant discounted price for subordinate CRE loans because they would realize a windfall if the subordinate CRE loans were repaid (*e.g.*, through a refinancing of debt).  Wachovia was willing to realize the loss in this manner because it could off-load the subordinate CRE loan, but still hide the related losses with an offsetting profit from a CMBS or CDO securitization transaction (if one could be consummated).

176.    As an example of one such deal, Wachovia extended a $265 million financing to a borrower in respect of a property located at 620 6th Avenue in the City of New York (the "***620 Transaction***"), structured as a $205 million senior loan, a $30 million subordinate loan and a $30 million mezzanine loan (*i.e.*, a loan that was subordinate to both the senior loan and the subordinate loan).  Wachovia earned a $1.325 million underwriting fee for doing the deal, which would reflect positively in Verrone's "profit and loss" calculation for bonus purposes.

177.    At the time of closing of the 620 Transaction, Wachovia assigned (and its internal credit department approved) a 6.28% interest rate for *each* of the senior loan, the subordinate loan and the mezzanine loan – an absurd and ridiculous economic proposition because the senior loan (which had less risk than the subordinate loan and the mezzanine loan), the subordinate loan (which had less risk than the mezzanine loan) and the mezzanine loan all carried the same return for different risk exposures, as reflected in the assigned interest rate.

178.    Accordingly, Wachovia had to know at the time of closing that (i) it would have to write-down its loans relating to the 620 Transaction – because a purchaser of the subordinate loan or the mezzanine loan would only buy such a loan at a discount (*i.e.*, to

get a return above 6.28%) – or (ii) alternatively, it would have to keep the subordinate loan and the mezzanine loan on its books and account for the significant credit risks it was taking on both positions.

179.    *Only one day after closing in a stable market*, Wachovia recognized a $8,188,151.45 loss on the subordinate loan and mezzanine loan when it sold them to third-parties; however, Schweigerath acknowledged that the "loss related to the sale of the [subordinate loan and the mezzanine loan]" would be deferred and "netted against the deferred fees and gains on the sale of the [senior loan] when it is securitized with either the C-23 or C-24 [CMBS] deal[s]", effectively concealing the astounding loss from anyone's review.

### viii.    *Concealing Retained CMBS Risks*

180.    Given the poor credit quality of many of the CRE loans Wachovia indiscriminately dumped into its CMBS transactions, Wachovia was sometimes unable to sell into the market subordinated tranches of its CMBS transactions, so Wachovia itself ultimately bought some of the CMBS securities at issuance in order to help facilitate the closing of the CMBS deal (resulting in WBNA's balance sheet holding subordinate CMBS positions of lower and lower actual value).  To the extent WBNA held subordinate CMBS positions on-balance sheet, it would have to set aside regulatory capital to cover the risks relating to such CMBS positions pursuant to the Applicable Laws and Regulations.

181.    Wachovia therefore again violated the Applicable Laws and Regulations and GAAP by selling subordinate CMBS positions to Lehman Brothers as part of an adjusted securities trading scheme, wherein a subordinate CMBS position would be sold

at its par value (even though Wachovia had been unable to sell the subordinate CMBS position at par value in an arms' length trade) and Lehman Brothers sold the same subordinate CMBS position back to WS, Wachovia's broker-dealer, in many cases *on the same day* and *at the same price*. As discovered by Relator Kraus, Schweigerath and Wes Thompson, Wachovia documented these trades in its CMBS daily ageing reports and in WS' sales and trading records.

182.   WS, being a part of the bank holding company structure of Wachovia but not subject to WBNA's regulatory capital requirements, retained these subordinate CMBS positions at their fraudulent "market prices" established through Wachovia's adjusted trading scheme with Lehman Brothers. As a corollary, WBNA did not hold regulatory capital against these CMBS positions, even though Wachovia knew that the Lehman Brothers' sale prices were sham prices not reflective of the positions' substantially lower market values. Of course, Wachovia as a group fully retained the risks relating to the CMBS positions even though they were held at inflated prices on WS' books.

### ix.   *Employing Other Unsafe and Unsound Practices*

183.   Wachovia engaged in numerous other unsafe and unsound practices in violation of the Safety and Soundness Laws and Regulations and the other Applicable Laws and Regulations as part of the control fraud. For example, Wachovia increased business line autonomy and selectively disregarded internal controls because internal controls affected bottom-line profitability. Certain internal control processes were in place prior to 2004, but with the blessing of Wachovia's senior management, Tom Wickwire, the Head of Structured Products, Bill Green ("**Green**"), Managing Director of

the RECM group, and Solie took deliberate steps to circumvent or dismantle these processes to enhance profitability at the CIB.

184.    Management prioritized business line profitability over safe and sound banking practices by making "middle-" and "back-office" personnel – including controllers – report to and follow the direction of "front-office" business line heads, notwithstanding the obvious risk to the safety and soundness of Wachovia as a whole in so doing.  An excerpt from the 2005 Mid Year Review of Robert Salvucci ("*Salvucci*") (a controller in the Structured Products group) is highly illustrative of how this management policy translated into actual practice: Salvucci's supervisor wrote in the "Current Goals" section of Salvucci's review that "[the structured products controller department's] objectives are heavily focused on controls ([Sarbanes-Oxley], Internal Audit, account reconciliations and documentation), operating efficiencies and budgeting & forecasting. These are all fine objectives and need to be achieved *but without sacrificing real analysis* and *thoughtful and accurate MIS reporting*…It is important that Bob and his team *never let GAAP supersede our ability or desire to perform financial analysis*" (emphasis added).

185.    Management also granted front-office business lines *de facto* autonomy from management supervision based on the level of profitability of such business lines, turning a blind-eye to the additional risk assumed by Wachovia as a result of this policy. Put simply, rules that were established to protect Wachovia did not apply to profitable business lines.  For example, Verrone's group was exempted – in violation of the Applicable Laws and Regulations and GAAP – from having to track unfunded commitments, advance obligations or forward commitments (*i.e.*, funding commitments of Wachovia that were *enforceable* against Wachovia as of deal closing but where

additional committed funding by Wachovia only took place after the satisfaction of additional conditions precedent in the future).  Because Wachovia would *have* to fund these additional amounts per contractual agreement if the conditions precedent were satisfied, banking practice and GAAP dictated that Wachovia track such commitments as liabilities on a going-forward basis.  Wachovia just decided not to do so because recognition of additional funding liabilities would reduce profitability (*i.e.*, Wachovia would have to set aside regulatory capital to account for these prospective liabilities).

186.    Moreover, Wachovia's senior management discouraged incorporation of market-standard risk mitigation techniques simply because such techniques would hamper Wachovia's ability to generate profits.  For example, Wachovia did not perform "specific risk" analyses in respect of CRE products because, according to senior management, they were too expensive and burdensome to implement (*c.f.*, Paragraphs 119-152, *supra*, regarding Wachovia's non-existent credit grading system and its unvalidated and untested Trading Desk Model).

187.    Similarly, Wachovia's senior management did not require business lines to input financial data in its centralized computer tracking systems, "CREW" and "Calypso".  Rather, Wachovia's management allowed profitable CIB business lines to operate autonomously from one another and the rest of Wachovia, thereby increasing business line independence and reducing the ability of Wachovia's accounting, compliance and legal departments to check individual business line activities (and thereby limit earnings arising out of unsafe and unsound business practices).  For example, Tippett's Trading Desk Model was, at all times, maintained separate and apart from any of Wachovia's other systems and, as shown in Paragraphs 135-152, *supra*, not subject to Wachovia's model validation process.  In addition, Royer Culp ("***Culp***"), the

Head of Wachovia's Structuring Department, kept vital structuring data relating to upcoming securitization deals "in his head" – not even on a spreadsheet – and refused to provide such critical data to other Wachovia employees, including financial control personnel.  Both Tippett and Culp were not required by Wachovia to provide information on their models to other Wachovia employees – including controller personnel – or to input information relating to such models on its centralized computer systems because they helped increase Wachovia's bottom-line.

188.   To avoid having to recognize profit and loss volatility relating to "synthetic" trades that Tippett entered into on behalf of WS (which could affect bottom line profitability at year end for the CIB), Tippett was also allowed to not report such trades and keep a segregated record of such trades on a spreadsheet at Wachovia's hedging desk.  However, notwithstanding Tippett's relaxed treatment of tracking such exposures, synthetic positions were legally created and enforceable among Wachovia desks resulting in actual, recognizable liabilities for Tippett's desk that were not reported to anyone at Wachovia but were nonetheless borne by Wachovia.

189.   Wachovia's management used its power of hiring, firing and paying bonuses to encourage employees to embrace management's short-term pursuit of profitability.  For example, Green determined bonuses for middle- and back-office Wachovia CIB and RECM personnel solely on the basis of front-office management's input, an obvious conflict of interest.

190.   Wachovia's management also fostered a corporate culture that operated through fear and intimidation and encouraged silence about issues relating to internal controls, internal audit, loan documentation, credit underwriting, asset and risk assessment and financial reporting.  For example, Nelson and Malter, both direct

-94-

supervisors of Relator Kraus, threatened Relator Kraus on numerous occasions to not raise issues or concerns to them or to others at Wachovia regarding Wachovia's CRE products.  Indeed, in one disturbing conversation, Nelson even told Relator Kraus that he did not want to know about such concerns because he would then have to "fix" them.

