UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
: 
UNITED STATES OF AMERICA ex rel. :
ROBERT KRAUS and PAUL BISHOP; :
:
                      Plaintiffs, : **MEMORANDUM**
: **DECISION & ORDER**
               - against - :
: 11 Civ. 5457 (BMC)
WELLS FARGO & COMPANY, WELLS :
FARGO BANK, N.A., and its and their :
subsidiaries and affiliates; :
:
                      Defendants. :
:
---------------------------------------------------------- X

**COGAN,** District Judge.

      Before me is defendants' motion to dismiss the Third Amended Complaint in its entirety for failure to state a claim. Relators bring this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), alleging essentially that defendants and their predecessors in interest presented false information to the Federal Reserve and Federal Home Loan Banks in connection with their receipt of payments in the form of loans and advances from those entities. On July 30, 2014, the United States notified the Court that it had elected to decline intervention. The Third Amended Complaint was filed shortly thereafter, and the United States again declined to intervene. For the reasons that follow, defendants' motion to dismiss is GRANTED, and the Third Amended Complaint is dismissed.

**BACKGROUND**

      Except where otherwise noted, the following facts are taken from the Third Amended Complaint ("Complaint") and are accepted as true for the purpose of deciding the instant motion. Defendants include Wells Fargo & Company (a bank holding company), Wells Fargo Bank,

N.A., and their "subsidiaries and affiliates." This case also, and to a large extent, concerns the activities of the former Wachovia Corporation and its subsidiaries, which merged into defendants' group of companies in 2008.[1] Relators are former employees who became aware of certain allegedly improper practices at the defendant banks.

From about 2001 onward, according to the Complaint, the defendant banks engaged in far-reaching "control fraud," through which individuals in control of the banks inflated short-term profits for personal gain (*i.e.*, inflated compensation and perks), at the expense of the banks' financial health. These allegations of financial chicanery – which span 79 pages of the Complaint – principally concern defendants' issuance of "toxic" loans backed by commercial real estate ("CRE") assets, a species of financial product that has become all too familiar in the wake of the 2008 financial crisis. For example, relators allege that defendants avoided reserve capital requirements by, among other things, "warehousing" toxic CRE-backed loans in off-balance sheet single purpose vehicles; engaged in fraudulent internal credit-grading and financial modeling practices; and concealed the risk created by these and other improper activities.

The intricacies of these allegations are not critical to the validity of the FCA claims in this case; it is sufficient to note that they include allegations of improper banking practices that impacted defendants' balance sheets and financial health; allegations of inaccuracies in financial statements and other disclosures made to regulators, shareholders, and the public; and allegations that these "known frauds," when discovered, would require "costly and extensive remedial measures to rebuild and incorporate risk management, internal control and accounting processes" at the banks that survived the merger.

---

[1] The parties dispute the extent to which Wachovia's activities can be imputed to defendants, but it is possible to decide the issues presented by this case without distinguishing between the named defendant entities, their subsidiaries and affiliates, and their predecessors. For purposes of this decision, I therefore refer to them all collectively as "defendants."

Relators also allege (and it is indisputably the case) that during this period of time, defendants were subject to various laws and regulations that governed the banking industry, including interagency "safety and soundness" regulations, which mandate certain internal controls, as well as various reporting requirements including: FDIC audit and reporting requirements; the Sarbanes-Oxley Act; certain criminal fraud provisions of 18 U.S.C. § 47; and 12 U.S.C. § 1831(n)(a)(2)(A), which mandates compliance with Generally Accepted Accounting Principles ("GAAP").

This brings us to the alleged "false claims" at issue in this case. Relators essentially allege that during what they define as the relevant period, from 2007 until the present, defendants sought and obtained payments and advances from the Federal Reserve discount window, which through its "primary credit program" afforded defendants certain preferential borrowing terms, and the Federal Reserve Term Auction Facility ("TAF").[2] Relators allege (and it is not disputed) that as a condition of receiving the loans, defendants adopted certain representations set forth in the Federal Reserve's Operating Circular No. 10, dated October 15, 2006 (the "Circular"), which in turn formed part of the agreement that governed the loans (the "Lending Agreement").

