UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x No. 11-CV-5457 (BMC)
UNITED STATES ex rel. ROBERT KRAUS
and PAUL BISHOP;

Plaintiffs,

    -against-                **FOURTH AMENDED COMPLAINT**

WELLS FARGO & COMPANY,           <u>JURY TRIAL DEMANDED</u>
WELLS FARGO BANK, N.A., and its and
their subsidiaries and affiliates;

Defendants.
-------------------------------------------------------------x

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
James J. Sabella
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500

**THE LAW OFFICES OF**
   **SHARAD A. SAMY LLC**
Sharad A. Samy
32 Old Oak Road
Darien, CT 06820
Telephone: (917) 673-0804

**GOLDSTEIN & RUSSELL, P.C.**
Tejinder Singh
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636

Of Counsel:
**PORT & SAVA**
George S. Sava
Gary Port
734 Franklin Ave., #574
Garden City, NY 11530
Telephone: (516) 352-2999

*Attorneys for Plaintiffs-Relators Paul Bishop and Robert Kraus*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................1

II.   JURISDICTION AND VENUE ..........................................................8

III.  PARTIES ...........................................................................................10

IV.  RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY ...........................12

V.   SUBSTANTIVE ALLEGATIONS .....................................................13

    A.    The Federal Programs.........................................................13

         1.    The Federal Reserve Discount Window .......................14

         2.    The Federal Reserve TAF.............................................23

         3.    The Limited Scope of the Federal Programs ................28

    B.    Why Wachovia's Certifications Were Patently False and Fraudulent ......29

         1.    Securitization and Wachovia's Commercial Real Estate Finance Division ................................................34

         2.    The Raison d'Être for Wachovia's "Black Box" and Its Repo SPVs: Using Fraudulent Off-Balance Sheet Accounting to Leverage a Securitization Business ...........................................37

               a.    The Black Box ...................................................39

               b.    The Repo SPVs..................................................49

         3.    Wachovia's Non-Existent Credit Grading System: Extending Its Fraud-on-Balance Sheet...........................................53

         4.    Using Untested and Unvalidated Models to Fabricate Its Financial Results..........................................................55

         5.    Originating Loans of Poorer and Poorer Quality...........58

               a.    Structuring Around Loan to Value Limits.......59

               b.    Manipulating "Value"......................................59

               c.    Limiting Customer and Borrower Recourse.....61

    d.  Paying Customers Kickbacks for Business .......................62

    e.  Concealing Unsupportable Credit Decisions in Poor Loan Documentation...........................................................62

  6.  Concealing Retained CRE Loan Risks .........................................65

  7.  Concealing Retained CMBS Risks ...............................................66

  8.  Employing Other Unsafe and Unsound Practices.........................67

  9.  Rushing Headlong to Financial Ruin and the Wachovia-Wells Fargo Cover-Up.................................................................69

 C. Why World Savings' Certifications Were Patently False and Fraudulent ......................................................................................83

  1.  Management's Philosophy at World Savings...............................84

  2.  World Savings' Residential Mortgage Operations ......................85

 D. The Banks Were Not Eligible to Participate in the Federal Program........87

  1.  Eligibility Based on Composite and Component Ratings .............90

  2.  Eligibility Based on Capitalization Requirements......................105

  3.  Eligibility Based on Supplementary Information .......................108

VI. CAUSES OF ACTION ........................................................................................109

 COUNT I: False Claims Act, 31 U.S.C. §3729(a)(1)/
      31 U.S.C. §3729 (a)(1)(A)
      (Presenting or Causing to Be Presented False or
      Fraudulent Claims) ........................................................................111

 COUNT II: False Claims Act, 31 U.S.C. §3729 (a)(2)/
      31 U.S.C. §3729 (a)(1)(B)
      (Making or Using or Causing to be Made or Used False
      Records and Statements Material to a False Claim)......................112

 COUNT III: False Claims Act, 31 U.S.C. §3729 (a)(1)(C)
      (Conspiracy)................................................................................113

PRAYER FOR RELIEF ...................................................................................................115

DEMAND FOR JURY TRIAL ........................................................................................115

Plaintiffs-Relators ROBERT KRAUS and PAUL BISHOP (together, the "*Relators*"), by and through their undersigned counsel, allege for their Fourth Amended Complaint on behalf of the United States of America (the "*United States*" or the "*U.S.*") against Defendants WELLS FARGO & COMPANY ("*WFC*"), WELLS FARGO BANK, NATIONAL ASSOCIATION ("*WFBNA*"), and its and their subsidiaries and affiliates (together, the "*Defendants*" or "*Wells Fargo*"), as follows:

## I.    INTRODUCTION

1.    This is an action brought by the Relators on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* (the "*False Claims Act*"), arising from fraud perpetrated by Defendants and their predecessors[1] on the U.S. Department of the Treasury (the "*Treasury Department*") and the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, the Federal Reserve Bank of Richmond and/or one or more other Federal Reserve Banks (together, the "*Federal Reserve System*" or the "*Federal Reserve*", and, together with the Treasury Department, in each of their respective capacities as, *inter alia*, agencies of the United States, agents, fiscal agents and/or depositories of the United States and recipients of monies spent on the United States' behalf and to advance U.S. government (the "*U.S. Government*") programs or interests, the "*Federal Entities*").

---

[1] Wachovia Corporation ("*WC*"), Wachovia Bank, N.A. ("*WBNA*") and its and their subsidiaries and affiliates (together with Wachovia Capital Markets LLC ("*WCM*") and Wachovia Securities LLC ("*WS*"), "*Wachovia*") merged into the Wells Fargo group of companies on or around December 31, 2008 (the "*Wachovia-Wells Merger Date*").  Golden West Financial Corporation ("*GWF*"), World Savings Bank, FSB ("*WSB*"), World Savings, Inc. ("*WSI*") and its and their subsidiaries and affiliates (together, "*World Savings*") merged into the Wachovia group of companies on or around October 2, 2006 (the "*World-Wachovia Merger Date*").  Wachovia, World Savings and Wells Fargo are referred to together as the "*Banks*."

2.      The claims arise out of the utilization by the Banks of one or more Federal funding programs, including, *inter alia*, the Federal Reserve Discount Window (the "***Discount Window***") and the Federal Reserve Term Auction Facility (the "***TAF***" and, together with the Discount Window, the "***Federal Programs***").[2]  As set forth herein, although the Banks knew that they were ineligible for these desirable credit programs – which are restricted to adequately capitalized institutions generally in sound financial condition – they knowingly misled the U.S. Government into deeming them eligible and impliedly certified that they were eligible.   In addition, as set forth herein, the Banks made express misrepresentations as to their compliance with material legal requirements each time they sought loans and advances under the Federal Programs.  The false express and implied certifications by the Banks were material because they caused the U.S. Government to extend credit to the Banks on unduly favorable terms, at significant cost to American taxpayers.   Defendants knew that if the U.S. Government had known about Defendants' fraud and that the Banks were not adequately capitalized and were not in sound financial condition, the Government would not have extended credit to the Banks on the terms that were in fact offered.

3.      Underlying the claims in this case is a pervasive pattern of financial, regulatory and accounting fraud engaged in by the Banks.  In particular, Wachovia's and World Savings' management perpetuated a "control fraud," subverting the Banks' statutory, regulatory and internal control procedures (including but not limited to the Banks' obligation to maintain adequate capitalization) by engaging in risky lending (in knowing contravention of prescribed underwriting standards) and deceptive financial accounting and regulatory reporting practices,

---

[2] For ease of reading, Appendix I appended hereto sets forth the defined terms used in this Fourth Amended Complaint.

including but not limited to (i) deceptively accounting for such loans as high quality loans or even "AAA" securitization exposures (and so holding only a small, or *de minimus*, amount of capital against such loans, when in fact a substantial capital reserve should have been held against such loans), (ii) deceptively hiding such loans (and other assets) in special purpose companies and otherwise accounting for such loans (and other assets) as being "off balance sheet" for the purpose of the Banks' calculations of financial asset and capital ratios reported by the Banks to regulators and the public (and so holding no capital against such loans and other assets, when in fact a substantial capital reserve should have been held against such loans), and (iii) deceptively accounting for such loans, securities and other assets as "trading assets" or "assets held for sale," when in fact such assets were illiquid and would necessarily be required to be held to maturity (and accounted for as such), for the purpose of the Banks' calculations of their capital ratios reported by the Banks to regulators and the public (and so holding a *de minimus* amount of capital against such assets, when in fact a substantial capital reserve should have been held against such loans, securities and other assets).  The Banks knowingly misrepresented themselves to customers, investors, regulators (through the filing of Call Reports and other financial information) and lenders (including but not limited to the Federal Reserve as a lender under its discount window lending facility) as well-managed, well-capitalized, sound financial institutions operating and reporting their positions and results in accordance with required regulatory and financial standards.  The Banks deliberately concealed these practices from the U.S. Government, and through accounting gimmicks and deception, the Banks obscured their exposure to tremendous risks, as well as the fact that they were severely undercapitalized.

4.    In the course of this widespread systemic fraud, the Banks violated multiple critically important banking laws, including, *inter alia*, 12 U.S.C. § 161(a), 12 U.S.C.

§ 1817(a)(3), and 12 C.F.R. 4.11(b)(1), which require periodic regulatory filings of true and accurate Call Reports, and 12 C.F.R. part 30, 12 C.F.R. part 263, 12 C.F.R. part 570 and 12 C.F.R. part 308, Subpart R (together, the "*Safety and Soundness Laws and Regulations*") requiring each to: (i) have appropriate internal controls and information systems; (ii) have an appropriate internal audit system; (iii) establish and maintain loan documentation practices that enabled it to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loans and sources for repayment, (D) assess the ability of borrowers to repay indebtedness in a timely manner, (E) ensure that claims against borrowers were enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of loans; (iv) establish and maintain prudent credit underwriting practices; (v) have prudent asset growth; and (vi) establish and maintain an appropriate system commensurate with its size to identify problem assets and prevent deterioration of those assets.

5.      The Banks also violated laws and regulations requiring each to, among other things: (i) provide various certifications in respect of the adequacy of its financial reporting and internal controls and its compliance with laws or regulations (including, *inter alia*, 12 C.F.R. 363); (ii) satisfy the reporting and certification requirements of the Sarbanes-Oxley Act of 2002, as amended ("*Sarbanes-Oxley*"), including Sections 302, 806 and 906 thereof; (iii) comply with the statutory requirements of 18 U.S.C. § 1005 and 18 U.S.C. §1001; and (iv) file financial reports and statements in accordance with generally accepted accounting principles ("*GAAP*") pursuant to 12 U.S.C. § 1831(n)(a)(2)(A) (such laws and regulations and the Safety and Soundness Laws and Regulations being the "*Applicable Laws and Regulations*").

6.      In order to be eligible to receive payments under a Federal Program, institutions were required to be "at least adequately capitalized" and "in generally sound financial

condition."   12 C.F.R. §§ 201.3(c)(1), 201.4(a), 201.5(a) and (c); *see also* Regulation A Final Rule (as defined below) p. 11 and The Federal Reserve Discount Window § 5, https://www.frbdiscountwindow.org/en/Pages/General-Information/The-Discount-Window.aspx #eligibilityps.   To determine whether a bank is adequately capitalized, the Federal Reserve considers whether it meets the minimum levels for each relevant capital measure set by its regulator.   For national banks prior to 2015, the relevant measures were Total Risk-Based Capital, Tier 1 Risk-Based Capital, and Leverage.   In general, these are ratios of the bank's equity capital to its total assets.   Equity capital is designed to absorb losses the bank might incur, insulating depositors, the FDIC, and lenders, such as the Federal Reserve, from such losses.   The regulations require banks seeking primary credit to hold specific ratios of equity capital to balance sheet assets to be deemed "well" or "adequately" capitalized.

7.     When the Banks artificially inflated these ratios by engaging in deceptive accounting, financial reporting and other frauds, and then reported these inflated ratios to bank regulators, they knowingly gave the impression that they were better capitalized – and therefore better candidates for the Federal Programs – than they actually were.   By applying for the Federal Programs and then drawing funds therefrom, the Banks impliedly certified that they were at least adequately capitalized, when in fact they knew otherwise, and they knew that this was a material condition of their eligibility for the Federal Programs.   The Banks knew that if the U.S. Government had known about Defendants' fraud and that the Banks were not adequately capitalized, the Government would not have extended credit to the Banks on the terms that were in fact offered.   The Banks knew that their false implied certifications that they were adequately capitalized were likely to induce a reasonable regulator to extend credit on the terms that the Banks received, whereas no reasonable regulator would have done so if it knew the true facts.

8.      In addition to its impact on capitalization, the fact that the Banks were engaged in extremely risky lending programs, and fraudulent financial balance sheet manipulations and reporting, all of which were knowingly concealed by widespread fraud, was material to whether they were in "generally sound financial condition," and whether they were soundly managed, both material requirements for eligibility for the Federal Programs.  For example, on information and belief, the fraud by the Banks misled regulators into issuing them unduly high supervisory ratings – known as CAMELS ratings.  The CAMELS rating is a composite comprising Capital adequacy, Assets, Management capability, Earnings, Liquidity, and Sensitivity to market risk. Ratings for each category range from 1 (best) to 5 (worst) and a composite rating is issued based on the category ratings.  CAMELS ratings are not disclosed to the public but are used by regulators and by the Federal Reserve to determine eligibility for the Federal Programs.

9.      Generally, a bank with a CAMELS rating of 4 or 5 is ineligible to participate in the Federal Programs.  It is highly unlikely that banks whose senior management perpetrates a fraud on the scale described herein would receive a rating better than 4, which is especially true where, as here, the Banks are undercapitalized and exposed to extremely risky assets.  Thus, only by concealing their misdeeds through false financial statements and reports were the Banks able to present themselves as eligible for the Federal Programs.  The Banks knew that if the U.S. Government had known about Defendants' fraud and that the Banks were not in sound financial condition, the Government would not have extended credit to the Banks on the terms that were in fact offered.  The Banks knew that their false implied certifications that they were in sound financial condition were likely to induce a reasonable regulator to extend credit on the terms that the Banks received, whereas no reasonable regulator would have done so if it knew the true facts.

10.     In addition to their false implied certifications, the Banks also made false express certifications.  The Federal Reserve's discount window programs are governed by Operating Circular 10, also known as the Lending Agreement.  Section 9.1(b) requires the borrower to represent that it is "not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement."  And Section 9.2 provides that "[e]ach time" the borrower requests funds, it "is deemed to make all of the foregoing representations and warranties."  The Lending Agreement also requires borrowers to covenant that they will "promptly notify" the Federal Reserve if they are "about to become an undercapitalized depository institution or a critically undercapitalized depository institution."

11.     The Banks falsely made the representations in Section 9.1(b) each time they sought credit from the discount window because they knew they were violating multiple core banking laws and regulations but failed to disclose such violations.  These misrepresentations were material, because they went to the heart of the bargain the Banks negotiated with the U.S. Government.  The representations and warranties in the Lending Agreement were designed to shift the burden of due diligence from the Federal Reserve onto the borrowing banks.  The Banks were in fact not able to truthfully make the required representations, and so should not have been able to borrow funds from the discount window. at all, let alone at the primary credit rate.

12.     If a bank was not in generally sound financial condition or adequately capitalized or was otherwise unable to make the express certifications required of it under the Operating Circular when it was approaching the Federal Programs for funding, that would be a material fact for any reasonable regulator deciding whether to provide funding to such bank under such Federal Program. Such facts would have a natural tendency to influence the decision by any

reasonable regulator as to whether or not to provide an advance to such bank under the Federal Programs.  Indeed, to do so with knowledge of those facts would violate the Federal Reserve Act and Regulation A promulgated thereunder.

13.     A former vice president of the Federal Reserve Bank of New York, knowledgeable about its Discount Window operations and Regulation A, told counsel for the Plaintiffs-Relators that if a bank was not in generally sound financial condition or adequately capitalized when it drew upon the Discount Window: (i) that bank would not be eligible under Regulation A to obtain funds under the Discount Window under the primary credit program and (ii) the fact that the bank was not in generally sound financial condition or was otherwise not adequately capitalized would be material to the Federal Reserve, and would be material to any person at the Federal Reserve making a lending decision with respect to that bank in regards to any advances requested by that bank under the Discount Window.  Because a bank would have to be qualified to borrow under the Discount Window to obtain funds under the TAF, the same analysis would apply to any advances requested by that bank under the TAF.

14.     The Relators seek, through this action, to recover damages and civil penalties from the Defendants for falsely and fraudulently accessing the Federal Programs for payments and for making, or causing to be made, false or fraudulent records, statements and/or claims to receive payments from the Federal Entities.

## II.        JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.  There are no bars to recovery under 31 U.S.C. § 3730(e), and, in the alternative, each Relator is an "original source", as defined therein.

Each Relator has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, each Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. As required pursuant to 31 U.S.C. § 3730(b) and (e), the Relators have voluntarily provided information, oral and/or written, and sent disclosure statement(s) describing all material evidence, and information, related to their Original Complaint, the First Amended Complaint, the Second Amended Complaint, the Third Amended Complaint and this Fourth Amended Complaint before filing their Original Complaint, the First Amended Complaint, the Second Amended Complaint, the Third Amended Complaint and this Fourth Amended Complaint to the U.S. Government and the agencies of the U.S. Government, including, but not limited to, the Attorney General of the United States and the U.S. Attorney for the Eastern District of New York.

16.     This Fourth Amended Complaint details the Relators' discovery and investigation of the Banks' fraudulent schemes and is supported by documentary evidence.

17.     The Defendants are deemed to be residents of the Eastern District of New York pursuant to 28 U.S.C. § 1391(c). Venue is therefore properly in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732, because the Defendants can be found in and transact or have transacted business in the Eastern District of New York. At all times relevant to this Fourth Amended Complaint, the Defendants regularly conduct or have conducted substantial business within the Eastern District of New York and made or make significant sales within the Eastern District of New York.

### III.   PARTIES

18.     Relator Kraus is a resident of Marvin, North Carolina.  From in or around June 2005 to in or around September 2006, Relator Kraus was employed by WCM in the capacity of Vice President, Controller for the Real Estate Capital Markets ("**RECM**") group and the Corporate and Investment Bank Finance group.  Relator Kraus was hired by WCM on the basis of his commercial real estate experience and was responsible for reviewing and monitoring commercial real estate activities across Wachovia entities, including WCM, WC, WBNA, WS and other Wachovia affiliates.  In his capacity as a controller, Relator Kraus had direct exposure to Wachovia's commercial real estate activities and its failure to comply with the Applicable Laws and Regulations.  Relator Kraus alleges that Wachovia and, post-merger, Wells Fargo falsely and fraudulently accessed the Federal Programs for payments and made false statements, records and/or claims at the time of request for a payment from the Federal Entities in respect of the Federal Programs, having, *inter alia*, falsely and fraudulently failed to disclose that they were not in generally sound financial condition and not adequately capitalized as it was required to be under the Federal Programs as and when they accessed the Federal Programs, and also certified that there was no violation of, or that they had complied with, the Applicable Laws and Regulations, that no event of default had occurred or was then continuing with respect to them and/or that certain reports, registrations, documents and filings submitted to various Federal agencies did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading, in each case to falsely and fraudulently access the Federal Programs and to falsely and fraudulently obtain payments from the Federal Entities through one or more Federal Programs for which they did not qualify.

19.     Relator Bishop is a resident of Millbrae, California.  From in or around November 2002 to in or around May 2006, Relator Bishop was employed by WSI in the capacity of a retail salesperson for residential mortgages.  In such capacity, Relator Bishop had direct contact with borrowers of World Savings mortgage products and World Savings underwriting, appraisal and wholesale brokerage personnel.   Relator Bishop had direct exposure to World Savings' residential mortgage activities and its failure to comply with the Applicable Laws and Regulations.  Relator Bishop alleges that World Savings and, post-merger with World Savings, Wachovia, and, post-merger with Wachovia, Wells Fargo falsely and fraudulently accessed the Federal Programs for payments and made false statements, records and/or claims at the time of request for a payment from the Federal Entities in respect of the Federal Programs, having, *inter alia*, falsely and fraudulently failed to disclose that they were not in generally sound financial condition and not adequately capitalized as it was required to be under the Federal Programs, as and when they accessed the Federal Programs, and also certified that there was no violation of, or that they had complied with, the Applicable Laws and Regulations, that no event of default had occurred or was then continuing with respect to them and/or that certain reports, registrations, documents and filings submitted to various Federal agencies did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading, in each case to falsely and fraudulently access the Federal Programs and to falsely and fraudulently obtain payments from the Federal Entities through one or more Federal Programs for which they did not qualify.

20.     The U.S. Government is the government plaintiff in this case.

21.     Defendant WFC is a Delaware corporation and a bank holding company registered under the Bank Holding Company Act of 1956, as amended.  It was at all relevant times the publicly-traded parent and holding company of the Wells Fargo group of companies, which have their principal place of business and national headquarters at 420 Montgomery Street, San Francisco, CA 94163.  It is the successor entity to WC and GWF on or around and after the Wachovia-Wells Merger Date.

22.     WFBNA is a California corporation, the significant banking subsidiary of Wells Fargo & Company and regulated by the U.S. Office of the Comptroller of the Currency (the "*OCC*").  It is the successor entity to WBNA and WSB on or around and after the Wachovia-Wells Merger Date.

### IV.     RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

23.     Any and all acts alleged herein to have been committed by the Defendants were committed by said Defendants' officers, directors, employees, representatives, or agents who at all times acted on behalf of their respective companies for the purpose of benefiting the Defendants and within the course and scope of their employment.

24.     The Defendants, as identified in Paragraphs 21 and 22, *supra*, are related entities sharing common employees, offices and business names such that they are joint and severally liable under legal theories of *respondeat superior*. Further, the past, present, and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    The Federal Programs

25.    Each of the Federal Entities, through one or more of the Federal Programs, provided domestic and foreign financial institutions with extensive financial support in the form of credit and liquidity support and subsidies throughout the Relevant Period.  Although the Federal Programs were intended to provide such support and subsidies to law-abiding financial institutions when market-originated funding was either too expensive to obtain or simply unavailable, the Federal Programs were never intended to provide extended financial support or subsidies – much less bailouts – to ailing financial institutions that were brazenly violating the Applicable Laws and Regulations, that were not in generally sound financial condition or adequately capitalized as they were required to be under the Federal Programs when accessing the Federal Programs and that were not disclosing critical information to the Federal Entities that would have been necessary for the Federal Entities to have been able to make a determination as to whether or not they were in generally sound financial condition.

26.    Indeed, by receiving a payment under a Federal Program, each institution impliedly certified that it satisfied certain eligibility criteria.  In addition, each time it accessed the Federal Programs for payment, such institution was required to make certain certifications to the Federal Entities at the time of each request for, and as a precondition to, each payment from the Federal Entities, whether as a funding, borrowing or drawing of an advance, as applicable, certify that there was no violation of, or that it had complied with, the Applicable Laws and Regulations, that no event of default had occurred or was then continuing with respect to it and/or that certain reports, registrations, documents and filings submitted to various Federal agencies by it did not contain an untrue statement of a material fact or omit to state a material

fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

27.     A description of each of the Federal Programs, the requirements to access each such program, and the certifications required to be delivered in connection therewith, follows:

**1.     The Federal Reserve Discount Window**

28.     The Federal Reserve System provides access to the Discount Window to certain financial and other institutions to enable them to borrow money from the Federal Reserve System, usually on a short-term basis, to address temporary shortages of liquidity.  Payments are advanced under the Discount Window at a low, subsidized "primary credit" rate to borrowing institutions that can satisfy certain primary credit rate eligibility criteria at the time of advance, which included having a certain minimum composite supervisory rating and being adequately capitalized.  A higher, more expensive (but still highly subsidized) "secondary credit" rate can, in the Federal Reserve's sole discretion, be provided to institutions that are not eligible to borrow under the primary credit rate criteria.  No institution has a right to access the Discount Window, and the Federal Reserve could deny (and has denied) payments thereunder for any reason or no reason.  The availability and rate of advances from the Discount Window depends on the soundness and creditworthiness of the borrowing institution and on its ability to make certain certifications required of it prior to and at the time of each particular advance.

29.     The Banks received payments from the Discount Window at the primary credit rate numerous times during the Relevant Period.  *See* Appendix II appended hereto for information relating to some of those payments.

