UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

UNITED STATES ex rel. ROBERT KRAUS and : 
PAUL BISHOP, :
 :  Case No. 11-cv-05457-BMC
                              Plaintiffs, :
 :
              - against - :
 :
WELLS FARGO & COMPANY, WELLS FARGO :
BANK, N.A., and its and their subsidiaries and :
affiliates, :
 :
                              Defendants. :
 :

-------------------------------------------------------------------X

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT

## TROUTMAN SANDERS LLP

*Attorneys for Defendants Wells Fargo & Company and Wells Fargo Bank, N.A.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

      A.    Allegations Concerning World Savings and Wachovia's Banking Practices ................................................................................................ 2

      B.    The Federal Reserve System .......................................................... 5

      C.    The Discount Window, the Operating Circular and the TAF Program ............................................................................................. 7

RELATORS' PLEADING BURDEN ................................................................................ 13

ARGUMENT ...................................................................................................................... 14

    I.    An advance under the Discount Window or Term Auction Facility is Not A "Claim" Under the FCA ............................................................. 14

      A.    Discount Window and TAF Advances Are Not Funded by the United States Treasury. ............................................................... 16

      B.    FRBs are Not the Government When Lending Money to Member Banks. ........................................................................................... 16

    II.    Relators Have Not Alleged a False or Fraudulent Claim Based on the Correct Interpretation of Section 9.1(b). ............................................. 20

    III.    Dismissal Is Required Even Under Relators' Interpretation. ............................. 24

      A.    No Violation of "Applicable Laws and Regulations" ............................. 24

      B.    No Alleged Violation of "Applicable Laws and Regulations" in 2007 or Thereafter ..................................................................... 29

      C.    In any Event, Insufficient Facts Alleged Showing Potential "Adverse Effect" ......................................................................... 30

    IV.    Claims Based on Sections 9.1(g) and (i) Must be Dismissed. ............................. 30

    V.    Relators' Implied Certification Claim Fails under Escobar. ............................. 31

    VI.    Relators' claims would frustrate government policy goals. ............................. 34

    VII.    The FAC Does Not Allege a Knowingly False Certification or Claim. ............. 36

      A.    Defendants' Reasonable Interpretation of Section 9.1(b) Cannot Constitute a Knowingly False Certification. ............................. 36

      B.    Knowing Falsity Cannot Be Based On "Collective Knowledge" ........... 38

    VIII.    Relators have not pled the requisite materiality to sustain an FCA claim. ......... 39

      A.    Relators Have Not Sufficiently Alleged that the Defendants Made Material Misrepresentations to the Government. ............................. 40

**TABLE OF CONTENTS**
(continued)

**Page**

B.      None of the Alleged False Certifications Could Have Been
        Material Because FRBs Continued Making Advances to the Banks
        Even After Becoming Aware of the Relators' Allegations ..................... 43

IX.     The Conspiracy Claim must be dismissed. .......................................................... 47

CONCLUSION ................................................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Achtman v. Kirby, McInerney & Squire, LLP,*
    464 F.3d 328 (2d Cir. 2006)..................................................................................14

*Ameti ex rel. United States v. Sikorsky Aircraft Corp.,*
    2017 WL 2636037 (D. Conn. June 9, 2017)..........................................................32

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................14, 27, 29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007).......................................................................................5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................14

*Bishop v. Lipman and Lipman, Inc.,*
    2013 WL 2190784 (M.D. Fla. May 21, 2013).......................................................50

*Bishop v. Wells Fargo & Co.,*
    823 F.3d 35 (2d Cir. 2016), *vacated on other grounds,* 137 S.Ct. 1067 (2017).............. *passim*

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,*
    601 F.3d 143 (2d Cir. 2010)...................................................................................18

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,*
    649 F. Supp. 262 (S.D.N.Y. 2009) ............................................................13, 19, 33

*Blusal Meats. v. United States,*
    638 F. Supp. 824 (S.D.N.Y. 1986), *affirmed on other grounds,* 817 F.2d 1007
    (2d Cir. 1987)........................................................................................................48

*Broich v. Inc. Vill. of Southampton,*
    650 F. Supp. 2d 234 (E.D.N.Y. 2009) ..................................................................49

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002).....................................................................................4

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991).......................................................................................5

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989).........................................................................................4

*DAG Enterprises v. EXXON Mobil. Corp.,*
    2001 WL 34778782 (D.D.C. Sept. 30, 2001) .......................................................49

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*DSAM Global Value Fund v. Altris Software*,
    288 F.3d 385 (9th Cir. 2002) ...................................................................................28

*Federal Reserve Bank of St. Louis v. Metrocentre Improvement Dist. #1*,
    657 F.2d 183 (8th Cir. 1981) ...................................................................................17

*Flippo v. CSC Assocs. III*,
    262 Va. 48 (2001) ...................................................................................................21

*Fox News Network, LLC v. Bd. Of Governors of the Fed. Reserve Sys.*,
    601 F.3d 158 (2d Cir. 2010).............................................................................18, 19

*Galiano v. Fid. Nat'l Title Ins. Co.*,
    684 F.3d 309 (2d Cir. 2012)....................................................................................14

*Leonard F. v. Israel Disc. Bank*,
    199 F.3d 99 (2d Cir. 1999).........................................................................................5

*Lewis v. United States*,
    680 F.2d 1239 (9th Cir. 1982) .................................................................................18

*Lloyd's Underwriters v. Craig & Rush, Inc.*,
    32 Cal. Rptr. 2d 144 (Ct. App. 1994) .......................................................................21

*Martin & Martin v. Bradley Enters.*,
    256 Va. 288 (1998) .................................................................................................21

*New York ex rel. Khurana v. Spherion Corp.*,
    2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016)..........................................................32

*Rainwater v. United States*,
    356 U.S. 590 (1958)................................................................................................16

*Rust v. Johnson*,
    597 F.2d 174 (9th Cir. 1979) ...................................................................................17

*Scott v. Federal Reserve Bank of Kansas City*,
    406 F.3d 532 (8th Cir. 2005) ...................................................................................16

*Shields v. Citytrust Bancorp.*,
    25 F.3d 1124 (2d Cir. 1994).....................................................................................36

*United States ex rel. Adams v. Aurora Loan Serv.*,
    813 F.3d 1259 (9th Cir. 2016) .................................................................................17

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*United States ex rel. Ahumada v. Nish,*
  756 F.3d 268 (4th Cir. 2014) ...................................................................48

*United States ex rel. Amin v. George Washington Univ.,*
  26 F. Supp. 2d 162 (D.D.C. 1998) ...........................................................48

*United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,*
  2000 WL 1207162 (E.D. Pa. Aug. 24, 2000) ...........................................47

*United States ex rel. Chilcott v. KBR, Inc.,*
  2013 WL 5781660 (C.D. Ill. Oct. 25, 2013)..............................................49

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,*
  543 F.3d 1211 (10th Cir. 2008) ...............................................................34

*United States ex rel. D'Agostino v. ev3, Inc.,*
  845 F.3d 1 (1st Cir. 2016)................................................................34, 35, 36, 43

*United States ex rel. Fago v. M&T Mortg. Corp.,*
  518 F. Supp. 2d 108 (D.D.C. 2007) .........................................................49

*United States ex rel. Fellhoelter v. Valley Milk Prods., LLC,*
  617 F. Supp. 2d 723 (E.D. Tenn. 2008)..................................................17, 19, 20

*United States ex rel. Forcier v. Computer Sciences Corp.,*
  2017 WL 3616665 (S.D.N.Y. Aug. 10, 2017)...........................................32

*United States ex rel. Greenfield v. Medco Health Sys., Inc.,*
  2014 WL 4798637 (D.N.J. Sept. 26, 2014) ..............................................49

*United States ex rel. Grupp v. DHL Express (USA), Inc.,*
  47 F. Supp. 3d 171 (W.D.N.Y. 2014)......................................................36, 37

*United States ex rel. Harman v. Trinity Indus.,*
  872 F.3d 645 (5th Cir. 2017) ...................................................................44

*United States ex rel. Hopper v. Anton,*
  91 F.3d 1261 (9th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).........................16

*United States ex rel. Hussain v. CDM Smith, Inc.,*
  2017 WL 4326523 (S.D.N.Y. Sept. 27, 2017)...........................................32

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency,*
  530 F.3d 980 (D.C. Cir. 2008)..................................................................37

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States ex rel. Kelly v. Serco, Inc.*,
   846 F.3d 325 (9th Cir. 2017) ...................................................................31

*United States ex rel. Ketroser v. Mayo Found.*,
   729 F.3d 825 (8th Cir. 2013) ...................................................................37

*United States ex rel. Kolchinsky v. Moody's Corp.*,
   2017 WL 825478 (S.D.N.Y. Mar. 2, 2017) .....................................32, 44

*United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*,
   205 F. Supp. 3d 276 (E.D.N.Y. 2017) .....................................................32

*United States ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017) ...............................................................44

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*,
   736 F. Supp. 2d 804 (S.D.N.Y. 2010) (Kaplan, J.) .................................48

*United States ex rel. Petras v. Simparel, Inc.*,
   857 F.3d 407 (3d Cir. 2017) .....................................................................20

*United States ex rel. Petratos v. Genentech, Inc.*,
   855 F.3d 481 (3d Cir. 2017) .....................................................................42

*United States. ex rel. Phillips v. L-3 Communs. Integrated Sys., L.P.*,
   2012 WL 3649699 (N.D. Texas Aug. 24, 2012) ......................................48

*United States ex rel. Potra v. Jacobson Companies, Inc.*,
   2014 WL 1275501 (N.D. Ga. Mar. 27, 2014)...........................................48

*United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*,
   2011 WL 976482 (D. Neb. Mar. 15, 2011) ........................................28, 37

*United States ex rel. Scharff v. Camelot Counseling*,
   2016 WL 5416494 (S.D.N.Y. Sept. 28, 2016)..............................14, 41, 42

*United States ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd.*,
   2017 WL 1133956 (E.D. Pa. Mar. 27, 2017).......................................32, 43

*United States ex rel. Shupe v. Cisco Sys.*,
   759 F.3d 379 (5th Cir. 2014) .............................................16, 17, 18, 20

*United States ex rel. Southeastern Carpenters Reg'l Council v. Fulton Cnty.*,
   2016 WL 4158392 (N.D. Ga. Aug. 5, 2016) ......................................15, 40

iv

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*United States ex rel. Taylor v. Gabelli*,
  345 F. Supp. 2d 313 (S.D.N.Y. 2004).................................................................47

*United States ex rel. Tessler v. City of New York*,
  2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016) .......................................................32

*United States ex rel. Thomas v. Black & Veach Special Projects Corp.*,
  820 F.3d 1162 (10th Cir. 2016) ...........................................................................40

*United States ex rel. Thulin v. Shopko Stores Operating Co., LLC*,
  771 F.3d 994 (7th Cir. 2014) ...............................................................................37

*United States ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 1032 (2005) .....................17

*United States ex rel. Vigil v. Nelnet, Inc.*,
  639 F.3d 791 (8th Cir. 2011) ...............................................................................48

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
  525 F.3d 370 (4th Cir. 2008) ...............................................................................36

*United States ex rel. Wood v. Allergan, Inc.*,
  246 F. Supp. 3d 772 (S.D.N.Y.)...........................................................................32

*United States ex rel. Yannacopoulos v. Gen. Dynamics*,
  652 F.3d 818 (7th Cir. 2011) ...............................................................................36

*United States v. Barel*,
  939 F.2d 26 (3d Cir. 1991)....................................................................................27

*United States v. Basin Elec. Power Coop.*,
  248 F.3d 781 (8th Cir. 2001) ...............................................................................37

*United States v. Catholic Health System of Long Island, Inc.*,
  2017 WL 1239589 (E.D.N.Y. Mar. 31, 2017).......................................................44

*United States v. Edwards*,
  566 F. Supp. 1219 (D. Conn. 1983).......................................................................27

*United States v. Glaxo Smith Kline, LLC*,
  2013 WL 6085125 (E.D.N.Y. Oct. 18, 2013)........................................................14

*United States v. McGauley*,
  279 F.3d 62 (1st Cir. 2002)...................................................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Ortiz,*
    906 F. Supp. 140 (E.D.N.Y. 1995) ...........................................................27

*United States v. Rubin/Chambers, Dunhill Ins. Serv.,*
    798 F. Supp. 2d 5177 (S.D.N.Y. 2011)....................................................27

*United States v. Sanford-Brown, Ltd.,*
    840 F.3d 445 (7th Cir. 2016) ...................................................31, 43, 44

*United States v. Science Applications Int'l Corp.,*
    626 F.3d 1257 (D.C. Cir. 2010) ...............................................................38

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006)......................................................................27

*United States v. Williams,*
    553 U.S. 285 (2008)....................................................................................22