191.    Wachovia's management expressly discouraged Wachovia employees from speaking with Wachovia's compliance department and/or legal department about problems they experienced at Wachovia concerning internal controls, internal audit, loan documentation, credit underwriting, asset and risk assessment and financial reporting. Relator Kraus was directly threatened for doing so on numerous occasions by several members of senior management, including Solie, Nelson and Malter.

192.    Wachovia's management also encouraged personnel to conceal violations of Applicable Laws and Regulations from Federal regulators.  For example, Relator Kraus was directed by Green, Malter and Nelson to not discuss the existence of the Black Box with Federal regulators or other Wachovia employees.  Relator Kraus was also expressly instructed by Wachovia's management to "confuse" Federal regulators during one on-site examination by "being so helpful" so as to overwhelm them with an unmanageable amount of unprocessed and unorganized data, information and documents.

### x.    *Rushing Headlong to Financial Ruin and the Wachovia-Wells Fargo Cover-Up*

193.    The stark truth is that Wachovia knew it was on the course of financial ruin long before it made false and fraudulent certifications to the Federal Entities under the Federal Programs to obtain much needed liquidity lifelines during the financial crisis. Rottmann, the Product Controller Group Head, wrote a Global Markets Product Control Statement on Management Issues & Concerns for the quarter ending in December 31,

2005 (the "***Rottmann Global Markets Product Control Statement***") that effectively predicted the collapse of Wachovia because of Wachovia's egregious violations of the Applicable Laws and Regulations and its sole reliance on the liquidity in the securitization markets to stay afloat. In an extensive twenty-two page write-up, Rottmann detailed significant management and operational issues relating to a number of Wachovia divisions beyond just the Structured Products group, including its Equity Division, its Fixed Income Division, its Credit Products group and its Finance Accounting & Control System (also known as "***FACS***"). With specific reference to Wachovia's Structured Products division, Rottmann stated, "There is a ***lack of visibility*** that CIB Finance has with Risk Management, specifically Market Risk. To be a valued business partner with our business unit, we ***need fully integrated and developed risk methodologies and systems to be analyzed in conjunction with financial data*** [(*c.f.*, Paragraph 139)]…[There are risk issues relating to the overall] ***lack of Risk [sic] transparency*** across the Structured Products trading desks. Currently ***no mechanism exists to monitor curve risk***, ***no P&L attribution testing*** and a general ***lack of staffing***. This can even be expanded to include ***Credit Risk*** which seems to be running at ***breakneck speed to keep up with volume increases***" (emphasis added). Rottmann even admitted that "[Structured Products] invests in the markets in a variety of ways. ***Many of the products do not qualify for mark to market accounting treatment per US GAAP*** [(*c.f.*, the third bullet point of Paragraph 99 and Paragraphs 105 and 106, *supra*, in respect of the Black Box, and Paragraph 118, *supra*, in respect of the Repo SPVs)]; however, ***more importantly the [trading desk] does not employ mark to market analysis*** for risk management purposes [(*c.f.*, Paragraphs 144, 146 and 150, *supra*, in respect of the Trading Desk Model, and Paragraphs 180 to 182, *supra*, in respect of adjusted trading for

residual CMBS positions]. **We believe this lack of discipline will exacerbate any potential and future problem if liquidity is removed from the markets**" (emphasis added). Rottmann's statement could not have been more prescient – when the failure of the securitization markets removed liquidity from the financial markets, Wachovia's potential and future financial problems were *acutely* exacerbated. Not surprisingly, Wachovia turned to the only other source of liquidity in the market at that time – the United States taxpayer – in a desperate bid to limit its "potential and future" financial problems.

194. Rottmann listed some of the portfolios where a "decline in liquidity could produce **material losses** in terms of the ability to distribute risk at levels greater than book value" (emphasis added), including, *inter alia*, the CREF/Repo warehouses (*c.f.*, Paragraphs 124 to 134, *supra*, regarding the CREF facility, and Paragraphs 113 to 118, *supra*, regarding the Repo SPVs) *and Wachovia's "Middle Market Loan" portfolio*. Rottmann also admitted the obvious problems relating to the Trading Desk Model, albeit with reference to Wachovia's Middle Market Loan portfolio, stating: "Finance is performing a **simplified** price validation for the Middle Market Loan portfolio on a monthly basis. The process utilizes a **simple mock securitization model** and **assumes that all loans can be securitized**. There is **no formal specific loan level evaluation**. **The accounting model for this book is a mark to market model but due to the nature of the asset type, we cannot obtain vendor marks on a consistent basis.** In addition, **Market Risk has not validated the pricing model** proposed by the **Front Office** to mark their loans. Market Risk and Finance have had several discussions with the Front Office resulting in **no clear definitive way to review the assumptions used to mark the portfolio** and **obtain comfort** on a month-end basis. In addition, Finance believes this portfolio

would be *better suited to be marked as a Held-for-Sale loan portfolio which is accounted for on a lower of cost or market basis*…[and credit default swap] positions still do not receive robust price validation reviews." Although the description could not have been more accurate in respect of the valuation process concerning the CRE loans in the CREF warehouse and the Class B Certificate of the Black Box, as has already been extensively shown in Paragraphs 119 to 134, *supra* (regarding the CREF facility), and Paragraphs 88 to 112, *supra* (regarding the Black Box), the frightening take-away from Rottmann's description is that the valuation problems identified in this Third Amended Complaint and the Rottmann Global Markets Product Control Statement were pervasive *throughout* Wachovia and extended to not only its CREF facility and the Black Box, but also to its sizeable Middle Market Loan warehouse (which represented an additional $4 to $6 billion (*i.e.*, *in addition to* the $6 billion exposure of the Black Box, the $4.141 billion exposure of the CREF facility and the $4 to $6 billion exposure to CRE loans in the Repo SPVs).

195.    Rottmann recognized that Wachovia's reckless growth and expansion of its securitization business came at the direct expense of its internal controls and risk management, writing "[it] is increasingly clear that [Wachovia's contemplated expansion in either Europe or Asia] will be self-funded by Structured Products/RECM. This decision has ramifications from a control standpoint as *it creates an environment whereby business must be booked prior to creation of internal controls/support functions.* We believe *this method of new product/new market development increases the Firm's risk of loss.* The Structured Products Finance staff endeavors to stay in front of the issues by facilitating weekly support staff meetings to address any problems. However, *it would be best* if management would commit to the new markets *in a more*

*systematic and robust way*" (emphasis added).

196.    But Rottmann also admitted that management had failed to commit resources to even its *existing businesses* in a more "systematic and robust way." Rottmann conceded that the "CIB looks for the *fastest, quickest way* to implement, but this is *not always the best way*.  We continue to *keep adding on to an old infrastructure* that is *disconnected*, and *unable to handle the volume increase*" (emphasis added). Indeed, his comments regarding FACS show how easily Wachovia's senior management was able to facilitate its control fraud by simply dismantling Wachovia's financial accounting and controls.   He wrote, "the FACS team has worked diligently to understanding [sic] and gain ownership of the accounting set up, [profit and loss] reporting and reconciliation of each subsystem loaded into the FACS warehouse.  As part of the implementation of each subsystem in the warehouse, FACS has become a tool finance can utilize to highlight and correct systemic system and process problems.  These items have been *in a black box to product controllers* and have *proven* to have potential impact on the books and records of the firm…*[these] items are in no way comprehensive but give management an idea* of the potential impact to the firm's books and records" (emphasis added).   He continued to state that "[t]he *set up of accounting* has been *traditionally owned* by the *operations group* and as a result *finance struggles* with the level of ownership in large [sic] because finance is currently *not properly staffed* to support the level of ownership that needs to transpire.  Because, [sic] Operations has traditionally had ownership of the set up of accounting rules, *[the operations group] may make changes* to the set up *without notifying CIB finance or corporate finance*. Accounting set up is *not properly tested before implementation* and as result [sic] it *does not work when implemented* into production.  As a result of new set ups or changes, it

sometimes *takes finance months, and sometimes years,* to establish and correct and accounting problem [sic] as some of the problems are considered immaterial…Accounting is *not always built out correctly or comprehensively* leaving finance and operations to make *manual* entries to correct the subsystems. These corrections are sometimes *done in bulk* making it *difficult for anyone to track and verify corrections*" (emphasis added).

197.    Rottmann's ominous and distressing conclusions in the Rottmann Global Markets Product Control Statement should have been enough to warn Wachovia's senior management of the real and present danger to Wachovia's financial future, but Relator Kraus himself also expressly warned senior management about the material financial irregularities identified in this Third Amended Complaint.  Concerned about his job and his family – and the fact that Wachovia's senior management had failed to address *any* of the issues he raised internally – Relator Kraus took the courageous (and, in hindsight, foolish) step of approaching Cummings on April 3, 2006 to discuss his concerns with a hope that something could be done to meaningfully address them.  The meeting lasted approximately one and a half hours, at the end of which Cummings "thanked" Relator Kraus for reporting the information to him.