Relators also allege that defendants are liable under the FCA because they received "payments . . . in the form of advances" from certain regional Federal Home Loan Banks ("FHLBs") pursuant to a lending agreement that contained false certifications. Relators allege that false claims made to the FHLBs, which are privately owned, are subject to the FCA essentially because their obligations "are considered to be guaranteed by the United States."[3]

---

[2] Although they are distinct programs, the discount window / primary credit program and TAF are governed by one set of lending terms, and can be treated as one program for purposes of this disposition.

[3] Relators have withdrawn additional claims relating to guarantees (*i.e.*, subsidies) obtained from the Federal Deposit Insurance Corporation ("FDIC").

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), a court must assume the truth of "all well pleaded, nonconclusory factual allegations" in the complaint. Harrington v. Cnty. of Suffolk, 607 F.3d 31, 33 (2d Cir. 2010) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009)). The Court must also draw "all reasonable inferences in the plaintiff's favor." Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). Nevertheless, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007).

To encourage private citizens to report fraud against the United States government, the FCA allows for *qui tam* lawsuits such as this one. See 31 U.S.C. § 3730(b). Relators assert three causes of action under three distinct provisions of § 3729(a), for presenting false claims; making or using false records; and conspiracy. The former two of these provisions were amended in 2009, while the conduct alleged in this case was ongoing. Nevertheless, relators' distinct causes of action need not be treated separately for purposes of this opinion. See U.S. ex rel. Colucci v. Beth Israel Med. Ctr., 785 F. Supp. 2d 303, 310 (S.D.N.Y. 2011), aff'd sub nom. Colucci v. Beth Israel Med. Ctr., 531 F. App'x 118 (2d Cir. 2013). In short, for a defendant to be liable under the FCA, the relator "must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001).

As a threshold matter, relators allege that defendants "received payments from the Federal Entities [including the Federal Reserve and FHLBs] by drawing advances and/or obtaining guarantees in connection with one or more of the Federal Programs," and defendants do not appear to dispute that this allegation is sufficient to satisfy the requirement that in each instance defendants "made a claim" and were "seeking payment" for purposes of FCA liability.

There are generally two types of false claims under the FCA. The first is a "factually false" claim, the "most common" type, which "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Mikes, 274 F.3d at 696. The second is a "legally false" claim, "where a party certifies compliance with a statute or regulation as a condition to governmental payment." Id. at 697. Such claims fall into two further subcategories. An *express* legally false certification is "a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Id. at 698. An *implied* legally false certification occurs when "the submission of the claim itself constitutes the certification of compliance." Colucci, 785 F. Supp. at 311 (citing Mikes, 274 F.3d at 700); see also U.S. ex rel. Bilotta v. Novartis Pharm. Corp., 50 F. Supp. 3d 497 (S.D.N.Y. 2014).

Relators assert four theories of FCA liability: (1) a legally false express certification to the Federal Reserve, by adopting § 9.2(b) of the Circular, involving misrepresentation of defendants' historical compliance with the laws and regulations discussed above; (2) a legally false implied certification stemming from the same provision; (3) two related factually false certifications to the Federal Reserve, by adopting §§ 9.2(g) and (i) of the Circular, essentially involving the accuracy of past financial reporting; and (4) express factually false claims relating to advances obtained from the FHLBs.

The parties appear to agree that Fed. R. Civ. P. 9(b) provides the pleading standard for relators' FCA claims. See United States v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 615-16 & n.14 (S.D.N.Y. 2013) (citing Gold v. Morrison–Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir. 1995)). That rule requires that "a party must state with particularity the circumstances constituting fraud or mistake." Pleadings subject to Rule 9(b) must therefore "(1) specify the

5

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 615-16 (citing Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)) (quotation omitted).

Rule 9(b) does provide some flexibility in the context of a long-running fraudulent scheme, allowing the requirement to be met by allegations that include "examples of specific false claims submitted to the government pursuant to that scheme." Wells Fargo Bank, N.A., 972 F. Supp. 2d at 616 (quoting United States ex rel. Bledsoe v. Cmty. Health Sys., 501 F.3d 493, 510 (6th Cir. 2007)) (internal quotation omitted). In addition, Rule 9(b)'s standards may be relaxed when "facts are peculiarly within the opposing party's knowledge." Boykin v. Keycorp, 521 F.3d 202, 215 (2d Cir. 2008).

## I. Section 9.2(b) – Express Legally False Certification

The central issue in this case concerns a representation made by defendants to the Federal Reserve as a condition of borrowing through the discount window or TAF. Section 9.2(b) of the Circular, which is adopted as a representation by the borrower, states in relevant part that the borrower "is not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement" of which it forms a part.