30.     The Federal Reserve Act and, specifically, Section 4(8) of the Federal Reserve Act (*i.e.*, 12 U.S.C. § 301), establishes the general rules under which a Federal Reserve Bank

may extend credit to institutions like the Banks, essentially requiring that a Federal Reserve Bank, like any lender, know the general character of its borrowers, and determine whether the loans it makes to those borrowers are consistent with sound credit conditions.   Under this statute, each Federal Reserve Bank is required by law to "keep itself informed of *the general character* and amount of the loans and investments *of its member banks* with a view to ascertaining *whether undue use is being made of bank credit* for the speculative carrying of or trading in securities, real estate, or commodities, or *for any other purpose inconsistent with the maintenance of sound credit conditions*; and, in determining whether to grant or refuse advances, rediscounts or other credit accommodations, [the Federal Reserve Bank] *shall give consideration to such information*" (emphasis added).   This statute also clearly authorizes the Federal Reserve to "prescribe regulations further defining within the limitations of [the Federal Reserve Act] the *conditions under which* discounts, *advancements*, and the accommodations *may be extended* to member banks [(*i.e.*, national banks, etc.)]" (emphasis added).   Quite clearly, Federal law does not permit a Federal Reserve Bank to just open up its vault to any fraudster desperate for cash.

31.     Regulation A, as adopted in 2003, specifically acknowledges and incorporates the requirements of Section 4(8) of the Federal Reserve Act in respect of borrowing from the Discount Window's primary credit program, reinforcing the obligation of Federal Reserve Banks to act prudently when extending loans under that program.   It establishes a duty on a Federal Reserve Bank to require *any* information it deems appropriate to "ensure that credit is used consistent with Regulation A" and "to keep itself informed of the general character" of a depository institution, which is obviously consistent with the express requirements of the Federal Reserve Act.

32.     Under Regulation A and as required by the Federal Reserve, in order to be able to draw funds under the Discount Window at the optimal primary credit rate, an institution would have to have a certain minimum composite supervisory rating and be adequately capitalized within the meaning of Regulation A.  In addition, each of the Banks had to execute a lending agreement and corporate resolutions conforming with Operating Circular No. 10, Lending, effective October 15, 2006 (the "*Circular*"), issued by the Federal Reserve System. The Circular therefore served as the "loan agreement" that enabled the Federal Reserve Bank to extend loans at the primary credit rate in a sound manner, consistent with the Federal Reserve Act and the regulations issued under that Act (including Regulation A), thereby helping the Federal Reserve Banks to fulfil their statutory obligations as lenders.  Section 1.1 of the Circular confirms this, stating in no uncertain terms, that "[t]his Operating Circular is issued by each Reserve Bank and sets forth the terms under which an entity may, in accordance with the Federal Reserve Act and regulations promulgated thereunder by the Board of Governors of the Federal Reserve System, obtain [advances] from, incur [obligations] to, or pledge [collateral] to a Federal Reserve Bank."

33.     As also required by the Federal Reserve, each of the Banks executed a letter agreement with the Federal Reserve agreeing to the terms of the Circular (including its certifications) in consideration of "being able to request advances from and incur indebtedness to the Federal Reserve" and in consideration of "the Federal Reserve making advances to it."

34.     Pursuant to Section 9.1(b) of the Circular, each of the Banks made the certification to the Federal Reserve that it "is not in violation of *any* laws or regulations *in any respect* which *could* have *any adverse effect whatsoever* upon the…performance…of any of the terms of the [Circular and the documents executed in connection with the Circular]" (emphasis

added) (the "*Section 9.1(b) Certification*") each time it borrowed or drew an advance from the Discount Window's primary credit program.

35.     In accordance with Section 9.1(g) of the Circular, each of the Banks made the certification to the Federal Reserve that "no statement or information contained in the [Circular and the documents executed in connection with the Circular] or any other document, certificate, or statement furnished [by it] to the [Federal Reserve] for use in connection with the transactions contemplated by the [Circular and the documents executed in connection with the Circular], on and as of the date when furnished, is untrue as to any material fact or omits any material fact necessary to make the same not misleading, and the representations and warranties in the [Circular and the documents executed in connection with the Circular] are true and correct in all material respects" (the "*Section 9.1(g) Certification*") each time it borrowed or drew an advance from the Discount Window's primary credit program.

36.     In accordance with Section 9.1(i) of the Circular, each of the Banks also made the certification to the Federal Reserve that "no Event of Default [with respect to it] has occurred or is continuing" (the "*Section 9.1(i) Certification*" and, together with the Section 9.1(b) Certification and the Section 9.1(g) Certification, the "*Section 9.1 Certifications*") each time it borrowed or drew an advance from the Discount Window's primary credit program, with an "Event of Default" being defined in Section 2.1 of the Circular to include: (i) the borrower failing "to perform or observe *any* of its obligations or agreements under the [Circular and the documents executed in connection with the Circular] or under any other instrument or agreement delivered or executed in connection with the [Circular and the documents executed in connection with the Circular] or under any other agreement with the [Federal Reserve System]" (emphasis added); and (ii) "…*any representation or warranty made or deemed to be made* by

[the borrower] under or in connection with the [Circular and the documents executed in connection with the Circular], or that is contained in *any certificate, document or financial or other statement delivered by it* or in connection with the [Circular and the documents executed in connection with the Circular], is *inaccurate in any material respect* on or as of the date made or deemed made" (emphasis added).

37.     As is typical in any market lending arrangement, each of the Banks was also required pursuant to Section 9.2 of the Circular to make each certification (including, without limitation, each of the Section 9.1 Certifications) to the Federal Reserve *each time* it requested an advance from the Discount Window, incurred any indebtedness through the Discount Window, or granted a security interest in any collateral in connection with a draw on the Discount Window, in each case on and as of the date of such advance, the extension of such indebtedness or the grant of such security.  Each of the Banks also covenanted in Section 9.2 of the Circular that such certifications would "remain true and correct so long as the [Circular] remains in effect, any [obligation] remains outstanding, or any other amount is owing to the [Federal Reserve System]."  Because of Section 9.2 of the Circular, each of the Section 9.1 Certifications was required to be made to the Federal Reserve as a precondition to and for the duration of every single advance under the primary credit program, as is typical in any market lending arrangement.  The Section 9.1 Certifications were required to be delivered as a precondition to *each* payment to ensure that there was no change in the contextual circumstances surrounding an institution's ability to participate in the Discount Window program and that particular payment (as would be evidenced by the redelivery of each such certification at the actual time of funding, consistent with market practice).  *See* Exhibit I for the relevant language from the Circular.

38.     Also, the drafters of the language wanted these certifications to be "air-tight" with no room for ambiguity – the relevant provisions were intentionally drafted both broadly and comprehensively to shift the burden of due diligence under the primary credit program at the time of each request for an advance *from* the Federal Reserve *to* the borrowing institution, consistent with published Federal Reserve policy.  Delivery of the certifications contained in the Section 9.1 Certifications and Section 9.2 of the Circular was therefore certainly material and critical to the Federal Reserve, both in assessing whether the borrowing institution could participate in the Discount Window program in the first place and also as to whether the Federal Reserve should make any particular advance to that institution under the Discount Window program.

39.     Looking at the history of the Circular, the Federal Reserve adopted the current Circular (which includes the Section 9.1 Certifications) to replace prior Operating Circular No. 10, effective January 2, 1998 (the "***Prior Circular***") (*which does not include the Section 9.1 Certifications (including the representation and warranty that no "Event of Default" has occurred or is continuing) or the more comprehensive definition of "Event of Default" contained in the current Circular*) on October 15, 2006, stating specifically that the certifications contained in the revised Section 9 of the Circular and the new definition of "Event of Default" of the current Circular were drafted to make them "more comprehensive."  *See* the Federal Reserve's Notice to Institutions Regarding Operating Circular No. 10, dated September 15, 2006, on page 2.   These revisions were implemented, in part, to address the Federal Reserve's revision to Regulation A that became effective on January 9, 2003, which both created the primary credit and secondary credit programs and fundamentally shifted the due diligence burden at the time of a request for an advance under the primary credit program from

the Federal Reserve to the borrowing institution.  *See* Exhibit II for the older language contained in the Prior Circular.

40.     Under the earlier Discount Window programs, the Federal Reserve required a borrowing institution to affirmatively explain to the Federal Reserve its need for funding and to demonstrate that it had exhausted all other sources of funding prior to obtaining funding from the Federal Reserve.   The Federal Reserve then evaluated the financial situation of the borrowing institution at the time of advance to determine both the reason for the drawing and whether such institution's use of borrowed funds was appropriate.

41.     Under the new primary credit program, the Federal Reserve intentionally shifted the due diligence burden from the Federal Reserve to the borrowing institution,  creating a funding facility under the primary credit program similar to that of a "letter of credit" type of funding arrangement, expressly stating that credit extensions under the new primary credit program would be "significantly less" burdensome administratively on the Federal Reserve System than extensions under the earlier Discount Window programs and that, "except in unusual circumstances," Federal Reserve Banks would not question depositary institutions about their reasons for borrowing under the primary credit program.  *See* the Interagency Advisory on the Use of the Federal Reserve's Primary Credit Program in Effective Liquidity Management (the "***Primary Credit Interagency Advisory***") issued jointly by the Federal Reserve, the OCC, the Federal Deposit Insurance Corporation (the "***FDIC***"), the U.S. Office of Thrift Supervision (the "***OTS***") and the National Credit Union Administration, dated July 23, 2003, on page 2**.**

42.     The Federal Reserve accordingly limited funding under the primary credit program to only "generally sound" financial institutions that could satisfy a Federal Reserve

System-wide set of eligibility criteria for borrowing under the primary credit program, based on both supervisory information (such as its composite supervisory rating and capitalization level) and "other relevant information," which would be used to determine whether an institution was in "generally sound" financial condition and thus eligible for primary credit advances. *See generally,* 12 C.F.R. Part 201, Regulation A; Docket No. R-1123, "Extension of Credit by Federal Reserve Banks" (the "***Regulation A Final Rule***"). In the Regulation A Final Rule, the Federal Reserve expressly rejected a comment from the public that funding under the primary credit program should be provided *solely* on the basis of an institution's composite supervisory rating concerning soundness, so, in keeping with the Federal Reserve's position, the Primary Credit Interagency Advisory advised borrowing institutions on page 2 that they must have "the necessary collateral arrangements *and documentation* in place with the appropriate Reserve Bank in order to utilize the primary credit program" (emphasis added). Notably, the documentation makes it clear that the borrowing institution must make the certifications set forth in the Section 9.1 Certifications and in Section 9.2 of the Circular *each* time of advance and for the *duration* of each such advance (as is typical in any market lending arrangement).

43.     Yet, as shown herein, each of the Banks, as and when it was accessing the Discount Window, was not in generally sound financial condition, was not adequately capitalized, was brazenly violating the Applicable Laws and Regulations, and was not disclosing critical information to the Federal Entities that would have been vital and necessary for the Federal Entities to have been able to make a determination as to whether it was in generally sound financial condition (such as (i) the fact that its violations of the Applicable Laws and Regulations, including the Safety and Soundness Regulations, were so egregious that it simply could not be – and the Federal Entities could not reasonably make a determination that

it was – in generally sound financial condition as and when it accessed the Discount Window and (ii) the fact that it could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time it accessed the Discount Window for payment).

44.     Furthermore, each of the Banks knew that the Federal Reserve needed to know such critical information for it to be able to determine whether the Banks could access the Discount Window in accordance with and pursuant to the Federal Reserve Act and Regulation A.

45.     And by failing to disclose and/or omitting to disclose such critical information to the Federal Entities, each of the Banks implicitly and fraudulently certified to the Federal Entities that it conformed to the eligibility and other requirements of the Discount Window to obtain payments thereunder.  Such critical information would have been material to the Federal Reserve in a decision as to whether to make payments to the Banks under the Discount Window.  The Federal Reserve, like any other reasonable lender, would have denied payments to a borrower under the Discount Window solely on the basis of the critical information that was concealed, but the Federal Reserve was also mandated to deny each and every payment to the Banks under the Discount Window in such circumstances because extending payments to them in such a manner would have violated the Federal Reserve Act and Regulation A.

46.     Simply put, had each of the Banks – like an honest and law-abiding citizen – told the Federal Reserve that, as and when it accessed the Discount Window, it was not in generally sound financial condition, was not adequately capitalized, and could not make the Section 9.1 Certifications in accordance with Section 9.2 of the Circular each time it requested an advance under the Discount Window program for the numerous reasons that it could not (or, alternatively, provided the Federal Reserve each such time with more accurate and forthcoming

disclosure about its true financial condition and reckless financial activities, along with certifications that it *was* in violation of laws or regulations which *could* have an adverse effect upon its performance of the repayment terms of the Circular and that an Event of Default *had* occurred and *was* continuing because the certifications made or deemed to be made by it under or in connection with the Circular, or contained in certificates, documents or financial or other statements delivered by it *were* inaccurate in material respects on or as of the date made or deemed made), such critical information would have undoubtedly made the Federal Reserve deny payments to the Banks under the Discount Window.

47.     Because the Banks, or their senior management, and certain of their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations prior to and at the time of each payment, each of the Banks, as and when it accessed the Discount Window, was not in generally sound financial condition, was not adequately capitalized, and could not make the Section 9.1 Certifications and the certifications of Section 9.2 of the Circular each time it or they obtained payments from the Discount Window. They therefore knowingly submitted false and fraudulent claims to the Federal Entities each time they accessed the Discount Window and impliedly certified their eligibility thereto and each time they made the Section 9.1 Certifications and certifications of Section 9.2 of the Circular to obtain payments from the Discount Window program.

**2.     The Federal Reserve TAF**

48.     Under the TAF, the Federal Reserve System auctioned term funds to certain institutions against a wide variety of collateral. The Federal Reserve System implemented the TAF as part of a global support program to address elevated pressures in the short-term funding markets. Similar programs were adopted by the Bank of Canada, the Bank of England, the

European Central Bank and the Swiss National Bank for their respective jurisdictions.

49.     The Banks received payments under the TAF numerous times during the Relevant Period.  *See* Appendix II appended hereto for information relating to some of those payments.

50.     No institution had a right to access the TAF, and the Federal Reserve could deny (and, upon information and belief, did deny) payments thereunder for any reason or no reason. The availability of advances under the TAF depends on the soundness and creditworthiness of the borrowing institution and on its ability to make certain certifications required of it prior to and at the time of each particular advance.

51.     The eligibility and other requirements of the Federal Reserve Act, Regulation A and the Circular set forth in Paragraphs 30 to 42, *supra*, applicable to drawing funds at the Discount Window's primary credit rate applied equally to institutions seeking to access the TAF, including each of the Banks.  Furthermore, to be able to draw funds under the TAF, as required by the Federal Reserve, each of the Banks executed a lending agreement and corporate resolutions conforming with the Circular (*i.e.*, the same documents used for the Discount Window's primary credit program, as noted in Paragraphs 32 and 33, *supra*).  As also required by the Federal Reserve, each of them executed a letter agreement with the Federal Reserve agreeing to the terms of the Circular (including its certifications) in consideration of "being able to request advances from and incur indebtedness to the Federal Reserve" and in consideration of "the Federal Reserve making advances to it."

52.     Each of the Banks made each of the Section 9.1 Certifications to the Federal Reserve each time it obtained an advance in respect of a TAF auction.

53.     As is typical in any market lending arrangement, pursuant to Section 9.2 of the Circular, each of the Banks was also required to make each certification (including, without

limitation, each of the Section 9.1 Certifications) to the Federal Reserve *each time* it requested an advance under a TAF auction, incurred any indebtedness through a TAF auction, or granted a security interest in any collateral in connection with an advance under a TAF auction, in each case on and as of the date of such advance, the extension of such indebtedness or the grant of such security.

54.     Each of the Banks also covenanted under Section 9.2 of the Circular that such certifications would "remain true and correct so long as the [Circular] remains in effect, any [obligation] remains outstanding, or any other amount is owing to the [Federal Reserve System]." Because of Section 9.2 of the Circular, each of the Section 9.1 Certifications was required to be made to the Federal Reserve as a precondition to and for the duration of every single advance under a TAF auction, as is typical in any market lending arrangement. The Section 9.1 Certifications were required to be delivered as a precondition to *each* payment to ensure that there was no change in the contextual circumstances surrounding an institution's ability to participate in the TAF program and that particular payment (as would be evidenced by the redelivery of each such certification at the actual time of funding, consistent with market practice).

55.     As set forth in Paragraphs 38-42, *supra*, delivery of the certifications contained in the Section 9.1 Certifications and Section 9.2 of the Circular was certainly material and critical to the Federal Reserve to determine whether an institution could access the TAF in the first place and also as a precondition for each advance under the TAF. Consistent with published Federal Reserve policy, the relevant provisions were intentionally drafted both broadly and comprehensively to shift the burden of due diligence at the time of a request for an advance *from* the Federal Reserve *to* the borrowing institution, and, consistent with published Federal Reserve

policy specific to the TAF, the Federal Reserve expressly wanted advances under the TAF to be treated (as a contractual matter) as "advances" under the Circular.

56.     Yet, as shown herein, each of the Banks, as and when it was accessing the TAF, was not in generally sound financial condition, was not adequately capitalized, was brazenly violating the Applicable Laws and Regulations, and was not disclosing certain critical information to the Federal Entities that would have been vital and necessary for the Federal Entities to have been able to make a determination as to whether it was in generally sound financial condition (such as (i) the fact that its violations of the Applicable Laws and Regulations, including the Safety and Soundness Regulations, were so egregious that it simply could not be – and the Federal Entities could not reasonably make a determination that it was – in generally sound financial condition as and when it accessed the TAF and (ii) the fact that it could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time it accessed the TAF for payment).

57.     Furthermore, each of the Banks knew that the Federal Reserve needed to know such critical information for it to be able to determine whether the Banks could access the TAF in accordance with and pursuant to the Federal Reserve Act and Regulation A.

58.     And by failing to disclose and/or omitting to disclose such critical information to the Federal Entities, each of the Banks implicitly and fraudulently certified to the Federal Entities that it conformed to the eligibility and other requirements of the TAF to obtain payments thereunder.  Such critical information would have been material to the Federal Reserve in a decision as to whether to make payments to the Banks under the TAF.  The Federal Reserve, like any other reasonable lender, would have denied payments to a borrower under the TAF solely on the basis of the critical information that was concealed, but the Federal Reserve was also

mandated to deny each and every payment to the Banks under the TAF in such circumstances because extending payments to them in such a manner would have violated the Federal Reserve Act and Regulation A.

59.     Simply put, had each of the Banks – like an honest and law-abiding citizen – told the Federal Reserve that, as and when it accessed the TAF, it was not in generally sound financial condition, was not adequately capitalized, and could not make the Section 9.1 Certifications in accordance with Section 9.2 of the Circular each time it requested an advance under the TAF for the numerous reasons that it could not (or, alternatively, provided the Federal Reserve each such time with more accurate and forthcoming disclosure about its true financial condition and reckless financial activities,  along with certifications that it *was* in violation of laws or regulations which *could* have an adverse effect upon its performance of the repayment terms of the Circular and that an Event of Default *had* occurred and *was* continuing because the certifications made or deemed to be made by it under or in connection with the Circular, or contained in certificates, documents or financial or other statements delivered by it *were* inaccurate in material respects on or as of the date made or deemed made), such critical information would have undoubtedly made the Federal Reserve deny payments to the Banks under the TAF.

60.     Because the Banks, or their senior management, and certain of their officers and employees were intentionally and flagrantly violating the Applicable Laws and Regulations prior to and at the time of each payment, each of the Banks, as and when it accessed the TAF, was not in generally sound financial condition, was not adequately capitalized, and could not make the Section 9.1 Certifications and the certifications of Section 9.2 of the Circular each time it or they obtained payments under a TAF auction.   They therefore knowingly submitted false and

fraudulent claims to the Federal Entities each time they accessed the TAF and impliedly certified their eligibility thereto and each time they made the Section 9.1 Certifications and certifications of Section 9.2 of the Circular to obtain payments under a TAF auction.

**3.      The Limited Scope of the Federal Programs**

61.      To be clear, the Federal Programs were not established under Federal law or regulation to allow the Federal Entities to simply fund and support institutions that were not eligible for those particular programs or that could not make the certifications required of them under those programs.  Indeed, the Federal Entities could not, by law or in fact, make payments to such institutions in such circumstances.  Rather, if the Federal Entities wanted or needed to fund any of the Banks in order to mitigate a systemic risk affecting the United States economy – notwithstanding the ineligibility of these institutions to access the Federal Programs and the inability of these institutions to provide the certifications required of them under the Federal Programs – the Federal Entities had *other programs* available to them that were specifically crafted under Federal law and regulation to facilitate the funding of those institutions in such circumstances, such as declaring a systemic risk and funding the entities accordingly (*e.g.*, 12 U.S.C. § 343(3)(A)).  The need for liquidity – no matter how great – does not excuse the submission of a false or fraudulent claim to the U.S. Government for money.

62.      Indeed, by failing to enforce what the False Claims Act and each of the Federal Programs' express terms clearly envision, the U.S. Government would inadvertently encourage future recipients of Federal funds under programs like the Federal Programs to simply ignore the eligibility criteria; the need for responsible, full and transparent disclosure concerning a potential borrower's purported satisfaction of those criteria; and the certifications mandated by the Federal Entities when drawing upon such or similar programs in the future, thereby creating a new

systemic risk in the banking industry with which future generations will have to contend.  The perversity of this result is perhaps best seen in the context of the Discount Window's primary credit program and the TAF – because of the intentional shift of the due diligence burden from the Federal Reserve to the borrowing institutions under Regulation A (*cf.* Paragraphs 38 to 42, *supra*), an effective "waiver" of the need to deliver the certifications required of those programs would convert the programs into *de facto* guarantees of financing for any reason – and for any fraud.

### B.    Why Wachovia's Certifications Were Patently False and Fraudulent

63.    Wachovia could not and should not have accessed the Federal Programs as and when it did because Wachovia had brazenly violated the Applicable Laws and Regulations from at least 2001 to on or around the Wachovia-Wells Merger Date in 2008 and beyond in order to satisfy Wachovia's senior management's unrestrained pursuit of short-term profitability – a pursuit that benefitted senior management and certain Wachovia personnel (who earned large bonuses) at the expense of Wachovia's long-term financial health and the financial well-being of the vast majority of its shareholders and employees.  And because Wells Fargo did not disclose, post-merger, that this known fraud had occurred, that this fraud had a material financial impact on its own balance sheet at and post-merger (which, *inter alia*, would have required it to make numerous financial disclosures in accordance with Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP concerning its discovery of the fraud and the extent to which that this fraud impacted its own financial controls, reports and statements), and that this known fraud required Wells Fargo to take costly and extensive remedial measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at the combined institutions post-merger to ensure its compliance with the Applicable Laws and Regulations on a

going-forward basis (assuming, of course, that Wells Fargo took such remedial measures), Wells Fargo concealed and perpetuated the fraud long after the Wachovia-Wells Merger Date, including up to today.

64.     Through a classic and almost formulaic application of "control fraud,"[3] Wachovia's senior management cleverly subverted and dismantled the checks and balances existing at Wachovia to commit fraud on an astounding scale for their own pecuniary benefit, recklessly and dangerously using Wachovia's purportedly "legitimate" Corporate and Investment Bank (the "**CIB**") securitization business as a front for their fraud.  To establish, grow and run this securitization business, Wachovia knowingly and willingly disregarded the Applicable Laws and Regulations to, *inter alia*: (i) originate loans of poorer and poorer credit quality in violation of the Safety and Soundness Laws and Regulations, with the uncertain hope that they could off-load these risky loans into the securitization markets and the hopeless certainty that they would suffer substantial losses if they could not; (ii) rely on sizeable illegal on- and off-balance sheet sham transactions to bury the risks it necessarily assumed in its reckless pursuit of profitability and to help it fabricate higher profit margins in spite of those risks; (iii) improperly reduce profit-

---

[3] A control fraud occurs when trusted persons in high positions of responsibility at an institution subvert the organization's checks and balances (*e.g.*, through the use of selective hiring and firing) to engage in extensive fraud for personal gain.  According to the noted professor and former bank regulator William K. Black, "the way that you do it is to make really bad loans, because they pay better.  Then you grow extremely rapidly, in other words, you're a Ponzi-like scheme.  And the third thing you do is we call it leverage.  That just means borrowing a lot of money, and the combination creates a situation where you have guaranteed record profits in the early years.  That makes you rich, through the bonuses that modern executive compensation has produced.  It also makes it inevitable that there's going to be a disaster down the road."  In his book, The Best Way to Rob a Bank is to Own One, Professor Black writes on page 3 thereof, "Accounting frauds are ideal for control fraud.  They inflate income and hide losses of even deeply insolvent companies.  This allows the control fraud to convert company funds to…personal use through seemingly normal, legitimate means [through salaries, bonuses, stock options and luxurious perks].  Control frauds almost always report fabulous profits, and top-tier audit firms bless those financial statements."

moderating loss reserves that might have helped Wachovia withstand the terrible financial shocks it would inescapably experience; and (iv) commit unabashed accounting fraud in brazen violation of the Applicable Laws and Regulations to conceal its fraudulent activities from its shareholders, depositors and regulators alike.