*Universal Health Services, Inc. v. United States. ex rel. Escobar,*
    136 S. Ct. 1989 (2016).......................................................................... *passim*

*Victoria v. Superior Court,*
    710 P.2d 833 (Cal. 1985) ..........................................................................21

*Wood ex. rel. United States v. Applied Research Assocs.,*
    328 Fed. App'x. 744 (2d Cir. 2009).........................................................34

**Statutes**

12 U.S.C. § 161................................................................................................28

12 U.S.C. § 164(a) ..........................................................................................28

12 U.S.C. § 225a................................................................................................6

12 U.S.C. § 241..................................................................................................6

12 U.S.C. § 246..................................................................................................6

12 U.S.C. § 248............................................................................................6, 19

12 U.S.C. § 263..................................................................................................6

12 U.S.C. § 282................................................................................................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

12 U.S.C. § 289 ..................................................................................................... 16

12 U.S.C. § 301–02 ............................................................................................. 7, 18

12 U.S.C. § 321–39 ............................................................................................. 6, 18

12 U.S.C. § 341 ................................................................................................... 6, 18

12 U.S.C. § 342 ......................................................................................................... 6

12 U.S.C. § 347 ............................................................................................... 6, 7, 19

12 U.S.C. § 357 ......................................................................................................... 7

12 U.S.C. § 356 ......................................................................................................... 6

12 U.S.C. § 481 ....................................................................................................... 13

12 U.S.C. § 1817 ..................................................................................................... 28

12 U.S.C. § 1820(d) ............................................................................................... 13

12 U.S.C. § 1831n(a)(2)(A) .................................................................................... 28

18 U.S.C. § 1001 ............................................................................................... 26, 27

18 U.S.C. § 1005 ............................................................................................... 26, 27

31 U.S.C. § 3729 ............................................................................................... 15, 36

**Other Authorities**

12 C.F.R. § 30 ................................................................................................. *passim*

12 C.F.R. § 263 ....................................................................................................... 25

12 C.F.R. § 265.11 .................................................................................................. 19

12 C.F.R. § 308 ....................................................................................................... 25

12 C.F.R. § 570 ....................................................................................................... 25

12 C.F.R. § 201 *et seq.* ................................................................................... *passim*

12 C.F.R. § 263.302 ................................................................................................ 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Civ. P. 4 ................................................................................................................16

Fed. R. Civ. P. 8(a) .................................................................................................14, 39, 48

Fed. R. Civ. P. 9(b) ................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................................. *passim*

## INTRODUCTION

Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (together "Wells Fargo"), submit this memorandum in support of their motion to dismiss Relators' Fourth Amended Complaint (the "FAC") for failure to state a claim under Rule 12(b)(6) and failure to plead a False Claims Act ("FCA") violation with particularity under Rule 9(b).[1]

The FAC relies on the same underlying factual allegations as the Third Amended Complaint ("TAC").[2]   Relators contend that Wachovia Bank, N.A. ("Wachovia") and Wells Fargo Bank, N.A. (together the "Banks") made false certifications between August 2007 and May 2009 when obtaining advances from Federal Reserve Banks ("FRBs") under their discount window or Term Auction Facility ("TAF") programs.  (FAC, ¶ 77)  These certifications were supposedly false because prior to May 2006, World Savings Bank, FSB ("World Savings") had engaged in allegedly improper residential lending practices, and a commercial real estate lending group at Wachovia had engaged in allegedly improper commercial loan origination and accounting practices.  There is no allegation that Wells Fargo engaged in any of this conduct.

Relators allege that these activities violated various laws and regulations unrelated to either the TAF or discount window, and had a negative impact on the Banks' ability to perform their repayment obligations to FRBs even though all of the loans were timely repaid with interest.  Like the TAC, the FAC claims that because of the alleged conduct, Wachovia and Wells Fargo made certain false express representations under the Operating Circular governing the advances.  The FAC has added a legal theory that Wachovia and Wells Fargo impliedly falsely certified that they were adequately capitalized when participating in both programs.

---

[1]  Documents relied on in support of the motion are attached as Exhibits to the Declaration of Amy Pritchard Williams (the "Williams Declaration").

[2]  A comparison of the TAC and FAC is Exhibit A to the Williams Declaration.

The FAC fails to state a FCA claim and should be dismissed for the following reasons:

(1)   FRBs do not use United States Treasury funds when making discount window or TAF advances and do not act as the United States when making advances under these programs; therefore, the advances at issue are not "claims" under the FCA;

(2)   The only representation made under section 9.1(b) of the Operating Circular was as to the Banks' legal authority to enter into and perform their obligations, and the Banks' section 9.1(b) representation was accurate;

(3)   Even under Relators' incorrect reading of the Operating Circular, the FAC fails to allege any false express certifications;

(4)   The FAC does not state a claim under an implied certification theory as the elements of that theory have been articulated by the Supreme Court;

(5)   The FAC does not allege a "knowingly" false claim because the Banks' interpretation of the Operating Circular was reasonable and the FAC incorrectly relies on collective knowledge to allege scienter; and

(6)   The FAC fails to allege facts that would show that any of the matters complained of in the FAC were material to the FRBs' decision to lend to the Banks.

## FACTUAL BACKGROUND

### A.   Allegations Concerning World Savings and Wachovia's Banking Practices

Relator Bishop worked at World Savings as a mortgage salesperson from November 2002 through May 2006. (FAC, ¶ 19) Relator Kraus was employed as a controller for Wachovia's Real Estate Capital Markets Group for less than 15 months, until September 2006. (FAC, ¶ 18)  Kraus was suspended the last three months of his employment and not involved in Wachovia's operations after May 2006. (FAC, ¶ 117)

Relator Bishop claims, without any specifics, that World Savings engaged in improper residential mortgage loan origination practices prior to its 2006 merger with Wachovia, and that

the practices were harmful to World Savings' long term financial health. (*See, e.g.*, FAC, ¶¶ 177, 183)[3]

Relator Kraus' allegations principally relate to accounting decisions that Wachovia made prior to or in 2005.  Kraus asserts, among other things, that a commercial loan group's manner of recording transactions failed to comply with generally accepted accounting principles ("GAAP").  Kraus makes various allegations concerning Wachovia's use of the College Street Funding Master Trust, a qualified special purpose entity, which Relators admit was dissolved at the end of 2005.  Kraus also criticizes the valuations and credit risks assigned to commercial real estate loans in 2005 and early 2006, as well as the use of certain unnamed repurchase special vehicle entities during an unspecified period. (FAC, ¶¶ 72–117) Kraus also complains of the quality of commercial real estate loan origination during his employment. (FAC, ¶¶ 118–39)

Relators assert that these alleged business activities overstated profits and concealed losses and had a material negative effect on Wachovia's finances.  The FAC asserts that following the Wachovia-Wells Fargo merger in 2008, this negatively affected Wells Fargo's financial statements. (FAC, ¶ 158)

The only attempt in the FAC to allege the relative effect of the pre-2007 conduct on Wachovia's balance sheet can be found in paragraphs 220-227.  In those paragraphs, Relators claim problems with: a $6 billion College Master Trust (which was admittedly wound down at the end of 2005 and incorporated into Wachovia's balance sheet); the lack of credit grades on $4.141 billion of commercial real estate loans held on balance sheet; valuation of an additional $4-6 billion of assets held off-balance sheet; and the quality of $4-6 billion of middle market

---

[3]  The FAC does not add any specifics to the World Savings allegations, and the Court should dismiss all claims to the extent that they are based on World Savings allegations for this reason alone.

loans that were allegedly AAA rated for securitizations. (FAC, ¶ 220) Relators claim that the total value of these assets with issues was $18.141 to 22.141 billion (FAC, ¶ 221), but nowhere in the FAC do the Relators set forth facts to establish that these assets were worthless nor do Relators allege any facts as to the actual impact of Relators' allegations on the value.

Relators claim that these problems resulted in misrepresentations in Wachovia's quarterly call reports from September 2005 through June 2009.  But Relators never point to line items of the call reports that were affected or by what amount.  Relators claim that the materiality of the alleged misrepresentations can be demonstrated through a "re-calculation of capital ratios presented in the call report, after giving effect to Relator Kraus' allegations herein." (FAC, ¶ 223) However, the FAC does not contain any such re-calculation or provide any information concerning what methodology would produce capital ratios that would be considered undercapitalized.

The only call report specifically referenced by Relators is that for the quarter end September 30, 2005. (FAC, ¶¶ 221, 224) They point to the shareholder equity listed in that call report of $47.053 billion as evidence that their allegations are material.  *Id.*  Citation to this figure is misleading given that Relators have not alleged the actual impact of their claims on Wachovia's balance sheet. Moreover, the same call report shows a quarterly net income of $4.5 billion and total assets of $477 billion. (Exhibit B at 5–6, 10)[4]  Finally, this report is nearly two

---

[4] Documents properly relied on in support of a motion to dismiss include exhibits to the complaint or statements or documents incorporated by reference. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.'") (quoting *International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

years prior to the first discount window advance at issue,[5] and Relators make no attempt to analyze any call report dating from the time period at issue or to trace any of these alleged issues to the time period at issue.

The FAC does not allege that either Relator ever had any involvement at all with respect to any advances from the FRBs.  Nor does the FAC identify which Bank employees were involved in such transactions.  The FAC is utterly devoid of any facts identifying: who made the decisions to request the advances; what, if anything, those persons might have known about the business practices challenged by the Relators; and any facts suggesting any intention to act unlawfully by requesting a discount window advance or bidding to participate in a TAF auction.

## B.      The Federal Reserve System

The Federal Reserve Act of 1913 ("FRA") created the current "hybrid Federal Reserve System," which purposefully possesses both government and private characteristics.  (Exhibit C at 4)[6]  FRA established three branches operating together as the Federal Reserve System: the Board of Governors of the Federal Reserve ("Board of Governors"), the Federal Open Market Committee ("FOMC"), and twelve FRBs.  *See* 12 U.S.C. §§ 241–52, 263, 341–62.  As a whole, the Federal Reserve consists of "a combination of public and private characteristics."  H.R. Rep. No. 69, 63rd Cong., 1st Sess., at 18 (1913) (a courtesy copy is attached as Exhibit D).  Each entity within the Federal Reserve System possesses distinct authority and characteristics in order

---

[5] Appendix II to the FAC lists advances taken out under the discount window and through the TAF by Wachovia, during the period August 22, 2007 through February 26, 2009.  Appendix II also identifies a handful of TAF advances received by Wells Fargo Bank, N.A. during the period January 29, 2009 through May 21, 2009.

[6] The FAC relies on documents such as an OCC Handbook (¶ 107), statements from an FRB officer (¶ 168) and former Board of Governors Chair Ben Bernanke (¶ 169), and information from the Federal Reserve System's website (e.g., ¶ 188).  Reliance on similar materials in this motion to dismiss is appropriate.  *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Leonard F. v. Israel Disc. Bank*, 199 F.3d 99, 107 (2d Cir. 1999).

to maintain the unique public and private hybridity of the Federal Reserve's "decentralized operating structure." (Exhibit E at 2)

The FRA framers intended to create "individually organized and individually controlled" FRBs with "[t]he only factor of centralization . . . found in the Federal reserve board, which is to be a strictly Government organization created for the purpose of inspecting existing banking institutions and of regulating relationships between the Federal reserve banks and between them and the Government itself." H.R. Rep. No. 69, at 18. For example, the FRA charges the Board of Governors and the FOMC with the task of ensuring the long-term stability and potential of the United States financial markets. *See* 12 U.S.C. § 225a. The Board of Governors "exercises broad responsibility over the nation's payment system . . . and plays a major role in supervision and regulation of the U.S. banking system." 12 U.S.C. § 248(j). The President of the United States appoints the members of the Board, subject to Senate approval. *See* 12 U.S.C. §§ 241, 246. Thus, the Board of Governors acts as the Government component of the Federal Reserve System.

On the other hand, FRBs are corporations which are owned and capitalized by their member banks and not the Government. *See* 12 U.S.C. §§ 321–39a, 341. The FRBs act as non-government lenders to their member banks; FRBs accept deposits, make advances, and purchase commercial paper using funds provided by their member banks or earned through market activities. *See* 12 U.S.C. §§ 342, 347, 356. The board of directors for each FRB is controlled by its stockholders: six directors are stockholder-elected, whereas only three are appointed by the Board of Governors. *See* 12 U.S.C. §§ 301–02. Each FRB's board of directors functions "[m]uch like the boards of directors of private corporations," where the president's oversight of the daily operations is analogous to that of a private corporation chief executive officer. (Exhibit

E at 13)  Each FRB "holds the fluid funds of the region in which it is organized and each [is] ordinarily dependent on no other part of the country for assistance."  H.R. Rep. No. 69, at 18.   In these ways, the FRBs constitute the private, independent branch of the Federal Reserve System.