198.    Months later, because Relator Kraus continued to uncover schemes and intentional efforts at Wachovia to circumvent the Applicable Laws and Regulations, Relator Kraus again returned to Cummings' office to speak with Cummings, but he was instead escorted from Wachovia and summarily placed on administrative leave.

199.    On or about July 2006, while on administrative leave, Relator Kraus was asked by Wachovia to attend a "Board of Inquiry" meeting with Bret Holmes ("*Holmes*") (then of Wachovia's legal department and now employed by Wells Fargo), Lars Carlston

(then of Wachovia's legal department), Amy Jacobson ("**Jacobson**") (then of Wachovia's compliance department and now employed by Wells Fargo), and Kris Rao ("**Rao**") (then of Wachovia's internal audit department and now employed by Wells Fargo) to discuss the material financial irregularities Relator Kraus observed at Wachovia (the "**July 2006 Meeting**").  The July 2006 Meeting lasted approximately three and a half hours.

200.    Wachovia did not contact Relator Kraus again until a few weeks later, when Deanna Lindquist ("**Lindquist**") (then an in-house lawyer employed at Wachovia and now employed by Wells Fargo) notified him that he was being terminated as an employee at Wachovia.  Lindquist informed Relator Kraus that, as a result of the July 2006 Meeting, Wachovia conducted its own internal investigation and prepared an internal report (the "**Wachovia Report**") that cleared Wachovia of any wrong doing (a temporal impossibility if Wachovia took Relator Kraus' concerns seriously, given that the investigation and related interviews would have to be fully conducted, concluded and summarized in mere weeks, and any external lawyers, accountants and/or auditors (which would have been necessary to do a wholesome investigation) would have had to also work within that time frame).  Lindquist further informed Relator Kraus that: (i) he was not entitled to see the Wachovia Report; and (ii) if he asked to see the Wachovia Report, he would not receive any severance pay upon termination of his employment and he would be 'blacklisted' from finding employment at another bank.  On September 15, 2006, Relator Kraus signed a separation agreement with Wachovia – without asking for the Wachovia Report – and he received the severance pay.  Affirming threats made to him by Lindquist and others, however, Relator Kraus soon learned that he was nonetheless blacklisted by Wachovia from obtaining a controller-type position at other financial institutions in Charlotte, North Carolina.

201.    On or about July 2010, after the Wachovia-Wells Merger Date, Relator Kraus reached out to Wells Fargo to refinance a mortgage on his house as he was having trouble meeting his financial commitments on his mortgage after approximately four years of unemployment at a controller-equivalent salary.  In response, Sarah Thayer, a representative from Wells Fargo's president's office, informed Relator Kraus that: (i) he had been unlawfully discharged by Wachovia; (ii) the Wachovia Report was, in fact, never prepared by Wachovia; and (iii) he was eligible for an extremely flexible residential mortgage on terms far more favorable then what was currently available in the market (which Relator Kraus subsequently accepted).

202.    Relator Kraus voluntarily disclosed and provided to the Federal Bureau of Investigation in 2007 and the Securities and Exchange Commission (the "*SEC*") in 2009 the information concerning Wachovia's and, (with respect to the SEC) after the Wachovia-Wells Merger Date, Wells Fargo's CRE operations, upon which the allegations or transactions set forth in this claim are based, both prior to any public disclosure and the filing of the complaint to which this Third Amended Complaint relates.  Relator Kraus also has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions relating hereto.

203.    Relator Kraus also provided information relating to the events described herein to Wachovia's Chief Executive Officer Robert Steele and, after the Wachovia-Wells Merger Date, to Wells Fargo's Chief Executive Officer John Stumpf, thereby putting Wells Fargo on notice of the fraud perpetrated by Wachovia.

204.    Even though Wells Fargo has not said a word about the extensive fraud that took place at Wachovia to date, Wells Fargo must have known about it pre- and post-merger.  If Wells Fargo did any substantive diligence on Wachovia when it purchased

Wachovia, Wells Fargo learned (or should have learned) about the material financial irregularities described in this Third Amended Complaint when performing such due diligence.  And even today, Wells Fargo employs at high levels of its own management a number of high-ranking former Wachovia employees with intimate knowledge of the unconscionable control fraud, including, *inter alia*, Solie, Tippett, Lindquist, Holmes, Jacobson and Rao.

205.   Wells Fargo's silence post-merger about the extensive fraud that took place at Wachovia makes it complicit in the fraud and, accordingly, liable to the United States for receiving payments post-merger from the Federal Entities under the Federal Programs under similarly false and fraudulent pretenses.  Wells Fargo did not disclose, and has not disclosed to date, that this material, extensive and unconscionable fraud took place at Wachovia, that the fraud had a material financial impact on its own balance sheet at and post-merger (which, *inter alia*, would have required it to make numerous financial disclosures in accordance with Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP concerning its discovery of the fraud and the extent to which the fraud impacted its own financial controls, reports and statements), and that the fraud required Wells Fargo to take costly and extensive remedial measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at the combined institutions post-merger to ensure its compliance with the Applicable Laws and Regulations on a going-forward basis (assuming, of course, that Wells Fargo took such remedial measures).  Because of this, Wells Fargo could not have and should not have certified post-merger to the Federal Entities at the time of each request for a payment: (i) that it had not violated, or that it had complied with, the Applicable Laws and Regulations; (ii) that an event of default (as defined for some of the programs) had

not occurred and was not then continuing in respect of it; and/or (iii) that certain reports, registrations, documents and filings submitted to various Federal agencies by it did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

206.   Indeed, if Wells Fargo knew about the pervasive fraud at Wachovia – a fraud that materially and negatively impacted Wells Fargo's own financial controls and statements, then Wells Fargo had actual knowledge of the false and fraudulent certifications it had to make under the Federal Programs to obtain Federal funds thereunder.  And if Wells Fargo somehow still does not know about the pervasive fraud that took place at Wachovia, Wells Fargo would clearly have been acting in deliberate ignorance of the truth or falsity of the information contained in the express certifications and in reckless disregard for the truth or falsity of such information when it made the false and fraudulent certifications under the Federal Programs to obtain Federal funds thereunder.  (If the latter is true, a more disturbing question remains: Why has Wells Fargo been unable to discover and disclose the pervasive fraud that took place at Wachovia over five years ago?)

207.   Either way, Wells Fargo has perpetuated this fraud long after the Wachovia-Wells Merger Date, including up to today.  Wells Fargo has not only retained high-level former Wachovia employees with intimate knowledge of the fraud/cover-up but has also irresponsibly left them in high levels of management within its own operations, all but guaranteeing that the impact of Wachovia's control fraud on Wells Fargo will forever remain buried at Wells Fargo and that a similar fraud will likely occur again under Wells Fargo's own securitization banner.  Wells Fargo's Chairman Dick

Kovacevich's October 3, 2008 press release relating to the proposed merger is truly disturbing when reviewed in this light, where he claimed that the combined company would have, post-merger, a strong presence in Charlotte, North Carolina, which would become the *headquarters* for the combined entity's *retail and commercial and corporate banking businesses*, and that an important measure of success for the integration would be whether Wells Fargo retained *as many of the "talented" Wachovia team members as possible* so that those individuals could *continue to provide "outstanding" service and financial advice to their customers* and *continue their careers with Wells Fargo*.

208.    Wells Fargo's silence is deafening, because it leaves so many important financial reporting and risk management, internal control and accounting questions wholly unanswered.  In terms of its balance sheet post-merger, did it (and how did it) revalue as of the date of the Wachovia-Wells Merger Date the billions of dollars of assets, including CRE loans, Middle Market Loans and CMBS positions, held on- and off- Wachovia's books that were valued for almost a decade using a faulty, simplified Trading Desk Model?  Did it take on the billions of dollars of CRE loans held in the Repo SPVs post-merger and revalue each of those CRE loans to determine a true market value for those loans, or did it simply re-roll them at the inflated fraudulent market price?  Did it grade the billions of dollars of CRE loans and Middle Market Loans that did not have any formal specific loan level evaluation, and how could it accomplish this with outdated and incomplete data in the related credit files, using the same personnel?  What kinds of corrections did it have to make on Wachovia's and its own financial statements?  And how did it recalculate its regulatory capital calculations to account for the discovery of the fraud?

209.    And equally important, in terms of its risk management, internal control

and accounting protocols and processes, did Wells Fargo clean its post-merger house? What steps did Wells Fargo take to bolster its risk management, internal control and accounting protocols and processes?  Did it investigate the control fraud that brought Wachovia down?  Did it test, validate or replace the faulty Trading Desk Model?  Did it terminate any high level employees involved in the massive Wachovia fraud?  Did it take any steps to ensure that such a control fraud would not occur under its own banner?  And why has Wells Fargo failed to disclose any of this in any Sarbanes-Oxley statement or any other disclosure required to be made pursuant to the Applicable Laws and Regulations?