Relators argue that this is a false claim for purposes of the FCA because, essentially, the undisclosed history of "control fraud" within the defendant banks and their predecessors constituted a violation of laws or regulations "which could have any adverse effect" on the "performance" of their borrowing obligations as a result of its impact on defendants' overall financial health.

Defendants argue at length, and with reliance on an legislative history, that § 9.2(b)'s inclusion of the term "performance," which was added to a revision of the Circular in 2006, is

6

simply bad draftsmanship, and that a borrowing bank's adoption of the provision only represents that it has the legal authority to enter into the loan. But I need not decide whether § 9.2(b) means what relators contend it means.[4] Even assuming the provision does call for the broad certification of past compliance that relators contend that it does, that kind of certification is too broad to be a "false claim" for purposes of the FCA.

To fall within the statute, a false claim of this variety must "falsely certif[y] compliance with a *particular* statute, regulation or contractual term, where compliance is a prerequisite to payment." Mikes, 274 F.3d at 698 (emphasis added). District Courts in the Second Circuit have consistently – and correctly, in my view – adhered to this limitation by its plain terms. See, e.g., Colucci, 785 F. Supp. 2d at 315 (certification of compliance with "laws and regulations regarding the provision of health care services, and that the services . . . were provided in compliance with such laws and regulations" was "too general" to support FCA liability); U.S. ex rel. Feldman v. City of New York, 808 F. Supp. 2d 641, 652 (S.D.N.Y. 2011) (representation that "reported expenditures contained therein are 'allowable in accordance with applicable implementing federal, state, and local statutes, regulations, [and] policies'" too "broad and vague" to support express false certification). In short, the Mikes "particular statute" limitation means what it says: One cannot make an express legally false claim by incorrectly representing that one is generally law-abiding, even if only in some limited respect; the representation has to refer to compliance with a particular law.

---

[4] As relators argue and defendants concede, the 2006 revisions to § 9.2 were intended by the Federal Reserve to make its representations "more comprehensive." And indeed, the word "performance" was absent from the pre-2006 provision, and I presume that it was added for a reason. Nevertheless, I am skeptical of relators' proposed construction, which defies common sense. If the Federal Reserve wanted a disclosure of any historical regulatory violation that could conceivably be traced to a negative impact on the borrowing bank's balance sheet, it would have found a less obtuse way to ask for it.

7

It appears that this is the first opportunity for a court to consider whether § 9.2(b) of Circular No. 10 is too broad to give rise to a false claim under <u>Mikes</u>. I hold that it is, as I cannot see a principled distinction between the representations to which courts have applied <u>Mikes</u> and the one allegedly made here. It is true, as relators argue, that the language of § 9.2(b) puts at least some limitation on the laws and regulations with which defendants, under relators' view, have certified compliance. But these limitations are eviscerated in any practical sense by the very theory under which relators allege noncompliance. The crux of relators' theory of this case is that because the various control frauds at Wachovia, and later at Wells Fargo, were at once violations of law and regulation, and also impacted the soundness of the defendant banks (whether because they were violations as such, or just coincidentally), they "could have [had] any adverse effect whatsoever upon the validity, performance or enforceability" of the loans.

This would mean that <u>any</u> violation of law or regulation that could arguably have impacted defendants' balance sheet would have rendered the § 9.2(b) certification a falsehood. If defendants had known, for example, that they were in systemic violation of labor laws, or building codes, or parking ordnances, as long as those violations were sufficiently serious to have a potential impact on the banks' bottom line, they would have had to disclose those violations prior to borrowing.

Relators, of course, emphasize the scope of the alleged control fraud, and I do not doubt that the underlying misconduct detailed in these allegations, if true, would be a serious matter. But no limiting principle has been suggested, and so the tenuous connection that relators draw between this misconduct and the "performance" of a discount window or TAF loan is, to some extent, the very undoing of their claim. In short, under relators' view, § 9.2(b) would reasonably be read to require disclosure of non-compliance with any law or regulation governing the

banking industry or governing corporations generally, which is exactly the kind of overbroad certification requirement rejected in the cases that follow Mikes.