65.    Indeed, Wachovia knowingly and willingly violated the Applicable Laws and Regulations to, *inter alia*:

•    falsify and fail to correct financial reports and statements (including call reports submitted to certain Federal Entities) for a period of at least nine years to concoct a fictional picture of its "sound" financial health for that period and for subsequent financial reporting periods as well;

•    falsely report higher and higher returns on equity capital (when, in fact, no such returns existed) and improperly maintain lower and lower reserves of balance sheet capital leaving Wachovia increasingly susceptible to collapse;

•    render its risk management, internal control and accounting processes meaningless by recklessly disregarding GAAP – in violation of Federal law – regarding on- and off-balance sheet accounting and fair market valuations of assets.  In so doing, senior management disregarded the legal and regulatory framework established by Congress and the Federal Entities to protect American banking institutions like Wachovia from unsafe and unsound banking practices, rendering these laws and rules ineffective and impotent;

•    use unrealistic, simplistic, untested and unvalidated internal financial models to perpetrate and perpetuate its complex and staggering financial and control fraud, thereby deceiving shareholders, depositors and regulators alike;

and

• as it was imploding, falsely and fraudulently access the Federal Programs for payments and make clearly false and fraudulent certifications to the United States that it simply could not and should not have made in order to draw upon public funds and resources to stay afloat.

66. Before the onset of the financial crisis, the fraud worked like a charm – the CIB, led by Steve Cummings ("*Cummings*"), a Senior Executive Vice President and Executive Officer of WC, quickly became Wachovia's gem and profit center. According to G. Kennedy Thompson ("*Ken Thompson*"), Chairman, President and Chief Executive Officer of WC, in WC's 2006 annual report, the CIB had "70% of revenues in 2006 coming from capital markets activity – heavily weighted to fixed income and focusing on high-margin, non-commodity businesses" and the CIB "*doubled its market share* and *grew faster than [Wachovia's] major investment banking competitors* over [a five-year period] while *reducing the capital needed to support the business*" (emphasis added). But the CIB's impressive growth and profits cannot be attributed to the quality of Wachovia's financial transactions or the caliber or wisdom of its senior management (Wachovia did fail, after all); rather, it can be attributed to management's mastery of the art of control fraud and Wachovia's wanton disregard for the Applicable Laws and Regulations as it grew its securitization business by any means necessary.

67. Specifically, Wachovia flagrantly disregarded the Applicable Laws and Regulations by (i) not having appropriate internal controls and information systems; (ii) not having an appropriate internal audit system; (iii) not establishing and maintaining loan documentation practices that enabled Wachovia to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loans and sources for repayment, (D) assess the

ability of the borrower to repay indebtedness in a timely manner, (E) ensure that claims against the borrower would be enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of loans; (iv) not establishing and maintaining prudent credit underwriting practices; (v) not having prudent asset growth; and (vi) not establishing and maintaining an appropriate system commensurate with Wachovia's size to identify problem assets and prevent deterioration of those assets; by violating the certification requirements regarding financial reporting, internal control and compliance with laws and regulations under 12 C.F.R. 363; by making false entries with an intent to deceive other officers of Wachovia in violation of 18 U.S.C. § 1005; by making false statements in a matter within the jurisdiction of a Federal department or agency in violation of 18 U.S.C. § 1001; by violating Sarbanes-Oxley, including Sections 302, 806 and 906 thereof; and by not filing financial reports and statements with the Federal Entities in accordance with GAAP pursuant to 12 U.S.C. § 1831(n)(a)(2)(A).

68.    The control fraud effected at Wachovia is distressingly reminiscent of the control fraud that took down some savings and loans institutions ("*S&Ls*") in the 1980s and Enron Corporation ("*Enron*") in 2001.  But the comparison fails to do justice to the allegations set forth in this Fourth Amended Complaint.  Horrific as those scandals were, the unconscionable control fraud perpetrated here is, in many ways, of significantly greater importance: A *U.S.-chartered bank* of significant national and international prominence was the instrument of this control fraud, and it knowingly and willingly adopted highly deceptive accounting practices that were *almost identical* to the fraudulent accounting practices of the S&Ls and Enron – all while brazenly scorning the very laws and regulations that were enacted after the S&L and Enron crises to specifically prevent those types of financial frauds from ever happening again.

69.     And when cracks started to show in Wachovia's fragile financial façade during the financial crisis, Wachovia, in its arrogance, committed fraud against the United States to secure critical lifelines to keep it afloat, materially and overtly lying to our Government just to save its skin from an imminent insolvency that was brought about by its own criminal recklessness.   At no time did Wachovia (or, post-merger, Wells Fargo) do what an honest, repentant and law-abiding corporate citizen would do:   Come clean to the United States about this massive unconscionable fraud.   Rather, it was business as usual as Wachovia and, post-merger, Wells Fargo took the money provided to it under false and fraudulent pretenses by the United States taxpayer and stayed silent about their egregious financial misdeeds.

70.     Sadly, unlike in the S&L and Enron contexts, Wachovia and, post-merger, Wells Fargo appear to have acted with impunity: Wachovia's shareholders and the United States taxpayer have borne the brunt of Wachovia's fall, and, remarkably, with the exception of the present lawsuit, neither Wachovia, Wells Fargo nor anyone in its or their senior management has faced criminal or civil liability to date for the blatant and astounding financial fraud that took place there – a fraud that represents the worst of what can happen on Wall Street, Main Street or any other street in America.   Only the size and complexity of this fraud distinguishes Wachovia and, post-merger, Wells Fargo from any other common fraudster, and the United States (and thus the U.S. taxpayers) should recover monies from Wachovia and Wells Fargo under the False Claims Act for having bailed them out under outrageously false and fraudulent pretenses.

71.     Senior management in the CIB included: (i) Ken Thompson; (ii) Cummings; (iii) Tom Wickwire, the Head of Structured Products; (iv) Bill Green, Managing Director of the RECM group; (v) Sam Solie, the Chief Operating Officer of RECM; (vi) Robert Verrone, head of the CIB's Large Loan Group (*i.e.,* commercial real estate loans in excess of $50 million

principal amount); (vii) Frank Tippett, a Director and Head of Hedging at WS, (viii) Keith Schleicher, Managing Director and the Head of Credit Risk Management; (ix) Royer Culp, Head of Wachovia's Structuring Department; (x) Robert Rottmann, the Product Controller Group Head; (xi) Stephen Nelson, the Product Controller for RECM; and (xii) Ira Malter, the Controller for Structured Products.  *See* Appendix III appended hereto, which illustrates the CIB reporting lines.

### 1.      Securitization and Wachovia's Commercial Real Estate Finance Division

72.     Wachovia's Commercial Real Estate Finance division, which was part of the CIB, originated CRE loans secured by commercial real estate properties located throughout the United States and funded them through its banking arm, WBNA.   After accumulating a sufficient number of CRE loans, Wachovia routinely securitized them in commercial mortgage-backed securities ("*CMBS*") transactions.

73.     In connection with each securitization, WBNA would sell some CRE loans to the special purpose vehicle (an "*SPV*") that issued the CMBS (*e.g.*, the Wachovia Bank Commercial Mortgage Trust), and then WBNA would "derecognize" those CRE loans from its balance sheet (*i.e.*, the CRE loans were removed from WBNA's balance sheet) and "recognize" the proceeds it received and the fees it earned in connection with the closing of the CMBS transaction.  *See* Appendix IV for a graphic representation of a typical Wachovia CMBS securitization transaction structure.

74.     However, for an interim period of time between the origination or purchase of a CRE loan and its related CMBS securitization (which could be a very long or even an indefinite period of time), WBNA would have to hold the CRE loans it had not sold (or could not sell) on its balance sheet; during this period, WBNA was required to set aside regulatory capital for those CRE loans based on the credit and/or market risk attributed to each such loan.  (For the CRE

loans it hoped to securitize, this interim period of time is typically referred to as such loan's "warehousing period," and Wachovia's on-balance sheet warehousing/holding facility was referred to internally as the "*CREF facility*".)  *See* Appendix V for a graphic representation of the CREF facility.

75.     Because of regulatory limits and internal controls, the CREF facility had an effective maximum funding limit, meaning there was also an effective cap on the dollar amount of CRE loans that could be warehoused at any given time for securitization purposes or otherwise held on-balance sheet pending some other sort of disposition (*e.g.*, sale, write-off). This cap was intended to keep Wachovia safe by limiting the amount of exposure it could take on its portfolio of CRE loans – as a corollary, though, the cap also severely limited Wachovia's ability to exponentially leverage and increase its securitization volume to achieve record profits.

76.     In addition, as part of its credit underwriting process and credit grading system, Wachovia was required to assign credit grades to the CRE loans to help it effectively track the credit risk embedded in its balance sheet.  These credit grades helped Wachovia know what credit and other risks it was assuming for each individual CRE loan it held on its balance sheet (*i.e.*, in its CREF facility) – no matter how briefly that loan was held – and the grades were to be made available to the bank's risk management, finance, internal audit and other personnel for surveillance, tracking and other purposes on a macro- and a micro-scale.  If it had been doing this correctly, Wachovia would be in a position to ensure that the growth of its CRE loan portfolio kept pace with its legal and regulatory obligations to avoid excessive risk-taking and to operate in a safe and sound manner consistent with the Safety and Soundness Laws and Regulations and the other Applicable Laws and Regulations.

77.     In total disregard for the Applicable Laws and Regulations, Wachovia: (i) used

purportedly off-balance sheet SPVs in violation of GAAP to recklessly and exponentially leverage and grow its securitization business, to circumvent regulatory capital constraints that would have restricted such growth, and to bury toxic CRE loans it originated but was unable to sell into the market; (ii) simply did not grade the CRE loans it held on-balance sheet in its CREF facility, leaving its risk management, internal control and accounting processes in the dark and preventing them from uncovering, identifying and addressing Wachovia's unsafe and unsound CRE loan origination and holding practices; and (iii) used untested and unvalidated models to fabricate the market values of its assets in violation of GAAP so it could fraudulently report record profits.  And once this unhealthy arrangement was firmly in place, Wachovia leveraged its precarious financial position even further to increase its securitization volume, originating *even more* CRE loans of poorer and poorer credit quality, in further violation of the Safety and Soundness Laws and Regulations and the other Applicable Laws and Regulations.  In essence, Wachovia's failure became a self-fulfilling prophecy.

> **2.    The Raison d'Être for Wachovia's "Black Box" and Its Repo SPVs: Using Fraudulent Off-Balance Sheet Accounting to Leverage a Securitization Business**

78.    A financial institution must, of course, strictly adhere to applicable accounting principles and standards if it expects to publish accurate and timely financial reports and statements.  Federal law requires entities like Wachovia and Wells Fargo to file financial reports and statements with the Agencies consistent with GAAP. *See* 12 U.S.C. § 1831n(a)(2)(A), which was incorporated into law by Section 121 of the Federal Deposit Insurance Corporation of 1991.  According to the Federal Reserve, the accounting rules serve as a necessary tool for efficient market discipline and bank supervision, providing a "foundation for credible and comparable financial statements and other financial reports." *See* Section 2120.1, "Accounting" in the Federal Reserve's "Trading and Capital-Markets Activities Manual" (the "***Federal Reserve***

*2120.1 Guidance*") dated April 2002 on page 1.  Indeed, the Federal Reserve noted that the effectiveness of market discipline itself rests, to a very considerable degree, "on the quality and timeliness of reported financial information" and that proper financial reporting enhances "the ability of [the Agencies] to monitor and supervise effectively."  The Federal Reserve stated (obviously consistent with Federal law) that "GAAP must be followed for financial-reporting purposes – that is, for annual and quarterly published financial statements."

79.    Notwithstanding 12 U.S.C. § 1831n(a)(2)(A) and the clear regulatory guidance on this subject, Wachovia routinely parked loans in violation of Federal law and GAAP in a massive SPV called the College Street Funding Master Trust (and known internally as the Black Box (the "***Black Box***")) and in numerous other smaller off-balance sheet SPVs (the "***Repo SPVs***"), in each case to skirt regulatory constraints that limited the number of loans Wachovia could hold on-balance sheet (*i.e.*, in the CREF facility) and to conceal credit issues relating to the many toxic CRE loans that it had originated.  If on-balance sheet warehousing in the CREF facility reached its funding capacity (because of regulatory capital or other constraints) or Wachovia wanted to hide certain loans from internal or regulatory review, Wachovia conveniently "sold" them to the Black Box or to a Repo SPV in a purportedly "off-balance sheet" transaction until the loans could (hopefully) be securitized out of WBNA at some later date.  (By holding assets "off-balance sheet" – at least in a legitimate transaction – the transferor would not have to book or directly hold regulatory capital against those assets.).

80.    Wachovia knew that it should have actually accounted for the CRE loans it purportedly held off-balance sheet in the Black Box or the Repo SPVs on-balance sheet, subjecting those loans to granular review by Wachovia's risk management, internal control and accounting processes and requiring Wachovia to hold regulatory capital against them based on

the credit risk that each such loan individually posed.  But Wachovia did not – rather, it used the Black Box and the Repo SPVs as warehousing facilities through which it could fraudulently hold billions of dollars of CRE loans "off-balance sheet" (and outside the prying and meddling eyes of its regulators, shareholders, and risk management, internal control and accounting personnel) and leverage off of its minimal capital reserves to recklessly grow its securitization business even more.

### a.  The Black Box

81.  To put the extent of the Black Box accounting fraud in perspective, the Black Box facility fraudulently held as of August 1, 2005 some *$6 billion* in loans and other assets that should have been on WBNA's balance sheet.  (On that day, Ira Malter ("*Malter*"), the Controller for Structured Products, wrote in an e-mail (the "*August 1 Malter E-mail*") that the Black Box facility was, at that time, the "largest ever," at $4 billion in funded loans and $6 billion after including rate-locked loans and related hedging.)  Around that time, this was roughly the equivalent of an astounding *12.75%* of the total equity capital of WBNA.  Wachovia's accounting treatment of the Black Box therefore had a material impact on its financial reports and statements for the entire period during which the Black Box was used as an off-balance sheet financing vehicle.  Such material misstatements in WBNA's financial reports and statements (and financial reports and statements issued by WC, and, post-merger, WFC) effectively prevented the Federal Entities from being able to make a determination that any such entity is in "generally sound financial condition".

82.  Pursuant to Paragraph 46 of the Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("*FAS 140*"), issued in September 2000, a "qualifying special purpose entity" (a

"*QSPE*") is not consolidated in the financial statements of a transferor or its affiliates (*i.e.*, it was considered to be off-balance sheet) if it is, *inter alia*, "demonstrably distinct" from the transferor of the loans.  According to Paragraph 36 of FAS 140, an entity is "demonstrably distinct" from a transferor if it cannot be unilaterally dissolved by any transferor, its affiliates or its agents *and* at least 10% of the fair value of its beneficial interest is held by parties other than the transferor, its affiliates or its agents.  (Note that Financial Accounting Standards No. 166, "Accounting for Transfers of Financial Assets" ("*FAS 166*"), issued in June 2009, significantly amended FAS 140.  This Fourth Amended Complaint uses and quotes FAS 140's original text (*i.e.*, does not give effect to the FAS 166 amendments) because the events described herein precede the date of issuance of FAS 166.))

83.     So to manipulate its accounting treatment of a sizeable portion of its CRE loans, Wachovia created the Black Box, whereby it parked those CRE loans into the Black Box via a "sale" of the loans to the Black Box, with the Black Box selling an interest in itself to a third party and another interest in itself back to Wachovia.  *See* Appendix VI for a graphic representation of the Black Box.  Based on information contained in Wachovia's own Corporate & Investment Bank Accounting Policy ("*Wachovia's 2003 Black Box Accounting Policy*") dated June 2003 and its internal undated Purchase of College Street Funding A Certificate summary (the "*Purchase Summary*"), Wachovia was clearly aware that GAAP required the Black Box to issue a beneficial interest of *at least* 10% to an unaffiliated third party (represented by a Class A Certificate) and a beneficial interest of *at most* 90% to WBNA (represented by a Class B Certificate) to maintain the Black Box's QSPE status.

84.     WBNA made up a Class A Certificate/Class B Certificate ratio that conveniently "satisfied" the GAAP requirement, with WBNA then treating the Black Box under the

accounting rules as an off-balance sheet QSPE in fraudulent reliance on Paragraph 36 of the FAS 140. According to a Wachovia Sarbanes-Oxley Team – Confidential – Process Narrative – CRES (the "**Wachovia SOX Process Narrative**") dated June 18, 2005 and other related Wachovia documentation, because, as fraudulently documented, at least 10% of the fair value of the Black Box's beneficial interests were held by parties other than WBNA, its affiliates or its agents (the Class A Certificate was held by Amsterdam Funding Corporation, a commercial paper conduit arranged by ABN Amro), Wachovia took the accounting position that the Black Box was a "demonstrably distinct" QSPE from WBNA for GAAP purposes. Wachovia therefore did not consolidate the Black Box on its balance sheet, in fraudulent reliance on Paragraph 46 of FAS 140 at FAS 140-40. When WBNA "sold" a CRE loan to the Black Box, WBNA then derecognized the loan from its balance sheet for accounting purposes (*i.e.*, on the basis that the Black Box was a QSPE) – and by doing so, no longer tracked the CRE loan individually for risk management, internal control and accounting purposes.

85. This accounting treatment was a sham because Wachovia's Finance department took steps – in total disregard of GAAP – to fabricate the market value of the Black Box's assets and/or the values of the Class A Certificate and the Class B Certificate to fraudulently "establish" that the Class A Certificate did not represent less than a 10% beneficial interest in those assets (*i.e.*, Wachovia manipulated the market value of the Black Box portfolio and/or reassigned the related values of the certificates in order to preserve the Black Box's "demonstrably distinct" QSPE status for Wachovia's self-serving accounting purposes.) This was nothing short of fraudulent, reverse-engineered, results-driven accounting, where market values of portfolios and/or securities are calculated as needed to achieve a desired accounting outcome. And this scheme was espoused – unbelievably – by Wachovia's own *financial control*

department.

86.    As Relator Kraus witnessed first-hand, Wachovia's Finance department performed a monthly, manual reconciliation of the aggregate market value of the CRE loans held in the Black Box for that month to line them up as necessary against the outstanding amounts of the outstanding Class A Certificate and/or the Class B Certificate, a highly manipulative and fraudulent approach to accounting in blatant violation of GAAP.  Indeed, Wachovia falsified documentation to make sure that the Class A Certificate never represented less than *11%* of the fair market value of the Black Box portfolio (apparently to maintain a "cushion") and Wachovia never deviated from that ratio (*i.e.*, to fraudulently preserve the Black Box's QSPE status).  If the fair market value of the Black Box and/or the sizes of the Class A Certificate and Class B Certificate did not line up correctly at any particular point in time, Wachovia would make manual entries in its records to actually get the numbers to line up appropriately for accounting purposes.  Wachovia would then, as needed, revise the Black Box's loan level schedules to dupe even Amsterdam Funding Corporation as to what it, in fact, owned.

87.    In respect of the Class B Certificate, pursuant to Paragraph 10 of FAS 140 at FAS 140-12, Wachovia had to "continue to carry in its statement of financial position any interest it continue[d] to hold in the transferred [CRE loans], including . . . beneficial interests in assets transferred to a QSPE in a securitization" upon the completion of the transfer of such assets; WBNA therefore recognized its holding of the Class B Certificate on its balance sheet.  By doing so, Wachovia managed to skirt GAAP rules once again – instead of booking the underlying CRE loans on-balance sheet as individual loans (as it should have), WBNA fraudulently relied on Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("*FAS 115*") to treat the Class B Certificate itself as a "debt

security" in its trading account.  WBNA thereafter tracked the value of the Class B Certificate on a fabricated mark-to-market basis (as substantiated in the August 1 Malter E-mail, Wachovia's 2003 Black Box Accounting Policy and a Wachovia RECM Finance Memorandum to December Close Files (the "***Wachovia RECM Finance Memorandum***") dated January 6, 2006) rather than tracking each individual loan as a separate, individual asset on its balance sheet.

88.     Wachovia employed this accounting treatment because it facilitated and enhanced the control fraud taking place at Wachovia:

•       Wachovia could now flagrantly and fraudulently originate CRE loans well in excess of the regulatory capital limitations that would apply if it had originated CRE loans and held them on-balance sheet in its CREF facility in accordance with the Applicable Laws and Regulations and GAAP.

•       WBNA now no longer individually tracked CRE loans warehoused in the Black Box for risk management, internal control and accounting purposes because WBNA fraudulently derecognized the CRE loans from its balance sheet when it purportedly "sold" them to the Black Box.

•       By booking the Class B Certificate as a security on-balance sheet in its "trading book" (as opposed to booking the individual CRE loans on-balance sheet in its "banking book") and tracking the Class B Certificate on a mark-to-market basis, Wachovia could fraudulently boost its financial reports and statements using an artificial and (to the extent possible given the need to maintain an appropriate Class A Certificate/Class B Certificate ratio) inflated market value for the Class B Certificate.  Had it held the CRE loans individually on-balance sheet in its "banking book," Wachovia would have been required to

use a "lower of cost or market" ("**LOCOM**") accounting treatment that would have to be determined on a per loan basis commencing at loan origination or purchase under GAAP, which would have led to drastically reduced valuations of the entire CRE loan portfolio.  Moreover, WBNA now fraudulently treated the Class B Certificate "trading security" as a proxy for the individual CRE loans for risk management, internal control and accounting purposes, resulting in no granular review of the associated CRE loan risks.

•      WBNA was able to immediately reduce its regulatory capital exposure by booking its holding of the Class B Certificate (*i.e.,* a trading book security) and not booking a warehoused CRE loan portfolio.  (WBNA's regulatory capital exposure was reduced by at least 10% because the Class B Certificate represented, as manipulated, at most a 90% beneficial interest in the Black Box. For example, if the Black Box was approximately $6 billion in size on August 1, 2005, as noted in the August 1 Malter E-mail, WBNA's risk capital would have been calculated against only the $5.4 billion Class B Certificate (*i.e.*, only 90% of the $6 billion portfolio exposure of the Black Box).  However, Wachovia attained through fraud a significantly greater regulatory capital reduction by treating the Class B Certificate as a "covered position" (*i.e.*, a "trading book" asset).  By doing so, WBNA could deduct the *entire* covered position (*i.e.*, $5.4 billion) from its risk-weighted assets calculation (resulting in a substantially lower adjusted risk-weighted assets calculation) and hold only risk capital for the "market risk" that it ultimately *made up* in respect of the Class B Certificate, using its untested and unvalidated Trading Desk Model (*see* Paragraphs 111-

117, *infra*.)

89.     Even putting aside the manipulation of the Class A Certificate/Class B Certificate valuations to improperly preserve the Black Box's QSPE status (which obviously violated GAAP), Wachovia also fundamentally violated *another* basic GAAP principle to make its fraudulent accounting treatment work – *none* of the CRE loans "sold" to the Black Box should have ever been derecognized from its balance sheet in the first place because WBNA never satisfied FAS 140's "true sale" requirements.

90.     WBNA used the Black Box as a holding facility and selectively took back CRE loans in order to securitize them.  Simply put, WBNA never intended or attempted to surrender "effective control" over the CRE loans it purportedly "sold" to the Black Box.  Rather, WBNA unquestionably retained effective control over the CRE loans through its unilateral ability to cause the Black Box to return specific CRE loans to it for future CMBS deals.  In doing so, it violated the clear directive of FAS 140 when it derecognized the CRE loans upon their purported "sale" to the Black Box.