This hybrid model is also reflected in the manner in which certain Federal Reserve programs are established and carried out.  Of particular relevance to this case, the Board of Governors has the authority to establish discount window and advance programs but the execution of these programs rests exclusively within the authority of each local FRB.  *See* 12 U.S.C. §§ 347, 357.

## C.    The Discount Window, the Operating Circular and the TAF Program

Regulation A, 12 C.F.R. § 201.1 *et seq.*, ("Reg A") authorizes the FRBs to extend credit through the operation of discount window programs.  Both the discount window and the TAF are authorized by Reg A and administered by FRBs.  Requests for advances are made to a member bank's FRB. (Exhibit F at 1; *see also* Exhibit G at 3) The terms of discount window advances are governed by Operating Circular No. 10.[7]  Prior to 1998, each individual FRB published its own circular.   On January 2, 1998, these were replaced with a single uniform Circular No. 10. (Exhibit I, § 1.1 ("1998 Circular")) The Circular attaches as exhibits a package of form agreements and resolutions that must be provided by borrowers in order to borrow at the discount window.[8]  No other documents are required. (*See* Exhibit H ("Sept. 2006 Notice"))

---

[7]   As discussed below, TAF participation is also governed by Operating Circular No. 10. TAF operated between 2007 and 2010 under the 2006 Circular.

[8]   A borrower must submit the following package of documents to gain access to the discount window: (1) a Letter of Agreement in which the bank agrees to the provision of Operating Circular No. 10; (2) a Certificate providing all the information needed by the FRB to make an effective UCC-1 financing statement filing; (3) Resolutions authorizing the borrowing and pledging of collateral; and (4) an Authorization List of individuals, including their titles, authorized to borrow and pledge collateral on the institution's behalf.  The individuals named on this Authorization list are the persons who call the discount window officers to request advances (Exhibit 11).

**The 1998 Circular**

Section 9 of the 1998 Circular contains the borrower's representations and warranties, which are at issue in this case.  Under section 9.2, these are deemed to be made each time an advance is requested.  Sections 9.1(a) and (b) of the 1998 Circular required representations as to the borrower's legal authority and the binding nature of the Lending Agreement (which is defined to include all of the documents furnished to the FRB in connection with the discount window transactions (*see* Exhibit I § 2.1(m) of the 1998 Circular).  More specifically, section 9.1(a) stated that the borrower represents and warrants that:

> [U]nder applicable law, the regulations and policies of its chartering and/or licensing authority*,* and its charter, bylaws or similar governing documents, and pursuant to authorization by its governing body, it is authorized to execute and perform its obligations under the Lending Agreement, obtain Advances from, incur Indebtedness to, or Pledge Collateral to a Reserve Bank . . . .

Subsection (b) of section 9.1 contained a representation that "the Lending Agreement is valid and binding and enforceable in accordance with its terms."  (*Id*.)

Subsections (c) - (g) dealt with the collateral to be provided. Subsection (h) addressed possible environmental issues regarding any real property collateral and subsection (i) related to representations particular to foreign institutions.

The 1998 Circular had no counterparts to what would later be subsections (g) (no untrue statements in any documents furnished to the Federal Reserve in connection with the advances) and (i) (Events of Default) found in the 2006 Circular.  (*See* Exhibit J ("2006 Circular"))

**Discount Window Programs Before and After 2002**

As explained in more detail in the Defendants' original motion to dismiss (Doc. 58 at 18), prior to the 2003 revision of Reg A, there were three programs under the discount window: the adjustment credit, extended credit and seasonal credit programs.  The structure and requirements of these programs were such that banks were reluctant to utilize the discount window.

Effective January 9, 2003, the Board of Governors made substantial changes to the discount window, which were designed to make the programs more effectively serve the interests of "depository institutions, the Federal Reserve System, and the economy more generally." 67 Fed. Reg. 36544, 36545 (May 24, 2002) (Regulation A proposed rule) (a courtesy copy is attached as Exhibit K). Under the revised Reg A, the primary credit program replaced the adjustment credit program. The primary credit program was designed to eliminate issues that had made banks reluctant to use its predecessor, and in particular, to reduce the "administration" of discount window operations by "minimizing a Reserve Bank's need to question potential borrowers" as to their efforts to first borrow elsewhere and their intended use of the borrowed funds. *Id.*

The revised Reg A permits, but does not require, FRBs to extend credit under the primary credit program to banks that are, in the judgment of the FRB, in generally sound financial condition. *See* 12 C.F.R. § 201.4(a). Under the revised Reg A, eligibility for discount window loans is "based mainly on examination ratings and capitalization, although supplementary information, including market-based information when available, also could be used . . . Reserve Banks will extend primary credit on an overnight basis with minimal administrative requirements, unless an aspect of the request for funds suggests that the credit extension would not meet the conditions of primary credit." 67 Fed. Reg. 67777, 67780 (Nov. 7, 2002) (Regulation A final rule) (courtesy copy attached as Exhibit L).

The FRB website confirms that only minimal information is sought from borrowing banks:

> The Federal Reserve describes the primary credit program as a 'no questions asked' program with minimum administration. What does that mean?
>
> Under the amended Regulation A in place *since the beginning of 2003, qualified depository institutions seeking overnight primary credit ordinarily are asked to*

9

> *provide only the minimum amount of information necessary to process the loan. In nearly all cases, this would be limited to the amount and term of the loan.* Should an institution's pattern of borrowing or the nature of a particular borrowing request strongly indicate that the depository institution is not using primary credit as a backup source of short-term liquidity, or if the request raises questions regarding an institution's eligibility for primary credit, the Reserve Bank may seek additional information.

(Exhibit M at 4 (emphasis added))  Throughout the time period at issue, the procedure to obtain advances under the primary credit program was very simple.  Borrowing banks, having already provided FRBs with collateral and the exhibits to Operating Circular No. 10, need only have an authorized employee call the FRB with the amount requested and the number of days that the funds will be needed. (Exhibit F at 1 ("The Mechanics of Borrowing"))

The Federal Register issue containing the commentary and final rule adopting the revised Reg A made no reference to any intention to have borrowers make any new or additional representations in connection with the new discount window programs. The 1998 Circular continued to govern discount window transactions for the next four years, until the October 15, 2006 adoption of the 2006 Circular.

**2006 Circular**

On October 15, 2006, a revised Circular 10 went into effect.  The structure of the revised section 9.1 largely tracked the structure of section 9.1 in the 1998 Circular.  The first group of representations (subsections (a), (b) and (c)) dealt with the legal authority of the borrower and the binding nature of the loan transaction documents.  As in the 1998 Circular, these representations as to the borrower's legal authority were followed by representations dealing with the collateral (subsections (d) through (f)).  A new subsection (g) was added requiring a representation that no information provided for use in connection with the lending transactions was untrue as to any material fact.  Subsection (h) dealt with environmental issues (as did former subsection (h)).  A new subsection (i) added a representation that there was no Event of Default.

The 2006 Circular split the former subsection 9.1(a) into new subsections (a) and (b), which provide as follows:

(a)      (i) the Borrower has the power and authority, and the legal right, to make, deliver and perform the Lending Agreement and to obtain an Advance or otherwise incur indebtedness; (ii) the Borrower has taken all necessary organizational action to authorize the execution, delivery of the Lending Agreement and to authorize the obtaining of an Advance on the terms and conditions of the Lending Agreement; (iii) no consent or authorization of, filing with, notice to or other act by or in respect of, any governmental authority or any other person is required in connection with the obtaining of Advances hereunder or with the execution, delivery, performance, validity or enforceability of the Lending Agreement; and (iv) the Lending Agreement has been duly executed and delivered on behalf of the Borrower;

(b)      the Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and is not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement . . . .

(Exhibit J)

New subsection (c) continues to require the same sort of representation previously found in former subsection (b) of the 1998 Circular, namely, that the agreements delivered by the borrower were valid and binding obligations, enforceable according to their terms.

**The TAF Program**

Pursuant to its authority under Section 10B of FRA, the Board of Governors approved the establishment of the TAF as a temporary solution to strains on short-term funding markets, which ended in March of 2010.  (Exhibit N)  The TAF allowed financial institutions to place bids on term funds of various short-term maturities.  (Exhibit G at 1 (for ease of reference, pincites are made to printed page numbers))  The Board of Governors would announce the auction, determine the term and set the offering amount of TAF advances to be auctioned, the minimum bid rate and amount, and the maximum bid rate.  (*Id.* at 3)  After the announcement, eligible financial institutions would place their bid(s) directly to their local FRB during the bidding

11

period.  (*Id.*)  Eligibility for the TAF is the same as that for the discount window's primary credit, meaning that the institution needed to be "in generally sound financial condition as determined by its Local Reserve Bank."  12 C.F.R. § 201.4(e).  (*See also* Exhibit G at 2)  The local FRB also determined whether the financial institution satisfied the collateral requirements for the prospective advance.  (*Id.*)

Once the bidding period closed, the FRB discount window staff then ordered the bids according to rate.  (*Id.* at 3)  The "stop out rate"—the interest rate applied to all winning advances—was set once the bid amounts requested equaled or exceeded the total amount offered in the TAF announcement.  (*Id.* at 3–4)  If several institutions placed bids at the stop-out rate, but granting all of them would exceed the offered amount, the actual advance award to those institutions was prorated.[9]  (*Id.*)

Even after winning an auction, a FRB could deem a financial institution's collateral insufficient to cover its indebtedness under Circular No. 10 and could refuse to post the award to the institution's account.  (*Id.* at 4)  Further, if at any time while the advance was outstanding the financial institution "cease[d] to qualify for Primary Credit . . . the lending Reserve Bank may, in its sole discretion, accelerate the repayment of such Advance . . . ."  (*Id.*)  However, in a board conference, former Federal Reserve Chair Ben Bernanke noted that the Federal Reserve System "has suffered no losses" on advances made pursuant to either the discount window or TAF.  (Exhibit O at 2 (for ease of reference, pincites are made to printed page numbers))

---

[9] A review of the TAF data released pursuant to FOIA shows that Wachovia and Wells Fargo never placed a bid at the stop-out rate because they received round amounts that would not otherwise have been possible if multiplied by the proration variable published in the results for each of the twenty-eight auctions listed by Relators in Appendix II of the FAC.  (*See* Exhibit N)

**Eligibility and Supervision**

Each FRB determines whether to extend primary credit to a financial institution based on whether that institution "is in generally sound financial condition in the judgment of the Reserve Bank."  12 C.F.R. § 201.4(a).  FRBs may extend credit to "undercapitalized" or "severely undercapitalized" financial institutions with either proof of viability or in consultation with the Board of Governors.  *See* 12 C.F.R. § 201.5.

As described in more detail below, in making a judgment as to whether to extend credit to national banks, FRBs utilize information from the OCC, the FRBs' bank holding company examination data as well as other market and publicly available information.  *See* Decl. Brian Madigan at ¶ 11, Economist, Bd. of Governors of the Fed. Reserve Sys., *Bloomberg, L.P. v. Bd. Of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 262 (S.D.N.Y. 2009) (No. 08-cv-09595), ECF No. 13 (courtesy copy attached as Exhibit W).  The OCC (in coordination with other federal banking agencies) conducts annual examinations of national banks and assigns CAMELS ratings.  *See* 12 U.S.C. §§ 481, 1820(d).  (*See also* Exhibit E at 42–43, 83; Exhibit P at 1 (describing supervisory "philosophy and methods" and noting throughout that examiners make "judgments" about various kinds of risk)).  Although CAMELS are one component that FRBs consider when deciding to make advances, FRBs are the ultimate gatekeeper for judging whether to make an advance to a prospective borrower.  Just as a FRB may choose to lend, it is also under no obligation to extend credit.  *See* 12 C.F.R. § 201.4(d)(11).

## <u>RELATORS' PLEADING BURDEN</u>

Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is required where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 313 (2d Cir. 2012) ("The plausibility standard … asks for more than a sheer possibility that a defendant

has acted unlawfully." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). Although a plaintiff's well-pleaded allegations must be accepted as true, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not accept mere conclusory statements as true. *See Iqbal*, 556 U.S. at 678; *see also Galiano*, 684 F.3d at 315 (dismissing kickback scheme pled in a "conclusory and speculative manner").

FCA claims must be pleaded with particularity. *United States v. Glaxo Smith Kline, LLC*, 2013 WL 6085125, at *3 (E.D.N.Y. Oct. 18, 2013); *see also Universal Health Services, Inc. v. United States. ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016) (noting that FCA "plaintiffs must … plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.") "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted); *see also United States ex rel. Scharff v. Camelot Counseling*, 2016 WL 5416494, at *8 (S.D.N.Y. Sept. 28, 2016) (dismissing complaint where allegations of materiality were conclusory or insufficient); *United States ex rel. Southeastern Carpenters Reg'l Council v. Fulton Cnty.*, 2016 WL 4158392, at *8 (N.D. Ga. Aug. 5, 2016). As shown below, the claims asserted by Relators fail as a matter of law.