210.    These are not merely theoretical queries to keep accountants up at night – in truth, pursuant to Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP, Wells Fargo has to provide grounded and clear answers to these and many other related questions.  Yet Wells Fargo has failed to provide *any* disclosure relating to *any* of the foregoing questions.

211.    Based on a review of Wells Fargo's own financial statements and call reports since the Wachovia-Wells Merger Date, Wells Fargo has stayed consistently quiet about the extensive fraud that took place in Charlotte, limiting its disclosure to saying it took over *$219 billion* of Wachovia CRE loans and corporate loans following the merger and has sustained losses on these assets.  According to its Form 8-K Ex. 99.1, filed January 28, 2009 at page 2, Wells Fargo announced that it tried to reduce the risk (or "de-risk") its balance sheet and future earnings stream by (i) taking a $37.2 billion credit write-down on Wachovia high-risk loans (which would include Wachovia's substantial CRE loan portfolio held on-balance sheet) taken at December 31, 2008, through purchase accounting adjustments on $93.9 billion of high-risk loans segregated in Wachovia's loan

portfolio; (ii) reducing the cost basis of the Wachovia securities portfolio (which would include the CMBS positions that Wachovia could not sell but kept on its books at an inflated market value) by $9.6 billion reflecting $2.4 billion of recognized losses and write-off of $7.2 billion of unrealized losses previously reflected in negative cumulative other comprehensive income, and (iii) Wachovia period-end loans, securities, trading assets and loans held for sale (which would include non-high risk CRE loans held on balance sheet) reduced by $15.2 billion, or 17 percent, from June 30, 2008." These write-downs and subsequent write-downs were clearly not enough to de-risk the effects of merging Wachovia's failed securitization business; as recently as October 2013, Well Fargo's Chief Financial Officer issued a terse, vague and – from a financial disclosure perspective – meaningless statement that Wells Fargo had sold a "structured asset" with a "punitive risk weighting" that it inherited from Wachovia that was worth "a few billion dollars" because "from a risk-return standpoint" Wells Fargo decided to "just sell this" and "just move on."

212.   Of note, Wells Fargo has no reason to hide the magnitude of losses it sustained as a result of its merger with Wachovia – the sad truth is that Wells Fargo also profited from Wachovia's fraud, again at the expense of the United States taxpayer. Wells Fargo bid to purchase Wachovia just three days after the U.S. Internal Revenue Service (the "*IRS*") relaxed its tax rules in a way that would allow Wells Fargo to apply Wachovia losses against Wells Fargo profits post-merger (*i.e.*, thereby allowing Wells Fargo to shelter its own income following a merger). The financial facts of the merger prove this to be the case: Wells Fargo paid around $12.7 billion for Wachovia at the start of 2009, but Wells Fargo earned approximately $17.96 billion in tax breaks because of the IRS ruling and the net losses it took on its acquisition of Wachovia. The losses Wells

Fargo declared on Wachovia assets helped Wells Fargo avoid paying any taxes from 2008 through 2010, receiving, instead, a $681 million tax credit.

213.    But Wells Fargo, like Wachovia before it, has at no time done what an honest or law-abiding corporate citizen might do: Come clean to the American people about the extensive fraud that it had inherited from Wachovia.  Rather, it has been business as usual even for Wells Fargo, who has taken funds provided to it by the United States taxpayer under false and fraudulent pretenses and has kept its mouth firmly shut about one of the greatest frauds committed in the history of finance, possibly even greater than Enron itself.

**C.      Why World Savings' Certifications were Patently False and Fraudulent**

214.    World Savings and, post-merger with World Savings, Wachovia, and, post-merger with Wachovia, Wells Fargo, could not and should not have made the referenced certifications to the Federal Entities in respect of the Federal Programs because World Savings had brazenly violated the Applicable Laws and Regulations from at least 2001 to on or around the World Savings-Wachovia Merger Date and beyond in order to satisfy World Saving's senior management's unrestrained pursuit of short-term profitability – a pursuit that benefitted senior management and certain World Savings personnel (who earned large bonuses) at the expense of World Savings' long-term financial health and the financial well-being of the vast majority of its shareholders and employees.  And because both Wachovia and Wells Fargo did not disclose, post-mergers, that this known fraud had occurred, that this fraud had a material financial impact on its and their own balance sheets at and post-merger (which, *inter alia*, would have required each of them to make numerous financial disclosures in accordance with GAAP and the Applicable Laws and Regulations concerning its discovery of the fraud and the impact

and extent that this fraud had on its own financial reports and statements), and that Wachovia would have needed to take significant material and costly remedial measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at World Savings post-merger to ensure its compliance with the Applicable Laws and Regulations on a going-forward basis (assuming, of course, that Wachovia took such remedial measures), both Wachovia and Wells Fargo concealed and perpetuated the fraud long after the World Savings-Wells Merger Date and the Wachovia-Wells Merger Date, including up to today.

> ### i.      *Management's Philosophy at the World Savings*

215.    In 2005-2006, World Savings had a significant presence in the Western United States, with a particularly active business in the State of California.   Ken Thompson described World Savings as a "crown jewel", with approximately $60 billion in deposits and 600 branches.

216.    However, like the CIB, World Savings knowingly disregarded the Applicable Laws and Regulations to satisfy World Savings' senior management's unrestrained pursuit of short-term profitability, a pursuit that benefitted certain World Savings' executives at the expense of not only the long-term financial health of World Savings but also many of the residential homeowners that obtained loans from World Savings.

217.    World Savings' senior management used its wholesale distribution model to encourage prospective borrowers to obtain loans that they simply could not pay. World Savings' senior management also encouraged its employees to take whatever steps were necessary (including, for example, predatory lending and falsification of loan

documentation) to get residential mortgage applications approved, thereby increasing the volume of residential mortgages processed by and through World Savings. World Savings' senior management encouraged silence about issues relating to its lending practices even though they were aware of the issues facing World Savings.

ii.       **World Savings' Residential Mortgage Operations**

218.    Relator Bishop discovered that World Savings, through its residential mortgage operations, violated the Applicable Laws and Regulations by: (i) not having appropriate internal controls and information systems; (ii) not having an appropriate internal audit system; (iii) not establishing and maintaining loan documentation practices that enabled World Savings to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loan and sources for repayment, (D) assess the ability of the borrower to repay indebtedness in a timely manner, (E) demonstrate appropriate administration and monitoring of loans and (F) take account of the size and complexity of a loan; (iv) not establishing and maintaining prudent credit underwriting practices; (v) not having prudent asset growth; and (vi) not establishing and maintaining an appropriate system commensurate with World Savings' size to identify problem assets and prevent deterioration of those assets, by violating the certification requirements regarding financial reporting, internal control and compliance with laws and regulations under 12 C.F.R. 363, by making false entries with an intent to deceive other officers of World Savings in violation of 18 U.S.C. §1005, by making false statements in a matter within the jurisdiction of a Federal department or agency in violation of 18 U.S.C. §1001 and by violating Sections 302, 806 and 906 of Sarbanes-Oxley.

219.    World Savings specialized in providing residential borrowers with adjustable rate mortgages with special payment options, which World Savings marketed

as "Pick-A-Pay" mortgages.  Under the Pick-A-Pay mortgages, borrowers were able to select the amount of interest they wanted to pay in respect of the mortgage.

220.    However, borrowers were not adequately informed that the monthly interest amount that was not paid by the borrowers would be capitalized against the outstanding principal amount of the related loans.  As a result, numerous borrowers under Pick-A-Pay mortgages were surprised to learn that, over time, their Pick-A-Pay mortgage balances had increased and that the interest payments they owed had similarly increased. The increase in the principal amount of the loan as a result of the partial repayment of interest and the capitalization of the remainder of interest is referred to as "negative amortization".

221.    Relator Bishop, in his capacity as a retail residential mortgage salesperson, had extensive exposure to World Savings' underwriting practices and loan documentation practices and its underwriting personnel.

222.    Relator Bishop observed World Savings' wholesale residential mortgage salespersons "pushing" residential mortgages on ethnic and other minorities in a concerted and predatory manner, so Relator Bishop reported his concerns in respect of such practices to World Savings' senior management.

223.    Relator Bishop also observed World Savings' wholesale residential mortgage salespersons being instructed by World Savings to take whatever steps were necessary to have residential loan applications approved, including, for example, falsifying borrower certifications regarding employment status and/or income levels.  As a result, Relator Bishop similarly reported his concerns in respect of such practices to World Savings' senior management.

224.    Relator Bishop also warned senior managers, including Maria Guadamuz and Tim Wilson, that World Savings was venturing into dangerous financial territory because World Savings' balance sheet was increasing at an alarming rate, mostly as a result of the negative amortization on its Pick-A-Pay loans.

225.    World Savings senior management dismissed each of Relator Bishop's concerns outright without investigation.

226.    Although World Savings knew that the negative amortization of its Pick-A-Pay loans was not beneficial for the long-term health of World Savings, senior management continued to push such products because the loan volume resulted in an extremely profitable business.  Indeed, World Savings even booked the interest on the capitalized interest as additional profit.