The single case cited by relators on this point is not to the contrary.[5] In U.S. ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1170-71 (10th Cir. 2010) (internal quotation marks omitted), the Tenth Circuit declined to apply the rule articulated in Mikes to a representation that certain "payments requested were only for work performed in accordance with the specifications, terms and conditions of the contract." The Tenth Circuit declined to follow the language of Mikes because, essentially, it thought that it would improperly narrow the scope of the FCA to "preclude claims whenever a payee certifies compliance with *all* contractual requirements rather than with a single, specific contractual requirement." Id. at 1171 (emphasis in original).

Without considering whether this ruling is correct in the context of a contract, where it makes at least some sense (because there is obviously a limit to how many terms that would refer to), it is not the same as a certification of compliance with any statute or regulation – a certification that is potentially limitless in scope. I therefore hold that the rule articulated in Mikes governs this case, and that § 9.2(b) is too broad to be an express legally false claim under the FCA.[6]

---

[5] Relators also appear to argue that Wells Fargo Bank, N.A., 972 F. Supp. 2d at 625 (S.D.N.Y. 2013), offers support for their position. The language cited, however, is addressed to impliedly false certifications, discussed further below. In addition, the certifications successfully alleged to be false in that case were factually false as well; the defendant bank (also defendant here), "[f]or each mortgage it submitted for insurance . . . was required to certify that the loan met [certain] conditions" and the Government alleged that "these certifications were, in many instances, knowingly false." Id. at 624.

[6] Because I can dispose of this claim on the grounds set forth above, I need not decide the numerous other issues put before me by the parties, such as whether it is sufficiently alleged that defendants' underlying "control fraud" would actually have impacted the performance of discount window or TAF loans; whether defendant's view of 9.2(b) was at least reasonable (so as to defeat the FCA's knowledge requirement); and so on.

## II. Section 9.2(b) – Implied Legally False Certification

Relators have not briefed an "implied false certification" theory in any great depth, nor have they alleged it with any detail. An implied false certification "takes place where a statute expressly conditions payment on compliance with a given statute or regulation, and the contractor, while failing to comply with the statute or regulation (and while knowing that compliance is required), submits a claim for payment." U.S. ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 114 (2d Cir. 2010), rev'd on other grounds, 131 S.Ct. 1885 (2011). An implied certification claim is only available in "limited circumstances, where the underlying statute or regulation upon which plaintiff relies expressly states the provider must comply in order to be paid." Colucci, 785 F. Supp. 2d at 311 (quoting Mikes, 274 F.3d at 700). As Judge Chin held in Colucci, that requirement "prevents the FCA from being used as a 'blunt instrument' to enforce compliance with all manner of regulations, even if such regulations are unrelated to the government's payment decisions." Id. (citing Mikes, 274 F.3d at 699).[7]

In the most basic sense, this claim is most appropriate where the statute or regulation of which the defendant is alleged to be in violation is the same statute that governs eligibility for the benefit that is the basis for the FCA claim. That is not what is alleged here. In a case like this one, it is not the Lending Agreement that would have to condition payment on compliance with laws and regulation to give rise to FCA liability; it is the laws and regulations themselves. By way of illustration: If, for example, relators were alleging that defendants' underlying "control fraud" was among other things a violation of the Sarbannes-Oxley Act (as they do allege), *and* it was the case (or alleged) that the Sarbanes-Oxley Act *itself* governed eligibility for the Federal

---

[7] I note briefly that in Feldman, 808 F. Supp. 2d at 652, Judge Rakoff appeared to have rejected the express statement requirement of Mikes, or at least limited it to the context of Medicare. But in finding an implied certification, he found that regulations concerning eligibility for reimbursement mandated compliance with state law, that the applicable state law set certain conditions on when benefits would be authorized, and that a claim for reimbursement therefore was an implied certification that those conditions were met. In other words, the result was consistent with Mikes, it simply required incorporating by reference the relevant federal and state regulations.

10

Reserve's primary credit program (and of course it does no such thing), only then would knowing violation of Sarbanes-Oxley be an implied false certification at the discount window.

Here, there quite simply is no allegation (nor could there be) that any of the many alleged violations of laws and regulations that took place at the defendant banks was ever a violation of a statute that governed eligibility for the primary credit program. For that reason, an implied legally false certification claim is misplaced on the facts alleged in this case.