91.     Wachovia admitted the same in its June 2005 internal Wachovia Sarbanes-Oxley narrative concerning Black Box procedures, stating:

> After accumulating sufficient collateral to offer into a deal, the front office…engages the equity buyers…commonly referred to the "B-piece buyers" [of a CMBS transaction]….Once the B-piece buyers have selected the collateral they will allow into the securitization and the rating agencies have set the subordination levels[,] the front office conducts a "road show" to gauge market interest.  Concurrent with this, Finance, Wholesale Operations and the Servicing group communicate the loan level detail to the College Street Funding conduit. These notes must be removed from the "black box" because they will need to be sold by Wachovia.  *This is effected via failing a condition of sale under USGAAP that governs securitizations.*  This information is communicated typically at the same time as the normal monthly meeting for new notes to be included into the black box (emphasis added).

92.     Wachovia therefore materially misstated its financials for the entire period that it

used the Black Box as an off-balance sheet financing facility – a period of no less than five years.  Wachovia's FAS 115 treatment of the Class B Certificate as a "debt security" was also clearly improper for both accounting and risk capital calculation purposes.  The Federal Reserve itself stated in no uncertain terms in the Federal Reserve 2120.1 Guidance on page 3 that "FAS 115 does not apply to loans, including mortgage loans, that have not been securitized" and, on page 5 thereof, that the "traditional model still applies to assets that are not within the scope of FAS 115" (*i.e.*, loans held in an asset held for sale account on-balance sheet must be accounted for under GAAP on a LOCOM basis, as noted in the third bullet point of Paragraph 88, *supra*).

93.     WBNA should have valued each individual CRE loan on a LOCOM basis under GAAP (thereby necessarily limiting any inappropriate market value inflation that might arise in respect of the CRE loans, both individually and in the aggregate).  Yet Relator Kraus witnessed first-hand that personnel at Wachovia routinely inflated the market value of Wachovia's CRE loans to manipulate financial results in violation of GAAP.  Wachovia's senior management knew this was the case – in e-mail correspondence between Steve Young ("***Young***"), the Head of the Credit and Counterparty Risk Analytics Group for the CIB, and Frank Tippett ("***Tippett***"), a Director and Head of Hedging at WS, Young told Tippett that "[t]he spread in the spreadsheet that is circulated, I am told, is overstated and reflects our pricing and not where we would sell a loan."  Young also told another colleague that "we have loans on our books that have some market spread associated with them…I understand that the spread we see in the spreadsheet that comes around may be high and not reflect the spread at which the desk could sell a loan."

94.     Equally important, Wachovia failed to satisfy risk management protocols, internal controls and accounting rules in respect of the CRE loans that it parked in the Black Box, which included both originated CRE loans that it wanted to securitize *and* CRE loans that it could not

get rid of and needed to hide from the light of day.  WBNA should have booked each CRE loan as an individual asset on its balance sheet, subjecting each individual loan to risk management, internal control and accounting scrutiny.  As a result of this failure, Wachovia also violated myriad other applicable regulations (*e.g.*, credit grading rules, limitations on exposure to single borrowers, etc.) that are premised on an institution actually being GAAP-compliant in accordance with Federal law.

95.    Given the impropriety of the accounting treatment of the Black Box in particular, it comes as no surprise that Wachovia shrouded it in mystery and secrecy.  According to Relator Kraus, senior Wachovia personnel had many emergency closed-door meetings around December 2005 to address the on-going accounting issues relating to the Black Box, and in this context, Nelson was even heard shouting loudly on the floor, "Someone is going to go to jail and it's not going to be me!"  In connection with a pending accounting reclassification of the Black Box's loans, Malter went so far as to admit to Robert Rottmann ("***Rottmann***"), the Product Controller Group Head, in a December 1, 2005 e-mail (the "***Malter-Rottmann E-mail***") about Wachovia's accounting processes generally that "[y]ou must remember that the current [accounting] process is being held together with band-aids, spit and gum.  A 'strong wind' will cause the entire process to keel over and die."

96.    Wachovia abruptly shut down the Black Box in December 2005.  To effect a hurried closure of the Black Box, WBNA purchased the Class A Certificate on December 22, 2005 at its par value plus its cost of funding.  WBNA off-loaded whatever CRE loans it could into a CMBS transaction that closed around that time (*i.e.*, the Wachovia Bank Commercial Mortgage Trust Series 2005-C22 deal) so that Wachovia could try to avoid having a significant balance sheet event that would attract regulatory, shareholder and public attention.  Wachovia

also concluded for GAAP purposes that the Black Box was no longer "demonstrably distinct" from WBNA because of its purchase of the Class A Certificate; accordingly, as noted in Wachovia's RECM Finance Memorandum, WBNA recognized on-balance sheet the remaining CRE loans at their fabricated "fair market value" *as of December 28, 2005*.

97.     They say that the greatest trick the Devil ever played was convincing the world that he did not exist.  By making the Black Box simply vanish overnight, Wachovia cleverly convinced the world that this accounting fraud never took place, even though the damage caused by the Black Box was already done and now deeply imbedded in WBNA's balance sheet. Rather than restating its previous financial reports and statements to reflect the fact that none of the CRE loans warehoused in the Black Box had, in fact, ever been actually sold to the Black Box (as a responsible, honest and law-abiding corporate citizen would do), WBNA instead treated its purchase of the Class A Certificate as the "accounting event" that brought the CRE loans back on its balance sheet.  In so doing, Wachovia conveniently and fraudulently reset the cost basis of the CRE loans to the inflated "fair value" of the loans as of December 28, 2005.  As detailed in the Purchase Summary, this means that Wachovia effectively locked in its inflated gains because LOCOM calculations going forward would be based on the lower of (i) the then-current market value of such loans and (ii) *the market value of the loans fixed as of December 28, 2005* (*i.e.*, the new, fabricated cost basis).

98.     Further, upon the closure of the Black Box, Wachovia took on-balance sheet billions more dollars of CRE loan exposures that had not been tracked from a risk management, internal control or accounting perspective for years, meaning Wachovia had absolutely no idea about what it was bringing on-balance sheet.  The only way that Wachovia and, post-merger, Wells Fargo could truly cure the ills that the Black Box had caused would be to significantly

deleverage their financial positions in a very public way, which, of course, neither wanted to do.

### b.    The Repo SPVs

99.    Wachovia also entered into repo transactions with numerous smaller purportedly off-balance sheet Repo SPVs to keep an *additional* $4 billion to $6 billion of CRE loans off of its books in violation of GAAP and to bypass regulatory constraints that would have hampered Wachovia's unsafe and unsound leveraging of its securitization business.

100.   In a typical repo transaction, Party A sells an asset to Party B at a designated purchase price, and Party A agrees to repurchase that asset from Party B at a slightly higher price at some designated date in the future.  Both parties to the repo transaction agree at the start of the repo that until Party A's eventual repurchase of the asset, they will agree to a discount (or "haircut") to be applied to the value of the asset so that Party B is sufficiently "collateralized" for the period in which it owns the asset.  The asset is typically revalued daily on a mark-to-market basis, and if there is too little collateral on hand at any point in time given the then-current mark on the asset and the designated haircut applied to that asset, Party A is required to provide some sort of additional collateral (*e.g.*, cash, U.S. Treasuries, etc.) to Party B to make up for the shortfall (thereby leaving Party B with sufficient collateral in the repo).  If, as a result of such valuation, there is too much collateral on hand at any point of time, Party B is required to provide liquid assets (*e.g.*, cash, U.S. Treasuries, etc.) back to Party A to reduce the amount of collateral on hand to the agreed upon level.  Repo transactions constitute a significant part of capital markets activity, and the mechanics, procedures, documentation and controls relating to repo transactions are very familiar to financial institutions, including, of course, Wachovia.

101.   Wachovia freely used repos in violation of the Applicable Laws and Regulations and GAAP to exponentially increase and leverage its securitization volume (and thereby increase

its short-term profitability at the expense of its long-term financial health) and to hide toxic CRE loans from regulatory, risk management, internal control and accounting purview. To effectively "create" a brand new repo market for its CRE loans where none existed, Wachovia incentivized customers with which it had a strong business relationship to create new Repo SPV "purchasers" for its CRE loans, with the customer putting up 10% of the funding of the SPV and Wachovia putting up the remaining 90% of the funding of the SPV (*i.e.*, if the SPV had $100, the customer would put up $10 and Wachovia would put up $90), thereby funding the Repo SPV to enable it to purchase CRE loans from WBNA. The Repo SPV would "roll" repo transactions (*i.e.*, enter into back-to-back repo transactions) until Wachovia could either securitize CRE loans in a CMBS or collateralized debt obligation (CDO) transaction or otherwise sell such loans to third-party buyers. (Using the example above, the Repo SPV would purchase a $100 CRE loan from WBNA on a specified date with an agreement from WBNA that WBNA would repurchase that CRE loan from the Repo SPV for $101 on a date in the future. They would enter into back to back repo trades until WBNA could find an outlet for its CRE loan, with the SPV effectively making $1 on each repo transaction roll. This example does not incorporate a valuation/haircut concept because, contrary to normal repo practice and Wachovia's own internal repo guidelines, Wachovia did not perform any valuations on CRE loans that it sold to Repo SPVs. In a normal repo transaction, the parties would perform a daily (or at least frequent) mark-to-market valuation of the asset subject to the repo and, depending on the valuation of that asset, one party might be required to pay the other party additional liquid funds if there was a market fluctuation in the value of the asset. Because Wachovia knew its CRE loans had low market values given the lack of market appetite for the credit risk attributable to these loans, Wachovia did not want true, arms'-length mark-to-market valuations to take place in respect of its CRE loans. Further,

if Wachovia had to provide additional *liquid* collateral to the Repo SPVs in respect of the CRE loans because of actual mark-to-market valuations of the CRE loans – as would be typical in a market repo transaction – Wachovia's risk management and internal control personnel might raise troublesome questions in the context of Wachovia's liquidity management when Wachovia had to deliver liquid collateral to its Repo SPVs.)  *See* Appendix VII for a graphic representation of the Repo SPVs.

102.   Using these repo transactions, Wachovia actually off-loaded $4 to $6 billion of retained CRE loan positions, keeping these loans effectively off of its books and away from regulatory, risk management, internal control and accounting purview.

103.   Like the Black Box, Wachovia's use of the Repo SPVs greatly facilitated the control fraud taking place at Wachovia:

•     Wachovia could now flagrantly and fraudulently originate CRE loans well in excess of the regulatory capital limitations that would apply if it had originated CRE loans and held them on-balance sheet in its CREF facility in accordance with the Applicable Laws and Regulations and GAAP.  Even though Wachovia *de facto* created, supported and controlled the Repo SPVs and knowingly retained the risks in the CRE loans it purportedly "sold" to the Repo SPVs, Wachovia treated each Repo SPV as an off-balance sheet vehicle in violation of GAAP.

•     WBNA now fraudulently treated the repo trades as "trading book" assets and (like the Black Box's Class B Certificate) used the repo trades as proxies for the underlying CRE loans for risk management, internal control and accounting purposes, resulting, again, in no granular review of the CRE loans it "sold" to

the Repo SPVs. Wachovia also waived its own internal repo guidelines for repo transactions involving its CRE loans so that Wachovia's repo department would not somehow inadvertently re-apply risk management, internal control and accounting protocols to the CRE loans in the context of the repo transactions.

• Because WBNA should have booked each CRE loan as an individual asset on its balance sheet, subjecting each individual loan to risk management, internal control and accounting scrutiny, Wachovia therefore also violated myriad other applicable regulations (*e.g.*, credit grading rules, limitations on exposure to single borrowers, etc.) that are premised on an institution actually being GAAP-compliant in accordance with Federal law.

• Of course, Wachovia's knowing failure to apply repo trading standards, including market valuation and haircuts, to its repo trades with the Repo SPVs, enabled Wachovia to leverage its reckless securitization business even further. WBNA should have valued each individual CRE loan on-balance sheet on a LOCOM basis under GAAP (thereby necessarily limiting any inappropriate market value inflation that might arise in respect of the CRE loans, both individually and in the aggregate). Instead, Wachovia routinely inflated the market value of its CRE loans by using the fictional repo purchase and repurchase price as a "market" price that was, of course, validated by the repo market that Wachovia had created and effectively controlled.

104. Wachovia's accounting fraud, which was used in respect of the Black Box and the Repo SPVs as well as other transactions, helped Wachovia falsify its financial statements to perpetuate a false reality about its true financial health. Through its fraud, Wachovia accounted

for assets as "trading assets" or "assets held for sale" under GAAP when, in fact, they should have been treated as assets to be held to maturity, which would have attracted significantly greater capital requirements, especially considering the low credit quality of such assets. The mischaracterization helped Wachovia deceive the Agencies into believing it held sufficient capital, when it clearly did not.

### 3.   Wachovia's Non-Existent Credit Grading System: Extending Its Fraud-on-Balance Sheet

105.   Wachovia also flouted the Applicable Laws and Regulations that required it to assign credit grades to its CRE loans (which had to be done no matter how long or how briefly they were held on-balance sheet) and to maintain a bank-integrated credit grading system in respect of those loans.

106.   Credit grading is critical to the risk management function of any bank. The Agencies noted in the Asset Securitization Guidelines on page 4 in 1999 that "[i]t is essential that the risk management function monitor origination, collection, and default management practices…[t]his includes regular evaluations of the quality of underwriting, soundness of the appraisal process…and the appropriateness of loss recognition practices." Senior management and risk management staff were expected to be on the alert for "any pressures on line managers to originate abnormally large volumes or higher risk assets in order to sustain ongoing income needs." Specifically, the Agencies wrote that the risk management function should "ensure that appropriate management information systems [("**MIS**")] exist to monitor securitization activities" because such pressures "can lead to a compromise of credit underwriting standards," which may "accelerate credit losses in future periods, impair the value of retained interests and potentially lead to funding problems."

107.   The Agencies required regulated institutions like Wachovia to implement a credit

grading system that both assessed the credit quality of its loans and identified problem loans. Under the credit grading system, originated or purchased loans were supposed to be assigned credit grades that reflected the risk of defaults and credit losses on such loans. The OCC said in the Rating Credit Risk Comptroller's Handbook (the "**Rating Credit Risk Handbook**") that "*all* credit exposures should be rated" (emphasis added), that "the risk rating system should assign an adequate number of ratings…to ensure that risks among pass credits…are adequately differentiated," and that "risk ratings must be accurate and timely." *See also,* the Agencies' Interagency Policy Statement on the Allowance for Loan and Lease Losses (the "***Interagency ALLL Policy***") dated December 13, 2006 on pages 6 and 17 and, more generally, Attachment 1 thereto.

108.   Yet Wachovia intentionally and knowingly violated the Applicable Laws and Regulations and its own written policies by failing to assign credit grades to the CRE loans it held on-balance sheet in its CREF facility and not maintaining a bank-integrated credit grading system.

109.   Instead, Wachovia assessed credit risk in respect of individual CRE loans as if they were part of a "hypothetical" CMBS transaction in which 87.5% of the loan pool was rated AAA by the rating agencies. Of course, the loans were not part of any securitization at that time – they were individual CRE loans held on WBNA's balance sheet *prior to securitization* and there was no guarantee that a securitization could even be effected with these loans, some of which Wachovia could not off-load into the market. Treating 87.5% of each loan as if such part of such loan represented a AAA-equivalent level of credit risk defies all logic, especially from any heightened credit risk management perspective.

110.   Wachovia's failure to assign credit grades to its warehoused CRE loans helps

explain why the institution was doomed to fail long before the advent of the financial crisis. Without the credit grades, Wachovia's risk management personnel had no possible way of determining the credit risk attributed to the CRE loans it held on-balance sheet in its CREF facility, which, according to Wachovia's Structured Products CREF Monthly Review dated August 31, 2005, equaled approximately *$4.141 billion* at that time.  (This is *in addition* to the $6 billion CRE loan portfolio fraudulently held off-balance sheet in the Black Box *and* the $4 to $6 billion of CRE loans fraudulently held off-balance sheet in the Repo SPVs around that same time.)  As a result, there was no conceivable way for Wachovia to accurately price its warehoused loans, assess credit and market risks relating to those loans, or even correctly calculate ALLL and other capital reserves for such loans (which clearly violates regulatory guidance contained the Rating Credit Risk Handbook that states that "[e]very credit's inherent loss should be factored into its assigned risk rating with an allowance provided either individually or on a pooled basis.  The ALLL must be directly correlated with the level of risk indicated by risk ratings.  Ratings are also useful in determining the appropriate amount of capital to absorb extraordinary, unexpected credit losses.").  Simply put, Wachovia had no idea of what it was holding on-balance sheet.

### 4.    Using Untested and Unvalidated Models to Fabricate Its Financial Results

111.   The OCC issued OCC Bulletin 2000-16 entitled "Risk Modeling" (the "*OCC Modeling Guidance*") on May 30, 2000 to Chief Executive Officers and Compliance Officers of all National Banks, Department and Division Heads and All Examining Personnel (including WBNA) concerning a bank's use and validation of models to estimate risk exposures, analyze business strategies and estimate fair values of financial instruments.  The objective of this guidance was, according to the OCC, to "help financial institutions mitigate potential risks arising from reliance on computer-based financial models that are improperly validated or

tested."  The OCC warned national banks on page 2 of that guidance that developing a model is "a complex and error-prone process" requiring "considerable judgment and expertise to apply model results outside of the narrow context under which they are derived."  The OCC recognized that when a bank's management relies on erroneous price or exposure estimates, or on an overly broad interpretation of model results, there is a potential for large losses that could have serious consequences for the bank's reputation and profitability.

112.    Wachovia knowingly and flagrantly violated the OCC model directive when it used Tippett's models (collectively, the "***Trading Desk Model***") to calculate the fair value of, *inter alia*: (i) the funded and rate locked CRE loans warehoused in the CREF facility and (ii) the Class B Certificate of the Black Box, and to estimate risk exposures and analyze business strategies in respect of such assets.  Wachovia's senior management took great pains to ensure that the Trading Desk Model did not undergo the rigorous validation procedures needed to satisfy the OCC directive because they knew the Trading Desk Model – which was also instrumental to the control fraud taking place at Wachovia – would invariably fail validation. Further, Wachovia did not bother verifying the financial outputs produced by its Trading Desk Model – had it done so, Wachovia could not have perpetuated the lie that its securitization business was operating in a truly profitable manner.

113.    The Trading Desk Model comprised a securitization model component and a hedging model component.  As substantiated in: (i) e-mails among various Wachovia personnel, including Nelson, Schweigerath, Cortney McComiskey and Pete Carlson ("***Carlson***"); (ii) a Wachovia RECM Finance memorandum to Accounting Policy ("***Wachovia's RECM Accounting Policy Memorandum***"), dated February 10, 2005; and (iii) the Malter-Rottmann E-mail, Wachovia used the securitization model component to determine (and essentially fabricate)

the mark-to-market value of the funded and rate-locked CRE loans warehoused in the CREF facility and the mark-to-market value of the Black Box's Class B Certificate.  According to the Malter-Rottmann E-mail and Wachovia's RECM Accounting Policy Memorandum, Wachovia loaded funded and rate-locked loan data into the securitization model along with various market parameter values that Wachovia derived from previous securitization deals (*e.g.*, subordination levels, interest rate curves, credit and swap spreads and servicing costs).

114.     Wachovia knew that its Trading Desk Model was gravely deficient.  Malter wrote in the Malter-Rottmann E-mail that "[the Trading Desk Model] is weak and full of simplifying assumptions.  For instance, I believe that it is flawed because the model assumes a well-diversified portfolio.  Subordination levels are not adjusted for lumpy portfolio with borrower or property type concentrations.  In addition, it is not clear how rate locked loans are valued; it appears that all loans are valued on the same spot basis…CIB Finance has lived with this process due to the high velocity in the warehouse and the strict variance pool policy."  (However, as Relator Kraus also witnessed firsthand, CRE loans that should have been in the variance pool "per the strict variance pool policy" referenced by Malter were routinely kept in the CREF facility because moving them would raise internal red flags.)  Based on correspondence among Nelson, Carlson, Tippett and Li, both Nelson and Tippett were also clearly aware that the Trading Desk Model was deficient for use in financial reporting.

115.     But despite these known and material deficiencies and OCC guidance issued as early as 2000, Wachovia used the Trading Desk Model from at least 2003 to at least mid-2006 because it helped Wachovia create a financial fiction that it was operating a highly profitable securitization business.

116.     In a March 23, 2006 e-mail, Wachovia's risk management group finally

acknowledged that the Trading Desk Model was a model that required validation in accordance with the OCC directive because Wachovia used it for financial reporting purposes.    Steve Friedman ("*Friedman*") asked a working group, "[d]oes this 'model' need to be validated by [Market Risk Management]…to allow Finance to attest to the quarterly financial results?" to which Adam Litke ("*Litke*"), the Head of Risk Management, responded, "yes – please contact Doug Gardner for details on validation."

117.    But according to Relator Kraus, the Trading Desk Model was not validated even after Litke, Gardner and the risk management group got involved because Sam Solie ("*Solie*"), the Chief Operating Officer of RECM, took charge of the working group and effectively prevented any substantive changes to the Trading Desk Model in January 2006.  Solie was successful in his efforts – the Trading Desk Model continued to be used *without validation* as late as May 31, 2006, when Relator Kraus was placed on administrative leave.

### 5.    Originating Loans of Poorer and Poorer Quality

118.    To leverage off of its massive accounting fraud further to increase its securitization volume and short-term profitability even more, Wachovia continued to extend more and more CRE loans of lower and lower credit quality, with the hope that it would dump these toxic CRE loans into securitization transactions.  If it could not dump them, Wachovia knew it could somehow bury them on- or off-balance sheet (*e.g.*, through the Black Box, via a repo transaction with a Repo SPV or even hiding them on-balance sheet in the CREF facility without any credit grades).  Despite these games, however, Wachovia also knew it could never escape the toxic risks associated with the origination of these CRE loans, and, as such, with each extension of a new CRE loan in this manner, Wachovia moved one step closer to its collapse.

119.    Wachovia therefore happily cornered a market share that no other competitor ever wanted – providing prospective customers with financing at or above the value of the property

being financed, even on CRE deals fraught with significant credit risk.   In this manner,

Wachovia could exponentially increase its short-term profitability through the high fees it

generally earned on risky extensions of credit and the even higher fees it earned when it dumped

CRE loans into the securitization markets.   Where Wachovia's competitors turned away CRE

deals because extending those loans would violate the Applicable Laws and Regulations,

Wachovia funded them – even providing generous financing terms to boot.

120.     Wachovia extended questionable CRE loans in the following ways, among

others:

### a.      Structuring Around Loan to Value Limits

121.     Under applicable regulations, Wachovia's CRE loans could not exceed certain

specified "supervisory" loan-to-value ("*LTV*") limits.   An LTV is calculated by dividing the

principal balance of the loan secured by the related property by the "value" of such property.   For

the CRE loans that Wachovia extended, the supervisory LTV limit was no more than 80% (*i.e.*,

the LTVs for these CRE loans had to be at 80% or less).

122.     To attract more business from customers and to lock out the competition,

however, Wachovia provided prospective customers with funds in excess of the supervisory

LTV limits.

### b.      Manipulating "Value"

123.     Because the senior loan's LTV had to be at or under 80% for regulatory purposes,

Wachovia knowingly and willingly used misleading and inaccurate data to increase the "value"

of the property.   Alternatively, Wachovia would reverse-engineer the "value" of the property

through aggressive appraisals to obtain a senior loan LTV of 80% or less.