## ARGUMENT

## I. AN ADVANCE UNDER THE DISCOUNT WINDOW OR TERM AUCTION FACILITY IS NOT A "CLAIM" UNDER THE FCA.

Relators allege that the Banks violated the FCA when they applied for and obtained advances under the discount window and TAF from the Richmond and San Francisco FRBs. Even if the FAC allegations were otherwise sufficient (and they are not, for reasons set forth

14

below), advances under these programs cannot be the basis for an FCA action because they are not claims.

Relators refer to the Board of Governors and the FRBs collectively as the "U.S. Government," but the discount window and TAF are or were FRB-executed, and not Board of Governors, programs. (FAC, ¶ 1) The Operating Circular constituted an agreement between a borrowing bank and its FRB – not the Board of Governors. Further, the discount window and TAF did not operate using funds from the U.S. Treasury. Rather, advances are funded by the local FRB, and the FRB's funds in turn come from that local FRB's member banks and the revenue generated by that FRB's market activities. Therefore, discount window and TAF auctions cannot be the subject matter of an FCA claim.

The FCA applies only to conduct relating to claims made either to the United States or under certain conditions, to a private recipient of Government funds. *See* 31 U.S.C. § 3729(b)(2); *Escobar*, 136 S.Ct at 1996 ("A claim now includes direct requests to the Government for payment as well as reimbursement requests made to recipients of federal funds under federal benefits programs."). The FCA "attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment.'" *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)). A "claim" is a "demand for money or for some transfer of public property" that requires the Government to disburse public funds or to "otherwise suffer immediate financial detriment." *Rainwater v. United States*, 356 U.S. 590, 599 (1958). The definition of claim reflects the ultimate purpose of the FCA, which is to protect the Government fisc. *See United States v. McNinch*, 356 U.S. 595, 599 (1958) (holding that an application for federal insurance is not in and of itself a claim and stating that a "claim" under the FCA is one

15

that induces the Government to disburse funds or "otherwise suffer immediate financial detriment"); *see also United States ex rel. Shupe v. Cisco Sys.*, 759 F.3d 379, 385 (5th Cir. 2014) (concluding no FCA claim in part because the United States Treasury did not fund program at issue).

**A.    Discount Window and TAF Advances Are Not Funded by the United States Treasury.**

FRBs do "not receive funding through the congressional budgetary process. The Fed's income comes primarily from the interest on government securities that it has acquired through open market operations." (Exhibit Q) FRBs are capitalized by their stockholder member banks. 12 U.S.C. § 282. Their "operation is not government-financed." *Scott v. Federal Reserve Bank of Kansas City*, 406 F.3d 532, 537 (8th Cir. 2005) (holding that a FRB is not an agency under Fed. R. Civ. P. 4).[10]

Not only are the FRBs privately funded by member institutions, but discount window and TAF transactions are funded by crediting the amount to the reserve account that the banks maintain with the FRBs. (*See* Exhibit I at § 3.2; Exhibit J at §3.3) The FAC contains no fact allegations to the contrary. Thus, at no point were Government funds involved in discount window or TAF advances.

**B.    FRBs are Not the Government When Lending Money to Member Banks.**

The FCA does not apply to claims made to independent statutorily-created entities that do not disburse government funds. *See United States ex rel. Adams v. Aurora Loan Serv.*, 813 F.3d 1259, 1261 (9th Cir. 2016) (finding that Fannie Mae and Freddie Mac are not officers, employees or agents of the federal government for purposes of the FCA, despite their status as

---

[10] After paying expenses and a dividend to its stockholders, FRBs pay their profits to the U.S. Treasury (12 U.S.C. § 289), but that does not mean that advances made from private funds are "claims."

government chartered or sponsored corporations)[11]; *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 1032 (2005) (finding that Amtrak is not covered by the FCA, despite its mixed Government ownership); *see also United States ex rel. Fellhoelter v. Valley Milk Prods., LLC*, 617 F.Supp.2d 723 (E.D. Tenn. 2008) (funds paid out by the USDA to milk producers are not "claims" when the payments are privately funded).   In *Cisco Systems*, the Court of Appeals for the Fifth Circuit reversed the denial of a motion to dismiss an FCA action because the program at issue was funded from private sources and administered by an independent entity even though the FCC maintained regulatory supervision over the program.   759 F.3d at 384 (concluding that there was no claim where government had a regulatory interest in program but no government funds were at risk).

As observed in *Cisco Systems*, "[c]ourts differentiate between entities that are the Government and those that are not by looking at their statutes rather than the extent of Government supervision." *Id*. at 385 (citing *Totten*, 380 F.3d at 492).   In this instance, FRBs are chartered corporations pursuant to 12 U.S.C. § 341.   FRBs are owned by member banks and not the Government.   *See* 12 U.S.C. §§ 321–39a.   Those stockholders control the board of directors for each FRB by electing six of the nine directors.   *See* 12 U.S.C. §§ 301–02.   The FRA does not designate FRBs as government agencies.   FRB employees are not employed by the Government, and FRBs may enter into contracts, institute their own legal proceedings or be sued directly, hire and fire their own employees, and directly administer advance programs.   *See* 12 U.S.C. § 341.

---

[11]   Fannie Mae and Freddie Mac have been found to be federal instrumentalities for tax purposes. *Rust v. Johnson*, 597 F.2d 174 (9th Cir. 1979).   Thus, "just because an entity is considered a federal instrumentality for one purpose does not mean that the same entity is a federal instrumentality for another purpose."   *Adams*, 813 F.3d at 126. FRBs have likewise been found to be federal instrumentalities for tax purposes (*see Federal Reserve Bank of St. Louis v. Metrocentre Improvement Dist. #1*, 657 F.2d 183 (8th Cir. 1981)), but this does not mean that discount window advances are "claims."

The Court of Appeals for the Ninth Circuit has concluded that FRB employees are not government employees for purposes of the Federal Tort Claims Act. *See Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) (noting that those employees do not participate in the Civil Service Retirement System and that each FRB purchases private worker's compensation insurance rather than participating in the Federal Employees Compensation Act). The Court in *Lewis* concluded that each FRB is properly considered "a separate corporation owned by commercial banks in its region." *Id.* at 1241.

The Court of Appeals for the Second Circuit reviewed the relationship between the FRBs and the Board of Governors in the context of FRB lending operations when deciding whether the Board of Governors had responded properly to two different FOIA requests for FRB lending data. *See Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143 (2d Cir. 2010) and *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 161 (2d Cir. 2010). The Court of Appeals declined to decide whether a FRB was an "agency" within the meaning of FOIA (*see Bloomberg*, 601 F.3d at 149 n.2), but stated with respect to the discount window and other programs that "the Federal Reserve Banks did not issue each loan on 'behalf of the Board,' or under the 'delegated authority' of the Board" and that "the Board neither issues nor authorizes [] specific loans." *Fox News*, 601 F.3d at 161 (Jacobs, J., and Hall, J., concurring in part and in judgment, Leval, J., dissenting in part and concurring in judgment).[12]

---

[12] In these cases, the Board of Governors itself asserted that FRBs are "not an 'authority' of the U.S. government" under FOIA. *See* Def. Bd. of Governors of the Fed. Reserve Sys.'s Supp. Br. at 2, *Bloomberg*, 649 F. Supp. 2d 262, 266 (No. 08-cv-09595) [hereinafter "Bd. Supp. Br."] (courtesy copy attached as Exhibit R). Instead, the Board of Governors argued that a FRB "is not an establishment of the executive branch because it is a corporation whose stock is privately held, is overseen by a board of directors the majority of whom are privately appointed, and has no authority to promulgate rules or carry out typically executive functions." *Id.* at 2–3. In support of its position, the Board of Governors submitted declarations of Board and FRB employees. Among other statements, the declarations stated that "establishment and

18

Congress granted FRBs directly the authority to determine whether to make discount window advances and to whom. *See* 12 U.S.C. § 347. Because this authority is granted directly to the FRBs, rather than to the Board to then delegate to the FRBs, this authority is a solely private lending function of the FRBs. *See Fox News Network*, 601 F.3d at 161 ("The Federal Reserve [System] is structured to empower local institutions to lend, while permitting federal oversight.") (quoting *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 639 F. Supp. 2d 384, 396 (2d Cir. 2009)).[13]

While made using private funds, FRB discount window and TAF transactions certainly served interests of the federal government.[14] This fact does not transform these transactions into claims under the FCA. *See Cisco Systems*, 759 F.3d at 384; *Fellhoelter*, 617 F. Supp. 2d at 725 (program part of USDA regulatory scheme). Moreover, government agencies are not always acting as the Government even when undertaking their statutory duties. *See United States ex rel.*

---

administration" of the discount window and TAF are "commercial activity in which the [FRBs] are authorized to engage but the Board is not." Decl. Alison M. Thro at ¶ 21, Attorney, Bd. of Governors of the Fed. Reserve Sys., *Bloomberg, L.P. v. Bd. Of Governors of the Fed. Reserve Sys.*, 649 F. Supp. 262 (S.D.N.Y. 2009) (No. 08-cv-09595), ECF No. 12 (courtesy copy attached as Exhibit S).

[13] The Board of Governors oversees the FRBs and delegates some of its functions to FRBs, but it is prevented from transferring its central government powers of policymaking and rulemaking to the FRBs. *See* 12 U.S.C. § 248(k). Moreover, delegated powers (such as bank holding company examinations) are distinct from the power to lend to member institutions. 12 C.F.R. 265.11.

[14] "The Federal Reserve System extends credit with due regard to the basic objectives of monetary policy and the maintenance of a sound and orderly financial system." 12 C.F.R. § 201.1(b). Discount window lending serves as a "short-run safety valve for the overall banking system." (Exhibit T at 313 (*Proposed Revision to the Federal Reserve's discount window Programs*, Fed. Reserve Bulletin July 2002)) Extensions of credit can "help relieve liquidity strains in a depository institution and in the banking system as a whole" and help "ensure the basic stability of the payment system more generally by supplying liquidity during times of systemic stress." (Exhibit U at 1).

*Petras v. Simparel, Inc.*, 857 F.3d 407 (3d Cir. 2017) (SBA not acting as the government when acting as receiver for a federally charted, but private, entity in which it had invested).

The Banks interacted solely with the FRBs when applying for advances.  Member institutions submit lending documents directly to the FRB for their district.  *See* Operating Circular No. 10.  The FRBs then individually determine whether to make the advances.  For the TAF, "[FRB] discount window staff [would] contact Participants who have been awarded TAF [a]dvances . . . ."  (Exhibit G at 4)  Then, funded by member institutions, each "Federal Reserve Bank open[ed] up *its* vault" to credit the requesting institution.  (FAC, ¶ 30 (emphasis added)) For these reasons, the advances at issue in this case were not made by the United States or by an employee or agent acting on its behalf or with funds from the United States Treasury and are not claims within the meaning of the FCA.

## II.   RELATORS HAVE NOT ALLEGED A FALSE OR FRAUDULENT CLAIM BASED ON THE CORRECT INTERPRETATION OF SECTION 9.1(B).

This action should also be dismissed because correctly interpreted, section 9.1(b) only seeks a representation as to a borrower's legal authority with respect to its ability to perform under the Operating Circular. Relators do not allege that the Banks misrepresented their legal authority to perform.

Section 9.1(b) of the 2006 Circular states:

> The Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and is *not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability* of any of the terms of the Lending Agreement. (Emphasis added)

Relators contend that section 9.1(b) must be interpreted as requiring a borrower to represent that there are no violations of "any" laws or regulations that could, as a *factual* matter, have "any adverse effect whatsoever" upon the borrower's ability to enter into or perform its

obligations to the FRBs.  Relators are wrong; section 9.1(b) requires a representation that there exist no violations of any laws or regulations that would adversely affect the borrower's *legal* authority to enter into or perform its obligations to the FRB making the loans

Because the Operating Circular constitutes the contract between the FRB as lender and the bank as borrower, reference to basic contract interpretation principles is appropriate in determining the correct interpretation of section 9.1(b).  In interpreting a contract, "[t]he facts and circumstances surrounding the parties when they made the contract, and the purposes for which it was made, may be taken into consideration as an aid to the interpretation of the words used."[15]  *Flippo v. CSC Assocs. III*, 262 Va. 48, 64 (2001); *Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 149 (Ct. App. 1994).  If there is an ambiguity in a contract, it must be construed against its drafter. *Martin & Martin v. Bradley Enters.*, 256 Va. 288, 291 (1998); *Victoria v. Superior Court*, 710 P.2d 833 (Cal. 1985).  The language of section 9.1(b) as well as all of the facts and circumstances surrounding the parties and the adoption of the 2006 Operating Circular support the conclusion that Defendants' interpretation is correct.