227.    On May 24, 2006, sixteen days after Relator Bishop learned that Wachovia intended to purchase World Savings, Relator Bishop asked his supervisors to speak with a senior executive at Wachovia to express his concerns that the portfolio of World Savings was "toxic".  In response, on May 30, 2006, Michelle Gadker terminated Relator Bishop's employment with World Savings, on the unsubstantiated ground that Relator Bishop violated a one-time warning for having had a heated discussion with a World Savings senior vice president over a loan that was being processed.

228.    Relator Bishop voluntarily disclosed and provided to the SEC the information concerning World Savings' and, after the World-Wachovia Merger Date, Wachovia's and, after the Wachovia-Wells Merger Date, Wells Fargo's residential mortgage operations, upon which the allegations or transactions set forth in this claim are in part based, prior to the filing of the complaint to which this Third Amended complaint

relates.  Relator Bishop has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions relating hereto.

## VI.     CAUSES OF ACTION

### A.     False Claims Act

229.    This is an action to recover damages and civil penalties on behalf of the U.S. Government and each Relator arising from the false or fraudulent statements, claims, and acts made in violation of the False Claims Act.  *See* 31 U.S.C. §§ 3729–3732 (2000).  For conduct occurring before May 20, 2009, the False Claims Act provides that any person who:

(a)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(c)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

is liable to the U.S. Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of damages sustained by the U.S. Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a).

230.    For conduct occurring on or after May 20, 2009, the False Claims Act provides that any person who:

(a)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008);

(c)   conspires to commit a violation of the False Claims Act;

is liable to the U.S. Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of damages sustained by the U.S. Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a), *amended by* Fraud Enforcement Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

231.   The amended False Claims Act defines "claim" as:

(A)   mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

232.   The False Claims Act allows any person who has knowledge of a false or fraudulent claim against the U.S. Government to bring an action in a U.S. Federal District Court for himself and for the U.S. Government and to share in any recovery.  *See* 31 U.S.C. § 3730.

233.   On behalf of the U.S. Government and as set forth in this Third Amended Complaint, each Relator seeks through this action to recover damages and civil penalties arising from Wachovia's, World Savings' and Wells Fargo's submission of false claims

to the U.S. Government.   In this case, such claims were submitted to the U.S. Government for payment under the Federal Programs.  Each Relator believes that the U.S. Government has suffered significant damages as a result of false claims for payment under these programs.

**B.**      ***Count I - False Claims Act, 31 U.S.C. §3729(a)(1)/31 U.S.C. §3729 (a)(1)(A)—(Presenting or Causing to Be Presented False or Fraudulent Claims)***

234.    Relators reallege and hereby incorporate by reference the allegations made in all other Paragraphs of this Third Amended Complaint as if fully set forth herein.

235.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

236.    Through the acts described in this Third Amended Complaint and otherwise, the Defendants knowingly presented or caused to be presented false or fraudulent claims, records and statements for payment or approval to the United States. The Defendants knowingly falsely certified, expressly and/or impliedly, and represented full compliance with all Federal and state laws and regulations, including the Applicable Laws and Regulations, prohibiting fraudulent acts and false reporting.

237.    Each time the Defendants applied to, participated in, received payments, drew funds or benefits from or received funds or benefits from a Federal Program, the Defendants caused the presentation of a false or fraudulent claim for payment or approval.

238.    The United States, unaware of the falsity and fraudulent nature of the claims, records and statements presented by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' false or fraudulent claims.

-115-

239.   By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for false and fraudulent claims made by the Defendants.

C.   **Count II - False Claims Act, 31 U.S.C. §3729 (a)(2)/31 U.S.C. §3729 (a)(1)(B)—Making or Using or Causing to be Made or Used False Records and Statements Material to a False Claim)**

240.   Relators reallege and hereby incorporate by reference the allegations made in all other Paragraphs of this Third Amended Complaint as if fully set forth herein.

241.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

242.   Through the acts described in this Third Amended Complaint and otherwise, the Defendants knowingly made or used false records or statements or omitted materials facts (a) to get false and/or fraudulent claims paid or approved by the U.S. Government and/or (b) that are material to false and/or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). These false statements or records include, but are not limited to, certifications made (representative examples of which certifications are set forth in this Third Amended Complaint) that they will comply with all laws and regulations, including compliance with the Applicable Laws and Regulations, the Safety and Soundness Laws and Regulations, the Circular, the Master Agreement, the Dallas FHLB Advances and Security Agreement, other relevant documentation and agreements and other applicable laws and regulations.

243.   Each time the Defendants applied to, participated in, received payments,

drew funds or benefits from or received funds or benefits from a Federal Program, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

244.   The United States, unaware of the making, the use, or the causing to be made or used, of a false record or statement material to a false or fraudulent claim by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' making, using or causing to be made or used, such false record or statement.

245.   By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for such false records and statements.

**D.**   ***Count III - False Claims Act, 31 U.S.C. §3729 (a)(1)(C)—(Conspiracy)***

246.   Relators reallege and hereby incorporate by reference the allegations made in all other Paragraphs of this Third Amended Complaint as if fully set forth herein.

247.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

248.   Through the acts described in this Third Amended Complaint and otherwise, each of the Defendants, Wachovia, World Savings, and, pre-merger, Wachovia, World Savings, and its or their officers and directors, entered into a conspiracy or conspiracies with each other and with other unnamed co-conspirators, including its or their auditors and accountants, to defraud the United States by presenting, or causing to be presented, a false or fraudulent claim for payment or approval and

-117-

making, using or causing to be made or used, false records or statements material to a false or fraudulent claim.  Each of the Defendants, Wachovia, World Savings, and, pre-merger, Wachovia, World Savings, and its or their officers and directors, and such other unnamed co-conspirators have taken substantial steps in furtherance of the conspiracies, including, *inter alia*, working together and coordinating with each other to flagrantly engage in unsafe and unsound banking practices, fraudulently misstate and manipulate its and their balance sheets in violation of applicable laws and regulations, fail to maintain adequate internal controls, make false certifications regarding its or their financial reporting and internal controls, fail to comply with the obligations of Sarbanes-Oxley, and mislead and deceive Federal regulators throughout the Relevant Period about the true state of their financial health, in each case in violation of the Applicable Laws and Regulations.

249.    The United States, unaware of the Defendants' conspiracies or the falsity of the claims, records or statements of the Defendants, have paid and continues to pay claims that would not be paid but for the Defendants' conspiracies and false claims, records and statements relating to such conspiracies.

250.    By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States has provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for such conspiracies and the related false and fraudulent claim, records and statements.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators Kraus and Bishop pray for judgment against the Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2. That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That the Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4. That the Relators be awarded all costs of this action, including attorneys' fees, costs and expenses, pursuant to 31 U.S.C. § 3730(d); and

5. That the United States and each Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated:  October 29, 2014.

By:     /s/Sharad A. Samy
Sharad A. Samy, Esq.
THE LAW OFFICES OF SHARAD A. SAMY LLC
One Landmark Square, 8th Floor
Stamford, CT 06820
Telephone: (917) 673-0804

BERG & ANDROPHY
Joel Androphy, Esq.
Chris Gadoury, Esq. (*Pro hac vice* pending)
Rachel Grier, Esq. (*Pro hac vice* pending)
Emily Smith, Esq. (*Pro hac vice* pending)
3704 Travis St.
Houston, Texas 77002

Telephone: (713) 529-5622

PORT & SAVA
Gary Port, Esq.
George S. Sava, Esq. *(Pending Admission)*
303 Merrick Road, Suite 301
Lynbrook, New York 11563
Telephone: (516) 352-2999

**Attorneys for Plaintiff-Relators
Paul Bishop and Robert Kraus**

## APPENDIX I

## DEFINED TERMS

| Defined Term | Meaning |
|---|---|
| 620 Transaction | The $265 million financing referenced in Paragraph 176 of the Third Amended Complaint. |
| Agencies | The Treasury Department, the Federal Reserve, the FDIC, the OCC and the OTS. |
| Alliance Loan | The $650 million financing referenced in Paragraph 169 of the Third Amended Complaint. |
| ALLL | Allowance for loan and lease losses. |
| Applicable Laws and Regulations | The laws and regulations referenced in Paragraph 7 of the Third Amended Complaint. |
| Asset Securitization Handbook | The Asset Securitization Comptroller's Handbook published by the OCC in November 1997. |
| Asset Securitization Interagency Guidelines | The Interagency Guidance on Asset Securitization Activities issued by the Agencies on December 13, 1999. |
| August 1 Malter E-mail | E-mail written by Malter on August 1, 2005, relating to, inter alia, the Black Box. |
| August 1 Schleicher E-mail | E-mail written by Schleicher on August 1, 2005, relating to, inter alia, credit grading of CRE loans. |
| Black Box | College Street Funding Master Trust. |
| Carlson | Pete Carlson, an employee of Wachovia. |
| CIB | Wachovia's Corporate and Investment Bank. |
| Circular | Operating Circular No. 10, Lending, effective October 15, 2006, issued by the Federal Reserve. |
| CMBS | Commercial mortgage-backed securities. |
| CRE | Commercial real estate. |
| CREF Facility | Wachovia's on-balance sheet warehousing/holding facility for CRE loans. |
| CRM | Wachovia's Credit Risk Management group. |
| Culp | Royer Culp, Head of Wachovia's Structuring Department. |
| Cummings | Steve Cummings, Senior Executive Vice President and Executive Officer of WC. |
| Dallas FHLB | The U.S. Federal Home Loan Bank of Dallas. |
| Dallas FHLB Certifications | The certifications in the Advances and Security Agreement, described in Paragraph 64 of the Third Amended Complaint. |
| Deposit Insurance Program | The FDIC's deposit insurance coverage program. |
| Discount Window | The Federal Reserve's Discount Window. |
| Dobie Center Transaction | The $60.875 million financing referenced in Paragraph 162 of the Third Amended Complaint. |