### III. Sections 9.2(g) and 9.2(i) – Factually False Certifications

Relators allege FCA liability under two additional provisions of the Circular. Both theories involve straightforward "factually false" claims concerning the accuracy of certain representations about defendants' balance sheets and internal procedures. See Mikes, 274 F.3d at 696; see also, e.g., U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 152-53 (E.D. Pa. 2012) ("This is, of course, not to say that . . . data fields [within a required submission] are 'conditions of payment,' such that submission of these records with incomplete or inaccurate data automatically gives rise to a violation of the False Claims Act. Rather, it is the act of certifying the truth, accuracy, and completeness of these fields . . . when such data is not actually truthful, accurate, or complete, that gives rise to a False Claims Act cause of action.").

First, § 9.2(g) of the Circular provides, among other things, that "no statement or information contained in . . . [any] document, certificate, or statement furnished by the Borrower to the [Federal Reserve] for use in connection with the transactions contemplated by the Lending Agreement [*i.e.*, discount window or TAF borrowing] is untrue as to any material fact or omits any material fact necessary to make the same not misleading." Relators, in opposing the instant motion, contend that their Complaint alleges that the defendants made that certification falsely because it purportedly alleges that defendants "prepared and delivered to the Federal Reserve and other regulators materially false financial statements, call reports and Financial Reporting

11

and Internal Control Certifications." Relators tacitly concede, however, that the Complaint only contains factual allegations that would support such an inference to the extent that documents in these three categories "would necessarily" have been presented to the Federal Reserve either by defendants, or by other regulators who had obtained it.

Of course, it is at least arguable that the detailed factual allegations of control fraud and balance sheet manipulation set forth in the Complaint are enough of a basis to find that relators have sufficiently alleged that there were untruths or material omissions in these three categories of documents. But the Complaint is devoid of any express allegation that these documents were ever "furnished" by defendants to the Federal Reserve, let alone under circumstances that clearly suggest they were so furnished "for use in connection" with any discount window (or TAF) borrowing activity.

What the Complaint does allege is that certain financial reporting, including at least some material in the categories above, was submitted to "Federal Entities," a term the Complaint defines as including the Federal Reserve, the Treasury Department, the FDIC, and the FHLBs. For example, the Complaint contains allegations that defendants violated laws and regulations in order to "falsify and fail to correct financial reports and statements (including call reports submitted to certain Federal Entities) for a period of at least nine years to concoct a fictional picture of its 'sound' financial health . . ." and to "falsely report higher and higher returns on equity capital (when, in fact, no such returns existed) and improperly maintain lower and lower reserves of balance sheet capital . . . ." Even more colorfully, the Complaint alleges that after generating "toxic" high-risk loans, defendants "employed illegal S&L- and Enron-like accounting techniques to deliberately and cleverly conceal the financial risks [they] had necessarily assumed . . . ."

The Complaint further explains that the primary credit program was limited "to only 'generally sound' financial institutions that could satisfy a Federal Reserve System-wide set of eligibility criteria for borrowing . . . based on both supervisory and 'other relevant information'" (quoting 12 C.F.R. Part 201, Regulation A; Docket No. R-1123, "Extension of Credit by Federal Reserve Banks"). Of course, such supervisory information had to come from somewhere, which may explain the cautious position being taken by defendants on this point; their position is that even if relators have alleged that misleading financial statements were furnished to the Federal Reserve somewhere along the way, they have not alleged that these statements were provided "in connection with" discount window or TAF borrowing, as liability in connection with § 9.2(g) would require.

But the Complaint also provides its own explanation of how eligibility for the primary credit program was determined, specifically, that "[t]he availability and rate of advances from the Discount Window depends on the creditworthiness and soundness of the borrowing institution based on its ability to make the express certifications required of it," and that to be eligible for the primary credit program, defendants "executed a lending agreement and corporate resolutions conforming with Operating Circular No. 10" and "executed a letter agreement with the Federal Reserve agreeing to the terms of the Circular." Nowhere in these documents, templates of which are provided as appendices to the Circular, is there any mention of a requirement that borrowing banks furnish their financials to the Federal Reserve – or that the Federal Reserve considers such material obtained from other agencies – in order to establish eligibility for the primary credit program, let alone in connection with any given draw.