124.     For example, Wachovia made an extension of credit to One Oliver Associates

Limited Partnership (the "*One Oliver Transaction*") in connection with the borrower's purchase

of an office complex property.  The funding was structured as a $40 million senior loan, with an additional $12 million being provided by Wachovia through two subordinated loans, and an additional $8 million being provided by a Lehman Brothers Inc. entity (together with its affiliates, parents and subsidiaries, "**Lehman Brothers**") that already had amounts owed to it in respect of the property.  In an e-mail written by Robert Verrone ("**Verrone**"), head of the CIB's Large Loan Group, *less than two months after closing in a stable market*, Verrone acknowledged that there were too few leases on the property to substantiate Wachovia's valuation of the property for LTV purposes and that the "true" value of the property was only $40 million (which, of course, was the size of the *entire* senior loan (*i.e.*, a 100% LTV)).  One of Wachovia's more honest, diligent and responsible employees, Carolyn Hubach ("**Hubach**"), confirmed in another e-mail that the value of the property was actually only $40 million and that Wachovia had lent $52 million against it.  In effect, according to Hubach's analysis, Wachovia provided the borrower in the One Oliver Transaction with well over 100% financing through its senior note, notwithstanding the 80% LTV supervisory limit.  As another example, in a separate financing relating to malls located in Macon, Georgia and Burlington, North Carolina (the "**Macon-Burlington Loans**"), Hubach acknowledged in an e-mail that the Macon-Burlington Loans had an actual LTV of at least 90%.

125.    Wachovia also intentionally used outdated financial data to increase the value of the property even though Wachovia had more recent, albeit less helpful, financial data that supported a lower valuation.  For example, Wachovia provided funding to seven Double Tree Hotels on or around June 30, 2005, including one property in Phoenix, Arizona and another in Tyson, Virginia.  When two of these properties were "non-performing" *within six months of closing in a stable market*, Relator Kraus questioned Schleicher to find out why.  Schleicher

informed Relator Kraus that Wachovia's credit department intentionally used outdated financial data from rent rolls relating to these two properties to increase the value of the properties for LTV purposes to enable the transaction to be funded, even though it had more recent rent rolls that were less "helpful" and did not support such an extension of credit.  In other words, of the current rent rolls Wachovia had for each of the seven Double Tree Hotel properties in that deal, Wachovia's credit department selectively used the most recent "helpful" rent rolls for five of the properties, discarded the two most recent "unhelpful" rent rolls for the Phoenix and Tyson properties, and used instead two *outdated* "helpful" rent rolls for those properties, to document internal credit approval for that deal.

### c.      Limiting Customer and Borrower Recourse

126.    Where the actual value of a property could not possibly support the repayment of a related subordinate CRE loan (and, quite possibly, even the related senior CRE loans), no rational customer would be willing to assume an obligation to repay Wachovia for the extension of such subordinate CRE loans.  Accordingly, in transactions like the One Oliver Transaction and a transaction involving Dobie Austin LP, a private dormitory next to the campus of University of Texas at Austin, (the "***Dobie Center Transaction***"), Wachovia offered customers "recourse-free" loans by extending the subordinate loans to newly-created and minimally-capitalized SPVs created and controlled by the customers themselves.  In effect, Wachovia would have to seek repayment from a shell entity in the event of a default of a subordinate CRE loan.

127.    Moreover, to sweeten the deal for its customers, Wachovia incredibly limited its recourse to the SPV to only specific circumstances, such as intentional misapplication by the SPV of loan or casualty insurance proceeds (*e.g.*, severely limiting Wachovia's recourse to *only* damages Wachovia sustained arising out of the SPV's possible fraud in using loan proceeds (*i.e.*,

failing to buy the commercial property or to properly apply holdback reserves) or to moneys the SPV might collect from an insurance carrier for fire or other casualty damage on the underlying commercial real estate property). Wachovia's credit documentation failed to explain how the SPV could repay the subordinated CRE loans (which were ignored for LTV calculations) other than through income generated from the property, given that the SPV did not have any cash or any recourse to a credit worthy line of credit or guarantee.

### d.      Paying Customers Kickbacks for Business

128.    Wachovia paid loyal customers kickbacks for doing business with Wachovia, through improper and unnecessary payment of brokerage fees, placement fees and other fees or amounts, when no related services were provided.   For example, in the Dobie Center Transaction, Wachovia paid a brokerage fee of $365,250 to an affiliate of the borrower, Carlton Advisory Services, Inc., when no true brokerage services were provided (*i.e.*, Wachovia effectively paid the borrower a "broker's fee" for arranging a loan for itself).   As another example, Verrone released half a million dollars from a "holdback reserve" to the borrower of the One Oliver Transaction after that deal closed, in direct violation of Wachovia's own loan transaction documentation and express credit department requirements.   Even though Verrone was separately questioned about the appropriateness of such release of funds by both Relator Kraus and another Wachovia employee, Robert Uhlin ("**Uhlin**"), Verrone ordered the release of funds and had senior management silence Relator Kraus and Uhlin about the issue.

### e.      Concealing Unsupportable Credit Decisions in Poor Loan
### Documentation

129.    Wachovia provided funding for CRE loans that it knew it could not and should not have funded if it wanted to comply with the Applicable Laws and Regulations and its own policies.   To facilitate extensions of credit for such loans, Wachovia significantly relaxed its loan

documentation practices and credit underwriting practices, effectively burying the obviously unsupportable credit decisions in inaccurate, confusing and misleading loan documentation.

130.   Wachovia's credit department executed a completed "1146" credit document prior to an extension of credit of a CRE loan to a prospective borrower.  However, on clearly questionable extensions of credit – many of which were originated through Verrone's Large Loan Group because they generated the largest fees when securitized – Wachovia intentionally abandoned loan documentation and credit underwriting practices because adherence to such practices would result in the CRE loans not being made (and short-term profits not being earned).

131.   For example, in the Dobie Center Transaction, Wachovia's 1146, among other things: (i) misidentified the student dormitory property as a "multi-family residential property" (thereby concealing from the credit department that it needed to consider risks particular to student housing); (ii) failed to account for losses attributable to it being student housing that would necessarily affect the value of the property (had the 1146 done so accurately, the borrower would have failed to meet the credit department's debt service coverage requirements at closing, resulting in a denial of the loan); (iii) showed that Wachovia's credit department only authorized $60,875,000 of funding, but that Wachovia had actually funded $62,330,000 to the borrower (*i.e.*, Wachovia effectively made a "gift" of $1.455 million to the borrower that was not discussed in the loan documents or the credit approval package); and (iv) acknowledged that in this particular transaction, Wachovia would earn only $5,000 in fees for a $60,875,000 extension of credit, without any explanation as to why this was the case.  (The fees charged for this loan are a good indication that something was amiss about this loan – the Large Loan Group typically earned millions of dollars in fees for the loans it extended.  In this deal, there is no credit

explanation whatsoever in the related 1146 as to why Wachovia extended $62,330,000 on a loan that was authorized for only $60,875,000 for a *de minimis* underwriting fee that probably did not even cover Wachovia's own internal cost to extend that loan.  Indeed, the loan documentation for the Dobie Center Transaction was so poor that Schleicher – again, the Head of CRM – acknowledged to Relator Kraus *just two days after closing* that he did not even know that the CRE loan was backed by a student housing center.  Putting aside the larger question of why Wachovia made this loan, there is no basis whatsoever from a credit perspective for Wachovia's credit department to have approved this loan.)

132.     Yet, as part of its fraud, Wachovia was careful to "fix" documentation discrepancies after extending a CRE loan if it knew that such discrepancies would be discovered when the loans were marketed to third parties for related securitizations.  (To make informed credit decisions relating to a securitization, a prospective securitization investor typically receives material information relating to the contractual debt forming the asset base of the securitization, with the investor evaluating the likelihood that he will continue to be paid from the securitization based on the characteristics of the underlying contractual debt.)  For instance, in the Dobie Center Transaction, only two weeks after closing, Wachovia prepared a separate securitization document for prospective securitization investors to review, at which time Wachovia corrected numerous credit deficiencies in the securitization document that remain in its original credit underwriting file.  Wachovia knew that although sub-standard credit analysis, review and diligence was sufficient for its own credit committee and, therefore, its own balance sheet, at least *some* reasonable credit due diligence needed to be fabricated when it wanted to pawn off such CRE loans into the market.

133.     As another example of Wachovia's intentional use of poor loan documentation to

approve questionable loans, Wachovia extended a $650 million financing to the Alliance Group for the recapitalization of an asset pool of 38 garden-style apartment units (the "**Alliance Loan**"). The financing was secured by two pools of properties: "Pool A" properties comprised of 7,712 units and "Pool B" properties comprised of 3,831 units.  Wachovia's internal documentation acknowledges that the borrower of the Alliance Loan was expected to repay its debt solely by: (i) improving the Pool B properties; (ii) selling them at a profit; (iii) using some of the proceeds of such sales to pay down the debt for Pool A properties; (iv) using the remaining proceeds to improve Pool A properties; and (v) selling the Pool A properties at a profit to repay the Alliance Loan.

134.    However, based on Wachovia's Alliance Loan credit documentation, Wachovia's credit department reached the incredible (and improbable) conclusion that with only $1,729 of Pool B property enhancements, the Alliance Loan borrower could increase the property value of Pool B units from $59,343 per unit to $90,574 per unit – which, coincidentally, was the increase needed for that borrower to meet its repayment obligations.

135.    Verrone's Large Loan Group earned $15,220,000 in fees for closing the Alliance Loan, which resulted in a large profit that would reflect positively on Verrone's "profit and loss" allocation, which would be used to determine year-end bonuses for Verrone and other individuals in senior management.  However, when recognizing yet another loss on the sale of the Alliance Loan subordinate loans in a stable market, Nelson wrote, "[T]he profitability of the Alliance portfolio didn't lend itself to take such a large profit at deal closing…Of course, back then it was all good, 'attaboys' for everyone.  Now, we have another [$1.8 million] mark to consider."

**6.    Concealing Retained CRE Loan Risks**

136.    Not surprisingly, Wachovia had problems selling many subordinate CRE loans

into the market because no reasonable purchaser would buy the subordinate loans based on the credit quality of such loans. Indeed, in the One Oliver Transaction, Verrone acknowledged that no less than twenty-two of its "regular" purchasers refused to buy any of the subordinate notes on that deal. Notwithstanding the clear signal from the market that the subordinate CRE notes for that deal represented a laughable investment, Wachovia extended those loans anyway at great risk to WBNA.

### 7. Concealing Retained CMBS Risks

137. Given the poor credit quality of many of the CRE loans Wachovia indiscriminately dumped into its CMBS transactions, Wachovia was sometimes unable to sell into the market subordinated tranches of its CMBS transactions, so Wachovia itself ultimately bought some of the CMBS securities at issuance in order to help facilitate the closing of the CMBS deal (resulting in WBNA's balance sheet holding subordinate CMBS positions of lower and lower actual value). To the extent WBNA held subordinate CMBS positions on-balance sheet, it would have to set aside regulatory capital to cover the risks relating to such CMBS positions pursuant to the Applicable Laws and Regulations.

138. Wachovia therefore again violated the Applicable Laws and Regulations and GAAP by selling subordinate CMBS positions to Lehman Brothers as part of an adjusted securities trading scheme, wherein a subordinate CMBS position would be sold at its par value (even though Wachovia had been unable to sell the subordinate CMBS position at par value in an arms' length trade) and Lehman Brothers sold the same subordinate CMBS position back to WS, Wachovia's broker-dealer, in many cases *on the same day* and *at the same price*. As discovered by Relator Kraus, Schweigerath and Wes Thompson, Wachovia documented these trades in its CMBS daily ageing reports and other similar trades in other daily ageing reports and in WS' sales and trading records.

139.    WS, being a part of the bank holding company structure of Wachovia but not subject to WBNA's regulatory capital requirements, retained these subordinate CMBS positions at their fraudulent "market prices" established through Wachovia's adjusted trading scheme with Lehman Brothers.  As a corollary, WBNA did not hold regulatory capital against these CMBS positions, even though Wachovia knew that the Lehman Brothers' sale prices were sham prices not reflective of the positions' substantially lower market values.  Of course, Wachovia as a group fully retained the risks relating to the CMBS positions even though they were held at inflated prices on WS' books.  However, through this artifice, Wachovia could, in violation of GAAP, hold CMBS positions and other securities as "assets held for sale" under GAAP without having to trouble themselves to track the actual time such positions and securities were held on-balance sheet, enabling them to fabricate their financial statements and financial health even more.

140.    Based on conversations Relator Kraus had with other employees at Wachovia and based on his own review of Wachovia's records, Wachovia used this adjusted trading scheme to mischaracterize CMBS, CDO, CLO, CBO, RMBS and other securities as "assets held for sale" under GAAP without holding capital against them, even though Wachovia knew it could not sell these securities.  Relator Kraus also understood, based on his conversations with other employees, that this technique was used across the Wachovia enterprise in respect of other asset classes to help prop up its healthy, albeit deceptive, financial picture.

### 8.    Employing Other Unsafe and Unsound Practices

141.    Wachovia engaged in numerous other unsafe and unsound practices in violation of the Safety and Soundness Laws and Regulations and the other Applicable Laws and Regulations as part of the control fraud.

142.    To avoid having to recognize profit and loss volatility relating to "synthetic"

trades that Tippett entered into on behalf of WS (which could affect bottom line profitability at year end for the CIB), Tippett was also allowed to not report such trades and keep a segregated record of such trades on a spreadsheet at Wachovia's hedging desk.  However, notwithstanding Tippett's relaxed treatment of tracking such exposures, synthetic positions were legally created and enforceable among Wachovia desks resulting in actual, recognizable liabilities for Tippett's desk that were not reported to anyone at Wachovia but were nonetheless borne by Wachovia.

143.    Wachovia's management also fostered a corporate culture that operated through fear and intimidation and encouraged silence about issues relating to internal controls, internal audit, loan documentation, credit underwriting, asset and risk assessment and financial reporting. For example, Nelson and Malter, both direct supervisors of Relator Kraus, threatened Relator Kraus on numerous occasions to not raise issues or concerns to them or to others at Wachovia regarding Wachovia's CRE products.  Indeed, in one disturbing conversation, Nelson even told Relator Kraus that he did not want to know about such concerns because he would then have to "fix" them.

144.    Wachovia's management expressly discouraged Wachovia employees from speaking with Wachovia's compliance department and/or legal department about problems they experienced at Wachovia concerning internal controls, internal audit, loan documentation, credit underwriting, asset and risk assessment and financial reporting.  Relator Kraus was directly threatened for doing so on numerous occasions by several members of senior management, including Solie, Nelson and Malter.

145.    Wachovia's senior management also encouraged personnel to conceal violations of Applicable Laws and Regulations from Federal regulators.  For example, Relator Kraus was directed by Green, Malter and Nelson to not discuss the existence of the Black Box with Federal

regulators or other Wachovia employees.  Relator Kraus was also expressly instructed by Wachovia's senior management, in an open conference room meeting with over twenty other Wachovia comptrollers, to "confuse" Federal regulators during one on-site examination by "being so helpful" so as to overwhelm them with an unmanageable amount of unprocessed and unorganized data, information and documents and to not disclose to Federal regulators any financial improprieties of which they were aware.  Relator Kraus understood from discussions with other Wachovia employees that this directive was from senior management and spread across the CIB and other divisions throughout Wachovia.

**9.      Rushing Headlong to Financial Ruin and the Wachovia-Wells Fargo Cover-Up**

146.    The stark truth is that Wachovia knew it was on the course of financial ruin long before it falsely and fraudulently accessed the Federal Programs and made false and fraudulent certifications to the Federal Entities to obtain much needed lifelines through the Federal Programs during the financial crisis.  Rottmann, the Product Controller Group Head, wrote a Global Markets Product Control Statement on Management Issues & Concerns for the quarter ending in December 31, 2005 (the "***Rottmann Global Markets Product Control Statement***") that effectively predicted the collapse of Wachovia because of Wachovia's egregious violations of the Applicable Laws and Regulations and its sole reliance on the liquidity of the securitization markets to stay afloat.  In an extensive twenty-two page write-up, Rottmann detailed significant management and operational issues relating to a number of Wachovia divisions *beyond* just the Structured Products group, including its Equity Division, its Fixed Income Division, its Credit Products group and its Finance Accounting & Control System (also known as "***FACS***").  With specific reference to Wachovia's Structured Products division, Rottmann stated, "There is a *lack of visibility* that CIB Finance has with Risk Management, specifically Market Risk.  To be a

valued business partner with our business unit, we *need fully integrated and developed risk methodologies and systems to be analyzed in conjunction with financial data ….* [There are risk issues relating to the overall] *lack of Risk [sic] transparency* across the Structured Products trading desks.  Currently *no mechanism exists to monitor curve risk*, *no P&L attribution testing* and a general *lack of staffing*.  This can even be expanded to include *Credit Risk* which seems to be running at *break-neck speed to keep up with volume increases*" (emphasis added).  Rottmann even admitted that "[Structured Products] invests in the markets in a variety of ways.  *Many of the products do not qualify for mark to market accounting treatment per US GAAP* [(*cf.* the third bullet point of Paragraph 88 and Paragraphs 90 and 91, *supra*, in respect of the Black Box, and Paragraph 103, *supra*, in respect of the Repo SPVs)]; however, *more importantly the [trading desk] does not employ mark to market analysis* for risk management purposes [(*cf.* Paragraphs 114-117, *supra*, in respect of the Trading Desk Model, and Paragraphs 137 to 139, *supra*, in respect of adjusted trading for residual CMBS positions].  *We believe this lack of discipline will exacerbate any potential and future problem if liquidity is removed from the markets*" (emphasis added).  Rottmann's statement could not have been more prescient – when the failure of the securitization markets removed liquidity from the financial markets, Wachovia's actual, potential and future financial problems were *acutely* exacerbated.  Not surprisingly, Wachovia turned to the only other source of liquidity in the market at that time – the United States taxpayer – in a desperate bid to limit its financial woes.

147.    Rottmann listed some of the portfolios where a "decline in liquidity could produce *material losses* in terms of the ability to distribute risk at levels greater than book value" (emphasis added), including, *inter alia*, the CREF/Repo warehouses (*cf.* Paragraphs 105 to 110, *supra*, regarding the CREF facility, and Paragraphs 99 to 104, *supra*, regarding the Repo SPVs)

*and Wachovia's "Middle Market Loan" portfolio.* Rottmann also admitted the obvious problems relating to the Trading Desk Model, albeit with reference to Wachovia's Middle Market Loan portfolio, stating: "Finance is performing a *simplified* price validation for the Middle Market Loan portfolio on a monthly basis. The process utilizes a *simple mock securitization model* and *assumes that all loans can be securitized*. There is *no formal specific loan level evaluation*. *The accounting model for this book is a mark to market model but due to the nature of the asset type, we cannot obtain vendor marks on a consistent basis.* In addition, *Market Risk has not validated the pricing model* proposed by the *Front Office* to mark their loans. Market Risk and Finance have had several discussions with the Front Office resulting in *no clear definitive way to review the assumptions used to mark the portfolio* and *obtain comfort* on a month-end basis. In addition, Finance believes this portfolio would be *better suited to be marked as a Held-for-Sale loan portfolio which is accounted for on a lower of cost or market basis*…[and credit default swap] positions still do not receive robust price validation reviews." Although the description could not have been more accurate in respect of the valuation process concerning the CRE loans in the CREF warehouse and the Class B Certificate of the Black Box, as has already been extensively shown in Paragraphs 105 to 110, *supra* (regarding the CREF facility), and Paragraphs 81 to 98, *supra* (regarding the Black Box), the frightening take-away from Rottmann's description is that the valuation problems identified in this Fourth Amended Complaint and the Rottmann Global Markets Product Control Statement were pervasive *throughout* Wachovia and extended to not only its CREF facility and the Black Box, but also to its sizeable Middle Market Loan warehouse (which represented an additional $4 to $6 billion (*i.e.*, *in addition to* the $6 billion exposure of the Black Box, the $4.141 billion exposure of the CREF facility and the $4 to $6 billion exposure to CRE loans in the Repo SPVs).

148.     Rottmann recognized that Wachovia's reckless growth and expansion of its securitization business came at the direct expense of its internal controls and risk management, writing "[it] is increasingly clear that [Wachovia's contemplated expansion in either Europe or Asia] will be self-funded by Structured Products/RECM.  This decision has ramifications from a control standpoint as *it creates an environment whereby business must be booked prior to creation of internal controls/support functions.*  We believe *this method of new product/new market development increases the Firm's risk of loss.*  The Structured Products Finance staff endeavors to stay in front of the issues by facilitating weekly support staff meetings to address any problems.  However, *it would be best* if management would commit to the new markets *in a more systematic and robust way*" (emphasis added).

149.     But Rottmann also admitted that management had failed to commit resources to even its *existing businesses* in a more "systematic and robust way."  Rottmann conceded that the "CIB looks for the *fastest, quickest way* to implement, but this is *not always the best way*.  We continue to *keep adding on to an old infrastructure* that is *disconnected*, and *unable to handle the volume increase*" (emphasis added).  Indeed, his comments regarding FACS show how easily Wachovia's senior management was able to facilitate its control fraud by simply dismantling Wachovia's financial accounting and controls.  He wrote, "the FACS team has worked diligently to understanding [sic] and gain ownership of the accounting set up, [profit and loss] reporting and reconciliation of each subsystem loaded into the FACS warehouse.  As part of the implementation of each subsystem in the warehouse, FACS has become a tool finance can utilize to highlight and correct systemic system and process problems.  These items have been *in a black box to product controllers* and have *proven* to have potential impact on the books and records of the firm…*[these] items are in no way comprehensive but give management an idea* of

the potential impact to the firm's books and records" (emphasis added).  He continued to state that "[t]he *set up of accounting* has been *traditionally owned* by the *operations group* and as a result *finance struggles* with the level of ownership in large [sic] because finance is currently *not properly staffed* to support the level of ownership that needs to transpire.  Because, [sic] Operations has traditionally had ownership of the set up of accounting rules, *[the operations group] may make changes* to the set up *without notifying CIB finance or corporate finance*. Accounting set up is *not properly tested before implementation* and as result [sic] it *does not work when implemented* into production.  As a result of new set ups or changes, it sometimes *takes finance months, and sometimes years,* to establish and correct and accounting problem [sic] as some of the problems are considered immaterial…Accounting is *not always built out correctly or comprehensively* leaving finance and operations to make *manual* entries to correct the subsystems.  These corrections are sometimes *done in bulk* making it *difficult for anyone to track and verify corrections*" (emphasis added).

150.    Rottmann's ominous and distressing conclusions in the Rottmann Global Markets Product Control Statement should have been enough to warn Wachovia's senior management of the real and present danger to Wachovia's financial future, but Relator Kraus himself also expressly warned senior management about the material financial irregularities identified in this Fourth Amended Complaint.   Concerned about his job and his family – and the fact that Wachovia's senior management had failed to address *any* of the issues he raised internally – Relator Kraus took the courageous (and, in hindsight, foolish) step of approaching Cummings on April 3, 2006 to discuss his concerns with a hope that something could be done to meaningfully address them.   The meeting lasted approximately one and a half hours, at the end of which Cummings "thanked" Relator Kraus for reporting the information to him.

151.    Months later, because Relator Kraus continued to uncover schemes and intentional efforts at Wachovia to circumvent the Applicable Laws and Regulations, Relator Kraus again returned to Cummings' office to speak with Cummings, but he was instead escorted from Wachovia and summarily placed on administrative leave.

152.    On or about July 2006, while on administrative leave, Relator Kraus was asked by Wachovia to attend a "Board of Inquiry" meeting with Bret Holmes ("**Holmes**") (then of Wachovia's legal department and now employed by Wells Fargo), Lars Carlston (then of Wachovia's legal department), Amy Jacobson ("**Jacobson**") (then of Wachovia's compliance department and now employed by Wells Fargo), and Kris Rao ("**Rao**") (then of Wachovia's internal audit department and now employed by Wells Fargo) to discuss the material financial irregularities Relator Kraus observed at Wachovia (the "**July 2006 Meeting**").  The July 2006 Meeting lasted approximately three and a half hours.

153.    Wachovia did not contact Relator Kraus again until a few weeks later, when Deanna Lindquist ("**Lindquist**") (then an in-house lawyer employed at Wachovia and now employed by Wells Fargo) notified him that he was being terminated as an employee at Wachovia.  Lindquist informed Relator Kraus that, as a result of the July 2006 Meeting, Wachovia conducted its own internal investigation and prepared an internal report (the "**Wachovia Report**") that cleared Wachovia of any wrong doing (a temporal impossibility if Wachovia took Relator Kraus' concerns seriously, given that the investigation and related interviews would have to be fully conducted, concluded and summarized in mere weeks, and any external lawyers, accountants and/or auditors (which would have been necessary to do a wholesome investigation) would have had to also work within that time frame).  Lindquist further informed Relator Kraus that: (i) he was not entitled to see the Wachovia Report; and

(ii) if he asked to see the Wachovia Report, he would not receive any severance pay upon termination of his employment and he would be 'blacklisted' from finding employment at another bank.  On September 15, 2006, Relator Kraus signed a separation agreement with Wachovia – without asking for the Wachovia Report – and he received the severance pay. Affirming threats made to him by Lindquist and others, however, Relator Kraus soon learned that he was nonetheless blacklisted by Wachovia from obtaining a controller-type position at other financial institutions in Charlotte, North Carolina.