*First,* the most natural reading of the text of subsection (b) is that it is only seeking a representation as to the borrower's legal authority rather than some sort of solvency representation.  The manner in which section 9.1(b) is drafted is inconsistent with an intention by the FRB to gain an assurance as to the financial health of a borrower.  If that were the FRBs' intention, subsection (b) would not be limited to situations where there are violations of laws or regulations.  Under Relators' interpretation, a borrower with financial difficulties but no ongoing

---

[15]  The 2006 Circular is governed by the law of the state in which the head office of the lending FRB is located. (Exhibit J at § 18.1).  Although the FAC does not identify which FRB made the loans, the Richmond FRB made loans to Wachovia and the San Francisco FRB made the Wells Fargo loans.  (Exhibit N) Therefore, Virginia and California law are relevant.  The basic contract interpretation principles are the same in both states.

violations of laws or regulations could accurately make the representation required.  It makes little sense to interpret section 9.1(b) as having been drafted for the purpose claimed by Relators given such a large gap in the scope of the representation required.  In contrast, Defendants' interpretation is consistent with the FRBs' intention to ensure that they had valid and binding obligations from its borrowers.  It is applicable "laws and regulations" that determine an institution's legal authority to act.

*Second,* the source from which subsection (b) was derived reinforces the view that Defendants' interpretation is correct.  Subsection (a) of the 1998 Circular contained a reference to whether "*applicable laws and regulations* legally authorized the borrower to enter into *and perform* the various loan and collateral agreements."  This reference to "laws and regulations" and to performance now appears in new subsection (b).  There, the representation is essentially the same as it was previously, other than being phrased as the non-existence of a negative (there are no violations) as opposed to a positive statement as to authority to perform under applicable laws and regulations.

*Third,* Defendants' interpretation is further reinforced by the interpretive principle known as "*noscitur a sociis,*" which counsels that words are given more precise content "by the neighboring words with which [they are] associated."  *United States v. Williams*, 553 U.S. 285, 294 (2008).  The nearest "neighbor" to the phrase in subsection (b) referring to "laws and regulations" is the opening phrase of the subsection, which states that "the Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization."  Manifestly, this is a representation as to the borrower's legal authority derived from being "validly existing and in good standing."  The following language referring to "laws and regulations" is most naturally viewed as referring to that same subject: the borrower's legal

22

authority.  This reading of the subsection as referring to legal authority is also consistent with the placement of the word "performance" in the subsection, referring to whether there would be any adverse effect on "the validity, performance or enforceability" of the parties' agreements.  The words "validity" and "enforceability" are commonly associated with whether a party has the legal authority to enter into valid and enforceable agreements.

This same interpretive principle applies with equal force with respect to the placement of subsection (b) in the overall section.  Subsection (b) is flanked by two subsections, (a) and (c), dealing with the borrower's legal authority.  Like its "neighbors," subsection (b) should be viewed as dealing with the borrower's legal authority.

*Fourth,* the FRBs' longstanding practice has been to not require any representation of the sort that Relators contend is embodied in section 9.1(b).  Rather, Defendants' interpretation of section 9.1(b) is consistent with the way that the FRBs have administered the discount window for decades.  FRBs begin with a great deal of information about the financial situation of its borrowers, because the FRB examines and supervises bank holding companies and also has access to the reports and ratings of the bank subsidiaries of these holding companies.  In contrast, as described above, FRBs have historically required borrowers to represent that they have the *legal* authority to enter into and perform their repayment and collateral agreements.  When the 2006 Circular was adopted, and the FRBs notified borrowers of the significant differences between it and its predecessor, there was no indication of any intention to change longstanding practice and now to require borrowers to make any representation of the sort that Relators contend is found in section 9.1(b).  Nor has the FRB ever published any notice or indication that section 9.1(b) was intended to be read as Relators contend.  (*See, e.g.*, Exhibit H ("Sept. 2006 Notice"))

To support their interpretation of section 9.1(b), Relators continue to assert incorrectly that the 2002 revision of the discount window program and Reg A "shifted the due diligence burden from the Federal Reserve to the borrowing institution." (FAC, ¶ 34)  As a result of this claimed "shift," Relators contend, the representation required by section 9.1(b) as to the borrower's factual ability to perform its obligations became "material and critical . . . as a precondition for each advance under the . . . primary credit program." (FAC, ¶ 31)

 Thus, as Relators present it, prior to the revision of Reg A, FRBs conducted general due diligence into the borrower's ability to repay discount window advances, but in 2003 the Board of Governors shifted this alleged due diligence burden by now requiring potential borrowers to make the sort of representation that Relators allege is required by section 9.1(b).

Relators are wrong.  The 1998 Circular did not change when the primary credit program began; rather, it remained unchanged and in effect until October 15, 2006.  Section 9.1(b) did not exist for the first four years of the primary credit program.  Thus, contrary to Relators' contention, no representation under section 9.1(b) could have been "material and critical" to obtaining an advance under the discount window's primary credit program.

Finally, if section 9.1(b) is ambiguous, under the rule of *contra proferentem* any ambiguity must be construed against the FRB.  The 2006 Circular was drafted by the FRBs and borrowers had no input into its terms.  Therefore, even assuming any ambiguity, section 9.1(b) must be construed as Defendants interpret it.

## III.   DISMISSAL IS REQUIRED EVEN UNDER RELATORS' INTERPRETATION.

### A.   No Violation of "Applicable Laws and Regulations."

Relators rely upon four sets of statutes or regulations, which they define as the "Applicable Laws and Regulations" as the basis for their argument that the section 9.1(b) representation was false because the Banks had violated a law.  (FAC, ¶ 4)  However, the FAC

fails to allege facts that support a plausible inference that any of the Banks were in violation of any of these laws or regulations.

The first of the Applicable Laws and Regulations are the safety and soundness regulations issued by each federal banking regulatory agency (*i.e.*, the OCC, Board of Governors, FDIC, and the Office of Thrift Supervision).[16]  (FAC, ¶ 4)  These regulations state that if an agency, through an examination or otherwise, finds that a bank has failed to satisfy the safety and soundness guidelines then the agency may require the bank to submit a compliance plan.  *E.g.*, 12 C.F.R. § 263.302.  The FAC does not contain any allegations concerning a request for a compliance plan.  Instead, the FAC alleges generically that Wachovia disregarded certain safety and soundness standards.  (FAC, ¶ 67)

The guidelines for safety and soundness practices are outlined in the *Interagency Guidelines Establishing Standards for Safety and Soundness*. 12 C.F.R. § 208, App. D-1 ("Interagency Guidelines").  These guidelines concern standards for management, compensation, and asset quality, earnings, and stock valuation. The safety and soundness regulations relied upon by Relators, however, do not impose legal obligations on banks. Rather, the regulations reflect the uniform standard that the agencies will use to ensure that the banks remain safe and sound.  *See* Interagency Guidelines, (iv) (stating that the Guidelines are not meant to dictate "how institutions must be managed and operated." Instead, they are "designed to identify potential safety and soundness concerns . . . before they pose a risk to the deposit insurance funds.").  Accordingly, the banks cannot "violate" these regulations in a manner that would make section 9.1(b) false unless they fail to submit a compliance plan, which Relators do not allege.

---

[16] The relevant regulations are 12 C.F.R. parts 3 and 30 (OCC); 12 C.F.R. part 263 (Federal Reserve); 12 C.F.R. part 570 (FDIC); and 12 C.F.R. part 308 (Office of Thrift Supervision). Each of the regulations contain the same language and information.

Second, Relators allege violations of the financial statement certification requirements imposed by the Sarbanes-Oxley Act of 2002 (Sections 302 and 906).[17]  (FAC, ¶ 5)  Section 302 requires an officer of the company to certify, among other things, that the quarterly and annual financial statements do not contain "any material untrue statements or material omission" and that the financial statements fairly present the bank's financial condition. Section 906 imposes a corresponding criminal violation for improperly certifying those reports. Relators do not identify sections of financial statements that they allege to be materially untrue such that the certification required in Section 302 would be false nor do they allege any facts concerning the certification of these financial statements.

Third, Relators assert violations of 18 U.S.C. §§ 1001 and 1005.  With respect to 18 U.S.C. § 1005, Relators allege that Wachovia and World Savings violated the statute "[b]y making false entries with an intent to deceive other officers of" Wachovia and World Savings. (FAC ¶¶ 67, 175)  Relators thus invoke the third paragraph of 18 U.S.C. § 1005, which imposes liability on "Whoever makes any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to . . . deceive any officer of such bank, company, branch, agency, or organization . . . ."  18 U.S.C. § 1005.

Courts have consistently held that the third paragraph of 18 U.S.C. § 1005 only applies to "bank insiders" and, therefore, cannot be used to impose liability on an entity such as a bank. *See, e.g., United States v. Rubin/Chambers, Dunhill Ins. Serv.*, 798 F. Supp. 2d 517, 52527 (S.D.N.Y. 2011); *see also United States v. Barel*, 939 F.2d 26, 39 (3d Cir. 1991); *United States v. Ortiz*, 906 F. Supp. 140, 144-46 & n.2 (E.D.N.Y. 1995); *United States v. Edwards*, 566 F. Supp.

---

[17]  Relators also point to Section 806 but this section concerns whistleblower protections and appears to be a mistaken citation.  Relators do not mention any allegation connected to whistleblowing in the FAC.

1219, 1220 (D. Conn. 1983).  The Banks clearly cannot violate a statute that does not apply to them.

Relators' factual allegations with respect to 18 U.S.C. § 1001 are too bare to plausibly allege a violation.  The elements of an 18 U.S.C. § 1001 violation are that the defendant: (i) made a statement; (ii) the statement was false, fictitious, or fraudulent; (iii) the statement was made knowingly; (iv) the statement was within the jurisdiction of a federal agency; and (v) the statement was material, i.e., influenced or was capable of influencing a government action or decision.  18 U.S.C. § 1001; *see also United States v. McGauley*, 279 F.3d 62, 69 (1st Cir. 2002).  Section 1001 is most often used to prosecute investigative targets who have lied to investigators during the course of an investigation.  *See United States v. Stewart*, 433 F.3d 273, 288-89 (2d Cir. 2006) (applying § 1001 to false statements made to federal investigators from the SEC, FBI and the US Attorneys' Office).  There are no such allegations here.  Even applying 18 U.S.C. § 1001 more broadly, Relators fail to meet the threshold required by *Iqbal*.  Relators have not pleaded facts identifying what false statement, within the jurisdiction of a federal agency, was knowingly made or how it was capable of influencing a government action or decision.  Simply stating that 18 U.S.C. § 1001 was violated is clearly insufficient.

Finally, Relators also argue that the Banks violated 12 U.S.C. § 161 which references the FDICA including, *inter alia*, 12 U.S.C. § 1817(a)(3) and § 1831n(a)(2)(A),[18] which promote uniform reporting to federal agencies that complies with GAAP.  (FAC, ¶ 4)  Sections 161 and 1817(a)(3) set forth call report guidelines.  The banking officer designated to make such a report must certify that "the report is true and correct to the best of his knowledge and belief."  12 U.S.C. § 161(a). Three directors of the bank must also attest that they have examined the report

---

[18] These statutes do not apply to statements filed with the SEC but to those filed with Federal banking agencies such as call reports.  12 U.S.C. § 1831n(a)(2)(A).

and that it is true and correct to the best of their knowledge.  *Id.*  Failure to submit a report or submitting a report with an error may result in a per diem penalty.  *See* 12 U.S.C. §§ 164(a), 1817(c)(4)(A).  Yet, the FAC does not allege that any of the call reports were filed late.  (FAC, ¶ 223)  Nor does the FAC contain any pleaded facts regarding who signed the call reports on behalf of the Banks and whether any of those individuals were unable to certify that the reports were true and correct to the best of their knowledge.  (FAC, ¶ 223)[19]  Merely assuming in a conclusory way that the call reports omitted or misstated information, without more, does not adequately alleged a violation of Section 161.

In sum, Relators fail to plead facts to support a claim that the Banks violated the Applicable Laws and Regulations.  Instead, Relators continue to only make blanket assertions that the rules were violated.  (*See* Exhibit A)  Such generic allegations are insufficient.  *Iqbal*, 556 U.S. at 678 (affirming the dismissal of the case and stating that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting *Twombly*, 550 U.S. at 544).