| | |
|---|---|
| *Dodd-Frank Act* | The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended. |
| *Enron* | Enron Corporation. |
| *FACS* | Finance Accounting & Control System. |
| *False Claims Act* | False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* |
| *FAS 115* | Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities"*, issued in May 1993. |
| *FAS 140* | Statement of Financial Accounting Standards No. 140, *"Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities"*, issued in September 2000. |
| *FAS 166* | Financial Accounting Standards No. 166, *"Accounting for Transfers of Financial Assets"*, issued in June 2009. |
| *FDIC* | The Federal Deposit Insurance Corporation. |
| *Federal Entities* | The Treasury Department, the Federal Reserve System, the FDIC and the FHLBs. |
| *Federal Programs* | *Inter alia*, the Discount Window, the TAF, the TLGP, the Deposit Insurance Program, the TAGP and FHLB Programs. |
| *Federal Reserve 2120.1 Guidance* | Section 2120.1, "Accounting" of the Trading and Capital-Markets Activities Manual, issued by the Federal Reserve in April 2002. |
| *Federal Reserve System or Federal Reserve* | The Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, the Federal Reserve Bank of Richmond and/or one or more other Federal Reserve Banks. |
| *FHLBs* | The U.S. Federal Home Loan Banks. |
| *FHLB Programs* | The FHLBs' advance programs. |
| *Friedman* | Steve Friedman, an employee of Wachovia. |
| *GAAP* | Generally accepted accounting principles. |
| *Gardner* | Douglas Gardner, an employee of Wachovia in its market risk department. |
| *Green* | Bill Green, Managing Director of Wachovia's RECM group. |
| *GWF* | Golden West Financial Corporation. |
| *Hamadah* | Talal Hamadah, an employee of Wachovia. |
| *Holmes* | Bret Holmes, an employee of Wachovia in its legal department. |
| *Hubach* | Carolyn Hubach, an employee of Wachovia. |
| *Interagency ALLL Policy* | The Interagency Policy Statement on the Allowance for Loan and Lease Losses issued by the Agencies on December 13, 2006. |
| *IRS* | The U.S. Internal Revenue Service. |
| *Jacobson* | Amy Jacobson, an employee of Wachovia in its compliance department. |

| | |
|---|---|
| *July 2006 Meeting* | The Board of Inquiry meeting conducted at Wachovia in July 2006. |
| *Ken Thompson* | G. Kennedy Thompson, Chairman, President and Chief Executive Officer of WC. |
| *Lehman Brothers* | Lehman Brothers Inc. and its affiliates and subsidiaries. |
| *Li* | Christine Li, an employee of Wachovia in its market risk group. |
| *Lindquist* | Deanna Lindquist, an employee of Wachovia in its legal department. |
| *Litke* | Adam Litke, the Head of Wachovia's Risk Management group. |
| *LOCOM* | An accounting term meaning "lower of cost or market". |
| *LTV* | A finance term meaning "loan-to-value", typically represented as a percentage, calculated by dividing the principal balance of a loan secured by a property by the value of that property. |
| *Macon-Burlington Loans* | The financing referenced in Paragraph 160 of the Third Amended Complaint. |
| *Malter* | Ira Malter, Wachovia's Controller for Structured Products. |
| *Malter-Rottmann E-mail* | E-mail written by Malter to Rottmann on December 1, 2005 regarding, *inter alia*, the Black Box. |
| *Master Agreement* | The Master Agreement, Federal Deposit Insurance Corporation, Temporary Liquidity Guarantee Program – Debt Guarantee Program, dated November 24, 2008, relating to the TLGP. |
| *MIS* | Management information systems. |
| *OCC* | The U.S. Office of the Comptroller of the Currency. |
| *OCC Modeling Guidance* | OCC Bulletin 2000-16 entitled *"Risk Modeling"* issued by the OCC on May 30, 2000 |
| *One Oliver Transaction* | The $52 million financing referenced in Paragraph 160 of the Third Amended Complaint. |
| *OTS* | The U.S. Office of Thrift Supervision. |
| *Primary Credit Interagency Advisory* | The Interagency Advisory on the Use of the Federal Reserve's Primary Credit Program in Effective Liquidity Management, issued jointly by the Federal Reserve, the OCC, the FDIC, the OTS and the National Credit Union Administration, dated July 23, 2003. |
| *Prior Circular* | Operating Circular No. 10, Lending, effective January 2, 1998, issued by the Federal Reserve. |
| *Purchase Summary* | An internal undated Wachovia summary titled "Purchase of College Street Funding A Certificate". |
| *QSPE* | A qualifying special purpose entity. |
| *Rao* | Kris Rao, an employee of Wachovia in its internal audit department. |
| *Rating Credit Risk Handbook* | The Rating Credit Risk Comptroller's Handbook published by the OCC in April 2001. |

| | |
|---|---|
| *RECM* | Real Estate Capital Markets. |
| *Regulation A Final Rule* | 12 C.F.R. Part 201, Regulation A; Docket No. R-1123, *"Extension of Credit by Federal Reserve Banks"*. |
| *Relators* | Robert Kraus and Paul Bishop. |
| *Relevant Period* | The period from in or around 2007 to the present date. |
| *Repo SPVs* | Numerous off-balance sheet SPVs that entered into repo transactions with Wachovia in respect of its CRE loans. |
| *Rottmann* | Robert Rottmann, the Product Controller Group Head of Wachovia. |
| *Rottmann Global Markets Product Control Statement* | The Global Markets Product Control Statement on Management Issues & Concerns for the quarter ending in December 31, 2005 prepared by Rottmann. |
| *S&Ls* | Savings and loans institutions. |
| *Safety and Soundness Laws and Regulations* | The safety and soundness laws and regulations referenced in Paragraph 6 of the Third Amended Complaint. |
| *Salvucci* | Robert Salvucci, a controller at Wachovia in its structured products group. |
| *San Francisco FHLB* | The U.S. Federal Home Loan Bank of San Francisco. |
| *Sarbanes-Oxley* | The Sarbanes-Oxley Act of 2002, as amended. |
| *Schleicher* | Keith Schleicher, Managing Director and Head of Wachovia's Credit Risk Management department. |
| *Schweigerath* | Jason Schweigerath, an employee at Wachovia who worked directly with Relator Kraus. |
| *SEC* | The U.S. Securities and Exchange Commission. |
| *Section 9.1 Certifications* | The Section 9.1(b) Certification, the Section 9.1(g) Certification and the Section 9.1(i) Certification. |
| *Section 9.1(b) Certification* | The certification of Section 9.1(b) of the Circular, described in Paragraph 27 of the Third Amended Complaint. |
| *Section 9.1(g) Certification* | The certification of Section 9.1(g) of the Circular, described in Paragraph 28 of the Third Amended Complaint. |
| *Section 9.1(i) Certification* | The certification of Section 9.1(i) of the Circular, described in Paragraph 29 of the Third Amended Complaint. |
| *Solie* | Sam Solie, Chief Operating Officer of Wachovia's RECM group. |
| *SPV* | A special purpose vehicle. |
| *TAF* | The Federal Reserve's Term Auction Facility. |
| *TAGP* | The FDIC's Transaction Account Guarantee Program. |
| *Tippett* | Frank Tippett, a Director and Head of Hedging at WS. |
| *TLGP* | The FDIC's Temporary Liquidity Guarantee Program. |
| *Trading Desk Model* | The model referenced in Paragraph 140 of the Third Amended Complaint. |
| *Treasury Department* | The U.S. Department of the Treasury. |