The only thing the parties appear to agree on is that this Court should make a determination about whether inaccurate financials are sufficiently alleged to have been part of or

13

formed a basis for the "supervisory and other relevant information" upon which the Federal Reserve bases its determination of eligibility for the primary credit program. Both sides ask me to draw favorable inferences about whether defendants' inaccurate financials (allegedly) wound up in the hands of the Federal Reserve, and if so how. Defendants in their reply brief ask me to take judicial notice of various regulatory materials purporting to show that defendants' allegedly fraudulent financials play no part in the Federal Reserve's eligibility determination, while relators invite me to infer from their factual allegations that these documents not only were furnished by defendants to the Federal Reserve at some point, but that this occurred under circumstances that could fairly be labeled "in connection with" their discount window or TAF borrowing. I decline both invitations.

If it were in fact susceptible to judicial notice – or if it had simply been alleged – that borrowing institutions are required to provide financial statements to the Federal Reserve as a prerequisite to participation in the primary credit program, then allegations of balance sheet manipulation like the ones here might be sufficient to state a claim under the FCA.

But none of this is anywhere near clear from the allegations in the Complaint or from the sources to which the parties refer, and the fact is that relators have not "nudged their claims across the line from conceivable to plausible," Bell Atl. Corp., 550 U.S. at 570, 127 S. Ct. 1955. It is not this Court's role, on a motion to dismiss, to surmise that it may be so. To say that by providing financial reporting to some nonspecific government agency, that somehow ends up in a supervisory rating compiled or issued by that or another agency, even if the Federal Reserve has some involvement in that process, that that information is thereby "furnished" to the Federal Reserve "in connection with" discount window (or TAF) borrowing is all far too speculative to constitute a well-plead claim under either Rule 8, see id. at 555, or Rule 9(b), even under the

14

more relaxed approach endorsed in large-scale fraud cases such as this. Cf. Wells Fargo Bank, N.A., 972 F. Supp. 2d at 616.

In short, relators have failed to allege with the particularity required by Rule 9(b) that defendants furnished any document falling into one of the three categories relied on by relators to the Federal Reserve "in connection with" discount window borrowing, and I can see no grounds for finding that they "would necessarily" have been, whether by judicial notice or by inference from any of the facts that relators have alleged.

It is also instructive, at least, to note that the Second Circuit has distinguished between conditions of participation in a federal program and conditions of payment in that program. Mikes, 274 F.3d at 701-02. That distinction was drawn in the context of an implied legally false certification claim, which is not the issue here, as the § 9.2(g) claim is a claim of factually false certification. However, it suggests that where a federal beneficiary certifies that no false information has been provided to the government agency "in connection with the benefit," but there are allegations that the agency may be aware of or have been a downstream recipient of misrepresentations made publically, and may have even considered that information in determining the beneficiary's eligibility to participate in the program – which is the most that is alleged here – it cannot be said that there has been a misrepresentation made *to* the agency *in connection with* the payment.

Relators allege one other factually false certification, in connection with § 9.2(i) of the Circular, which simply represents that there is "no event of default" occurring. Default, defined elsewhere in the Circular, includes when a borrowing bank "fails to perform or observe any of its obligations or agreements" under the Lending Agreement or other instruments or agreements executed in connection with the loan. The Complaint contains no allegation that defendants

15

were in breach of any obligation or agreements in connection with their discount window or TAF borrowing, and relators do not seriously argue otherwise.

Default also includes when "any representation or warranty" made by the borrowing bank "under or in connection with the Lending Agreement, or that is contained in any certificate, document or financial or other statement delivered by it or in connection with the Lending Agreement, is inaccurate in any material respect on or as of the date made or deemed made." This latter provision tortures the language in ways that might allow some colorable argument for reading it broadly, but I see no basis (and relators assert no basis) for reading it more broadly than the representation contained in § 9.2(g), discussed above. Any claim potentially arising from the "representation or warranty" definition of "default" therefore fails for the same reasons that relators' § 9.2(g) claim fails.

## IV. Federal Home Loan Banks

In their last cause of action, relators allege that defendants are liable for false claims because they received "payments . . . in the form of advances" from certain regional Federal Home Loan Banks pursuant to a lending agreement that contained various express certifications. There is no dispute that the FHLBs are privately owned entities. Relators allege that false claims for payment made to the FHLBs are nevertheless subject to the FCA because "the obligations of FHLBs are considered to be guaranteed by the United States." I need not decide whether these certifications would give rise to FCA liability in any other respect, because this allegation is insufficient to plausibly suggest that the FHLBs are the "United States government" for purposes of the FCA. See Mikes, 274 F.3d at 695.