154.   On or about July 2010, after the Wachovia-Wells Merger Date, Relator Kraus reached out to Wells Fargo to refinance a mortgage on his house as he was having trouble meeting his financial commitments on his mortgage after approximately four years of unemployment at a controller-equivalent salary.  In response, Sarah Thayer, a representative from Wells Fargo's president's office, informed Relator Kraus that: (i) he had been unlawfully discharged by Wachovia; (ii) the Wachovia Report was, in fact, never prepared by Wachovia; and (iii) he was eligible for an extremely flexible residential mortgage on terms far more favorable then what was currently available in the market (which Relator Kraus subsequently accepted).

155.   Relator Kraus voluntarily disclosed and provided to the Federal Bureau of Investigation in 2007 and the Securities and Exchange Commission (the "*SEC*") in 2009 the information concerning Wachovia's and, (with respect to the SEC) after the Wachovia-Wells Merger Date, Wells Fargo's CRE operations, upon which the allegations or transactions set forth in this claim are based, both prior to any public disclosure and the filing of the complaint to which this Fourth Amended Complaint relates.  Relator Kraus also has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions relating

hereto.

156.    Relator Kraus also provided information relating to the events described herein to Wachovia's Chief Executive Officer Robert Steele and, after the Wachovia-Wells Merger Date, to Wells Fargo's Chief Executive Officer John Stumpf, thereby putting Wells Fargo on notice of the fraud perpetrated by Wachovia.

157.    Even though Wells Fargo has not said a word about the extensive fraud that took place at Wachovia to date, Wells Fargo must have known about it pre- and post-merger.  If Wells Fargo did any substantive diligence on Wachovia when it purchased Wachovia, Wells Fargo learned (or should have learned) about the material financial irregularities described in this Fourth Amended Complaint when performing such due diligence.  And even today, Wells Fargo employs at high levels of its own management a number of high-ranking former Wachovia employees with intimate knowledge of the unconscionable control fraud, including, *inter alia*, Solie, Tippett, Lindquist, Holmes, Jacobson and Rao.

158.    Wells Fargo's silence post-merger about the extensive fraud that took place at Wachovia makes it complicit in the fraud and, accordingly, liable to the United States for receiving payments post-merger from the Federal Entities under the Federal Programs under similarly false and fraudulent pretenses.  Wells Fargo did not disclose, and has not disclosed to date, that this material, extensive and unconscionable fraud took place at Wachovia, that the fraud had a material financial impact on its own balance sheet at and post-merger (which, *inter alia*, would have required it to make numerous financial disclosures in accordance with Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP concerning its discovery of the fraud and the extent to which the fraud impacted its own financial controls, reports and statements), and that the fraud required Wells Fargo to take costly and extensive remedial

measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at the combined institutions post-merger to ensure its compliance with the Applicable Laws and Regulations on a going-forward basis (assuming, of course, that Wells Fargo took such remedial measures).  Because of this, Wells Fargo could not have and should not have falsely and fraudulently accessed the Federal Programs or certified post-merger to the Federal Entities at the time of each request for a payment: (i) that it had not violated, or that it had complied with, the Applicable Laws and Regulations; (ii) that an event of default had not occurred and was not then continuing in respect of it; and/or (iii) that certain reports, registrations, documents and filings submitted to various Federal agencies by it did not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

159.    Indeed, if Wells Fargo knew about the pervasive fraud at Wachovia – a fraud that materially and negatively impacted Wells Fargo's own financial controls and statements, then Wells Fargo had actual knowledge that it was falsely and fraudulently accessing the Federal Programs and had actual knowledge of the false and fraudulent certifications it had to make under the Federal Programs to obtain Federal funds thereunder.  And if Wells Fargo somehow still does not know about the pervasive fraud that took place at Wachovia, Wells Fargo would clearly have been acting in deliberate ignorance of the truth or falsity of the information contained in the certifications and in reckless disregard for the truth or falsity of such information when it made the false and fraudulent certifications under the Federal Programs to obtain Federal funds thereunder.  (If the latter is true, a more disturbing question remains: Why has Wells Fargo been unable to discover and disclose the pervasive fraud that took place at

Wachovia over eight years ago?)

160. Either way, Wells Fargo has perpetuated this fraud long after the Wachovia-Wells Merger Date, including up to today. Wells Fargo has not only retained high-level former Wachovia employees with intimate knowledge of the fraud/cover- up but has also irresponsibly left them in high levels of management within its own operations, all but guaranteeing that the impact of Wachovia's control fraud on Wells Fargo will forever remain buried at Wells Fargo and that a similar fraud will likely occur again under Wells Fargo's own securitization banner. Wells Fargo's Chairman Dick Kovacevich's October 3, 2008 press release relating to the proposed merger is truly disturbing when reviewed in this light, where he claimed that the combined company would have, post-merger, a strong presence in Charlotte, North Carolina, which would become the headquarters for the combined entity's retail and commercial and corporate banking businesses, and that an important measure of success for the integration would be whether Wells Fargo retained as many of the "talented" Wachovia team members as possible so that those individuals could continue to provide "outstanding" service and financial advice to their customers and continue their careers with Wells Fargo.

161. Wells Fargo's silence is deafening, because it leaves so many important financial reporting and risk management, internal control and accounting questions wholly unanswered. In terms of its balance sheet post-merger, did it (and how did it) revalue as of the date of the Wachovia-Wells Merger Date the billions of dollars of assets, including CRE loans, Middle Market Loans and CMBS positions, held on- and off- Wachovia's books that were valued for almost a decade using a faulty, simplified Trading Desk Model? Did it take on the billions of dollars of CRE loans held in the Repo SPVs post-merger and revalue each of those CRE loans to determine a true market value for those loans, or did it simply re-roll them at the inflated

fraudulent market price?  Did it grade the billions of dollars of CRE loans and Middle Market Loans that did not have any formal specific loan level evaluation, and how could it accomplish this with outdated and incomplete data in the related credit files, using the same personnel? What kinds of corrections did it have to make on Wachovia's and its own financial statements? And how did it recalculate its regulatory capital calculations to account for the discovery of the fraud?

162.    And equally important, in terms of its risk management, internal control and accounting protocols and processes, did Wells Fargo clean its post-merger house?  What steps did Wells Fargo take to bolster its risk management, internal control and accounting protocols and processes?  Did it investigate the control fraud that brought Wachovia down?  Did it test, validate or replace the faulty Trading Desk Model?  Did it terminate any high level employees involved in the massive Wachovia fraud?  Did it take any steps to ensure that such a control fraud would not occur under its own banner?  And why has Wells Fargo failed to disclose any of this in any Sarbanes-Oxley statement or any other disclosure required to be made pursuant to the Applicable Laws and Regulations?

163.    These are not merely theoretical queries to keep accountants up at night – in truth, pursuant to Sarbanes-Oxley, the other Applicable Laws and Regulations and GAAP, Wells Fargo has to provide grounded and clear answers to these and many other related questions.  Yet Wells Fargo has failed to provide *any* disclosure relating to *any* of the foregoing questions.

164.    Based on a review of Wells Fargo's own financial statements and call reports since the Wachovia-Wells Merger Date, Wells Fargo has stayed consistently quiet about the extensive fraud that took place in Charlotte, limiting its disclosure to saying it took over *$219 billion* of Wachovia CRE loans and corporate loans following the merger and has sustained

losses on these assets.  According to its Form 8-K Ex. 99.1, filed January 28, 2009 at page 2, Wells Fargo announced that it tried to reduce the risk (or "de-risk") its balance sheet and future earnings stream by (i) taking a $37.2 billion credit write-down on Wachovia high-risk loans (which would include Wachovia's substantial CRE loan portfolio held on-balance sheet) taken at December 31, 2008, through purchase accounting adjustments on $93.9 billion of high-risk loans segregated in Wachovia's loan portfolio; (ii) reducing the cost basis of the Wachovia securities portfolio (which would include the CMBS positions that Wachovia could not sell but kept on its books at an inflated market value) by $9.6 billion reflecting $2.4 billion of recognized losses and write-off of $7.2 billion of unrealized losses previously reflected in negative cumulative other comprehensive income, and (iii) Wachovia period-end loans, securities, trading assets and loans held for sale (which would include non-high risk CRE loans held on balance sheet) reduced by $15.2 billion, or 17 percent, from June 30, 2008."  These write-downs and subsequent write-downs were clearly not enough to de-risk the effects of merging Wachovia's failed securitization business; as recently as October 2013, Well Fargo's Chief Financial Officer issued a terse, vague and – from a financial disclosure perspective – meaningless statement that Wells Fargo had sold a "structured asset" with a "punitive risk weighting" that it inherited from Wachovia that was worth "a few billion dollars" because "from a risk-return standpoint" Wells Fargo decided to "just sell this" and "just move on."

165.    Wells Fargo has no reason to hide the magnitude of losses it sustained as a result of its merger with Wachovia – the sad truth is that Wells Fargo also profited from Wachovia's fraud, again at the expense of the United States taxpayer.  Wells Fargo bid to purchase Wachovia just three days after the U.S. Internal Revenue Service (the "***IRS***") relaxed its tax rules in a way that would allow Wells Fargo to apply Wachovia losses against Wells Fargo profits post-merger

(*i.e.*, thereby allowing Wells Fargo to shelter its own income following a merger). The financial facts of the merger prove this to be the case: Wells Fargo paid around $12.7 billion for Wachovia at the start of 2009, but Wells Fargo earned approximately $17.96 billion in tax breaks because of the IRS ruling and the net losses it took on its acquisition of Wachovia. The losses Wells Fargo declared on Wachovia assets helped Wells Fargo avoid paying any taxes from 2008 through 2010, receiving, instead, a $681 million tax credit.

166. But Wells Fargo, like Wachovia before it, has at no time done what an honest or law-abiding corporate citizen might do: Come clean to the American people about the extensive fraud that it had inherited from Wachovia. Rather, it has been business as usual even for Wells Fargo, who has taken funds provided to it by the United States taxpayer under false and fraudulent pretenses and has kept its mouth firmly shut about one of the greatest frauds committed in the history of finance, possibly even greater than that of Enron itself.

167. The Federal Entities would have been lucky to discover the frauds perpetrated by the Banks. First, senior management expressly instructed employees at Wachovia to deceive Federal regulators during supervisory examinations. Second, the control fraud was cleverly executed, with complex and brazen manipulation of on- and off-balance sheet financing techniques in violation of GAAP and other Applicable Laws and Regulations but also with false and fraudulent filings of Call Reports, internal control certifications and other similar filings that helped mask the fraud. Accordingly, the Banks were able to deceive Federal regulators, shareholders and other market participants alike. This control fraud would never have come to light if it were not for Relator Kraus' prosecution of this action.

168. The Federal Reserve itself has also indirectly acknowledged that gaps in the Agencies' supervisory framework during the Relevant Period facilitated the ability of financial

institutions to take actions like the Banks did as alleged in this Fourth Amended Complaint. Julie Stackhouse, an Executive Vice President and the officer-in-charge of supervision at the Federal Reserve Bank of St. Louis, noted on March 23, 2017 that "while many market participants recognized the exuberance of the housing market, other factors contributing to the crisis led to a "perfect storm" that made it difficult for many stakeholders, including regulators, to foresee the impending meltdown," including the fact that the "growth in the private mortgage-backed securities market was fueled by lax standards in assigning credit ratings, which hid building systemic risk" and that "many large banking firms had insufficient levels of high-quality capital, excessive amounts of short-term wholesale funding and too few high-quality liquid assets ... these problems were frequently compounded by inadequate internal risk measurement and management systems."   The Banks clearly exploited the gaps in the supervisory framework to carry out their intricate control fraud.

169.   Former Federal Reserve Chairman Ben Bernanke circulated a document dated January 13, 2010 entitled "The Public Policy Case for a Role for the Federal Reserve in Bank Supervision and Regulation" that also lays blame on the gaps in the supervisory framework.  The document states that "[The Federal Reserve recognizes], of course, that bank supervision, including ours, needs to be more effective than in the past, and we have reviewed our performance and are making improvements at multiple levels."  It goes on to state that "[t]he system for regulating bank holding companies was, in important ways, inadequate.…  One issue of concern was that the Federal Reserve's consolidated supervision of such companies was, by statute, both narrowly focused on the safety and soundness of their bank subsidiaries and heavily reliant on functional supervisors of the bank and regulated nonbank subsidiaries of these companies; in turn, the functional supervisors themselves were statutorily focused only on the

safety and soundness of the specific entities they regulated.  None of the federal regulators had sufficient authority to focus on the systemic risk that large banking organizations posed."

170.    With a mixture of employees being instructed to deceive Federal regulators during examinations, a massive control fraud being buried in financial complexity with an overlay of senior management certifications of compliance with Applicable Laws and Regulations, and inefficiencies in regulatory review arising out of gaps in the supervisory framework, it is not hard to see how the Banks committed one of the greatest financial frauds in history.

**C.    Why World Savings' Certifications Were Patently False and Fraudulent**

171.    World Savings and, post-merger with World Savings, Wachovia, and, post-merger with Wachovia, Wells Fargo, could not and should not have accessed the Federal Programs or made the referenced certifications to the Federal Entities in respect of the Federal Programs because World Savings had brazenly violated the Applicable Laws and Regulations from at least 2001 to on or around the World Savings-Wachovia Merger Date and beyond in order to satisfy World Saving's senior management's unrestrained pursuit of short-term profitability – a pursuit that benefitted senior management and certain World Savings personnel (who earned large bonuses) at the expense of World Savings' long-term financial health and the financial well-being of the vast majority of its shareholders and employees.  And because both Wachovia and Wells Fargo did not disclose, post-mergers, that this known fraud had occurred, that this fraud had a material financial impact on its and their own balance sheets at and post-merger (which, *inter alia*, would have required each of them to make numerous financial disclosures in accordance with GAAP and the Applicable Laws and Regulations concerning its discovery of the fraud and the impact and extent that this fraud had on its own financial reports and statements), and that Wachovia would have needed to take significant material and costly

remedial measures to rebuild and incorporate risk management, internal control and accounting processes and protocols at World Savings post-merger to ensure its compliance with the Applicable Laws and Regulations on a going-forward basis (assuming, of course, that Wachovia took such remedial measures), both Wachovia and Wells Fargo concealed and perpetuated the fraud long after the World Savings-Wells Merger Date and the Wachovia-Wells Merger Date, including up to today.

### 1.     Management's Philosophy at World Savings

172.    In 2005-2006, World Savings had a significant presence in the Western United States, with a particularly active business in the State of California.  Ken Thompson described World Savings as a "crown jewel", with approximately $60 billion in deposits and 600 branches.

173.    However, like the CIB, World Savings knowingly disregarded the Applicable Laws and Regulations to satisfy World Savings' senior management's unrestrained pursuit of short-term profitability, a pursuit that benefited certain World Savings' executives at the expense of not only the long-term financial health of World Savings but also many of the residential homeowners that obtained loans from World Savings.

174.    World Savings' senior management used its wholesale distribution model to encourage prospective borrowers to obtain loans that they simply could not pay.  World Savings' senior management also encouraged its employees to take whatever steps were necessary (including, for example, predatory lending and falsification of loan documentation) to get residential mortgage applications approved, thereby increasing the volume of residential mortgages processed by and through World Savings.  World Savings' senior management encouraged silence about issues relating to its lending practices even though they were aware of the issues facing World Savings.

## 2.    World Savings' Residential Mortgage Operations

175.    Relator Bishop discovered that World Savings, through its residential mortgage operations, violated the Applicable Laws and Regulations by: (i) not having appropriate internal controls and information systems; (ii) not having an appropriate internal audit system; (iii) not establishing and maintaining loan documentation practices that enabled World Savings to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loan and sources for repayment, (D) assess the ability of the borrower to repay indebtedness in a timely manner, (E) demonstrate appropriate administration and monitoring of loans and (F) take account of the size and complexity of a loan; (iv) not establishing and maintaining prudent credit underwriting practices; (v) not having prudent asset growth; and (vi) not establishing and maintaining an appropriate system commensurate with World Savings' size to identify problem assets and prevent deterioration of those assets, by violating the certification requirements regarding financial reporting, internal control and compliance with laws and regulations under 12 C.F.R. 363, by making false entries with an intent to deceive other officers of World Savings in violation of 18 U.S.C. § 1005, by making false statements in a matter within the jurisdiction of a Federal department or agency in violation of 18 U.S.C. § 1001 and by violating Sections 302, 806 and 906 of Sarbanes-Oxley.

176.    World Savings specialized in providing residential borrowers with adjustable rate mortgages with special payment options, which World Savings marketed as "Pick-A-Pay" mortgages.  Under the Pick-A-Pay mortgages, borrowers were able to select the amount of interest they wanted to pay in respect of the mortgage.

177.    However, borrowers were not adequately informed that the monthly interest amount that was not paid by the borrowers would be capitalized against the outstanding principal

amount of the related loans.  As a result, numerous borrowers under Pick-A-Pay mortgages were surprised to learn that, over time, their Pick-A-Pay mortgage balances had increased and that the interest payments they owed had similarly increased.  The increase in the principal amount of the loan as a result of the partial repayment of interest and the capitalization of the remainder of interest is referred to as "negative amortization."

178.    Relator Bishop, in his capacity as a retail residential mortgage salesperson, had extensive exposure to World Savings' underwriting practices and loan documentation practices and its underwriting personnel.

179.    Relator Bishop observed World Savings' wholesale residential mortgage salespersons "pushing" residential mortgages on ethnic and other minorities in a concerted and predatory manner, so Relator Bishop reported his concerns in respect of such practices to World Savings' senior management.

180.    Relator Bishop also observed World Savings' wholesale residential mortgage salespersons being instructed by World Savings to take whatever steps were necessary to have residential loan applications approved, including, for example, falsifying borrower certifications regarding employment status and/or income levels.  As a result, Relator Bishop similarly reported his concerns in respect of such practices to World Savings' senior management.

181.    Relator Bishop also warned senior managers, including Maria Guadamuz and Tim Wilson, that World Savings was venturing into dangerous financial territory because World Savings' balance sheet was increasing at an alarming rate, mostly as a result of the negative amortization on its Pick-A-Pay loans.

182.    World Savings senior management dismissed each of Relator Bishop's concerns outright without investigation.

183.    Although World Savings knew that the negative amortization of its Pick-A-Pay loans was not beneficial for the long-term health of World Savings, senior management continued to push such products because the loan volume resulted in an extremely profitable business.   Indeed, World Savings even booked the interest on the capitalized interest as additional profit.

184.    On May 24, 2006, sixteen days after Relator Bishop learned that Wachovia intended to purchase World Savings, Relator Bishop asked his supervisors to speak with a senior executive at Wachovia to express his concerns that the portfolio of World Savings was "toxic." In response, on May 30, 2006, Michelle Gadker terminated Relator Bishop's employment with World Savings, on the unsubstantiated ground that Relator Bishop violated a one-time warning for having had a heated discussion with a World Savings senior vice president over a loan that was being processed.

185.    Relator Bishop voluntarily disclosed and provided to the SEC the information concerning World Savings' and, after the World-Wachovia Merger Date, Wachovia's and, after the Wachovia-Wells Merger Date, Wells Fargo's residential mortgage operations, upon which the allegations or transactions set forth in this claim are in part based, prior to the filing of the complaint to which this Fourth Amended complaint relates.   Relator Bishop has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions relating hereto.

**D.    The Banks Were Not Eligible to Participate in the Federal Programs**

186.    As and when they accessed the Federal Programs, the Banks knew that they were not in generally sound financial condition, were not adequately capitalized, were brazenly violating the Applicable Laws and Regulations, and were not disclosing critical information to the Federal Entities that would have been vital and necessary for the Federal Entities to have

been able to make a determination as to whether they were, in fact, eligible to participate in the Federal Programs (such as (i) the fact that their violations of the Applicable Laws and Regulations, including the Safety and Soundness Regulations, were so egregious that they simply could not be – and the Federal Entities could not reasonably make a determination that they were – in generally sound financial condition as and when they accessed the Federal Programs and (ii) the fact that they could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs for payment).  As the Banks further knew, the Banks' false implied certifications that they were adequately capitalized and were in generally sound financial condition, and the Banks' undisclosed violations of the Applicable Laws and Regulations, were matters that had a natural tendency to influence reasonable regulators to extend credit to the Banks on terms that the Banks were not entitled to receive.

187.    Based on the criteria established for drawing from the Federal Programs under the Federal Reserve Act and Regulation A and based on other guidance provided by the Federal Reserve about the Federal Programs, an institution's eligibility to access the Discount Window at the primary credit rate and to access the TAF was based on three factors: (i) the institution's composite supervisory rating; (ii) the institution being adequately capitalized as and when it accessed the program; and (iii) at the Federal Reserve's discretion, there being no other supplementary information that would cause the Federal Reserve to not provide access to the Federal Programs to that institution.

188.    The rules set forth by the Federal Reserve state:

Eligibility for the Primary and Secondary Credit Program

To qualify for primary credit, a depository institution must have access to the Discount Window and be in generally sound financial condition as determined by its Reserve Bank. A Reserve Bank reviews an institution's condition on an

ongoing basis using supervisory ratings and capitalization data.  Supplementary information, when available, may also be used.  The same criteria that are used to determine eligibility for daylight credit under the Board of Governors' Payment System Risk Policy are used to determine eligibility for primary credit. In brief:

- An institution assigned a composite CAMELS rating of 1, 2, or 3 (or SOSA 1 or 2 and ROCA 1, 2, or 3) that is at least adequately capitalized is eligible for primary credit unless supplementary information indicates that the institution is not generally sound.

- Institutions assigned a composite CAMELS rating of 4 (or SOSA 1 or 2 and ROCA 4 or 5) are not eligible for primary credit unless an ongoing examination or other supplementary information indicates that the institution is at least adequately capitalized and that its condition has improved sufficiently to be deemed generally sound by its Reserve Bank.

- Institutions assigned a composite CAMELS rating of 5 (or SOSA 3 regardless of ROCA) are not eligible for primary credit.

Depository institutions that do not qualify for primary credit are eligible for secondary credit when use of such credit is consistent with a timely return to a reliance on market sources of funding or the orderly resolution of a troubled institution, subject to limitations described below.

The Federal Reserve Discount Window § 5, https://www.frbdiscountwindow.org/en/Pages/ General-Information/The-Discount-Window.aspx#eligibilityps.

189.    The frauds detailed herein were highly material, because had any of these frauds been disclosed to the Federal Entities or had the Banks notified the Federal Reserve that they could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs, the Federal Reserve would have had to necessarily deny each of the Banks access to and participation in the Federal Programs.  This is because (i) had such critical information been known, it would have resulted in each of the Banks receiving the lowest composite supervisory rating, thereby prohibiting its access to the Federal Programs by law and regulation; (ii) had such critical information been known and if the Banks had a higher composite supervisory rating, such critical information would call into question whether that composite supervisory rating was correct such that the Federal Reserve

could not, in good faith, allow it access to the Federal Programs pursuant to the terms of the Federal Reserve Act and Regulation A; (iii) had such critical information been known, it would have revealed that the Banks were not adequately capitalized as and when they accessed the Federal Programs; and (iv) had such critical information been known, such critical information would have constituted supplementary information that would have made the Federal Reserve deny them access to the Federal Programs pursuant to the Federal Reserve Act and Regulation A.

### 1.      Eligibility Based on Composite and Component Ratings

190.    The Federal Reserve would have had to necessarily deny each of the Banks access to and participation in the Federal Programs if it knew of any of the frauds detailed in this Fourth Amended Complaint or that the Banks could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs because each of the Banks would have received the lowest composite supervisory rating, thereby prohibiting its access to the Federal Programs by law and regulation, or, if it had a higher composite supervisory rating, that critical information would call into question whether the composite supervisory rating was correct such that the Federal Reserve could not, in good faith, allow it access to the Federal Programs pursuant to the terms of the Federal Reserve Act and Regulation A.