---

[19] Relators allege in a conclusory manner that call reports submitted to the OCC were inaccurate. (FAC, ¶¶ 219-225)  But the only call report mentioned specifically is the report for the quarter ending September 30, 2005, and as explained in detail above at Section III.A., Relators do not identify any specific line item that is wrong, and they do not identify how or to what extent any of the alleged problems would have impacted this call report.  Further, an allegation that a party did not follow GAAP does not by itself form the basis for finding a violation of law.  *See, e.g., DSAM Global Value Fund v. Altris Software*, 288 F.3d 385, 390 (9th Cir. 2002) (holding that establishing scienter requires "more than a misapplication of accounting principles.").  In *United States ex rel. Raynor v. Nat'l Rural Util. Coop. Fin., Corp.*, a relator argued that the company intentionally violated GAAP in order to "cover[] up significant loan losses and an embezzlement scheme."  2011 WL 976482 (D. Neb. Mar. 15, 2011), *aff'd*, 690 F.3d 951 (8th Cir. 2012).  The Court dismissed the case under Rule 12(b)(6) because "[e]ven taking the hundreds of allegations in the TAC as true, they do not state objective falsity" and cannot form the basis for a FCA violation.  *Id.*, at *9.

### B. No Alleged Violation of "Applicable Laws and Regulations" in 2007 or Thereafter.

The FAC does not contain any allegations regarding the operations or accounting practices employed by any of the Banks after mid-2006. As a result, even if the Court concludes that any of conduct alleged in the FAC plausibly alleges a violation in 2006 or earlier years, the FAC still does not allege a breach of the "Applicable Laws and Regulations" in 2007 or later years.

All of Relators' allegations pertaining to the operations or accounting practices of the Banks relate to conduct occurring prior to May 2006, when Relator Bishop's employment at World Savings was terminated and Relator Kraus was placed on leave from Wachovia before being terminated in September 2006. (FAC, ¶¶ 18, 19, 117) Relators do not allege that Wachovia began receiving discount window advances until August 2007. (FAC Appendix II) Relators fail to connect any of the pre-2007 conduct with a breach of any of the Applicable Laws and Regulations in 2007 or later. Relators simply make conclusory statements that Wachovia's financial statements and call reports from 2007 forward, and Wells Fargo's post-merger financial statements and call reports, were affected by the pre-2007 conduct without explaining what aspect was affected, how they were affected or why. (FAC, ¶ 98)

Relators do not allege any post-merger conduct by Wells Fargo, other than that Wells Fargo "limit[ed] its disclosure to saying it took over $219 billion of Wachovia CRE loans and corporate loans following the merger and has sustained losses on these assets." (FAC, ¶ 164) Relators fail to connect any of those losses with the alleged pre-2007 conduct, however, as opposed to loans from the many other lending units within Wachovia or the impact of the 2008 financial crisis and the related downturn of the real estate market. Relators have thus failed to

allege facts that plausibly show a violation of the Applicable Laws and Regulations at the time of the advances.

> ### C.      In any Event, Insufficient Facts Alleged Showing Potential "Adverse Effect."

Dismissal is also required because the FAC does not contain sufficient factual allegations to make "plausible" its contention that any of the alleged violations could adversely affect the Banks' ability to perform their obligations to the FRBs.  The FAC contains no facts seeking to "connect the dots" between the effect of the alleged violations and any inability to repay these loans – which were in fact timely repaid with interest.  Absent any facts making such a claim plausible, there is no showing that the representations given under section 9.1(b) were false.

## IV.      CLAIMS BASED ON SECTIONS 9.1(G) AND (I) MUST BE DISMISSED.

Neither *Escobar* nor the revised allegations of the FAC have any effect on the Court's prior ruling that Relators did not allege that Defendants provided the FRBs with falsified documents or information in connection with borrowing funds as required to assert a violation of 9.1(g), or that Relators failed to allege a violation of 9.1(i). Doc. No. 62, July 24, 2015 Memorandum Decision & Order; *see also Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 47 (2d Cir. 2016), *vacated on other grounds*, 137 S.Ct. 1067 (2017).

Section 9.1(g) states that no statement or information "furnished by the Borrower to the Bank or any other Reserve Bank *for use in connection with the transactions contemplated by the Lending Agreement*" is untrue as to any material fact or omission as of the date furnished. (Emphasis added).  The Court of Appeals previously observed, "Wachovia and Wells Fargo did not need to submit any financial information 'in connection with' borrowing through the discount window[.]"  823 F.3d at 47; *see also*, 12 C.F.R. § 201.4, *et seq.*  The FAC does not contain any new factual allegations to change this outcome.

30

Relators' theory regarding a violation of section 9.1(i) regarding Events of Default is derivative of whether there is a violation of subsections (b) and (g).  Relators have failed to allege a plausible violation of either (b) or (g) and therefore have not alleged an Event of Default that would cause the Banks to violate subsection (i).

## V.    RELATORS' IMPLIED CERTIFICATION CLAIM FAILS UNDER *ESCOBAR.*

The FAC does not contain allegations that meet the *Escobar* test that implied certification can be valid "at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods and services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001.  The FAC ignores the *Escobar* conditions and depends on a theory that the Banks made an actionable implied false certification as to their financial condition merely by seeking advances.  (FAC, ¶ 7)

The Court of Appeals for the Second Circuit has not yet applied *Escobar* to an implied certification claim. However, other Courts of Appeal applying *Escobar* have required that a request for payment contain specific representations. *See e.g. United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (finding defendant made no specific representations in connection with its claims for payment); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332-33 (9th Cir. 2017) (affirming dismissal where there were no specific representations in voucher forms and back-up documentation).  Further, most of the districts courts in this Circuit to consider the issue have held that, under *Escobar*, in order to state a false implied certification claim, the plaintiff must plead that the defendant "made specific representations that were rendered misleading by its failure to disclose noncompliance with material regulatory requirements."  *United States ex rel. Forcier v. Computer Sciences Corp.*, 2017 WL 3616665

*12 (S.D.N.Y. Aug. 10, 2017); *see also New York ex rel. Khurana v. Spherion Corp.*, 2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016); *United States ex rel. Tessler v. City of New York*, 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016); *United States ex rel. Kolchinsky v. Moody's Corp.*, 2017 WL 825478 (S.D.N.Y. Mar. 2, 2017);  *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276 (E.D.N.Y. 2017); *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, 2017 WL 2636037 (D. Conn. June 9,  2017); *United States ex rel. Hussain v. CDM Smith, Inc.*, 2017 WL 4326523, at *7 (S.D.N.Y. Sept. 27, 2017); *but see United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 811 (S.D.N.Y.).[20]

In *Escobar*, the Court found that by "using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided" various specific kinds of treatment. *Escobar*, 136 S. Ct. at 2000; *see also United States ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd.*, 2017 WL 1133956, at *6 (E.D. Pa. Mar. 27, 2017) (dismissing case in part because of lack of allegations regarding specific representations).

The Banks did not make a "'specific representation'" about creditworthiness or capitalization when seeking advances from the FRBs.  Rather, very little was required of banks when seeking an advance from the window, and Reg A does not require banks to provide any information to the FRBs.  *Bishop*, 823 F.3d at 40-41 (stating that Reg A is "explicit that any loan is made at the sole discretion of the Fed" and "does not require the borrowing banks themselves to provide any specific information").  In its statement of interest filed with the Second Circuit, the Government pointed to Operating Circular representations related to collateral, but none of these statements have anything to do with Relators' allegations in the FAC.  Br. for the United States

---

[20] The Government acknowledged to the Court of Appeals that under *Escobar,* the relevant question for an implied certification claim "is whether Wells Fargo has made 'specific representations about the goods or services provided.'"  Br. for the United States as Amicus Curiae Supporting Neither Party at 7, *Bishop*, 823 F.3d (June 6, 2017) (No. 12-2449).

as Amicus Curiae Supporting Neither Party at 7, *Bishop*, 823 F.3d (June 6, 2017) (No. 12-2449) (a courtesy copy is attached as Exhibit V).  Specifically, **none** of Relators' allegations in the FAC relate to collateral pledged by the Banks to the FRBs.  Moreover, neither Relator was in a position to know what collateral had been pledged.  Relators were not employed at the time of the advances nor do they allege that they ever had any involvement in discount window participation.

Banks also do not have to show or represent to the FRBs that they are in "generally sound financial condition."  Rather, this determination is made by the FRB in its *judgment*.  *See* 12 C.F.R. § 201.4(a) (the Reserve Bank makes the "judgment" as to whether an institution is in "generally sound financial condition").  (Exhibit E at 42–43, 83; Exhibit P)  *See also* Decl. Brian Madigan at ¶ 11, *Bloomberg, L.P*, 649 F. Supp. 262 (No. 08-cv-09595)  (stating "The financial condition of potential borrowers is carefully monitored, often in consultation with a borrower's primary regulator.  In addition, the [FRBs] only lend against acceptable collateral." And "The Board is only rarely involved in decisions regarding extension of credit to individual institutions.") (courtesy copy attached as Exhibit W).

Relators have not alleged any specific facts to render plausible their conclusory allegations that the Banks were not eligible for primary credit because they were not adequately capitalized in 2007-2009.  They have also not made allegations concerning the Banks' communications with the FRBs or what was known or thought by the FRBs in 2007 and later years – nor can they.  For example, Relators speculate that the Banks "misled regulators into issuing them unduly high supervisory ratings" (FAC, ¶ 8), and then admit that they have no knowledge of what Wachovia's ratings were, let alone what the specific rationales for Wachovia's ratings were at the time.  (*See, e.g.*, FAC, ¶ 9)  Relators have added allegations that

33

describe the CAMELS components, but these paragraphs do not contain any facts concerning the OCC's examinations of Wachovia.  (FAC, ¶¶ 190-216)  The Court should reject Relators' implied certification theory, unsupported by *Escobar* or any plausibly pled facts, and Relators' improper attempt to seek discovery for "unknown wrongs." *See Wood ex. rel. United States v. Applied Research Assocs.*, 328 Fed. App'x. 744, 747 (2d Cir. 2009) (quoting *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)) (stating that a relator's contention "that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage.")

## VI.   RELATORS' CLAIMS WOULD FRUSTRATE GOVERNMENT POLICY GOALS.

Courts have been careful not to broaden FCA liability in such a way that it actually undermines Governmental policy goals.  *See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008) (affirming dismissal where allowing claim "would undermine the government's own administrative scheme"). Since the Court first dismissed this case, the Court of Appeals for the First Circuit expressed similar concerns when affirming dismissal of a qui tam action alleging fraud in obtaining FDA approval for a medical device. *United States ex rel. D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016). The Court commented:

> To rule otherwise would be to turn the FCA into a tool with which a jury of six people could retroactively eliminate the value of FDA approval and effectively require that a product largely be withdrawn from the market even when the FDA itself sees no reason to do so. The FCA exists to protect the government from paying fraudulent claims, not to second-guess agencies' judgments about whether to rescind regulatory rulings.

*Id*. at 8. Adopting Relators' interpretation of section 9.1(b) or their implied certification theory would discourage use of the discount window and thus interfere with the Federal Reserve System's ability to fulfill its mission.  *See Bishop*, 823 F.3d at 39.

34

The primary credit program was introduced to facilitate use of the discount window, which in turn would further the Federal Reserve System's mission of "ensur[ing] the stability of the nation's monetary and financial system." *Id*. at 46 (citations omitted). Relators' interpretation would frustrate these goals. Banks using the window would run the risk of a groundless qui tam lawsuit based on: (1) an alleged violation of any law or regulation that "could have any effect whatsoever" on the ability to perform financially or (2) what amounts to second guessing of complicated judgments made by banking examiners. (*See, e.g.,* FAC ¶ 189 questioning correctness of supervisory ratings). They would face this risk even if they repaid window advances fully on time with interest. The extensive self-examination and vetting of examination outcomes required before using the window would also be at odds with what the Court of Appeals found with respect to the operation of the program:

> Indeed, purposefully little is required of the borrower at the time of the loan; the Fed describes the primary credit program as a 'no questions asked program with minimum administration,' meaning that 'qualified depository institutions seeking overnight primary credit ordinarily are asked to provide only the minimum amount of information necessary to process the loan. In nearly all cases, this would be limited to the amount and term of the loan.' J.A. 437. The Fed clarified that these changes were necessary to induce banks to borrow from it, in turn increasing the Fed's ability to protect the financial system. *See* 67 Fed. Reg. at 67,778.

*Id*. at 40. The concerns that the Court of Appeals expressed with "[incentivizing] individuals to bring suit without regard for the larger implications on the financial system" are not discounted by *Escobar*. 823 F.3d at 46; *see also D'Agostino*, 845 F.3d at 8-9. It remains the case that "[p]ermitting qui tam plaintiffs like the relators here to proceed on the facts of this case could discourage banks from accessing the discount window." 823 F.3d at 46. The Court should affirm dismissal because Relators' claims hurt the Federal Reserve System's ability to implement monetary policy and are contradicted by Reg A's text and purpose.