| | |
|---|---|
| *U.S. Government* | The government of the United States. |
| *Uhlin* | Robert Uhlin, an employee at Wachovia. |
| *United States* | The United States of America. |
| *VaR* | A finance term meaning "value-at-risk". |
| *Verrone* | Robert Verrone, head of Wachovia's CIB's Large Loan Group. |
| *Wachovia* | WC, WBNA, WCM, WS and its and their subsidiaries and affiliates. |
| *Wachovia RECM Finance Memorandum* | Wachovia's RECM Finance Memorandum to December Close Files, dated January 6, 2006. |
| *Wachovia Report* | An internal report allegedly prepared by Wachovia in respect of the July 2006 Meeting. |
| *Wachovia SOX Process Narrative* | Wachovia's Sarbanes-Oxley Team – Confidential – Process Narrative – CRES, dated June 18, 2005. |
| *Wachovia's 2003 Black Box Accounting Policy* | Corporate & Investment Bank Accounting Policy, dated June 2003. |
| *Wachovia's Credit Grade Guidelines* | Wachovia's Policy/Guidelines/Procedures relating to Credit Grades, dated June 2005. |
| *Wachovia's RECM Accounting Policy Memorandum* | Wachovia's RECM Finance memorandum to Accounting Policy, dated February 10, 2005. |
| *Wachovia-Wells Merger Date* | December 31, 2008. |
| *WBNA* | Wachovia Bank, N.A. |
| *WC* | Wachovia Corporation. |
| *WCM* | Wachovia Capital Markets LLC. |
| *Wells Fargo* | WFC, WFBNA and its and their subsidiaries and affiliates. |
| *Wes Thompson* | Wes Thompson, an employee at Wachovia who worked directly with Relator Kraus. |
| *WFBNA* | Wells Fargo Bank, National Association. |
| *WFC* | Wells Fargo & Company. |
| *World Savings* | GWF, WSB, WSI and its and their subsidiaries and affiliates. |
| *World-Wachovia Merger Date* | October 2, 2006. |
| *WS* | Wachovia Securities LLC. |
| *WSB* | World Savings Bank, FSB. |
| *WSI* | World Savings, Inc. |
| *Young* | Steve Young, Wachovia's CIB's Head of Credit and Counterparty Risk Analytics Group. |

# APPENDIX II

## SOME OF THE PAYMENTS MADE UNDER THE FEDERAL PROGRAMS

*The Federal Reserve's Discount Window Primary Credit Program ("**DW-PCP**")
and Term Auction Facility*

| Borrower | Federal Program | Amount of Subsidy (in billions) | Date of Payment | Term (in days) | Rate of Subsidized Advance |
|---|---|---|---|---|---|
| WBNA | DW – PCP | 0.050 | 8/22/2007 | 30 | 5.750% |
| WBNA | DW | .450 | 8/22/2007 | 1 | 5.750% |
| WBNA | TAF | 0.025 | 12/20/2007 | 28 | 4.650% |
| WBNA | DW – PCP | 1.235 | 1/16/2008 | 1 | 4.750% |
| WBNA | TAF | 3.500 | 3/27/2008 | 28 | 2.615% |
| WBNA | TAF | 3.500 | 4/10/2008 | 28 | 2.820% |
| WBNA | TAF | 5.000 | 4/24/2008 | 28 | 2.870% |
| WBNA | TAF | 5.000 | 5/8/2008 | 28 | 2.220% |
| WBNA | TAF | 5.000 | 5/22/2008 | 28 | 2.100% |
| WBNA | TAF | 5.000 | 6/5/2008 | 28 | 2.260% |
| WBNA | TAF | 5.000 | 6/19/2008 | 28 | 2.360% |
| WBNA | TAF | 7.500 | 7/3/2008 | 28 | 2.340% |
| WBNA | TAF | 5.000 | 7/17/2008 | 28 | 2.300% |
| WBNA | TAF | 5.000 | 7/31/2008 | 28 | 2.350% |
| WBNA | TAF | 5.000 | 8/14/2008 | 28 | 2.450% |
| WBNA | TAF | 2.500 | 8/14/2008 | 84 | 2.754% |
| WBNA | TAF | 5.000 | 8/28/2008 | 28 | 2.380% |
| WBNA | TAF | 2.500 | 9/11/2008 | 28 | 2.530% |
| WBNA | TAF | 2.500 | 9/11/2008 | 84 | 2.670% |
| WBNA | TAF | 5.000 | 9/25/2008 | 28 | 3.750% |
| WBNA | DW – PCP | 23.000 | 10/6/2008 | 87 | 2.250% |
| WBNA | DW – PCP | 6.000 | 10/6/2008 | 28 | 2.250% |
| WBNA | DW – PCP | 7.000 | 10/8/2008 | 26 | 1.750% |
| WBNA | TAF | 15.000 | 10/9/2008 | 85 | 1.390% |
| WBNA | TAF | 15.000 | 10/23/2008 | 28 | 1.110% |
| WBNA | TAF | 15.000 | 11/6/2008 | 84 | 0.600% |
| WBNA | TAF | 15.000 | 11/20/2008 | 28 | 0.510% |
| WBNA | TAF | 10.000 | 12/22/2008 | 17 | 0.528% |
| WBNA | TAF | 5.000 | 2/26/2009 | 84 | 0.250% |
| WFBNA | TAF | 15.000 | 1/29/2009 | 84 | 0.250% |
| WFBNA | TAF | 15.000 | 2/12/2009 | 28 | 0.250% |
| WFBNA | TAF | 15.000 | 2/26/2009 | 84 | 0.250% |
| WFBNA | TAF | 5.000 | 5/7/2009 | 28 | 0.250% |
| WFBNA | TAF | 10.000 | 5/21/2009 | 84 | 0.250% |

*The FDIC's Temporary Liquidity Guarantee Program*

| Issuer Name | Issue Date | Maturity Date | Rate Type | Subsidized Interest Rate | Amount of Debt |
|---|---|---|---|---|---|
| WBNA | 11/6/2008 | 12/8/2008 | Fixed | 1.5% | 2,000,000 |
| WBNA | 11/6/2008 | 12/8/2008 | Fixed | 1.98% | 5,000,000 |
| WBNA | 11/7/2008 | 12/8/2008 | Fixed | 1.34% | 1,000,000 |
| WBNA | 11/7/2008 | 12/8/2008 | Fixed | 3% | 1,000,000 |
| WBNA | 11/13/2008 | 2/11/2009 | Fixed | 1.89% | 15,000,000 |
| WBNA | 11/26/2008 | 2/12/2009 | Fixed | 1.72% | 253,500 |
| WBNA | 11/26/2008 | 3/3/2009 | Fixed | 1.85% | 700,000 |
| WBNA | 11/28/2008 | 2/26/2009 | Fixed | 0.62% | 1,000,000 |
| WBNA | 12/3/2008 | 2/27/2009 | Fixed | 1.8% | 50,000 |
| WBNA | 12/3/2008 | 2/27/2009 | Fixed | 1.8% | 100,000 |
| WBNA | 12/4/2008 | 3/4/2009 | Fixed | 1.9% | 2,000,000 |
| WBNA | 12/4/2008 | 12/4/2009 | Fixed | 3% | 250,000 |
| WBNA | 12/8/2008 | 1/8/2009 | Fixed | 1.56% | 5,000,000 |
| WBNA | 12/9/2008 | 1/9/2009 | Fixed | 1.75% | 7,000,000 |
| WBNA | 12/16/2008 | 2/16/2009 | Fixed | 1.37% | 3,000,000 |
| WBNA | 12/16/2008 | 12/15/2009 | Fixed | 2.6% | 1,310,000 |
| WBNA | 12/17/2008 | 1/20/2009 | Fixed | 0.78% | 1,900,000 |
| WBNA | 12/19/2008 | 2/17/2009 | Fixed | 0.9% | 3,000,000 |
| WBNA | 12/23/2008 | 3/23/2009 | Fixed | 1.24% | 9,000,000 |
| WBNA | 12/24/2008 | 6/24/2009 | Fixed | 1.59% | 800,000 |
| WBNA | 12/26/2008 | 6/26/2009 | Fixed | 1.53% | 200,000 |
| WBNA | 12/28/2008 | 3/28/2009 | Fixed | 0.05% | 1,104,246 |
| WBNA | 12/28/2008 | 1/28/2010 | Fixed | 2.33% | 2,000,000 |
| WBNA | 12/29/2008 | 9/15/2009 | Fixed | 2.1% | 450,000 |
| WBNA | 1/6/2009 | 6/30/2009 | Fixed | 1.7% | 1,950,000 |
| WBNA | 1/7/2009 | 7/7/2009 | Fixed | 1.5% | 1,000,000 |
| WBNA | 1/7/2009 | 8/14/2009 | Fixed | 1.65% | 340,000 |
| WBNA | 1/8/2009 | 1/4/2010 | Fixed | 2.46% | 2,000,000 |
| WBNA | 1/12/2009 | 4/13/2009 | Fixed | 1.17% | 3,000,000 |
| WBNA | 1/12/2009 | 1/12/2010 | Fixed | 1.86% | 502,851 |
| WBNA | 1/13/2009 | 4/21/2009 | Fixed | 1.11% | 350,000 |
| WBNA | 1/13/2009 | 4/21/2009 | Fixed | 1.11% | 455,000 |
| WBNA | 1/13/2009 | 1/13/2010 | Fixed | 1.86% | 463,469 |
| WBNA | 1/15/2009 | 1/11/2010 | Fixed | 2.16% | 2,000,000 |
| WBNA | 1/15/2009 | 1/15/2010 | Fixed | 1.9% | 300,000 |
| WBNA | 1/16/2009 | 1/18/2010 | Fixed | 1.95% | 1,930,000 |
| WBNA | 1/26/2009 | 4/27/2009 | Fixed | 1.25% | 5,000,000 |
| WBNA | 1/27/2009 | 1/22/2010 | Fixed | 2.05% | 1,675,000 |
| WBNA | 1/29/2009 | 4/29/2009 | Fixed | 1.03% | 1,004,158 |
| WBNA | 1/29/2009 | 1/29/2010 | Fixed | 2.28% | 100,000 |