This is yet another question of first impression presented by this case. Moreover, the FHLBs' organic statute is of little or no assistance in making this determination. Cf. U.S. ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 491-92 (D.C. Cir. 2004) (Roberts, J.) (holding that

16

Amtrak, which was part-owned and subsidized by the federal government, was not itself "the Government" for purposes of the FCA because its organic statute expressly stated that was not an agency or instrumentality of the United States; distinguishing Rainwater v. U.S., 356 U.S. 590, 78 S.Ct. 946 (1958)).

However, I am guided by the observation that the FCA, by its terms, limits the meaning of "claim" to a situation where the Government "provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii)(I); see also U.S. ex rel. Shupe v. Cisco Sys., Inc., 759 F.3d 379, 383 (5th Cir. 2014) (noting that "the key term 'provides'" appears in both the pre- and post-amendment FCA, and holding that non-profit Universal Service Administrative Company was not subject to the FCA). The Fifth Circuit in Shupe noted "that courts have limited the FCA's application to instances of fraud that might result in financial loss to the Government." 759 F.3d at 385 (quotation omitted). In other words, the Fifth Circuit held, FCA liability does not attach where the entity dispensing payment is one in which the Government might have a "regulatory interest," but does "not have a financial stake in its fraudulent losses." Id.

Although relators attempt to argue that they have alleged otherwise, they have not presented any plausible factual allegation to contradict the well-recognized fact that an FHLP "is privately owned and privately funded. It receives no government money, and its consolidated obligations are not guaranteed by the government." Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco, 792 F.2d 1432, 1435 (9th Cir. 1986). I therefore think that the reasoning of the Fifth Circuit is on all fours with this case, and that the FHLBs are not the "government."

Neither Fahey v. O'Melveny & Myers, 200 F.2d 420 (9th Cir. 1952), nor the cases that have followed it in holding that an FHLB was a "federal instrumentality," id. at 446, require a

17

different result. The court in Fahey made that determination for purposes of deciding whether an FHLB's members had a vested private property right (and therefore a due process right) in its continued existence. Id.; see also, e.g., Osei-Bonsu v. Fed. Home Loan Bank of New York, 726 F. Supp. 95, 97 (S.D.N.Y. 1989) (Title VII).[8]

Moreover, in the time since Fahey was decided, "it is clear that Congress has reduced government control of the management and operations" of the FHLBs, in that it has "removed the power of [FHLB]s to serve as agents of the federal government in supervising federal savings and loan institutions;" "provided that members of the Federal Home Loan Banks 'shall own the retained earnings, surplus, undivided profits and equity reserves, if any, of the bank;'" and "eliminated the government's power to appoint directors of a Federal Home Loan Bank." Fed. Home Loan Bank of San Francisco v. Deutsche Bank Sec., Inc., No. 10-cv-3039, 2010 WL 5394742, at *9 (N.D. Cal. Dec. 20, 2010) (legislative citations omitted).

Finally, I note that although it is true that the FHLBs are, by statute, considered to be government agencies for purposes of certain tax-exempt benefits, I "doubt[] that Congress intends for every organization receiving tax exemptions to be considered a government agency." Id. at *10.

The False Claims Act has come a long way since its enactment in 1863 "with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." Colucci, 785 F. Supp. 2d at 309 (quoting Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 781, 120 S.Ct. 1858 (2000)). To include the Federal Home Loan Banks within its ambit, unless clearly consistent with the existing body of case law under the

---

[8] Wood ex rel. U.S. v. Am. Inst. in Taiwan, 286 F.3d 526, 528 (D.C. Cir. 2002), which both parties argue supports their view, is inapposite; there, the entity whose governmental status was at issue was the defendant, and its sovereign immunity was the question before the court.

18

statute, would be an expansion of its reach that I see no good cause to approve. I therefore decline relators' invitation to be the first court to do so.

**V.      Further Amendment**

Relators' request for leave to file a Fourth Amended Complaint is denied. The FCA claims in this case fail because their expansive theory of FCA liability simply is not viable. The facts plead do not suggest that any further information available to relators will change that. Further amendment would therefore be futile. See Green v. Mattingly, 585 F.3d 97 (2d Cir. 2009). Moreover, relators have had three opportunities to amend their allegations already.

**CONCLUSION**

For the foregoing reasons, defendants' [57] motion to dismiss the Third Amended Complaint in its entirety is granted. The Clerk of Court is directed to enter judgment dismissing the case.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
	July 24, 2015