191.    Under the composite and component rating system (sometimes referred to as the CAMELS ratings system), the Agencies endeavor to ensure that all financial institutions are evaluated in a comprehensive and uniform manner and that supervisory attention is appropriately focused on financial institutions exhibiting financial and operational weaknesses or adverse trends.    The ratings system also serves as a useful vehicle for identifying problem or deteriorating financial institutions, as well as for categorizing institutions with deficiencies in

particular component areas.  The ratings system also assists Congress and regulators in following safety and soundness trends and in assessing the aggregate strength and soundness of the financial industry.  It also helps the Agencies fulfill their collective mission of maintaining stability and public confidence in the U.S. financial system.

192.    Under the CAMELS ratings system, a financial institution is assigned a composite rating that is based on an evaluation and rating of six essential component ratings of an institution's financial condition and operations.  These component factors address (i) the adequacy of capital (the "C" in CAMELS); (ii) the quality of assets (the "A" in CAMELS); (iii) the capability of management (the "M" in CAMELS); (iv) the quality and level of earnings (the "E" in CAMELS); (v) the adequacy of liquidity (the "L" in CAMELS); and (vi) the sensitivity to market risk (the "S" in CAMELS).  Evaluations of each component rating take into account the institution's size and sophistication, the nature and complexity of its activities, and its risk profile.  Composite ratings and the individual component ratings are assigned a number based on a 1 to 5 numerical scale.  A "1" indicates the highest rating, indicative of strongest performance and risk management practices and the least degree of supervisory concern, while a "5" indicates the lowest rating, weakest performance, inadequate risk management practices and, therefore, the highest degree of supervisory concern.

193.    Both composite ratings and component ratings of an institution are not generally publicly available – indeed, they are frequently known only by the Agencies and senior management of the institution.  However, because Wachovia and, post-merger, Wells Fargo were able to access the Discount Window at the primary credit rate and also access the TAF, both Wachovia and, post-merger, Wells Fargo had to have a composite supervisory rating of "4" or above.

194.    If the matters discussed in this Fourth Amended Complaint had been known to the Federal Entities, however, the Banks knew that each of the Banks would have received the lowest composite supervisory rating possible (*i.e.*, a "5"), thereby prohibiting them from accessing the Federal Programs by law and regulation.  And if each of them had a composite rating above "5" as and when they accessed the Federal Programs because the matters discussed in this Fourth Amended Complaint were not known to the Federal Entities, full disclosure of those matters would call into question whether the assigned composite supervisory ratings were correct such that the Federal Reserve could not, in good faith, allow them access to the Federal Programs pursuant to the terms of the Federal Reserve Act and Regulation A.

195.    With respect to the capital adequacy component rating (the "C" in CAMELS), a financial institution must maintain capital commensurate with the nature and extent of risks to the institution and the ability of management to identify, measure, monitor, and control these risks.  Therefore, the effect of credit, market, and other risks on an institution's financial condition is considered when evaluating the adequacy of capital.  The capital adequacy of an institution is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The level and quality of capital and the overall financial condition of the institution;

- The ability of management to address emerging needs for additional capital;

- The nature, trend, and volume of problem assets, and the adequacy of ALLL and other valuation reserves;

- Balance sheet composition, including the nature and amount of intangible assets, market risk, concentration risk, and risks associated with nontraditional activities;

- Risk exposure represented by off-balance sheet activities;

- The quality and strength of earnings, and the reasonableness of dividends;

- Prospects and plans for growth, as well as past experience in managing growth; and

- Access to capital markets and other sources of capital, including support provided by a parent holding company.

196.     Each of the Banks' level and quality of capital was severely deficient, with its overall financial condition perilously close to collapse; its management was unable and unwilling to address emerging needs for additional capital, in part, because it was simply unable and unwilling to assess that need; its management was unable and unwilling to determine the nature, trend, and volume of its problem assets and to calculate the level of ALLL it required; its management had no idea of its balance sheet composition, including the nature and amount of intangible assets, market risk, concentration risk, and risks associated with non-traditional activities; the risk exposure represented by its off-balance sheet activities was magnified because of its failure to track credit risk and its illegal violation of GAAP; its management had no way of reasonably assessing the quality and strength of its earnings, because its management had absolutely no idea of what it could or could not sell or securitize or what risks those assets posed to its balance sheet; its prospects and plans for growth were a pure fiction because its management did not want to consider its long-term financial health as and when it perpetrated its control fraud; and its management knew there would be severely limited to no access to the capital markets if the securitization markets were to dry up – and it would be stuck with the toxic assets it originated in such circumstances.

197.     Each of the Banks therefore maintained a critically deficient level of capital such that its viability was threatened, requiring immediate assistance from shareholders or other external sources of financial support – the standard for a CAMELS component rating of "5" for

capital adequacy.

198.    The asset quality component rating (the "A" in CAMELS) reflects the quantity of existing and potential credit risk associated with loan and investment portfolios, other real estate owned, and other assets, as well as off-balance sheet transactions.  The ability of management to identify, measure, monitor, and control credit risk is also reflected in this component rating.  The evaluation of asset quality considers the adequacy of ALLL and weighs the exposure to counterparty, issuer, or borrower default under actual or implied contractual agreements.  All other risks that may affect the value or marketability of an institution's assets, including, but not limited to, operating, market, reputation, strategic, or compliance risks, are also considered with respect to this component rating.  The asset quality of a financial institution is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The adequacy of underwriting standards, soundness of credit administration practices, and appropriateness of risk identification practices;

- The level, distribution, severity, and trend of problem, classified, non-accrual, restructured, delinquent, and non-performing assets for both on- and off-balance sheet transactions;

- The adequacy of ALLL and other asset valuation reserves;

- The credit risk arising from, or reduced by, off-balance sheet transactions, such as unfunded commitments, credit derivatives, commercial and standby letters of credit, and lines of credit;

- The diversification and quality of the loan and investment portfolios;

- The extent of securities underwriting activities and exposure to

counterparties in trading activities;

- The existence of asset concentrations;

- The adequacy of loan and investment policies, procedures, and practices;

- The ability of management to properly administer its assets, including the timely identification and collection of problem assets;

- The adequacy of internal controls and MIS; and

- The volume and nature of credit documentation exceptions.

199.   Each of the Banks had severely deficient underwriting standards, credit administration practices and risk identification practices; it had excessive levels of problem, classified, non-accrual, restructured, delinquent, and non-performing assets both on- and off-balance sheet; it maintained severely deficient ALLL; it assumed excessive credit risk arising from, and magnified by, off-balance sheet transactions, unfunded commitments, credit derivatives and lines of credit; the diversification and quality of its loan and investment portfolios was sub-standard and wholly dependent on its ability to sell such portfolios through the securitization markets; its management was reckless and violated Applicable Laws and Regulations in its securities underwriting activities and with respect to its exposure to counterparties in trading activities; its balance sheet was concentrated with toxic assets it could not sell, other than through the securitization markets when such markets were frothy; its management had inadequate loan and investment policies, procedures, and practices in place; its management improperly administered its assets, including ignoring and hiding problem assets; it had deficient internal controls and MIS; and it simply did not maintain credit documentation.

200.   Each of the Banks therefore had critically deficient asset quality or credit administration practices that presented an imminent threat to its viability, which would have

mandated a CAMELS component rating of "5" for its asset quality.

201.    The management component rating (the "M" in CAMELS) assesses the capability of the board of directors and management, in their respective roles, to identify, measure, monitor, and control the risks of an institution's activities and to ensure a financial institution's safe, sound, and efficient operation in compliance with applicable laws and regulations.  Generally, directors need not be actively involved in day-to-day operations; however, they must provide clear guidance regarding acceptable risk exposure levels and ensure that appropriate policies, procedures, and practices have been established.  Senior management, on the other hand, must develop and implement policies, procedures, and practices that translate the board's goals, objectives, and risk limits into prudent operating standards.  Depending on the nature and scope of an institution's activities, management practices may need to address some or all of the following risks: credit, market, operating or transaction, reputation, strategic, compliance, legal, liquidity, and other risks.  Sound management practices are demonstrated by: active oversight by the board of directors and management; competent personnel; adequate policies, processes, and controls taking into consideration the size and sophistication of the institution; maintenance of an appropriate audit program and internal control environment; and effective risk monitoring and MIS. This component rating reflects the board's and management's ability as it applies to all aspects of banking operations as well as other financial service activities in which the institution is involved.  The capability and performance of management and the board of directors is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The level and quality of oversight and support of all institution activities by the board of directors and management;

- The ability of the board of directors and management, in their respective

roles, to plan for, and respond to, risks that may arise from changing business conditions or the initiation of new activities or products;

- The adequacy of, and conformance with, appropriate internal policies and controls addressing the operations and risks of significant activities;

- The accuracy, timeliness, and effectiveness of MIS and risk monitoring systems appropriate for the institution's size, complexity, and risk profile;

- The adequacy of audits and internal controls to: promote effective operations and reliable financial and regulatory reporting; safeguard assets; and ensure compliance with laws, regulations, and internal policies;

- Compliance with laws and regulations;

- Responsiveness to recommendations from auditors and supervisory authorities;

- Management depth and succession;

- The extent that the board of directors and management is affected by, or susceptible to, dominant influence or concentration of authority;

- Reasonableness of compensation policies and avoidance of self-dealing;

- Demonstrated willingness to serve the legitimate banking needs of the community; and

- The overall performance of the institution and its risk profile.

202.    None of the Banks had substantive oversight and support of its activities by its board of directors and management; its board of directors and management, in their respective

roles, simply did not plan for, or respond to, risks arising from changing business conditions, such as the possibility of a seizure of the securitization markets; its management did not maintain or enforce appropriate internal policies and controls to address the operations and risks of its significant activities; there was no effective MIS and risk monitoring system in place; audits and internal controls were severely deficient and unable to promote effective operations and reliable financial and regulatory reporting, safeguard assets or ensure compliance with laws, regulations and internal policies; its management brazenly violated Applicable Laws and Regulations, including the Safety and Soundness Laws and Regulations; its board of directors and management were not responsive to recommendations from its own internal auditors about material and substantial risks it assumed; its board of directors and management were motivated solely by greed and short-term profitability over long-term viability of the institution.

203.    Each of the Banks had critically deficient management and board performance and risk management practices; its management and the board of directors did not demonstrate the ability to correct problems and implement appropriate risk management practices; problems and significant risks were not inadequately identified, measured, monitored, or controlled and threatened its continued viability; and replacing or strengthening management or the board of directors was absolutely necessary and required – these facts would have mandated a CAMELS component rating of "5" for its management.

204.    The earnings component rating (the "E" in CAMELS) reflects not only the quantity and trend of earnings but also factors that affect the sustainability or quality of earnings. The quantity as well as the quality of earnings are affected by excessive or inadequately managed credit risk that results in loan losses and require additions to ALLL, or by high levels of market risk that unduly expose an institution's earnings to volatility in interest rates.  The quality

of earnings can also be diminished by undue reliance on extraordinary gains, nonrecurring events, or favorable tax effects.  Future earnings may be adversely affected by an inability to forecast or control funding and operating expenses, improperly executed or ill-advised business strategies, or poorly managed or uncontrolled exposure to other risks.  The rating of an institution's earnings is based upon, but not limited to, an assessment of the following evaluation factors:

- The level of earnings, including trends and stability;

- The ability to provide for adequate capital through retained earnings;

- The quality and sources of earnings;

- The level of expenses in relation to operations;

- The adequacy of the budgeting systems, forecasting processes, and MIS in general;

- The adequacy of provisions to maintain ALLL and other valuation allowance accounts; and

- The earnings exposure to market risk such as interest rate, foreign exchange, and price risks.

205.    Each of the Banks' earnings was extremely unstable, based solely on accounting fraud and, in direct contravention of OCC guidance, its ability to off-load toxic assets into the securitization markets; it did not use retained earnings to ensure adequate capital to prevent losses; rather, earnings were used to increase bonuses to senior management and "high performers" like Verrone; it intentionally did not have adequate budgeting systems, forecasting processes, and MIS; and it did not maintain appropriate ALLL or other valuation allowance accounts, partly because it had no idea of what it was actually holding.

206.    Each of the Banks' earnings were critically deficient, experiencing losses that represented a distinct threat to its viability through the erosion of capital, thereby mandating a CAMELS component rating of "5" for its earnings.

207.    The liquidity component rating (the "L" in CAMELS) evaluates the adequacy of an institution's liquidity position, with consideration being given to the current level and prospective sources of liquidity compared to funding needs, as well as to the adequacy of funds management practices relative to the institution's size, complexity, and risk profile.  In general, funds management practices ensure that an institution is able to maintain a level of liquidity sufficient to meet its financial obligations in a timely manner and to fulfill the legitimate banking needs of its community.  Practices must reflect the ability of the institution to manage unplanned changes in funding sources, as well as react to changes in market conditions affecting the ability to quickly liquidate assets with minimal loss.  In addition, funds management practices must ensure that liquidity is not maintained at a high cost, or through undue reliance on funding sources that are not available in times of financial stress or adverse changes in market conditions. Liquidity is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The adequacy of liquidity sources compared to present and future needs and the ability of the institution to meet liquidity needs without adversely affecting its operations or condition;

- The availability of assets readily convertible to cash without undue loss;

- Access to money markets and other sources of funding;

- The level of diversification of funding sources, both on- and off-balance sheet;

- The degree of reliance on short-term, volatile sources of funds, including borrowings and brokered deposits, to fund longer term assets;

- The trend and stability of deposits;

- The ability to securitize and sell certain pools of assets; and

- The capability of management to properly identify, measure, monitor, and control the institution's liquidity position, including the effectiveness of funds management strategies, liquidity policies, MIS and contingency funding plans.

208.    Each of the Banks had no liquidity source other than the securitization markets and the Federal Programs to cover its present and future liquidity needs; it did not have assets that were readily convertible to cash without undue loss; it did not have access to money markets and other sources of funding because of the toxicity of its balance sheet; it did not diversify funding sources, both on- and off-balance sheet, using the balance sheet instead to originate toxic assets and relying wholly on the securitization markets to off-load such toxic assets; in direct contravention of OCC guidance, it was wholly dependent on the securitization markets for liquidity; it was unable securitize or sell pools of toxic assets when the securitization markets seized; and its management was simply unable and unwilling to properly identify, measure, monitor, and control its liquidity position.

209.    Each of the Banks' liquidity levels and funds management practices were so critically deficient that its continued viability was threatened and required immediate external financial assistance to meet maturing obligations or other liquidity needs – thereby necessitating a CAMELS component rating of "5" for its liquidity position.

210.    The sensitivity to market risk component rating (the "S" in CAMELS) reflects the

degree to which changes in interest rates, foreign exchange rates, commodity prices, or equity prices adversely affect an institution's earnings or economic capital. When evaluating this component, consideration is given to: management's ability to identify, measure, monitor, and control market risk; the institution's size; the nature and complexity of its activities; and the adequacy of its capital and earnings in relation to its level of market risk exposure. For institutions like the Banks, the primary source of market risk arises from non-trading positions and its trading activity. Market risk is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The sensitivity of the institution's earnings or the economic value of its capital to adverse changes in interest rates, foreign exchange rates, commodity prices, or equity prices;

- The ability of management to identify, measure, monitor, and control exposure to market risk given the institution's size, complexity, and risk profile;

- The nature and complexity of interest rate risk exposure arising from non-trading positions; and

- Where appropriate, the nature and complexity of market risk exposure arising from trading and foreign operations.

211. Each of the Banks' earnings and capital were unduly sensitive to adverse changes in the securitization markets, which could quickly and materially be affected by changes in interest rates, foreign exchange rates, commodity prices, or equity prices; its management was simply unable and unwilling to identify, measure, monitor, and control exposure to market risk because that would hinder its reckless growth of its securitization business; and it was unable and

unwilling to assess the nature and complexity of interest rate risk exposure on its non-trading positions or market risk exposure arising from its trading operations because it simply did not track those positions in accordance with GAAP or as required by other Applicable Laws and Regulations, including the Safety and Soundness Laws and Regulations.

212.    Each of the Banks' control of market risk sensitivity was unacceptable and deficient and the level of market risk taken by it was an imminent threat to its viability, with risk management practices being wholly inadequate for the size, sophistication, and level of market risk accepted by it, which would result in a CAMELS component rating of "5" for sensitivity to market risk.

213.    The composite rating of an institution (which would have been used to determine whether an institution was eligible to participate in the Federal Programs pursuant to Regulation A and other guidance provided by the Federal Reserve) generally bears a close relationship to the component ratings assigned to that institution.

214.    However, a composite rating is not derived by computing an arithmetic average of component ratings – each component rating is based on a qualitative analysis of the factors comprising that component and its interrelationship with the other components.  When assigning a composite rating, some components are given more weight than others depending on the situation at the institution and can incorporate any factor that bears significantly on the overall condition and soundness of the financial institution.  The ability of management to respond to changing circumstances and to address the risks that arise from changing business conditions is an important factor in evaluating an institution's overall risk profile and the level of supervisory attention warranted.  For this reason, the management component (the "M" in CAMELS) is given special consideration when assigning a composite rating – the ability of management to

identify, measure, monitor, and control the risks of its operations is also taken into account when assigning each component rating.  At more complex institutions (like the Banks), detailed and formal management systems and controls must address their broader range of financial activities and provide senior managers and directors, in their respective roles, with the information they need to monitor and direct day-today activities.

215.    Each of the Banks exhibited unsafe and unsound practices and conditions, in clear contravention of the Applicable Laws and Regulations, including the Safety and Soundness Laws and Regulations and had severely deficient risk management practices relative to its size, complexity, and risk profile and, therefore, should have been of the greatest supervisory concern. In addition, the volume and severity of its problems was beyond its management's ability or willingness to control or correct, requiring outside financial or other assistance for it to continue to be viable.  All of this would have mandated a CAMELS composite rating of "5".

216.    Had any of the frauds detailed in this Fourth Amended Complaint been disclosed to the Federal Entities or had the Banks notified the Federal Reserve that they could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs, the Banks knew that the Federal Reserve would have had to necessarily deny each of the Banks access to and participation in the Federal Programs.  This is because (i) had such critical information been known, it would have resulted in each of the Banks receiving the lowest composite supervisory rating, thereby prohibiting its access to the Federal Programs by law and regulation; and (ii) had such critical information been known and if the Banks had a higher composite supervisory rating, such critical information would call into question whether that composite supervisory rating was correct such that the Federal Reserve could not, in good faith, allow it access to the Federal Programs pursuant to the terms of the

Federal Reserve Act and Regulation A.

**2.      Eligibility Based on Capitalization Requirements**

217.      Had any of the frauds detailed in this Fourth Amended Complaint been disclosed to the Federal Entities or had the Banks, notified the Federal Reserve that they could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs, the Banks knew that the Federal Reserve would have had to necessarily deny each of the Banks access to and participation in the Federal Programs.  This is because, had such critical information been known, it would have revealed that the Banks were not adequately capitalized as and when they accessed the Federal Programs.

218.      Under Regulation A and other guidance provided by the Federal Entities in respect of the Federal Programs, an institution could not access the Federal Programs for funds at the Discount Window at the primary credit rate or access the TAF program if they were not adequately capitalized as and when they accessed the Federal Programs.  Each of the Banks were not only not adequately capitalized but actually undercapitalized and possibly even critically undercapitalized as and when they accessed Federal Programs for funds, in clear violation of the Federal Program eligibility requirements.

219.      The fraud discovered by Relator Kraus, and confirmed by the Rottmann Global Markets Control Statement, was, simply put, extensive, material and pervasive.  Each of the Banks materially misstated its financial statements, its call reports and its certifications concerning the adequacy of its financial reporting and internal controls — these misrepresentations collectively enabled them to mislead their regulators (including the Federal Reserve) as well as other third parties (including investors).

220.      Wachovia's misrepresentations, as more particularly described in this Fourth

Amended Complaint, included the following: (i) illegally utilizing the Black Box vehicle to inappropriately hold at least $6 billion of assets off-balance sheet; (ii) failing to grade the credit of at least $4.141 billion of the CRE loans it held on-balance sheet; (iii) illegally using the Repo SPVs to hold at least $4-6 billion of assets off-balance sheet; (iv) illegally accounting for at least $4-6 billion of its Middle Market Loan portfolio as a "AAA" rated securitization exposure; and (v) illegally manipulating the aging of loan assets and securities and other securities held on-balance sheet as "assets held for sale", rather than as assets held to maturity.

221.    The total equity capital of Wachovia around that time was $47.053 billion, so these five acts of fraud alone, which involve a balance sheet fraud in the amount of approximately $18.141 billion to $22.141 billion, represented from 38.56% to 47.06% of the total equity capital of Wachovia at around that time.

222.    These misrepresentations were made in order to fundamentally misrepresent its financial standing (including but not limited to its risk based capital to assets ratios and its total capital to assets ratios) and creditworthiness in Call Reports, financial statements and other documents presented to its regulators (including but not limited to the Federal Reserve) and other third parties (including investors).

223.    It systematically and continuously repeated these misrepresentations in the Call Reports it filed quarterly, and financial statements at least annually, from September 2005 to June 2009.  The materiality of the misrepresentations contained in Call Reports filed by it is demonstrated through a review of each Call Report filed from September 2005 to June 2009 and a re-calculation of capital ratios presented in the Call Report, after giving effect to Relator Kraus' allegations herein.

224.    For example, Wachovia filed a Call Report dated September 30, 2005 that

purportedly shows its financial health – and, importantly, the fact that it is adequately capitalized.  With knowledge of the frauds described in this Fourth Amended Complaint, in order to correctly calculate Wachovia's key capitalization ratios for the quarterly period covered by this report: (i) the assets the bank fraudulently removed from the balance sheet should be "added back in"; (ii) loan assets the bank fraudulently accounted for as having been properly underwritten should be re-risk weighted, based upon the correct assumption that such loans were not properly underwritten, (iii) "AAA" securitization exposures should be re-risk weighted, based on the correct assumption that such exposures were at best improperly underwritten loans or an unrated securitization exposure; and (iv) loans and securities fraudulently accounted for as assets "held for sale," or "trading assets," rather than as assets "held to maturity," should be correctly classified as assets "held to maturity," and risk weighted appropriately, and then the ratios should be re-run, to show Wachovia's true capitalization levels.

225.    The Call Reports filed by Wachovia and Wells Fargo during these relevant periods present each Bank's Tier 1 Risk Based Capital Ratios and Total Risk Based Capital Ratios as being "well capitalized" for such periods.

226.    However, when Wachovia's fraudulent misrepresentations are corrected, as described above, the Tier 1 Risk Based Capital Ratios and the Total Risk Based Capital Ratios are actually at levels consistent with the Banks being considered to be "undercapitalized" or "critically undercapitalized" for such periods.

227.    Based on these calculations and other similar calculations run from September 2005 to June 2009, Wachovia was either "undercapitalized" or "critically undercapitalized" throughout the Relevant Period – and not "well capitalized" or even "adequately capitalized" (which was the capitalization level required to access the Discount Window primary credit rate

and the TAF).

### 3. Eligibility Based on Supplementary Information

228.    Had any of the frauds detailed in this Fourth Amended Complaint been disclosed to the Federal Entities or had the Banks notified the Federal Reserve that they could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs, the Banks knew that the Federal Reserve would have had to necessarily deny each of the Banks access to and participation in the Federal Programs.  This is because, had such critical information been known, such critical information would have constituted supplementary information that would have made the Federal Reserve deny it access to the Federal Programs pursuant to the Federal Reserve Act and Regulation A.

229.    Consistent with the Federal Reserve Act, the Federal Reserve carefully preserved in Regulation A the Federal Reserve Bank's discretion whether to fund an institution even if that institution was eligible to participate in the primary credit program based on supervisory ratings and capitalization levels, expressly stating that "[a]lthough the primary credit program is designed to make short-term credit available as a backup source of liquidity to generally sound institutions, a Reserve Bank is *not* obligated to extend primary credit.  A Reserve Bank therefore may choose *not* to lend to a generally sound depository institution if the Reserve Bank determines that doing so would be inconsistent with the purposes of the primary credit program" (emphasis added).