## VII.  THE FAC DOES NOT ALLEGE A KNOWINGLY FALSE CERTIFICATION OR CLAIM.

Under the FCA, the claim at issue must be knowingly and objectively false. 31 U.S.C. §
3729; *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376-77 (4th Cir.
2008) (affirming denial of leave to amend where representations were vague and the alleged
violations could not qualify as objective falsehoods); *see also Shields v. Citytrust Bancorp.*, 25
F.3d 1124, 1128 (2d Cir. 1994) (fraud complaint must "allege facts that give rise to a strong
inference of fraudulent intent.") (*citing O'Brien v. National Property Analysts Partners*, 936
F.2d 674, 676 (2d Cir. 1991)).   A person acts "knowingly" when he speaks with "actual
knowledge" of the falsity of what is being said, acts "in deliberate ignorance of [its] truth or
falsity," or speaks with "reckless disregard of [its] truth or falsity."  *United States ex rel. Grupp
v. DHL Express (USA), Inc.*, 47 F.Supp.3d 171, 175 (W.D.N.Y. 2014).   In *Escobar*, the Court
stated that the FCA's scienter requirement is "rigorous" and should be strictly enforced. *Escobar*,
136 S. Ct. at 2002.

### A.  Defendants' Reasonable Interpretation of Section 9.1(b) Cannot Constitute a Knowingly False Certification.

At a minimum, Defendants' interpretation of Section 9.1(b) is objectively reasonable, and
the FAC does not allege facts to show that there was any reason to doubt this interpretation.
"'[D]ifferences in interpretation growing out of a disputed legal question' involving the terms of
a contract" do not constitute a false statement. *United States ex rel. Yannacopoulos v. Gen.
Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011) (citations omitted).  Where a regulation or contract
is subject to more than one reasonable interpretation, one of which renders the defendant's
statement true, then the statement is not "knowingly" false within the meaning of the FCA.
*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir.
2008) (granting summary judgment where parties disagreed on interpretation of ambiguous

contract and relator could not point to evidence that defendant was warned that its interpretation was wrong); *see also United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 805 (8th Cir. 2001).

Other courts have similarly held that dismissal of FCA claims is warranted at the pleading stage where a representation was truthful under an objectively reasonable interpretation of a contract or statute. *See, e.g., Grupp*, 47 F.Supp.3d at 177 (Rule 12(b)(6) dismissal where defendant's contract interpretation was reasonable, and pleading lacked facts sufficient to strongly support an inference of fraud), *aff'd on other grounds*, 604 F. App'x 40 (unpublished summary order); *United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) (Rule 12(b)(6) dismissal; "An FCA defendant does not act with the knowledge that the FCA requires . . . when the defendant's interpretation . . . is a reasonable interpretation") (internal citation omitted); *United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*, 2011 WL 976482, at \*9 (D. Neb. Mar. 15, 2011) (Rule 12(b)(6) dismissal where "[n]othing indicates that [plaintiff's] allegations of GAAP violations are anything more than imprecise statements or differences in interpretation of a disputed or unclear legal question, neither of which are false claims under the FCA"). "Vague allegations" that the defendant knew or was reckless in not knowing its interpretation was wrong are insufficient. *United States ex rel. Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 1000 (7th Cir. 2014) (affirming FCA dismissal and rejecting relator's argument that it was fair to assume that because of the corporate defendant's sophistication and experience, it knew its interpretation was incorrect).

Defendants' interpretation of section 9.1(b) is at the very least reasonable. This Court previously noted that Relators' interpretation of section 9.1(b) "defies common sense," and that "[i]f the Federal Reserve wanted a disclosure of any historical regulatory violation that could

conceivably be traced to a negative impact on the borrowing bank's balance sheet, it would have found a less obtuse way to ask for it." *Kraus*, 117 F.Supp.3d at 221 n.4. Because under Defendants' reasonable interpretation of section 9.1(b), the claims were not knowingly or objectively false, section 9.1(b) cannot be the basis for a false certification.

### B.        Knowing Falsity Cannot Be Based On "Collective Knowledge."

Relators also fail to satisfy their burden to plead facts showing that the loan requests were "knowingly" false because they rely on "collective knowledge" to establish scienter. As previously mentioned, the FAC does not identify which individuals were involved in requesting advances from the FRBs, much less provide any facts indicating that any of those unnamed individuals had any idea that: (a) any of the business activities criticized by Relators occurred or were improper; (b) they had led to violations of any laws or regulations; or (c) those violations might adversely affect the Bank's ability to repay the loans and to otherwise perform their discount window obligations.

Relators evidently are seeking to prove scienter by piecing together the knowledge of the participants in the underlying activities with those of the Bank employees making the loan requests, employing a "collective knowledge" approach.   In *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010), the Court held that it would only be appropriate to impose liability on a constructive knowledge basis when the defendant "deliberately avoided learning the truth or engaged in aggravated gross negligence" and noted that there was "no circuit that has applied the 'collective knowledge' theory to the FCA."

Application of a collective knowledge theory would be especially unwarranted here.  The FAC does not contain any allegations of underlying allegedly improper business practices by World Savings and Wachovia that post-date mid-year 2006.  (See FAC, ¶¶ 110, 145, 151, 199). The first loans listed by Relators that are supposedly the false claims did not occur until late

38

August 2007, over a year later.  The FAC does not contain any factual allegations that connect their complaints about the business conduct with knowledge on the part of those requesting advances or making TAF auction bids. Relators have also failed to allege any facts to show that the individuals submitting these loan requests sought to deliberately avoid learning the truth or engaged in aggravated gross negligence.  The FAC must be dismissed because it fails to plead that there were any "knowing" violations of the FCA.

## VIII.   RELATORS HAVE NOT PLED THE REQUISITE MATERIALITY TO SUSTAIN AN FCA CLAIM.

In *Escobar*, the Supreme Court held that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable [under the FCA]."  136 S. Ct. at 1996.  The Court described the materiality standard repeatedly as both "rigorous" and "demanding," and noted that it should be strictly enforced in order to address "concerns about fair notice and open-ended liability" under the FCA.  *Id.* at 1996, 2002, 2003, 2004 n.6.  The Court also specified that materiality must be pled with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b).  *Id.* at 2004 n.6.  The Court expressly rejected the assertion "that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss . . . ."  *Id.*

Under *Escobar*, the Government's express designation of a provision as a "condition of payment" is relevant but not dispositive to the materiality inquiry.  *Id.* at 2003.  The fact that the Government has the option to decline payment if it knew of the defendant's noncompliance is insufficient to establish materiality.  *Id.*  In addition, materiality "cannot be found where noncompliance is minor or insubstantial."  *Id.*

The Court placed a renewed emphasis on the knowledge and conduct of the Government in assessing materiality.  The Court held that "if the government pays a particular claim in full

despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements were not material." *Id.* at 2003-04. Likewise, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.*

To plead materiality under *Escobar*, Relators needed to allege facts demonstrating that the Defendants "misrepresented matters so central to [the Circular] that the government would not have paid claims [or made advances to Defendants under the discount window or the TAF] had it known of [the alleged] violations." *United States ex rel. Southeastern Carpenters Reg'l Council v. Fulton Cnty.,* 2016 WL 4158392, at *8 (N.D. Ga. Aug. 5, 2016) (quoting *Escobar*, 136 S.Ct. at 2003); *see also United States ex rel. Thomas v. Black & Veach Special Projects Corp.*, 820 F.3d 1162, 1172 (10th Cir. 2016) (materiality not satisfied because the allegedly false statements had no effect on the Government's decision to pay the defendant). Relators have not met this burden. In fact, according to Relators' allegations, the FRBs continued to make advances to the Defendants under the discount window and TAF, even after the Relators disclosed their allegations to the Government. Relators have therefore failed to meet *Escobar*'s "rigorous" and "demanding" materiality standard, and the FAC should be dismissed in its entirety.

### A. Relators Have Not Sufficiently Alleged that the Defendants Made Material Misrepresentations to the Government.

Relators have not adequately pled facts that would support a finding that Defendants misrepresented matters so central to the discount window, the TAF, or the Operating Circular, such that the FRBs would not have made advances to Defendants under the discount window or the TAF had it known of the alleged misrepresentations.

40

Relators have not pled facts alleging that Defendants made any misrepresentations to the FRBs in connection with the discount window or TAF whatsoever.  Relators have not connected their allegations occurring prior to May 2006 to the section 9.1 certifications made in August 2007 and later.  Nor have Relators asserted facts sufficient to support a finding that the Banks' alleged conduct prior to May 2006 made the Banks ineligible for primary credit under Reg A on or after August 2007.  Relators have not made any specific allegations about the effect on the Banks' balance sheets or connected the alleged misconduct occurring in and prior to 2006 with any particularized factual allegations that any of the Banks was not adequately capitalized beginning in August 2007. *See, e.g.*, *Scharff*, 2016 WL 5416494, at *8 (dismissing FCA complaint because, *inter alia*, it did not "connect specific conduct … to specific submissions").

Relators have not alleged a violation of the FRA or Reg A.  Instead, they appear to allege that, if the FRBs had known of the alleged underlying business conduct, the Banks would not have been eligible for primary credit and "the Federal Reserve would have had to necessarily deny each of the Banks access to and participation in the Federal Programs."  (FAC, ¶ 189) Relators base this assertion on their unsubstantiated conclusion that, had the alleged fraud "been known, it would have resulted in the Banks receiving the lowest composite supervisory rating, thereby prohibiting its access to the Federal Programs by law and regulation"; "it would have revealed that the Banks were not adequately capitalized"; and it "would have constituted supplementary information that would have made the Federal Reserve deny them access to the Federal Programs pursuant to the Federal Reserve Act and Regulation A."  (*Id.*)

Relators essentially argue that, but for the alleged fraud, the Banks would never have been able to access the discount window or the TAF.  To the extent Relators added the allegations about eligibility to the FAC in an attempt to comply with *Escobar*'s heightened

materiality standard, these allegations fail because Relators conflate causation with materiality. Materiality cannot "be established by proving that the alleged fraud was the 'but for' cause of the submitted claim." *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 491 (3d Cir. 2017).  Causation is "a separate element of a False Claims Act cause of action." *Id.*  Indeed, even causation cannot be shown "merely by showing 'but for' causation." *Id.*  Relators' allegations regarding eligibility for the discount window and the TAF are therefore insufficient to allege either causation or materiality.

Moreover, even if eligibility was relevant to the materiality inquiry, the allegations in paragraphs 186-230 of the FAC are either conclusory or speculative and contain no facts that could establish materiality.   The FAC includes only conclusory assertions[21] that the Banks "would have received the lowest composite supervisory rating possible" if the OCC had known of the purported fraud (*see, e.g.*, FAC, ¶ 194), and Relators do not cite a single fact allegation that would support such a conclusion.  Relators plead no facts concerning the OCC's examination of Wachovia and implicitly admit that they have no knowledge of what was known by the OCC or FRBs in 2007-09. (*See, e.g.*, FAC, ¶ 189 (alleging that if information was known, then supervisory rating may not have been correct and FRB "could not, in good faith, allow access" to primary credit))  They do not allege a single instance wherein a FRB refused to advance funds under the discount window or the TAF, or initiated an action to recover advances paid under the discount window or the TAF to financial institutions whether because of a failure to make section 9.1 certifications or violations of the "Applicable Laws and Regulations" or because an institution was not adequately capitalized.  Relators have therefore failed to plead the materiality of any statutory, regulatory or contractual FRB lending requirement, and the FAC must be

---

[21] Conclusory allegations of materiality are insufficient.  *See, e.g.*, *Scharff*, 2016 WL 5416494, at *8.

dismissed.  *See, e.g.*, *Schimelpfenig*, 2017 WL 1133956 at *7 (dismissing FCA claims where, "[b]eyond broad conclusory statements," the complaint did "little to allege" materiality).

**B.     None of the Alleged False Certifications Could Have Been Material Because FRBs Continued Making Advances to the Banks Even After Becoming Aware of the Relators' Allegations.**

Relators' own allegations show that the matters of which they complain were *not* material.  Relators admit that they informed the Government about the allegations forming the basis for their claims as early as 2007, and that the FRBs nevertheless continued issuing advances to the Defendants under the discount window and the TAF on at least thirty different occasions, from August 2007 through May 2009.  (FAC, ¶¶ 155, 185; Appendix II)  Thus, any assertion that the alleged conduct was material is belied by the FRBs' continued issuance of advances to the Defendants, even after the Government became aware of the purported "fraud."

Since *Escobar* was decided, courts have routinely dismissed or affirmed dismissal of FCA complaints when the relator's chronology indicates that the government paid claims in full despite knowledge that certain requirements were violated.  In *D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016), the court affirmed dismissal of an FCA claim under Rule 12(b)(6), holding that the fact that the government continued to reimburse the defendant in the wake of relator's allegations "casts serious doubt on the materiality" of the purportedly fraudulent representations. *Id.* at 7.  In *United States v. Sanford-Brown, Ltd.*, the court affirmed dismissal of an FCA claim for lack of materiality because the government had "already examined [the defendant] multiple times over and concluded that neither administrative penalties nor termination was warranted." 840 F.3d at 447; *see also United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (affirming summary judgment in favor of the defendant based on materiality because the government investigated the relator's allegations and nevertheless did not disallow any of the defendant's charged costs); *United States ex rel. Harman v. Trinity Indus.*, 872 F.3d

43

645, 668 (5th Cir. 2017) (granting judgment as a matter of law in favor of defendant based on materiality because, *inter alia*, the relator disclosed the purported fraud to the government both in a presentation and through his complaint, and the government nevertheless paid defendant "because it was not persuaded by the allegations").