| WBNA | 1/30/2009 | 3/2/2009 | Fixed | 0.4% | 5,000,000 |
|------|-----------|----------|-------|------|-----------|
| WBNA | 1/30/2009 | 4/30/2009 | Fixed | 1.3% | 262,751 |
| WBNA | 2/2/2009 | 4/21/2009 | Fixed | 0.85% | 160,000 |
| WBNA | 2/11/2009 | 5/11/2009 | Fixed | 1.17% | 10,000,000 |
| WBNA | 2/11/2009 | 5/12/2009 | Fixed | 1.02% | 20,000,000 |
| WBNA | 2/12/2009 | 4/13/2009 | Fixed | 0.77% | 254,432 |
| WBNA | 2/13/2009 | 4/14/2009 | Fixed | 0.76% | 1,000,000 |
| WBNA | 2/18/2009 | 5/18/2009 | Fixed | 1.2% | 20,009,667 |
| WBNA | 2/18/2009 | 8/18/2009 | Fixed | 1.73% | 6,000,000 |
| WBNA | 2/20/2009 | 3/23/2009 | Fixed | 0.32% | 300,000 |
| WBNA | 2/20/2009 | 8/19/2009 | Fixed | 1.56% | 80,000 |
| WBNA | 2/27/2009 | 9/25/2009 | Fixed | 2.5% | 2,000,000 |
| WBNA | 3/2/2009 | 5/1/2009 | Fixed | 0.95% | 5,000,000 |
| WBNA | 3/2/2009 | 5/29/2009 | Fixed | 0.71% | 50,000 |
| WBNA | 3/2/2009 | 5/29/2009 | Fixed | 0.71% | 100,000 |
| WBNA | 3/3/2009 | 6/1/2009 | Fixed | 1.06% | 6,000,000 |
| WBNA | 3/3/2009 | 6/3/2009 | Fixed | 1.02% | 700,000 |
| WBNA | 3/4/2009 | 9/30/2009 | Fixed | 2.11% | 2,000,000 |
| WBNA | 3/17/2009 | 3/17/2010 | Fixed | 1.25% | 1,650,000 |
| WBNA | 3/23/2009 | 4/29/2009 | Fixed | 0.27% | 100,000 |
| WBNA | 3/24/2009 | 6/24/2009 | Fixed | 1.18% | 500,000 |
| WBNA | 3/27/2009 | 6/26/2009 | Fixed | 0.47% | 100,000 |
| WBNA | 3/27/2009 | 6/29/2009 | Fixed | 1.12% | 5,000,000 |
| WBNA | 3/30/2009 | 6/28/2009 | Fixed | 0.05% | 1,104,382 |
| WBNA | 3/31/2009 | 6/29/2009 | Fixed | 1.05% | 3,600,000 |
| WBNA | 4/8/2009 | 6/10/2009 | Fixed | 0.81% | 20,030,276 |
| WBNA | 4/8/2009 | 8/25/2009 | Fixed | 0.97% | 550,000 |
| WBNA | 4/13/2009 | 7/13/2009 | Fixed | 0.38% | 255,000 |
| WBNA | 4/14/2009 | 7/14/2009 | Fixed | 1% | 10,000,000 |
| WBNA | 4/14/2009 | 8/12/2009 | Fixed | 0.76% | 1,000,000 |
| WBNA | 4/17/2009 | 5/18/2009 | Fixed | 0.34% | 10,000,000 |
| WBNA | 4/17/2009 | 7/16/2009 | Fixed | 0.95% | 5,001,704 |
| WBNA | 4/20/2009 | 7/20/2009 | Fixed | 1% | 5,000,000 |
| WBNA | 4/21/2009 | 12/28/2009 | Fixed | 1.23% | 1,260,000 |
| WBNA | 4/21/2009 | 12/28/2009 | Fixed | 1.23% | 2,256,000 |
| WBNA | 4/23/2009 | 6/23/2009 | Fixed | 0.72% | 12,000,000 |
| WBNA | 4/24/2009 | 6/24/2009 | Fixed | 0.8% | 5,000,000 |
| WBNA | 4/24/2009 | 4/23/2010 | Fixed | 1.13% | 1,500,000 |
| WBNA | 4/27/2009 | 7/30/2009 | Fixed | 0.19% | 101,436 |
| WBNA | 4/29/2009 | 6/8/2009 | Fixed | 0.15% | 1,004,158 |
| WBNA | 4/30/2009 | 6/12/2009 | Fixed | 0.05% | 2,000,600 |
| WBNA | 4/30/2009 | 7/30/2009 | Fixed | 0.5% | 263,540 |
| WBNA | 5/5/2009 | 8/5/2009 | Fixed | 0.68% | 10,000,000 |

| WBNA | 5/8/2009 | 12/28/2009 | Fixed | 1.07% | 600,000 |
| WBNA | 5/21/2009 | 6/22/2009 | Fixed | 0.29% | 3,550,000 |
| WBNA | 5/22/2009 | 6/22/2009 | Fixed | 0.15% | 300,000 |
| WBNA | 5/26/2009 | 11/23/2009 | Fixed | 0.65% | 70,000 |
| WBNA | 5/28/2009 | 11/24/2009 | Fixed | 0.56% | 3,500,000 |
| WBNA | 6/3/2009 | 11/30/2009 | Fixed | 0.3% | 50,000 |
| WFC | 3/30/2009 | 6/15/2012 | Fixed | 2.125% | 1,750,000,000 |
| WFC | 3/30/2009 | 6/15/2012 | Floating | LIBOR + 0.2200% | 1,750,000,000 |
| WFBNA | 1/9/2009 | 3/9/2009 | Fixed | 0.5% | 59,750,000 |
| WFBNA | 2/27/2009 | 3/31/2009 | Fixed | 0.4% | 30,000,000 |
| WFBNA | 3/2/2009 | 4/2/2009 | Fixed | 0.45% | 6,750,000 |
| WFBNA | 4/21/2009 | 5/22/2009 | Fixed | 0.45% | 15,000,000 |
| WFBNA | 4/24/2009 | 5/26/2009 | Fixed | 0.45% | 5,000,000 |
| WFBNA | 4/24/2009 | 5/26/2009 | Fixed | 0.45% | 20,000,000 |
| WFBNA | 5/4/2009 | 6/4/2009 | Fixed | 0.45% | 10,000,000 |
| WFBNA | 5/5/2009 | 6/5/2009 | Fixed | 0.45% | 10,000,000 |
| WFBNA | 5/6/2009 | 6/8/2009 | Fixed | 0.45% | 15,000,000 |
| WFBNA | 5/7/2009 | 6/8/2009 | Fixed | 0.45% | 15,000,000 |
| WFBNA | 5/14/2009 | 6/15/2009 | Fixed | 0.48% | 10,000,000 |
| WFBNA | 5/18/2009 | 6/18/2009 | Fixed | 0.48% | 25,000,000 |

## APPENDIX III

### CIB REPORTING LINES



## <u>APPENDIX IV</u>

### WACHOVIA CMBS SECURITIZATION TRANSACTION STRUCTURE



# APPENDIX V

## THE CREF FACILITY



# APPENDIX VI

## THE BLACK BOX

**Step 3:** *Sell the CRE Loans to the CMBS Issuer*

**Wachovia Bank, National Association's Balance Sheet**

How it was accounted for:

1.   Recognize CRE Loans when originated or purchased;

2.  Derecognize CRE Loans from balance sheet when "sold" to the Black Box (FAS 140);

3.  Recognize Class B Certificate on balance sheet as a Debt Security (FAS 115);

4.  Take back the CRE Loans from the Black Box when a CMBS deal is ready to close, and immediately move them to the CMBS Issuer; and

5.  Reconcile Class A Certificate/Class B Certificate funding numbers to fabricate at least 10% beneficial interest in the Black Box for the Class A Certificate holder.

$

CRE Loans

**Wachovia Bank Commercial Mortgage Trust (the CMBS Issuer)**

Commercial Mortgage-Backed Securities

$

**Market**

Class B Certificate (90% Beneficial Interest)

$

"Sale" of CRE Loans

$

**College Street Master Funding Trust (*a.k.a.*, the Black Box)**

Class A Certificate (10% Beneficial Interest)

$

$

CRE Loans

**Step 2:** *Park the CRE Loans in the Black Box and Take the CRE Loans back out of the Black Box when ready to securitize*

**Commercial Real Estate Loan Borrowers**

**Amsterdam Funding Corporation**

**Step 1:** *Originate or Purchase the CRE Loans*

## APPENDIX VII

### THE REPO SPVs

**Step 2:** *Repo the CRE Loans to the Repo SPV and roll until some sort of final disposition (e.g., sale to CMBS Issuer, write-off, etc.)*



**Step 1:** *Originate or Purchase the CRE Loans*