230.    Accordingly, the Federal Reserve expressly required a Federal Reserve Bank to consider supplemental information and to consider sufficient information about its "general character" as and when an institution accessed the Federal Programs to help the Federal Reserve Bank "ascertain whether undue use" is being made of the money loaned under the Federal

Programs or for any other purpose inconsistent with the maintenance of sound credit conditions. Indeed, the Federal Reserve even expressly stated in connection with its promulgation of Regulation A that "[t]he Board believe that, in order to ensure uniformity of credit eligibility criteria throughout the Federal Reserve System, the criteria must rely heavily on objective supervisory data, which reflect determinations made by an institution's primary regulator after an extensive review process,  However, the Board also recognizes that an institution could experience significant changes in its financial strength between examinations, in which case the institution's supervisory ratings might not reflect its current soundness and creditworthiness.  To protect the Reserve Banks from the risks and to avoid the allocative distortions that could be involved in lending to such an institution, the Board believes that the eligibility criteria must allow for the use of some amount of supplementary information, including market-based information when available, to confirm that an institution's most recent supervisory data accurately reflect the institution's current condition."  Of course, critical information about the frauds detailed in this Fourth Amended Complaint and the critical fact that the Banks could not make the Section 9.1 Certifications or satisfy Section 9.2 of the Circular each and every time they accessed the Federal Programs would constitute supplementary information that would "protect the Reserve Banks from the risks and to avoid the allocative distortions that could be involved in lending to" each of the Banks, especially given that their "most recent supervisory data" – including their capitalization ratios – would not have accurately reflected their "current condition."

## VI.    CAUSES OF ACTION

231.    This is an action to recover damages and civil penalties on behalf of the U.S. Government and each Relator arising from the false or fraudulent statements, claims, and acts

made in violation of the False Claims Act.  *See* 31 U.S.C. §§ 3729–3732 (2000).  For conduct

occurring before May 20, 2009, the False Claims Act provides that any person who:

> (a)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (c)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

is liable to the U.S. Government for a civil penalty of not less than $5,500 and not more than

$11,000 for each claim, plus three times the amount of damages sustained by the U.S.

Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a).

232.     For conduct occurring on or after May 20, 2009, the False Claims Act provides

that any person who:

> (a)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008);
>
> (c)     conspires to commit a violation of the False Claims Act;

is liable to the U.S. Government for a civil penalty of not less than $5,500 and not more than

$11,000 for each claim, plus three times the amount of damages sustained by the U.S.

Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a), *amended by*

Fraud Enforcement Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

233.     The amended False Claims Act defines "claim" as:

> (A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
>
> > (i) is presented to an officer, employee, or agent of the United States; or
> >
> > (ii) is made to a contractor, grantee, or other recipient, if the money or

property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

234.   The False Claims Act allows any person who has knowledge of a false or fraudulent claim against the U.S. Government to bring an action in a U.S. Federal District Court for himself and for the U.S. Government and to share in any recovery.  *See* 31 U.S.C. § 3730.

235.   On behalf of the U.S. Government and as set forth in this Fourth Amended Complaint, each Relator seeks through this action to recover damages and civil penalties arising from the Banks' submission of false claims to the U.S. Government.  In this case, such claims were submitted to the U.S. Government for payment under the Federal Programs.  Each Relator believes that the U.S. Government has suffered significant damages as a result of false claims for payment under these programs.

## COUNT I

### False Claims Act, 31 U.S.C. §3729(a)(1)/31 U.S.C. §3729(a)(1)(A)
### (Presenting or Causing to Be Presented False or Fraudulent Claims)

236.   Relators reallege and hereby incorporate by reference the allegations made in all other Paragraphs of this Fourth Amended Complaint as if fully set forth herein.

237.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

238.   Through the acts described in this Fourth Amended Complaint and otherwise, the Defendants knowingly presented or caused to be presented false or fraudulent claims, records and statements for payment or approval to the United States.  The Defendants knowingly falsely

certified, expressly and/or impliedly, and represented full compliance with all Federal and state laws and regulations, including the Applicable Laws and Regulations, prohibiting fraudulent acts and false reporting, and falsely certified, expressly and/or impliedly, their eligibility to obtain funds as described herein.

239.     Each time the Banks applied to, participated in, received payments, drew funds or benefits from or received funds or benefits from a Federal Program, the Defendants caused the presentation of a false or fraudulent claim for payment or approval.

240.     The United States, unaware of the falsity and fraudulent nature of the claims, records and statements presented by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' false or fraudulent claims.

241.     By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for false and fraudulent claims made by the Defendants.

## COUNT II

**False Claims Act, 31 U.S.C. §3729(a)(2)/31 U.S.C. §3729(a)(1)(B)**
**(Making or Using or Causing to be Made or Used False Records**
**and Statements Material to a False Claim)**

242.     Relators reallege and hereby incorporate by reference the allegations made in all other Paragraphs of this Fourth Amended Complaint as if fully set forth herein.

243.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

244.     Through the acts described in this Fourth Amended Complaint and otherwise, the

Defendants knowingly made or used false records or statements or omitted materials facts (a) to get false and/or fraudulent claims paid or approved by the U.S. Government and/or (b) that are material to false and/or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).  These false statements or records include, but are not limited to, certifications made (representative examples of which certifications are set forth in this Fourth Amended Complaint) that they will comply with all laws and regulations, including compliance with the Applicable Laws and Regulations, the Safety and Soundness Laws and Regulations, the Circular, other relevant documentation and agreements and other applicable laws and regulations.

245.    Each time the Banks applied to, participated in, received payments, drew funds or benefits from or received funds or benefits from a Federal Program, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

246.    The United States, unaware of the making, the use, or the causing to be made or used, of a false record or statement material to a false or fraudulent claim by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' making, using or causing to be made or used, such false record or statement.

247.    By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal Programs, the United States provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for such false records and statements.

**COUNT III**

**False Claims Act, 31 U.S.C. §3729(a)(1)(C)**
**(Conspiracy)**

248.    Relators reallege and hereby incorporate by reference the allegations made in all

other Paragraphs of this Fourth Amended Complaint as if fully set forth herein.

249.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

250.    Through the acts described in this Fourth Amended Complaint and otherwise, each of the Banks, and their officers and directors, entered into a conspiracy or conspiracies with each other and with other unnamed co-conspirators, including their auditors and accountants, to defraud the United States by presenting, or causing to be presented, a false or fraudulent claim for payment or approval and making, using or causing to be made or used, false records or statements material to a false or fraudulent claim.  Each of the Banks, and their officers and directors, and such other unnamed co-conspirators have taken substantial steps in furtherance of the conspiracies, including, *inter alia*, working together and coordinating with each other to flagrantly engage in unsafe and unsound banking practices, fraudulently misstate and manipulate its and their balance sheets in violation of applicable laws and regulations, fail to maintain adequate internal controls, make false certifications regarding their financial reporting and internal controls, fail to comply with the obligations of Sarbanes-Oxley, and mislead and deceive Federal regulators throughout the Relevant Period about the true state of Wachovia's financial health, in each case in violation of the Applicable Laws and Regulations.

251.    The United States, unaware of the Defendants' conspiracies or the falsity of the claims, records or statements of the Defendants, have paid and continues to pay claims that would not be paid but for the Defendants' conspiracies and false claims, records and statements relating to such conspiracies.

252.    By reasons of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.  Through the Federal

Programs, the United States has provided significant funding and subsidies to the Defendants, amounting to at least tens of billions of dollars, for such conspiracies and the related false and fraudulent claim, records and statements.

## PRAYER FOR RELIEF

WHEREFORE, Relators Kraus and Bishop pray for judgment against the Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq.*;

2.      That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729;

3.      That the Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.      That the Relators be awarded all costs of this action, including attorneys' fees, costs and expenses, pursuant to 31 U.S.C. § 3730(d); and

**5.**      That the United States and each Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated:  November 9, 2017

**GRANT & EISENHOFER P.A.**

By:_____/s/ James J. Sabella_____
Jay W. Eisenhofer
James J. Sabella
485 Lexington Avenue
New York, NY  10017
Telephone: (646) 722-8500

**THE LAW OFFICES OF**
    **SHARAD A. SAMY LLC**
Sharad A. Samy
32 Old Oak Road
Darien, CT 06820
Telephone: (917) 673-0804

**GOLDSTEIN & RUSSELL, P.C.**
Tejinder Singh
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636

Of Counsel:

**PORT & SAVA**
George S. Sava
Gary Port
734 Franklin Ave., #574
Garden City, NY 11530
Telephone: (516) 352-2999

*Attorneys for Plaintiffs-Relators Paul Bishop and Robert Kraus*

**APPENDIX I**

**DEFINED TERMS**

| Defined Term | Meaning |
|---|---|
| Agencies | The Treasury Department, the Federal Reserve, the FDIC, the OCC and the OTS. |
| Alliance Loan | The $650 million financing referenced in Paragraph 133 of the Fourth Amended Complaint. |
| ALLL | Allowance for loan and lease losses. |
| Applicable Laws and Regulations | The laws and regulations referenced in Paragraph 5 of the Fourth Amended Complaint. |
| Asset Securitization Handbook | The Asset Securitization Comptroller's Handbook published by the OCC in November 1997. |
| Asset Securitization Interagency Guidelines | The Interagency Guidance on Asset Securitization Activities issued by the Agencies on December 13, 1999. |
| August 1 Malter E-mail | E-mail written by Malter on August 1, 2005, relating to, *inter alia*, the Black Box. |
| August 1 Schleicher E-mail | E-mail written by Schleicher on August 1, 2005, relating to, *inter alia*, credit grading of CRE loans. |
| Banks | Wachovia, World Savings and Wells Fargo |
| Black Box | College Street Funding Master Trust. |
| Carlson | Pete Carlson, an employee of Wachovia. |
| CIB | Wachovia's Corporate and Investment Bank. |
| Circular | Operating Circular No. 10, Lending, effective October 15, 2006, issued by the Federal Reserve. |
| CMBS | Commercial mortgage-backed securities. |
| CRE | Commercial real estate. |
| CREF Facility | Wachovia's on-balance sheet warehousing/holding facility for CRE loans. |
| CRM | Wachovia's Credit Risk Management group. |
| Culp | Royer Culp, Head of Wachovia's Structuring Department. |
| Cummings | Steve Cummings, Senior Executive Vice President and Executive Officer of WC. |
| Deposit Insurance Program | The FDIC's deposit insurance coverage program. |
| Discount Window | The Federal Reserve's Discount Window. |
| Dobie Center Transaction | The $60.875 million financing referenced in Paragraph 126 of the Fourth Amended Complaint. |
| Enron | Enron Corporation. |

| | |
|---|---|
| *FACS* | Finance Accounting & Control System. |
| *False Claims Act* | False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* |
| *FAS 115* | Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities"*, issued in May 1993. |
| *FAS 140* | Statement of Financial Accounting Standards No. 140, *"Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities"*, issued in September 2000. |
| *FAS 166* | Financial Accounting Standards No. 166, *"Accounting for Transfers of Financial Assets"*, issued in June 2009. |
| *FDIC* | The Federal Deposit Insurance Corporation. |
| *Federal Entities* | The Treasury Department and the Federal Reserve System. |
| *Federal Programs* | *Inter alia*, the Discount Window and the TAF. |
| *Federal Reserve 2120.1 Guidance* | Section 2120.1, "Accounting" of the Trading and Capital-Markets Activities Manual, issued by the Federal Reserve in April 2002. |
| *Federal Reserve System or Federal Reserve* | The Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, the Federal Reserve Bank of Richmond and/or one or more other Federal Reserve Banks. |
| *Friedman* | Steve Friedman, an employee of Wachovia. |
| *GAAP* | Generally accepted accounting principles. |
| *Gardner* | Douglas Gardner, an employee of Wachovia in its market risk department. |
| *Green* | Bill Green, Managing Director of Wachovia's RECM group. |
| *GWF* | Golden West Financial Corporation. |
| *Hamadah* | Talal Hamadah, an employee of Wachovia. |
| *Holmes* | Bret Holmes, an employee of Wachovia in its legal department. |
| *Hubach* | Carolyn Hubach, an employee of Wachovia. |
| *Interagency ALLL Policy* | The Interagency Policy Statement on the Allowance for Loan and Lease Losses issued by the Agencies on December 13, 2006. |
| *IRS* | The U.S. Internal Revenue Service. |
| *Jacobson* | Amy Jacobson, an employee of Wachovia in its compliance department. |
| *July 2006 Meeting* | The Board of Inquiry meeting conducted at Wachovia in July 2006. |
| *Ken Thompson* | G. Kennedy Thompson, Chairman, President and Chief |

| | |
|---|---|
| | Executive Officer of WC. |
| *Lehman Brothers* | Lehman Brothers Inc. and its affiliates and subsidiaries. |
| *Li* | Christine Li, an employee of Wachovia in its market risk group. |
| *Lindquist* | Deanna Lindquist, an employee of Wachovia in its legal department. |
| *Litke* | Adam Litke, the Head of Wachovia's Risk Management group. |
| *LOCOM* | An accounting term meaning "lower of cost or market". |
| *LTV* | A finance term meaning "loan-to-value", typically represented as a percentage, calculated by dividing the principal balance of a loan secured by a property by the value of that property. |
| *Macon-Burlington Loans* | The financing referenced in Paragraph 124 of the Fourth Amended Complaint. |
| *Malter* | Ira Malter, Wachovia's Controller for Structured Products. |
| *Malter-Rottmann E-mail* | E-mail written by Malter to Rottmann on December 1, 2005 regarding, *inter alia*, the Black Box. |
| *MIS* | Management information systems. |
| *OCC* | The U.S. Office of the Comptroller of the Currency. |
| *OCC Modeling Guidance* | OCC Bulletin 2000-16 entitled *"Risk Modeling"* issued by the OCC on May 30, 2000 |
| *One Oliver Transaction* | The $52 million financing referenced in Paragraph 124 of the Fourth Amended Complaint. |
| *OTS* | The U.S. Office of Thrift Supervision. |
| *Primary Credit Interagency Advisory* | The Interagency Advisory on the Use of the Federal Reserve's Primary Credit Program in Effective Liquidity Management, issued jointly by the Federal Reserve, the OCC, the FDIC, the OTS and the National Credit Union Administration, dated July 23, 2003. |
| *Prior Circular* | Operating Circular No. 10, Lending, effective January 2, 1998, issued by the Federal Reserve. |
| *Purchase Summary* | An internal undated Wachovia summary titled "Purchase of College Street Funding A Certificate". |
| *QSPE* | A qualifying special purpose entity. |
| *Rao* | Kris Rao, an employee of Wachovia in its internal audit department. |
| *Rating Credit Risk Handbook* | The Rating Credit Risk Comptroller's Handbook published by the OCC in April 2001. |
| *RECM* | Real Estate Capital Markets. |

| | |
|---|---|
| *Regulation A Final Rule* | 12 C.F.R. Part 201, Regulation A; Docket No. R-1123, *"Extension of Credit by Federal Reserve Banks"*. |
| *Relators* | Robert Kraus and Paul Bishop. |
| *Relevant Period* | The period from in or around 2007 to the present date. |
| *Repo SPVs* | Numerous off-balance sheet SPVs that entered into repo transactions with Wachovia in respect of its CRE loans. |
| *Rottmann* | Robert Rottmann, the Product Controller Group Head of Wachovia. |
| *Rottmann Global Markets Product Control Statement* | The Global Markets Product Control Statement on Management Issues & Concerns for the quarter ending in December 31, 2005 prepared by Rottmann. |
| *S&Ls* | Savings and loans institutions. |
| *Safety and Soundness Laws and Regulations* | The safety and soundness laws and regulations referenced in Paragraph 4 of the Fourth Amended Complaint. |
| *Salvucci* | Robert Salvucci, a controller at Wachovia in its structured products group. |
| *Sarbanes-Oxley* | The Sarbanes-Oxley Act of 2002, as amended. |
| *Schleicher* | Keith Schleicher, Managing Director and Head of Wachovia's Credit Risk Management department. |
| *Schweigerath* | Jason Schweigerath, an employee at Wachovia who worked directly with Relator Kraus. |
| *SEC* | The U.S. Securities and Exchange Commission. |
| *Section 9.1 Certifications* | The Section 9.1(b) Certification, the Section 9.1(g) Certification and the Section 9.1(i) Certification. |
| *Section 9.1(b) Certification* | The certification of Section 9.1(b) of the Circular, described in Paragraph 34 of the Fourth Amended Complaint. |
| *Section 9.1(g) Certification* | The certification of Section 9.1(g) of the Circular, described in Paragraph 35 of the Fourth Amended Complaint. |
| *Section 9.1(i) Certification* | The certification of Section 9.1(i) of the Circular, described in Paragraph 36 of the Fourth Amended Complaint. |
| *Solie* | Sam Solie, Chief Operating Officer of Wachovia's RECM group. |
| *SPV* | A special purpose vehicle. |
| *TAF* | The Federal Reserve's Term Auction Facility. |
| *Tippett* | Frank Tippett, a Director and Head of Hedging at WS. |
| *Trading Desk Model* | The model referenced in Paragraph 112 of the Fourth Amended Complaint. |
| *Treasury Department* | The U.S. Department of the Treasury. |
| *U.S. Government* | The government of the United States. |

| *Uhlin* | Robert Uhlin, an employee at Wachovia. |
|---|---|
| *United States* | The United States of America. |
| *VaR* | A finance term meaning "value-at-risk". |
| *Verrone* | Robert Verrone, head of Wachovia's CIB's Large Loan Group. |
| *Wachovia* | WC, WBNA, WCM, WS and its and their subsidiaries and affiliates. |
| *Wachovia RECM Finance Memorandum* | Wachovia's RECM Finance Memorandum to December Close Files, dated January 6, 2006. |
| *Wachovia Report* | An internal report allegedly prepared by Wachovia in respect of the July 2006 Meeting. |
| *Wachovia SOX Process Narrative* | Wachovia's Sarbanes-Oxley Team – Confidential – Process Narrative – CRES, dated June 18, 2005. |
| *Wachovia's 2003 Black Box Accounting Policy* | Corporate & Investment Bank Accounting Policy, dated June 2003. |
| *Wachovia's Credit Grade Guidelines* | Wachovia's Policy/Guidelines/Procedures relating to Credit Grades, dated June 2005. |
| *Wachovia's RECM Accounting Policy Memorandum* | Wachovia's RECM Finance memorandum to Accounting Policy, dated February 10, 2005. |
| *Wachovia-Wells Merger Date* | December 31, 2008. |
| *WBNA* | Wachovia Bank, N.A. |
| *WC* | Wachovia Corporation. |
| *WCM* | Wachovia Capital Markets LLC. |
| *Wells Fargo* | WFC, WFBNA and its and their subsidiaries and affiliates. |
| *Wes Thompson* | Wes Thompson, an employee at Wachovia who worked directly with Relator Kraus. |
| *WFBNA* | Wells Fargo Bank, National Association. |
| *WFC* | Wells Fargo & Company. |
| *World Savings* | GWF, WSB, WSI and its and their subsidiaries and affiliates. |
| *World-Wachovia Merger Date* | October 2, 2006. |
| *WS* | Wachovia Securities LLC. |
| *WSB* | World Savings Bank, FSB. |
| *WSI* | World Savings, Inc. |
| *Young* | Steve Young, Wachovia's CIB's Head of Credit and Counterparty Risk Analytics Group. |

## APPENDIX II

## SOME OF THE PAYMENTS MADE UNDER THE FEDERAL PROGRAMS

*The Federal Reserve's Discount Window Primary Credit Program ("**DW-PCP**")*
*and Term Auction Facility*

| Borrower | Federal Program | Amount of Subsidy (in billions) | Date of Payment | Term (in days) | Rate of Subsidized Advance |
|---|---|---|---|---|---|
| WBNA | DW – PCP | 0.050 | 8/22/2007 | 30 | 5.750% |
| WBNA | DW | .450 | 8/22/2007 | 1 | 5.750% |
| WBNA | TAF | 0.025 | 12/20/2007 | 28 | 4.650% |
| WBNA | DW – PCP | 1.235 | 1/16/2008 | 1 | 4.750% |
| WBNA | TAF | 3.500 | 3/27/2008 | 28 | 2.615% |
| WBNA | TAF | 3.500 | 4/10/2008 | 28 | 2.820% |
| WBNA | TAF | 5.000 | 4/24/2008 | 28 | 2.870% |
| WBNA | TAF | 5.000 | 5/8/2008 | 28 | 2.220% |
| WBNA | TAF | 5.000 | 5/22/2008 | 28 | 2.100% |
| WBNA | TAF | 5.000 | 6/5/2008 | 28 | 2.260% |
| WBNA | TAF | 5.000 | 6/19/2008 | 28 | 2.360% |
| WBNA | TAF | 7.500 | 7/3/2008 | 28 | 2.340% |
| WBNA | TAF | 5.000 | 7/17/2008 | 28 | 2.300% |
| WBNA | TAF | 5.000 | 7/31/2008 | 28 | 2.350% |
| WBNA | TAF | 5.000 | 8/14/2008 | 28 | 2.450% |
| WBNA | TAF | 2.500 | 8/14/2008 | 84 | 2.754% |
| WBNA | TAF | 5.000 | 8/28/2008 | 28 | 2.380% |
| WBNA | TAF | 2.500 | 9/11/2008 | 28 | 2.530% |
| WBNA | TAF | 2.500 | 9/11/2008 | 84 | 2.670% |
| WBNA | TAF | 5.000 | 9/25/2008 | 28 | 3.750% |
| WBNA | DW – PCP | 23.000 | 10/6/2008 | 87 | 2.250% |
| WBNA | DW – PCP | 6.000 | 10/6/2008 | 28 | 2.250% |
| WBNA | DW – PCP | 7.000 | 10/8/2008 | 26 | 1.750% |
| WBNA | TAF | 15.000 | 10/9/2008 | 85 | 1.390% |
| WBNA | TAF | 15.000 | 10/23/2008 | 28 | 1.110% |
| WBNA | TAF | 15.000 | 11/6/2008 | 84 | 0.600% |
| WBNA | TAF | 15.000 | 11/20/2008 | 28 | 0.510% |
| WBNA | TAF | 10.000 | 12/22/2008 | 17 | 0.528% |
| WBNA | TAF | 5.000 | 2/26/2009 | 84 | 0.250% |
| WFBNA | TAF | 15.000 | 1/29/2009 | 84 | 0.250% |
| WFBNA | TAF | 15.000 | 2/12/2009 | 28 | 0.250% |
| WFBNA | TAF | 15.000 | 2/26/2009 | 84 | 0.250% |

| WFBNA | TAF | 5.000 | 5/7/2009 | 28 | 0.250% |
| WFBNA | TAF | 10.000 | 5/21/2009 | 84 | 0.250% |

## APPENDIX III

### CIB REPORTING LINES



## APPENDIX IV

### WACHOVIA CMBS SECURITIZATION TRANSACTION STRUCTURE



### APPENDIX V

### THE CREF FACILITY



## APPENDIX VI

## THE BLACK BOX



*Step 3:* Sell the CRE Loans to the CMBS Issuer

Wachovia Bank, National Association's Balance Sheet

How it was accounted for:

1.   Recognize CRE Loans when originated or purchased;

2.  Derecognize CRE Loans from balance sheet when "sold" to the Black Box (FAS 140);

3.  Recognize Class B Certificate on balance sheet as a Debt Security (FAS 115);

4.  Take back the CRE Loans from the Black Box when a CMBS deal is ready to close, and immediately move them to the CMBS Issuer; and

5. Reconcile Class A Certificate/Class B Certificate funding numbers to fabricate at least 10% beneficial interest in the Black Box for the Class A Certificate holder.

Wachovia Bank Commercial Mortgage Trust (the CMBS Issuer)

$

CRE Loans

Commercial Mortgage-Backed Securities

$

Market

Class B Certificate (90% Beneficial Interest)

$

College Street Master Funding Trust (*a.k.a.,* the Black Box)

"Sale" of CRE Loans

$

$

CRE Loans

Commercial Real Estate Loan Borrowers

*Step 2:* Park the CRE Loans in the Black Box and Take the CRE Loans back out of the Black Box when ready to securitize

Class A Certificate (10% Beneficial Interest)

$

Amsterdam Funding Corporation

*Step 1:* Originate or Purchase the CRE Loans

## APPENDIX VII

### THE REPO SPVs

***Step 2:*** *Repo the CRE Loans to the Repo SPV and roll until some sort of final disposition (e.g., sale to CMBS Issuer, write-off, etc.)*



***Step 1:*** *Originate or Purchase the CRE Loans*