Indeed, earlier this year, this Court dismissed an FCA complaint for want of materiality because the Government continued to pay the defendants, despite learning of their alleged fraud. *United States v. Catholic Health System of Long Island, Inc.*, 2017 WL 1239589, at *23 (E.D.N.Y. Mar. 31, 2017).  Similarly, in *United States ex rel. Kolchinsky v. Moody's Corp.*, 2017 WL 825478 (S.D.N.Y. Mar. 2, 2017), the court held that *Escobar* defeated the relator's FCA claim because relator's claims "relate to a time period at which the Government – and the general public – was on notice of the very facts relied upon to support the fraud alleged here." *Id.* at *6.  And, as the "Complaint and its spreadsheet appendix establish, the Government has nonetheless continued to pay" the defendant each year.  *Id.*  "Sources abound regarding pre-2009 studies . . . and ultimately, media reports holding credit reporting agencies [like the defendant] responsible for aspects of the financial crisis."  *Id.*  The relator "provide[d] no allegation giving rise to an inference that any listed agency could have been unaware of the alleged fraud during the proscribed time period."  *Id.*

Relators' own allegations demonstrate that the alleged conduct was not material.  Relator Kraus reported his allegations of fraud to the FBI in 2007 and to the SEC in 2009.  (FAC, ¶ 155) Relator Bishop likewise reported his allegations of fraud to the SEC.  (FAC, ¶ 185) Nevertheless, the FRBs continued issuing advances to Defendants under the discount window and the TAF, from August 2007 through at least May 2009, on more than thirty different occasions.  (*See* FAC, Appendix II)

In addition, the Banks were subject to continuous and ongoing review by the Federal Reserve in its supervisory role,[22] and the OCC.  (*See* Exhibit X at 60; Exhibit P at 1; Exhibit Y at 304 ("FCIC Report"))[23]   Indeed, as explained in the FCIC Report, which was delivered on January 27, 2011 – almost ten months before Relators filed their Complaint – the Government's knowledge of Wachovia's liquidity challenges beginning no later than July 2008 is well-documented.   In July 2008, based on the results of examinations and inspections conducted pursuant to its supervisory responsibilities, the Federal Reserve downgraded Wachovia's rating to a 3, and "criticized the board and senior management for 'an environment with inconsistent and inadequate identification, escalation and coverage of all risk-taking activities.'"  (Exhibit Y at 305).  "Nonetheless, the Fed concluded that Wachovia's liquidity was currently adequate and

---

[22] Both the Board of Governors and the FRBs, under delegated authority from the Board, have supervisory responsibilities over financial institutions. (Exhibit 29 at 45) The Board of Governors oversees the FRBs' examination and supervision of various banking institutions.  (*Id.* at 10)  Thus, although the FRBs are not acting as a government entity in their role in connection with the discount window and the TAF, because the FRBs are acting pursuant to authority delegated to them by the Board of Governors when acting in a supervisory role, any knowledge gained by the FRBs in connection with their supervisory responsibilities can fairly be characterized as government knowledge.

[23] The Financial Crisis Inquiry Commission ("FCIC") was created on May 20, 2009 as part of the Fraud Enforcement and Recovery Act (Pub. L. 111-21, S. 386, 123 Stat. 1617 ("FERA")). The FCIC was created "to examine the causes, domestic and global, of the current financial and economic crisis in the United States."  (FERA, § 5(a)).  The FCIC consisted of an independent, ten-member panel composed of private citizens "with national recognition and significant depth of experience in such fields as banking, regulation of markets, taxation, finance, economics, consumer protection, and housing" who were appointed by Congress.  (FERA, § 5(b)). Congress, through FERA, instructed the FCIC to examine the collapse of major financial institutions that failed or would have failed if not for assistance from the government, and specified topics for inquiry including, *inter alia*, fraud and abuse in the financial sector, monetary policy and the availability and terms of credit, accounting practices including mark-to-market fair value rules and the treatment of off-balance sheet vehicles, capital requirements and regulations on leverage and liquidity, lending practices and securitization, and financial institution reliance on numerical models.  (FERA, § 5(c)).  The FCIC delivered its report on January 27, 2011.  Wachovia's 2008 difficulties related primarily to liquidity strains in the market and deposit runs; the FCIC Report did not point to any internal fraud within Wachovia. (*See* Exhibit Y)

that throughout the market disruption, management had minimized exposure to overnight funding markets." (*Id.*)  Similarly, on August 4, 2008, the OCC downgraded Wachovia and assessed its overall risk profile as "high."  (*Id.*)  Nevertheless, the Richmond FRB continued to issue advances to Wachovia under the TAF on six different occasions in July and August.  (FAC, Appendix II)

On September 11, 2008, Wachovia executives "met Fed officials to ask for an exemption from rules that limited holding companies' use of insured deposits to meet their liquidity needs." (Exhibit Y at 366)  On September 19, Wachovia's request to use insured deposits to provide liquidity to the holding company was approved.  (*Id.*)  Nevertheless, the Richmond FRB continued to issue advances to Wachovia under the discount window and the TAF through the date of the Wachovia merger with Wells Fargo, on twelve different occasions.  (FAC, Appendix II)

Finally, by Order entered October 12, 2008, the Board of Governors approved Wells Fargo's application to acquire Wachovia.  (*See* Exhibit Z)  The Statement issued by the Board of Governors in connection with this approval demonstrates that: (1) Wachovia and post-merger Wells Fargo were simply too large for alleged problems with assets worth $18 – $22 billion as alleged by Relators to have had a material impact on their capitalization, [24] and (2) the Board and the FRBs carefully considered evidence from multiple sources concerning the financial and managerial resources of both entities.  (*Id.*)  The Board stated that it was approving the merger on an expedited basis in part because of Wachovia's "weakened condition."  (*Id.*)  However, the

---

[24] As of June 30, 2008, Wachovia was the third largest depository institution in the United States with assets of $812.4 billion. (Exhibit AA) The combined post-merger Wells Fargo entity was anticipated to have total consolidated assets of approximately $1.37 trillion.  (*Id.*)  In fact, the Statement contains a detailed review of the deposits under the Banks' control as part of ensuring that the combined bank post-closing would not run afoul of limits on deposit concentration.  (*Id.*)

Board expressly found that Wells Fargo and the Wachovia depository institutions were "well capitalized" (*Id.* at 22) and after considering both federal and state supervisory and examination data, publicly reported and other financial information as well as public comments, the Board concluded that the financial resources of both entities were sufficient to support the merger.  (*Id.*) With respect to materiality, the Board's Statement shows that the Board and the FRBs had carefully examined Wachovia's financial condition as of October 12, 2008, (including public comments that were critical of that condition), and yet FRBs continued to make advances to Wachovia and Wells Fargo. Under *Escobar*, continued issuance of advances to Defendants despite actual knowledge of Relators' allegations and the financial circumstances of both Wachovia and Wells Fargo forecloses a well-pled allegation of materiality, and the FAC should therefore be dismissed.

## IX.    THE CONSPIRACY CLAIM MUST BE DISMISSED.

The above described pleading deficiencies also require dismissal of the conspiracy claim. As shown above, there was nothing unlawful in requesting advances from the FRBs.  As a result, there can be no actionable conspiracy claim with regard to those loans. "An agreement to commit a lawful act by lawful means . . . is not actionable."   *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co*., 2000 WL 1207162, at *11 (E.D. Pa. Aug. 24, 2000).  For example, in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 335 (S.D.N.Y. 2004), the Court dismissed an FCA conspiracy count for this reason, where there could be no underlying violation because the allegedly false document submitted was not a "claim" because it was not a request for payment. *See also United States ex rel. Vigil v. Nelnet, Inc.,* 639 F.3d 791, 801 (8th Cir. 2011) (concluding that because the complaint failed to state an FCA claim, it also failed "to state an actionable conspiracy claim"); *United States ex rel. Potra v. Jacobson Companies, Inc.*, 2014 WL 1275501, *4 (N.D. Ga. Mar. 27, 2014) (dismissing conspiracy claim

where underlying FCA claim dismissed); *United States. ex rel. Phillips v. L-3 Communs. Integrated Sys., L.P.*, 2012 WL 3649699, *8 (N.D. Tex. Aug. 24, 2012) (same).

The conspiracy claim must also be dismissed because it has not been adequately pleaded. *See United States ex rel. Ahumada v. Nish,* 756 F.3d 268, 282 (4th Cir. 2014) (dismissing FCA conspiracy claim where it "fail[ed] to meet even the basic plausibility standard of Rule 8(a), much less the more stringent particularity requirement of Rule 9(b)"); *Phillips*, 2012 WL 3649699 at *8 (applying Rule (9)(b) to FCA conspiracy claim).

"An agreement among two or more persons to commit a crime is the essence of conspiracy." *Blusal Meats. v. United States,* 638 F. Supp. 824, 828 (S.D.N.Y. 1986), *affirmed on other grounds,* 817 F.2d 1007 (2d Cir. 1987).  Where a complaint contains only conclusory allegations with regard to a claimed conspiracy, the claim must be dismissed.  *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 815 (S.D.N.Y. 2010) (Kaplan, J.) (relator has "made only conclusory allegations with regards to the claimed conspiracy, failing to plead any facts making plausible an unlawful agreement").  To adequately plead a conspiracy, the relator must provide facts to make plausible the assertion that two or more persons reached an agreement to get a false claim paid, and committed an overt act in furtherance of that unlawful agreement.  *United States ex rel. Amin v. George Washington Univ.,* 26 F. Supp. 2d 162, 164–65 (D.D.C. 1998) (dismissing complaint where relators failed to "identify any agreement between the parties to defraud the government or to engage in any act that could constitute an attempt to defraud the government").

The FAC makes no *factual* allegations as to the when and how any agreement was reached to submit false claims.  Paragraph 250 of the FAC does nothing more than make the boilerplate conclusory allegation that the Defendants, their officers and directors "entered into a

48

conspiracy or conspiracies with each other and with other unnamed co-conspirators, including its or their auditors and accountants" to defraud the Government by presenting false claims to payment or approval.  The FAC does not allege who reached the alleged agreement, when, by what means (in person, by phone, by emails) or any facts to support a contention that the alleged co-conspirators had as their object to get a false claim paid.

The conspiracy claim is also barred by the intra-corporate conspiracy doctrine, which applies to FCA claims.  *See, e.g.*, *United States ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007); *United States ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660, *10 (C.D. Ill. Oct. 25, 2013).   That doctrine forecloses conspiracy claims between and among a corporation, its subsidiaries and employees and separate corporations acting together preceding a merger.  *United States ex rel. Greenfield v. Medco Health Sys., Inc.,* 2014 WL 4798637, *12 (D.N.J. Sept. 26, 2014); *Broich v. Inc. Vill. of Southampton,* 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009); *DAG Enterprises v. EXXON Mobil. Corp.,* 2001 WL 34778782, *11 (D.D.C. Sept. 30, 2001).[25]   Relators cannot preclude application of the doctrine by simply alleging that unknown co-conspirators were involved. "[T]here is no case law that stands for the proposition that alleging 'unknown co-conspirators' bars the application of the intra-corporate doctrine."  *Bishop v. Lipman and Lipman, Inc.*, 2013 WL 2190784, *3 (M.D. Fla. May 21, 2013).

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed in its entirety because of its failure to state a claim (under Rule 12(b)(6)) and failure to plead the elements of an FCA claim with particularity (under Rule 9(b)).

---

[25]  Paragraph 24 of the FAC alleges that the "past, present and continuing relations and dealings by and between these related entities [the Defendants and their employees] are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity."

Dated:     New York, New York
           December 8, 2017

                                        TROUTMAN SANDERS LLP

                                        By: /s/ Stephen G. Rinehart
                                            Stephen G. Rinehart
                                            stephen.rinehart@troutman.com
                                            875 Third Avenue
                                            New York, NY  10022
                                            (212) 704-6305

                                            Amy Pritchard Williams
                                            amy.williams@troutman.com
                                            Sara Salehi Ash
                                            sara.ash@troutman.com
                                            301 S. College Street, Suite 3400
                                            Charlotte, NC  28202
                                            (704) 998-4102

                                        *Attorneys for Defendants Wells Fargo &
                                        Company and Wells Fargo Bank, N.A.*