UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES ex rel. ROBERT KRAUS and PAUL BISHOP,<br><br>        Plaintiffs,<br><br>    - against -<br><br>WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., and its and their subsidiaries and affiliates,<br><br>        Defendants. | No.  11-cv-05457-BMC |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT

**GRANT & EISENHOFER P.A.**
Kyle J. McGee
Jon T. Pearson
Viola Vetter
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
James J. Sabella
485 Lexington Avenue
New York, NY  10017
Telephone: (646) 722-8500

**GOLDSTEIN & RUSSELL, P.C.**
Tejinder Singh
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
Telephone:  (202) 362-0636

**THE LAW OFFICES OF
    SHARAD A. SAMY LLC**
Sharad A. Samy
32 Old Oak Road
Darien, CT 06820
Telephone: (917) 673-0804

Of Counsel:

**PORT & SAVA**
George S. Sava
Gary Port
734 Franklin Ave., #574
Garden City, NY 11530
Telephone: (516) 352-2999

*Attorneys for Plaintiffs-Relators Robert Kraus and Paul Bishop*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

    A.    THE BANKS' RAMPANT FRAUD ................................................................. 2

    B.    THE DISCOUNT WINDOW AND TAF PROGRAMS ...................................... 4

        1.    Eligibility ........................................................................................ 5

        2.    Express Representations in the Lending Agreement .................... 6

RELEVANT PROCEDURAL HISTORY ................................................................... 7

THE SUPREME COURT'S DECISION IN *ESCOBAR* ............................................ 8

THE APPLICABLE PLEADING STANDARD ......................................................... 9

ARGUMENT ............................................................................................................... 10

I.     DEFENDANTS' MOTION IMPERMISSIBLY RELIES ON DOCUMENTS
      NOT REFERENCED IN OR RELIED ON BY THE COMPLAINT .............................. 10

II.    A CLAIM SUBMITTED TO A FEDERAL RESERVE BANK IS A CLAIM
      SUBJECT TO THE FALSE CLAIMS ACT ..................................................... 13

III.   THE COMPLAINT STATES AN IMPLIED CERTIFICATION CLAIM ...................... 17

IV.   RELATORS' EXPRESS CERTIFICATION CLAIM IS BASED ON A
      PROPER INTERPRETATION OF SECTION 9.1(b) ...................................... 22

    A.    SECTION 9.1(b) IS UNAMBIGUOUS .......................................................... 22

    B.    DEFENDANTS' ATTEMPT TO MANUFACTURE AMBIGUITY
        BY MODIFYING SECTION 9.1(b)'S LANGUAGE FAILS .............................. 24

    C.    IF SECTION 9.1(b) WERE AMBIGUOUS, INTERPRETING
        IT WOULD BE FOR THE TRIER OF THE FACTS ....................................... 27

i

V.    RELATORS PLAUSIBLY ALLEGE THAT THE BANKS'
      SECTION 9.1(b) CERTIFICATIONS WERE FALSE ................................................28

      A.    THE FAC ADEQUATELY ALLEGES THAT DEFENDANTS' SECTION 9.1(b)
            CERTIFICATIONS WERE FALSE ...............................................................28

      B.    THE BANKS' ARGUMENT THAT THEY CANNOT BE HELD TO VIOLATE
            18 U.S.C. § 1005 RUNS AFOUL OF THE PLAIN LANGUAGE OF THE STATUTE .........32

VI.   RELATORS PLAUSIBLY ALLEGE CLAIMS BASED ON SECTIONS 9.1(g)
      AND 9.1(i) ...........................................................................................35

      A.    RELATORS ALLEGE THAT DEFENDANTS SUPPLIED FALSE FINANCIAL
            INFORMATION TO THE FEDERAL RESERVE IN CONNECTION WITH LENDING
            AGREEMENTS .....................................................................................35

      B.    RELATORS PLAUSIBLY ALLEGE VIOLATIONS OF SECTION 9.1(i)............................38

VII.  RELATORS' CLAIMS FURTHER THE FEDERAL RESERVE SYSTEM'S
      MISSION AND THE POLICIES UNDERLYING THE FALSE CLAIMS ACT............38

VIII. THE FAC ADEQUATELY PLEADS SCIENTER........................................................40

      A.    DEFENDANTS' INTERPRETATION OF SECTION 9.1(b) IS NOT "OBJECTIVELY
            REASONABLE" AND CANNOT SHIELD THEM FROM LIABILITY IN THIS CASE .........41

      B.    DEFENDANTS' "COLLECTIVE KNOWLEDGE" ARGUMENT FAILS .............................43

IX.   THE COMPLAINT SATISFIES THE MATERIALITY REQUIREMENT ...................45

      A.    DEFENDANTS' FALSE CERTIFICATIONS WENT TO THE VERY ESSENCE
            OF THE BARGAIN WITH THE GOVERNMENT .............................................45

      B.    THE FACT THAT FEDERAL RESERVE BANKS CONTINUED TO MAKE LOANS
            TO THE BANKS AFTER RELATORS MADE CERTAIN DISCLOSURES TO THE SEC
            AND FBI DOES NOT DISPROVE MATERIALITY AS A MATTER OF LAW ...................47

CONCLUSION.................................................................................................50

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng.*,
  136 F.3d 82 (2d Cir. 1998)...................................................................................22

*Allen v. WestPoint-Pepperell, Inc.*,
  945 F.2d 40 (2d Cir. 1991).................................................................................10

*Ameti ex rel. United States v. Sikorsky Aircraft Corp.*,
  2017 WL 2636037 (D. Conn. June 19, 2017).....................................................21

*Andrews v. Ring*,
  585 S.E.2d 780 (Va. 2003)..................................................................................26

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................12

*Auto Sport Motors, Inc. v. Bruno Auto Dealers, Inc.*,
  721 F. Supp. 63 (S.D.N.Y. 1989)........................................................................43

*Barrie v. United States*,
  615 F.2d 829 (9th Cir. 1980) .............................................................................48

*Bishop v. Wells Fargo & Co.*,
  137 S. Ct. 1067 (2017)..........................................................................................8

*Bishop v. Wells Fargo & Co.*,
  870 F.3d 104 (2d Cir. 2017)..............................................................................8, 9

*Bishop v. Wells Fargo & Co.*,
  823 F.3d 35 (2d Cir. 2016), *vacated*, 137 S. Ct. 1067 (2017) .............................7, 8

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
  601 F.3d 143 (2d Cir. 2010)...........................................................................15, 16

*Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*,
  463 S.E.2d 661 (Va. 1995)..................................................................................22

*Brink's, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  466 F. Supp. 116 (D.D.C. 1979) .........................................................................15

*In re Cardiac Devices Qui Tam Litig.*,
  221 F.R.D. 318 (D. Conn. 2004).........................................................4, 28, 31, 39

*Cerritos Valley Bank v. Stirling,*
    81 Cal. App. 4th 1108 (Cal. Ct. App. 2000) ..................................................22

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) ....................................................................11

*City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.,*
    628 S.E.2d 539 (Va. 2006) ......................................................................22

*Coremetrics, Inc. v. AtomicPark.com,*
    2005 WL 3310093 (N.D. Cal. Dec. 7, 2005) .........................................27

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) ......................................................................12

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989) ........................................................................11

*D'Agostino v. ev3, Inc.,*
    845 F.3d 1 (1st Cir. 2016) .......................................................................39

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104 (2d Cir. 2010) ....................................................................12

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
    822 F.2d 1242 (2d Cir. 1987) ..................................................................45

*Espinoza ex rel. v. JPMorgan Chase & Co. v. Dimon,*
    797 F.3d 229 (2d Cir. 2015) ....................................................................10

*Faber v. Metro. Life Ins. Co.,*
    648 F.3d 98 (2d Cir. 2011) ........................................................................9

*Facility Wizard Software, Inc. v. Southeastern Technical Servs. LLC,*
    647 F. Supp. 2d 938 (N.D. Ill. 2009) ......................................................24

*Fasano v. Fed. Reserve Bank,*
    457 F.3d 274 (3d Cir. 2006) .........................................................15, 16, 17

*Faulkner v. Beer,*
    463 F.3d 130 (2d Cir. 2006) ....................................................................11

*Fed. Reserve Bank v. Comm'r of Corps. & Taxation,*
    499 F.2d 60 (1st Cir. 1974) ......................................................................15

*Fed. Reserve Bank v. Metrocentre Improvement Dist.,*
    657 F.2d 183 (8th Cir. 1981), *aff'd*, 455 U.S. 995 (1982) ....................15

*Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*,
    601 F.3d 158 (2d Cir. 2010)........................................................................16

*Friedman v. Bloomberg L.P.*,
    871 F.3d 185 (2d Cir. 2017)........................................................................49

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*,
    1980 WL 1146 (S.D.N.Y. 1980)..................................................................36

*Givati v. Air Techniques, Inc.*,
    960 N.Y.S.2d 196 (App. Div. 2013)........................................................25, 42

*Glob. Network Commc'ns, Inc. v. City of N.Y.*,
    458 F.3d 150 (2d Cir. 2006)........................................................................11

*Graham Cty. Soil & Water Cons. Dist. v. United States ex. rel. Wilson*,
    559 U.S. 280 (2010)....................................................................................26

*Greenfield v. Philles Records, Inc.*,
    780 N.E.2d 166 (N.Y. 2002)........................................................................22

*Hurley v. Comm'r*,
    2005 WL 2077778 (T.C. Aug. 16, 2005)....................................................36

*Hussein v. Dahabshiil Transfer Servs. Ltd.*,
    230 F. Supp. 3d 167, 174 (S.D.N.Y. 2017)..................................................9

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002)..........................................................................22

*Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*,
    218 F.R.D. 455 (M.D.N.C. 2003)................................................................24

*James v. Fed. Reserve Bank*,
    471 F. Supp. 2d 226 (E.D.N.Y. 2007)........................................................15

*Jet Courier Servs., Inc. v. Fed. Reserve Bank*,
    713 F.2d 1221 (6th Cir. 1983)....................................................................15

*Jo-Dim Inv. Trust S.A. v. U.S. Dep't of Transp.*,
    2001 WL 1033429 (S.D.N.Y. Sept. 7, 2001)..............................................48

*Junius Constr. Co. v. Cohen*,
    178 N.E. 672 (N.Y. 1931)............................................................................45

*Kautz v. Sugarman*,
    2011 WL 1330676 (S.D.N.Y. Mar. 31, 2011)............................................42

*New York ex rel. Khurana v. Spherion Corp.*,
  2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016) ...............................................21, 22

*Lee Constr. Co. v. Fed. Reserve Bank*,
  558 F. Supp. 165 (D. Md. 1982) ...........................................................14, 21, 33

*Leonard F. v. Israel Disc. Bank*,
  199 F.3d 99 (2d Cir. 1999) ...........................................................................12

*Lewis v. United States*,
  680 F.2d 1239 (9th Cir. 1982) ...............................................................14, 15

*Local Union 36, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*,
  631 F.3d 23 (2d Cir. 2010) ..........................................................................33

*Lumet v. SMH (U.S.), Inc.*,
  1992 WL 380004 (S.D.N.Y. Dec. 4, 1992) ...................................................42

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ........................................................................10

*Mental Hygiene Legal Serv. v. Sullivan*,
  59 N.Y.S.3d 518 (App. Div. 2017) .......................................................24, 26, 27

*Mikes v. Straus*,
  274 F.3d 687 (2d Cir. 2001) ...................................................................8, 9, 19

*Millington v. Vill. of S. Glens Falls*,
  915 N.Y.S.2d 432 (Sup. Ct. 2010) ...............................................................26

*Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*,
  225 F.3d 270 (2d Cir. 2000) ........................................................................22

*Nappy v. Nappy*,
  836 N.Y.S.2d 256 (App. Div. 2007) .............................................................27

*Nat. Resources Def. Council, Inc. v. Muszynski*,
  268 F.3d 91 (2d Cir. 2001) ..........................................................................33

*Neder v. United States*,
  527 U.S. 1 (1999) .......................................................................................45

*Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*,
  847 F.3d 92 (2d Cir. 2017) .............................................................................9

*Picard v. Merkin*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..........................................................50

*Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman*,
   65 Cal. App. 4th 1469 (Cal. Ct. App. 1998) .......................................................22

*Raichle v. Fed. Reserve Bank*,
   34 F.2d 910 (2d Cir. 1929)......................................................................................14

*Rose v. Stephens Inst.*,
   2016 WL 5076214 (N.D. Cal. Sept. 20, 2016) .............................................20, 21

*Salahuddin v. Coughlin*,
   993 F.2d 306 (2d Cir. 1993).....................................................................................42

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992).....................................................................................22

*Snow v. Comm'r*,
   416 U.S. 500 (1974)...................................................................................................36

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008).....................................................................................44

*Telesca v. L.I. Hous. P'ship*,
   443 F. Supp. 2d 397 (E.D.N.Y. 2006) ...................................................................49

*Tijani v. Holder*,
   628 F.3d 1071 (9th Cir. 2010) .................................................................................31

*United States v. 121 Allen Place*,
   75 F.3d 118 (2d Cir. 1996).......................................................................................42

*United States v. A & P Trucking Co.*,
   358 U.S. 121 (1958)...................................................................................................34

*United States v. Barel*,
   939 F.2d 26 (3d Cir. 1991).................................................................................34, 35

*United States v. Basin Elec. Power Co-op.*,
   248 F.3d 781 (8th Cir. 2001) ...................................................................................43

*United States v. Bushwick United Hous. Dev. Fund Corp.*,
   977 F. Supp. 2d 235 (E.D.N.Y. 2013) ...................................................................19

*United States v. Compian-Torres*,
   712 F.3d 203 (5th Cir. 2013) ...................................................................................48

*United States v. Edick*,
   432 F.2d 350 (4th Cir. 1970) ...................................................................................34

*United States v. Harms*,
442 F.3d 367 (5th Cir. 206) ...................................................................48

*United States v. Hollingshead*,
672 F.2d 751 (9th Cir. 1982) .................................................................15

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968).............................................................................38

*United States v. Painter*,
314 F.2d 939 (4th Cir. 1963) .................................................................31

*United States v. Rossomando*,
144 F.3d 197 (2d Cir. 1998).................................................................31

*United States v. Sanford-Brown*,
840 F.3d 445 (7th Cir. 2016) .................................................................21

*United States v. Science Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010)...........................................................44

*United States v. Squire*,
2005 WL 3470297 (N.D. Ill. Dec. 12, 2005) .........................................15

*United States v. Wilmington Trust Corp.*,
No. 15-cr-23 (D. Del. July 7, 2016) .......................................................35

*United States ex rel. Cairns v. D.S. Med., L.L.C.*,
2017 U.S. Dist. LEXIS 175775 (E.D. Mo. Oct. 24, 2017) ......................4

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
862 F.3d 890 (9th Cir. 2017) .................................................................49

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)...............................................10, 29, 31, 32

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*,
543 F.3d 1211 (10th Cir. 2008) .............................................................39

*United States ex rel. Costa v. Baker & Taylor, Inc.*,
1998 WL 230979 (N.D. Cal. Mar. 20, 1998).........................................39

*United States ex rel. Feldman v. Van Gorp*,
674 F. Supp. 2d 475 (S.D.N.Y. 2009)....................................................41

*United States ex rel. Grupp v. DHL Exp. (USA), Inc.*,
47 F. Supp. 3d 171 (W.D.N.Y. 2014) ....................................................43

*United States ex rel. Hussain v. CDM Smith, Inc.*,
 2017 WL 4326523 (S.D.N.Y. Sept. 27, 2017) ................................................................21

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
 530 F.3d 980 (D.C. Cir. 2008) .......................................................................................43

*United States ex rel. Kelly v. Serco, Inc.*,
 846 F.3d 325 (9th Cir. 2017) .........................................................................................21

*United States ex rel. Ketroser v. Mayo Found.*,
 729 F.3d 825 (8th Cir. 2013) .........................................................................................43

*United States ex rel. Kholi v. Gen. Atomics*,
 2003 WL 21536816 (S.D. Cal. June 12, 2003) ...............................................................44

*United States ex rel. Kolchinsky v. Moody's Corp.*,
 2017 WL 825478 (S.D.N.Y. Mar. 2, 2017) ....................................................................21

*United States ex rel. Kraus v. Wells Fargo & Co.*,
 117 F. Supp. 3d 215, 228 (E.D.N.Y. 2015), *aff'd sub nom. Bishop v. Wells
 Fargo & Co.*, 823 F.3d 35 (2d Cir. 2016), *vacated*, 137 S. Ct. 1067 (2017) ................. *passim*

*United States ex rel. Laporte v. Premiere Educ. Grp., L.P.*,
 2017 WL 3471163 (D.N.J. Aug. 11, 2017) ....................................................................21

*United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*,
 205 F. Supp. 3d 276 (E.D.N.Y. 2017) ...........................................................................21

*United States ex rel. Panarello v. Kaplan Early Learning Co.*,
 2016 U.S. Dist. LEXIS 158193 (W.D.N.Y. Nov. 14, 2016) ...........................................21

*United States ex rel. Pasto v. Megabyte Bus. Sys., Inc.*,
 2000 U.S. Dist. LEXIS 23099 (E.D. Va. Apr. 18, 2000) ...........................................13, 14

*United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*,
 2011 WL 976482 (D. Neb. Mar. 15, 2011), *aff'd*, 690 F.3d 951 (8th Cir. 2012) ...................43

*United States ex rel. Sun v. Baxter Hemoglobin Therapeutics*,
 2010 U.S. Dist. LEXIS 30218 (D. Mass. Mar. 25, 2010) .................................................4

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
 848 F.3d 1161 (9th Cir. 2016) .......................................................................................40

*United States ex rel. Taylor v. Gabelli*,
 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005) ..................................................................38

*United States ex rel. Tessler v. City of New York*,
 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016) ................................................................21

*United States ex rel. Wood v. Allergan, Inc.*,
   246 F. Supp. 3d 772 (S.D.N.Y. 2017)...................................................................19

*United States ex rel. Yannacopoulos v. Gen. Dynamics Corp.*,
   652 F.3d 818 (7th Cir. 2011) ........................................................................43

*United States Small Bus. Admin. v. Bridges*,
   894 F.2d 108 (5th Cir. 1990) ........................................................................48

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016)........................................................................ *passim*

*W.W.W. Assocs., Inc. v. Giancontieri*,
   566 N.E.2d 639 (N.Y. 1990)........................................................................22

*Wolf v. Walt Disney Pictures & Television*,
   162 Cal. App. 4th 1107 (Cal. Ct. App. 2008) ......................................................22

*Zumbrun Law Firm v. Calif. Legislature*,
   165 Cal. App. 4th 1603 (Ct. App. 2008).............................................................26

## Statutes and Rules

1 U.S.C. § 1 ................................................................................33

12 U.S.C. § 161(a) ..........................................................................3

12 U.S.C. § 289 .............................................................................14

12 U.S.C. § 290 .............................................................................14

12 U.S.C. § 301 .............................................................................47

12 U.S.C. § 324 .............................................................................34

12 U.S.C. § 1817(a)(3)........................................................................3

12 U.S.C. § 1831(n)(a)(2)(A) ..................................................................4

12 U.S.C. § 1831o(b)(1)(B) ...................................................................6

18 U.S.C. § 1001 .........................................................................4, 29

18 U.S.C. § 1005 .................................................................... *passim*

31 U.S.C. § 3729 ............................................................................1

31 U.S.C. § 3729(b)(1)(A)....................................................................40

31 U.S.C. § 3729(b)(4) ...................................................................................45

31 U.S.C. § 3730(b) .........................................................................................4

12 C.F.R. § 4.11(b)(1) ......................................................................................3

12 C.F.R. § 6.4(a)(1) .........................................................................................6

12 C.F.R. § 6.4(b) .............................................................................................6

12 C.F.R. § 201.4(a) ...............................................................................5, 17, 18

12 C.F.R. § 201.4(b) .........................................................................................6

12 C.F.R. § 201.4(e) .........................................................................................6

12 C.F.R. § 363 .................................................................................................3

12 C.F.R. part 30 ..............................................................................................3

12 C.F.R. part 263 ............................................................................................3

12 C.F.R. part 308 ............................................................................................3

12 C.F.R. part 570 ............................................................................................3

Rule 10b-5 ......................................................................................................36

FED. R. CIV. P. 9(b) .............................................................10, 29, 32, 40, 45

FED. R. CIV. P. 12 ...........................................................................................49

FED. R. CIV. P. 12(b)(6) ......................................................................9, 10, 11

**Other Authorities**

BLACK'S LAW DICTIONARY 950 (9th ed. 2009) ...........................................50

John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.01[B] (4th ed. 2015) ................4

The Discount Window, https://www.frbdiscountwindow.org/en/Pages/General-Information/The-Discount-Window.aspx #eligibilityps ...................................5, 6, 17

2A Norman J. Singer, SUTHERLAND STAT. CONSTR. § 46:5 (7th ed. 2017) ..................................33

Plaintiffs-Relators Robert Kraus and Paul Bishop ("Relators") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Fourth Amended Complaint ("FAC" or "Complaint").[1]

## PRELIMINARY STATEMENT

This case involves billions of dollars in loans made by the U.S. Government to several large Banks[2] at highly subsidized interest rates that were supposed to be available only to adequately capitalized banks in sound financial condition.  The Complaint alleges that the Banks were inadequately capitalized and not in sound financial condition, and that the Banks' senior management violated numerous laws and regulations and employed sham accounting practices to hide those facts.  The Banks also provided fraudulent financial reports and information to bank regulators in order to obtain, *inter alia*, artificially good supervisory ratings.  Armed with a clean bill of financial health from regulators, the Banks applied for and received from Federal Reserve banks billions of dollars of loans at below-market rates for which they were not eligible.  The Banks' fraudulent implied certification that they were eligible for these highly subsidized loans renders them liable under the False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA").

In addition, each time the Banks applied for loans from the Government, they certified, *inter alia*, that they were not violating any laws or regulations that could adversely affect their ability to perform their obligations under the Lending Agreement (defined below) with the Federal Reserve banks.  At the time they made these certifications, the Banks were violating numerous banking laws and regulations relating to equity capital requirements, underwriting

---

[1] References herein in the form "¶__" are to paragraphs in the FAC.  Unless otherwise noted, all emphasis in quoted material has been supplied.

[2] The banks involved include Wachovia Bank, N.A. and its subsidiaries and affiliates ("Wachovia") and World Savings Bank, FSB and its subsidiaries and affiliates ("World Savings").  In 2006, World Savings merged into Wachovia, and in 2008 Wachovia merged into the Wells Fargo group of companies.  *See* ¶ 1 n.1.  Wachovia, World Savings and Wells Fargo are collectively referred to herein as the "Banks."

practices, risk assessment and other matters that adversely affected their ability to perform their obligations under the Lending Agreement. These false express certifications by the Banks render them liable under the FCA.

By this action, Relators seek to recover for taxpayers the damages sustained as a result of Defendants' wrongdoing.

## STATEMENT OF FACTS

### A.   THE BANKS' RAMPANT FRAUD

The FAC contains nearly 60 pages of detailed allegations that set forth the pervasive pattern of financial, regulatory and accounting fraud engaged in by the Banks, to which the Court respectfully is referred. ¶¶ 63-185. As explained in the FAC, the Banks' management perpetrated a control fraud, subverting the Banks' statutory, regulatory and internal control procedures (including but not limited to the Banks' obligation to maintain adequate capitalization) by engaging in risky lending and deceptive financial accounting and regulatory reporting practices, principally to accrue fees from the origination and securitization of such loans. ¶¶ 64-145.

To avoid holding capital against their toxic, low-grade assets, the Banks knowingly engaged in control fraud, through which individuals in high-level positions used sham accounting techniques to create fictitious financial information about the Banks. Specifically, among other things, the Banks (1) deceptively accounted for such loans as high quality loans and thus held only a small amount of capital against such loans, *e.g.* ¶¶ 105-10, 121-25; (2) deceptively hid such loans in "off balance sheet" entities and thus held no capital against such loans, *e.g.* ¶¶ 81-98; and (3) deceptively accounted for such loans, securities and other assets as "trading assets" or "assets held for sale," when in fact such assets were illiquid and would necessarily be required to be held to maturity (and accounted for as such), and thus held only a

*de minimis* amount of capital against such assets, *e.g.* ¶¶ 104, 164, 224.

The Banks' fraud made them appear to be financially sound, sufficiently capitalized, and in compliance with banking laws, when none of that was true. *E.g.* ¶¶ 220-21, 225-27. The fraud also allowed them to report higher returns on their equity capital when no such returns existed. The Banks thus maintained lower and lower reserves of balance sheet capital to cover the potential default of any assets. *E.g.* ¶¶ 63-65, 77, 88, 99, 103, 115.

In the course of this widespread systemic fraud, the Banks violated multiple critically important banking laws, including, *inter alia*, 12 U.S.C. § 161(a), 12 U.S.C. § 1817(a)(3), and 12 C.F.R. § 4.11(b)(1), which require periodic regulatory filings of true and accurate Call Reports, and 12 C.F.R. part 30, 12 C.F.R. part 263, 12 C.F.R. part 570 and 12 C.F.R. part 308, Subpart R requiring each to: (i) have appropriate internal controls and information systems; (ii) have an appropriate internal audit system; (iii) establish and maintain loan documentation practices that enabled it to (A) make informed lending decisions, (B) assess risks, (C) identify the purposes of loans and sources for repayment, (D) assess the ability of borrowers to repay indebtedness in a timely manner, (E) ensure that claims against borrowers were enforceable, (F) demonstrate appropriate administration and monitoring of loans and (G) take account of the size and complexity of loans; (iv) establish and maintain prudent credit underwriting practices; (v) have prudent asset growth; and (vi) establish and maintain an appropriate system commensurate with its size to identify problem assets and prevent deterioration of those assets. ¶ 4.

The Banks also violated laws and regulations requiring each to, among other things: (i) provide various certifications in respect of the adequacy of its financial reporting and internal controls and its compliance with laws or regulations (including, *inter alia*, 12 C.F.R. § 363); (ii) satisfy the reporting and certification requirements of the Sarbanes-Oxley Act, including

§§ 302, 806 and 906 thereof; (iii) comply with the statutory requirements of 18 U.S.C. § 1005 and 18 U.S.C. § 1001; and (iv) file financial reports and statements in accordance with generally accepted accounting principles ("GAAP") pursuant to 12 U.S.C. § 1831(n)(a)(2)(A). ¶ 5.

Anxious to deflect the FAC's detailed recitation of facts concerning the Banks' fraud, Defendants attempt to minimize the personal knowledge of Relators Kraus and Bishop, stressing that they ceased employment with the Banks prior to the Banks' receipt of loans from the Federal Reserve.[3] The fact that Relators' employment ceased before the loans were made is irrelevant. Nothing in the FCA requires that a relator be employed at the subject company for the entire duration of the fraud.[4] Courts have recognized that a relator can bring claims even if he or she left employment before the scheme to defraud the Government was fully implemented. *See*, *e.g*., *United States ex rel. Sun v. Baxter Hemoglobin Therapeutics*, 2010 U.S. Dist. LEXIS 30218, at *4 (D. Mass. Mar. 25, 2010). The FAC provides numerous details as to Relators' knowledge of the fraud and how they obtained such knowledge, *see* as to Kraus ¶¶ 18, 86, 93, 95, 114, 117, 125, 131, 140, 143, 144, and 145; as to Bishop ¶¶ 19, 175, 178, 179, 180, 181. Given their extensive, detailed knowledge of the Banks' fraud, Defendants' argument that Relators left employment with the Banks before the scheme was completed is a red herring.

**B.    THE DISCOUNT WINDOW AND TAF PROGRAMS**

The Banks borrowed funds from Federal Reserve banks through the Discount Window and the Term Auction Facility ("TAF"). The Discount Window allows eligible banks to borrow

---

[3] *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Fourth Amended Complaint ("Def. Br.") at 2-5. Defendants do not urge dismissal on this ground, instead adopting a "drive-by" approach and merely taking potshots at Relators in the Factual Background section of Defendants' brief.

[4] Indeed, relators need not be employees of the company at all, but can be employees of competitors, *see*, *e.g*., *United States ex rel. Cairns v. D.S. Med., L.L.C.*, 2017 U.S. Dist. LEXIS 175775, at *5 (E.D. Mo. Oct. 24, 2017), and just about anyone else. "Under 31 U.S.C. § 3730(b), virtually anyone can be a *qui tam* relator." John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.01[B] (4th ed. 2015). "Congress clearly intended that *qui tam* cases be brought by a wide variety of people and entities." *Id*.

money from the Federal Reserve on a short-term basis in order to meet temporary shortages of liquidity caused by internal or external disruptions to the bank's operations.  There are two relevant lending rates – the primary rate (which is the lowest interest rate) for the least risky borrowers, and the secondary rate, for more risky borrowers.  The TAF was created in response to the 2007-2008 economic crisis.  Unlike the Discount Window, which provides short-term, overnight funding, the TAF provided longer borrowing, on an auction basis.

1.    **Eligibility**

The regulations governing the Discount Window are explicit that a bank is not eligible for primary credit unless it is in "generally sound financial condition," Regulation A, 12 C.F.R. § 201.4(a), and "at least adequately capitalized."  The Federal Reserve Discount Window § 5, https://www.frbdiscountwindow.org/en/Pages/General-Information/The-Discount-Window.aspx #eligibilityps; *see* ¶ 188.

A bank's financial condition is evaluated using its supervisory ratings (also known as CAMELS ratings) and capitalization data.  The CAMELS component factors address (i) the adequacy of **C**apital; (ii) the quality of **A**ssets; (iii) the capability of **M**anagement; (iv) the quality and level of **E**arnings; (v) the adequacy of **L**iquidity; and (vi) the **S**ensitivity to market risk.  ¶ 192.  Evaluations of each component rating take into account the institution's size and sophistication, the nature and complexity of its activities, and its risk profile.  Composite ratings and the individual component ratings are assigned a number based on a 1 to 5 numerical scale. A "1" indicates the highest rating, indicative of strongest performance and risk management practices and the least degree of supervisory concern, while a "5" indicates the lowest rating, weakest performance, inadequate risk management practices and, therefore, the highest degree of supervisory concern.  *Id*.  Banks with a CAMELS rating of 5 are ineligible to participate in the

5

primary credit program, and therefore also the TAF.[5]  *See* The Federal Reserve Discount Window, *supra*, § 5; ¶ 188.

Whether a bank is adequately capitalized turns on whether it meets the minimum levels for each relevant capital measure set by its regulator.  *See* 12 U.S.C. § 1831o(b)(1)(B).  For national banks prior to 2015, the relevant measures were total risk-based capital, Tier 1 risk-based capital, and leverage.  12 C.F.R. § 6.4(a)(1); *see* ¶ 6.  Roughly speaking, these are ratios of the bank's equity capital to its total assets.  ¶ 6.  Equity capital is designed to absorb losses the bank might incur, insulating depositors, the FDIC, and lenders such as the Fed from such losses.  *Id*.  The regulations require banks seeking primary credit to hold specific ratios of equity capital to balance sheet assets to be deemed "well" or "adequately" capitalized.  *See* 12 C.F.R. § 6.4(b).  The ratios are calculated principally by reference to a bank's balance sheet.  Banks not eligible for primary credit may receive secondary credit at a higher interest rate "on a very short-term basis … if, in the judgment of the Reserve Bank, such a credit extension would be consistent with a timely return to a reliance on market funding sources" or "would facilitate the orderly resolution of serious financial difficulties of a depository institution."  12 C.F.R. § 201.4(b).

The Banks' fraud, which distorted their supervisory ratings and capital ratios and hid their serious undercapitalization, was directly relevant to their eligibility to participate in the Discount Window and TAF programs.

### 2.   Express Representations in the Lending Agreement

To borrow under the primary credit program, the Banks were required to make the representations and warranties of the Federal Reserve's Operating Circular No. 10 (the "Lending

---

[5] TAF funding was available only to institutions that were eligible for primary credit.  *See* 12 C.F.R. § 201.4(e); ¶ 51.

Agreement"), including representing that they were "not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement."   Lending Agreement § 9.1(b).   The Banks further represented that "no statement or information contained in the Lending Agreement or any other document, certificate, or statement furnished by the Borrower to the Bank or any other Reserve Bank for use in connection with the transactions contemplated by the Lending Agreement, on and as of the date when furnished, is untrue as to any material fact or omits any material fact necessary to make the same not misleading…."   Lending Agreement § 9.1(g).  The Banks further represented that "no Event of Default has occurred or is continuing." Lending Agreement § 9.1(i).[6]   Lastly, the Lending Agreement also required borrowers to covenant that they "shall promptly notify the Bank if the Borrower is or is about to become an undercapitalized depository institution or a critically undercapitalized depository institution, as such terms are defined in Regulation A."  Lending Agreement § 10.0(i).

## **RELEVANT PROCEDURAL HISTORY**

On July 24, 2015, this Court entered its opinion granting Defendants' motion to dismiss the Third Amended Complaint, with prejudice, and thereafter entered judgment for the Defendants.  *See United States ex rel. Kraus v. Wells Fargo & Co.*, 117 F. Supp. 3d 215, 228 (E.D.N.Y. 2015) ("*Bishop I*").  The Court of Appeals affirmed.  *See Bishop v. Wells Fargo & Co.*, 823 F.3d 35 (2d Cir. 2016) ("*Bishop II*").

Plaintiffs petitioned for certiorari.  On February 21, 2017, the U.S. Supreme Court granted the petition, vacated the decision in *Bishop II* and remanded the case to the Court of

---

[6] Among other things, an Event of Default occurs when "any representation or warranty made or deemed to be made by the Borrower under or in connection with the Lending Agreement … is inaccurate in any material respect …." Lending Agreement § 2.1.

Appeals for further consideration in light of *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). *See Bishop v. Wells Fargo & Co.*, 137 S. Ct. 1067 (2017). On remand, on September 7, 2017, the Court of Appeals vacated this Court's judgment. *See Bishop v. Wells Fargo & Co.*, 870 F.3d 104 (2d Cir. 2017) ("*Bishop III*"). The Court of Appeals remanded the case to this Court for further proceedings consistent with *Bishop III*. With the permission of the Court, the Fourth Amended Complaint was filed on November 9, 2017.

## THE SUPREME COURT'S DECISION IN *ESCOBAR*

This Court's decision in *Bishop I* dismissing the Third Amended Complaint, and the Second Circuit's decision in *Bishop II* affirming dismissal, relied heavily on certain judicially-crafted requirements for such claims articulated in *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001). Specifically, Relators' implied certification claim was dismissed because the implied certification was deemed to relate only to a condition of participation in the borrowing programs, whereas *Mikes* had held that implied false certification claims exist only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid. (The Second Circuit called this the "express designation" requirement.) Relators' express certification claim based on § 9.1(b) of the Lending Agreement was dismissed because *Mikes* held that an expressly false claim is a claim that falsely certifies compliance with a *particular* statute, regulation or contractual term, whereas Lending Agreement § 9.1(b) merely stated that the borrower was not in violation of "any laws or regulations" which could affect performance of the Lending Agreement, without specifying particular laws or regulations. (The Second Circuit called this the "particularity" requirement.)

But these two *Mikes* requirements "did not survive *Escobar*." *Bishop III*, 870 F.3d at 106. Thus, *Escobar* "directly abrogated *Mikes*'s express-designation requirement." *Id*.

Furthermore, "although *Escobar* was an implied false certification case, it also abrogated *Mikes*'s particularity requirement for express false certification claims." *Id.*

But *Escobar* did even more. It expressly rejected the underlying premise animating decisions such as *Mikes* that the FCA should be narrowly construed to limit FCA liability. Instead, the Supreme Court instructed the courts to (1) resist engrafting atextual limitations onto the causes of action, *see* 136 S. Ct. at 2001; (2) refrain from treating violations of conditions of participation differently from conditions of payment, *see id.* at 2002; and (3) interpret the element of falsity broadly, consistent with the common law, *see id.* at 1999. Notwithstanding this clear teaching, however, Defendants would lead the Court into error by urging a crabbed and narrow approach to the FCA that the Supreme Court in *Escobar* has reaffirmed is inappropriate.

## THE APPLICABLE PLEADING STANDARD

On a motion to dismiss under Rule 12(b)(6), courts "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). "'Plausibility' is not certainty. [Rule 12(b)(6)] does not require the complaint to allege 'facts which can have no conceivable other explanation, no matter how improbable that explanation may be.'" *Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 174 (S.D.N.Y. 2017) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013)). Instead, a claim is plausible when there is sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 94 (2d Cir. 2017) (internal quotation marks omitted). Moreover, when deciding a motion to dismiss, a court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits,

and any documents incorporated in the complaint by reference," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), as well as "matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

Because the FCA is an anti-fraud statute, Plaintiffs' claims are also subject to Rule 9(b)'s particularity requirement.  Under that rule, "a party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

"[T]he adequacy of particularized allegations under Rule 9(b) is ... case- and context-specific."  *Espinoza ex rel. v. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015).  Indeed, in *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81-82 (2d Cir. 2017), the Second Circuit recently made clear that, despite the requirement of Rule 9(b), "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge" (internal quotation marks omitted).  Thus, *Chorches* provides that a complaint may satisfy Rule 9(b) when it plausibly alleges (i) "that the information that would permit further identification of [the purportedly false] claims is peculiarly within the [defendant's] knowledge," and (ii) specific facts "creating a strong inference that specific false claims were submitted." *Id.* at 86.

As shown below, Plaintiffs have adequately pleaded their claims.

## ARGUMENT

## I.   DEFENDANTS' MOTION IMPERMISSIBLY RELIES ON DOCUMENTS NOT REFERENCED IN OR RELIED ON BY THE COMPLAINT

Defendants rely on a multitude of documents that were neither exhibits to, nor quoted in, nor otherwise relied upon by the FAC.  Reliance on such materials is inappropriate on a Rule 12(b)(6) motion, and the Court should disregard any of Defendants' arguments based on them.

"On a motion to dismiss, the district court must limit itself to a consideration of the facts alleged on the face of the complaint, and to any documents attached as exhibits or incorporated by reference."  *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (internal citations omitted). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits.  The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."  *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 155 (2d Cir. 2006).

In some limited circumstances, the Court may also rely on documents that, although not exhibits to or otherwise incorporated into the complaint, are relied upon so "heavily" that they are "integral" to the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  This exception is narrow.  *See Glob. Network Commc'ns*, 458 F.3d at 157 (noting that "[i]n most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason . . . was not attached to the complaint.").  And, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document [and it] must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  *Faulkner v. Beer*, 463 F.3d 130, 134–35 (2d Cir. 2006) (reversing district court's dismissal of complaint as improperly based on matters outside the complaint).

Defendants submit with their motion statements extrinsic to the FAC from the Federal Reserve website (*e.g.*, Exs. F, G, H, M, N, Q), fact declarations by witnesses in *other* proceedings (Exs. S, W), statements made by a former Chair of the Federal Reserve (Exs. C, O),

and other writings about the Federal Reserve System and the economy at large (Exs. E, X, Y), to argue variously that the Federal Reserve is not a governmental entity subject to False Claims Act protection, that the Federal Reserve's lending decisions must not be second-guessed, that Defendants' interpretation of § 9.1(b) should govern, and that Wachovia was adequately capitalized. *See*, *e.g.*, Def. Br. at 4-10, 16-20, 32-35, 44-46. Even if these documents were considered, Defendants' motion should still be denied, but the fact is that these documents cannot be considered because they are not referenced in, nor are they are integral to, the FAC. Nor could the Court take judicial notice of them (which Defendants have not requested).[7]

For ease of reference, Relators identify below which of Defendants' exhibits were either attached to the FAC or otherwise incorporated into it, and may be properly considered here, and the many others that were not. Relators ask that the Court strike the improperly proffered exhibits (*i.e.*, Exs. C-H, K, M-Q, S, and W-AA) and disregard Defendants' arguments made in reliance on those documents. *See*, *e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (holding that it was reversible error to consider a document that "was not attached to the complaint, was not incorporated by reference in the complaint, and was not integral to the complaint [and was not] relied upon in any way in [plaintiff's] claim for breach of contract").

---

[7] In a footnote, Defendants claim that simply because the FAC made reference to one OCC Handbook, some statements by Federal Reserve officials, and information on the Federal Reserve's website, "[r]eliance on *similar* materials in this motion to dismiss is appropriate." Def. Br. at 5 n. 6. By Defendants' logic, one quotation from any statement by any agency official or any publication would put at play all other statements by the same or any other official at that agency or any other publication by the same author. This is absurd – and not supported by the handful of cases Defendants cite, which merely restate the well-established standard that a court may rely on documents "integral" to the complaint. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (concluding that the Court could have considered the stock purchase agreement, offering memorandum, and warrant on which plaintiffs had "relied in bringing suit" and that "were integral to plaintiffs' claim"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (observing that the court can properly rely on "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"). In fact, *Leonard F. v. Israel Disc. Bank*, on which Defendants also rely, vacated the District Court's dismissal of the underlying complaint for having improperly relied on a representation outside the pleadings. 199 F.3d 99, 107 (2d Cir. 1999) (vacating and remanding so that the plaintiff may have "appropriate discovery").

| Defendants' Exhibit | Exhibit to FAC | Referenced/Quoted in FAC |
|---|---|---|
| A | N/A | N/A |
| B | No | Yes |
| C | No | No |
| D | No | No |
| E | No | No |
| F | No | No |
| G | No | No |
| H | No | No |
| I | Yes | Yes |
| J | Yes | Yes |
| K | No | No |
| L | No | Yes |
| M | No | No |
| N | No | No |
| O | No | No |
| P | No | No |
| Q | No | No |
| R | No | No |
| S | No | No |
| T | No | No |
| U | No | Yes |
| V | No | No |
| W | No | No |
| X | No | No |
| Y | No | No |
| Z | No | No |
| AA | No | No |

## II.   A CLAIM SUBMITTED TO A FEDERAL RESERVE BANK IS A CLAIM SUBJECT TO THE FALSE CLAIMS ACT

Betraying the overall weakness of their position on this motion, Defendants' leadoff argument is the meritless assertion that a claim submitted to a Federal Reserve bank is not a claim submitted to the U.S. Government, and therefore the FCA does not apply. Defendants fail to cite any case so holding, and, in fact, Defendants' argument has been rejected by the courts.

In *United States ex rel. Pasto v. Megabyte Bus. Sys., Inc.*, 2000 U.S. Dist. LEXIS 23099 (E.D. Va. Apr. 18, 2000) – an on-point case that Defendants never mention – the Court held that a claim submitted to the Federal Reserve Bank of Richmond is subject to the FCA. In *Megabyte*,

the relator alleged that her former employer knowingly made false claims for payment of the purchase price for counterfeit Microsoft software licenses sold to the Federal Reserve and other entities.  Precisely like Defendants here, Megabyte argued in its brief that claims made to Federal Reserve banks "are not 'claims' within the meaning of the FCA," because those banks "'receive no appropriated funds from Congress.'"   Declaration of James J. Sabella, dated Jan. 11, 2018 ("Sabella Decl.") Ex. 1 at 4 (quoting *Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982) – the same case on which Defendants rely here, *see* Def. Br. at 18).  But the Court rejected Megabyte's argument and held that the FCA applies to claims submitted to a Federal Reserve bank.

The Court stressed that after funding its operations, any excess funds in the hands of a Federal Reserve bank are turned over to the Treasury.  *See* 12 U.S.C. §§ 289, 290.  Therefore, any claim submitted to a Federal Reserve bank will reduce funds on hand and hence reduce amounts available to be remitted back to the Treasury.  Therefore, the Court concluded:

> Since the Federal Reserve Banks return all earnings in excess of operating and other expenses to the U.S. Treasury, fraudulent claims reduce the excess earnings, causing the Treasury to forfeit money to which it would otherwise be entitled, and triggering liability under the False Claims Act.

*Megabyte*, 2000 U.S. Dist. LEXIS 23099, at *8.

It has long been the law in this Circuit that Federal Reserve banks are part of the Government.  In *Raichle v. Fed. Reserve Bank*, 34 F.2d 910, 916 (2d Cir. 1929), the Second Circuit recognized that a Federal Reserve bank is "a governmental agency."  A wide variety of cases have agreed that Federal Reserve banks are part of the Government, and in so doing have specifically found the arguments and facts relied on by Defendants to be unpersuasive.  *See*, *e.g.*, *Lee Constr. Co. v. Fed. Reserve Bank*, 558 F. Supp. 165, 177 (D. Md. 1982) (Federal Reserve banks are part of the Government for purposes of the Administrative Procedures Act "despite the

ostensibly private ownership of Federal Reserve Banks and despite the private election of six of the nine members of the board of directors of each Bank"); *United States v. Hollingshead*, 672 F.2d 751, 754 (9th Cir. 1982) (Federal Reserve banks are part of the Government for purposes of the federal bribery statute and noting: "[F]ederal reserve banks are not operated for the profit of their member bank stockholders."  After payment of dividends, "[a]ll remaining earnings are paid into a United States Treasury surplus fund."); *James v. Fed. Reserve Bank*, 471 F. Supp. 2d 226, 240 (E.D.N.Y. 2007) ("the New York Fed is a federal instrumentality for the purposes of state employment law"); *Brink's, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 466 F. Supp. 116 (D.D.C. 1979) (Federal Reserve banks are part of the Government for purposes of the Service Contract Act); *Jet Courier Servs., Inc. v. Fed. Reserve Bank*, 713 F.2d 1221 (6th Cir. 1983) (Federal Reserve banks are part of the Government for purposes of the Sherman Antitrust Act); *Fed. Reserve Bank v. Metrocentre Improvement Dist.*, 657 F.2d 183 (8th Cir. 1981), *aff'd*, 455 U.S. 995  (1982) (Federal Reserve banks are part of the Government for purposes of state taxation); *United States v. Squire*, 2005 WL 3470297, at *5 (N.D. Ill. Dec. 12, 2005) (Federal Reserve banks are part of the Government for purposes of making Medicaid reimbursement payments to fiscal intermediary); *see also Fed. Reserve Bank v. Comm'r of Corps. & Taxation*, 499 F.2d 60, 62 (1st Cir. 1974) ("federal reserve banks … are plainly and predominantly fiscal arms of the federal government.  Their interests seem indistinguishable from those of the sovereign").[8]

Defendants' reliance on *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,

---

[8] *Lewis*, the sole decision relied on by Defendants as holding that Federal Reserve banks are not the Government, is clearly an outlier.  Indeed, later courts have found *Lewis* unpersuasive and have "reject[ed] reliance on *Lewis*." *Fasano v. Fed. Reserve Bank*, 457 F.3d 274, 282 n.7 (3d Cir. 2006).  Furthermore, given the mountain of authority specifically dealing with the Federal Reserve banks' status as governmental bodies, cases cited by Defendants dealing with other entities (Def. Br. at 16-17) are irrelevant.

601 F.3d 143 (2d Cir. 2010), and *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158 (2d Cir. 2010), is misplaced.  Those cases explicitly stated that they were not deciding whether a Federal Reserve bank is a Government agency.  *See Bloomberg*, 601 F.3d at 149 n.2.  Instead, the issue was whether records of the Federal Reserve banks were records of the Board of Governors that the Board could be required to produce under the Freedom of Information Act.  The Court's statements as to whether loans by Federal Reserve banks are issued "on behalf of" the Board, while relevant to the FOIA issue, are irrelevant to the question of whether a claim submitted to a Federal Reserve bank is a claim against the Government.  As shown above, because, *inter alia*, surplus funds in the hands of Federal Reserve banks are turned over to the Treasury, claims submitted to such banks impact the Treasury, and the courts consistently hold that such banks are considered part of the Government.  It does not matter if their lending activities are done on behalf of the Board or not.

> As eleven different Federal Reserve Banks stated in a recent *amicus* brief:
>
> Although stock of each Federal Reserve Bank is owned by member commercial banks within its Federal Reserve District, none of the stockholders control any Federal Reserve Bank.  Stock in Federal Reserve Banks, unlike stock in a private corporation, is not acquired for investment purposes or for purposes of control.  Rather, such stock is acquired because its ownership is a condition of membership in the Federal Reserve System.  Unlike owners of a private corporation, Federal Reserve Bank stockholders do not possess a residual equity interest in Federal Reserve Bank assets.  That residual interest remains always with the United States.
>
> *     *     *     *
>
> Federal Reserve Banks are corporate instrumentalities of the United States….

Brief of Federal Reserve Banks as *Amici Curiae*, *Fasano v. Fed. Reserve Bank of N.Y.*, No. 05-4661 (3d Cir.), 2006 U.S. 3d Cir. Briefs LEXIS 901, at *1-2, 6.[9]

---

[9] Because the Third Circuit decided *Fasano* on other grounds, it did not reach the question of whether Federal Reserve banks are federal instrumentalities.  It noted, however, that "strong arguments have been made in favor of

*(Cont'd)*

Defendants' request that the Court break new ground and hold that a claim submitted to a Federal Reserve bank is not covered by the FCA should be rejected.

## III.     THE COMPLAINT STATES AN IMPLIED CERTIFICATION CLAIM

The Complaint states an implied certification claim under *Escobar* because the Banks' fraud, which concealed and compromised their financial condition, went directly to their eligibility for the primary credit rate, *i.e.*, "to the very essence of the bargain" the Banks struck with the Government. *Escobar*, 136 S. Ct. at 2003 n.5 (internal quotation marks omitted). The Complaint alleges that by applying for primary credit, the Banks impliedly certified that they were eligible for such credit, *see*, *e.g.*, ¶¶ 2, 7, 26, 47, 60, 238, whereas in fact they were not, for reasons that were highly material.

A bank is not eligible for primary credit unless it is in "generally sound financial condition," 12 C.F.R. § 201.4(a), and "at least adequately capitalized." The Federal Reserve Discount Window, *supra*, § 5; *see* ¶ 188. The Complaint alleges that the Banks were not adequately capitalized, and hence not eligible for the primary credit program, and were able to give the impression that they were adequately capitalized only by engaging in deceptive accounting and loan underwriting schemes, and then reporting inflated ratios to bank regulators. ¶¶ 7, 217-27. Such misrepresentations give rise to an implied certification claim because by applying for and drawing funds from the primary credit program, the Banks implicitly represented that they were at least adequately capitalized, when in fact they knew otherwise, and they knew that this was a material condition of eligibility for the primary credit program.

In addition, the Complaint alleges that the fact that the Banks were running an extremely risky lending program, concealed by widespread control fraud, resulted in them not being in

_____

such status."  457 F.3d at 281.

"generally sound financial condition," and for this additional reason were not eligible for primary credit.   ¶¶ 8, 194-216.   For example, the Complaint alleges that the Banks' fraud and misrepresentations misled their regulators into issuing them unduly high supervisory ratings—also known as CAMELS ratings.  *Id.*; *see* p. 5 *supra*.  The Complaint alleges that where senior management perpetrates a control fraud on the scale described in the Complaint, banks would not be eligible for a rating better than "5," ¶¶ 194-216, which would disqualify them from access to the primary credit program and the TAF.

Defendants' argument that the Complaint does not state an implied certification claim is based on a misreading of *Escobar*.   According to Defendants, *Escobar* limited implied certification claims only to situations where the defendant "does not merely request payment, but also makes specific representations about the goods and services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."   Def. Br. at 31.   To the contrary, *Escobar* made clear that it was not holding that this is the exclusive scenario for implied certification claims.  As the facts in *Escobar* involved misleading half-truths, that is what the Court addressed, but the Court expressly declined to address the question of whether the submission of a claim that the defendant was not eligible for, without any further representation about the goods or services, could be sufficient to support an implied certification claim.  The Court stated:  "We need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment."  *Escobar*, 136 S. Ct. at 2000.  Thus, *Escobar* upheld the validity of the implied certification theory in certain circumstances and plainly declined to foreclose it in others where no specific representation or half-truth is involved.  Indeed, by stressing that the implied certification theory is viable "at least" when the two conditions stressed

by Defendants are present, *id*. at 1995, 2001, the Court plainly indicated that there would be other situations in which it would also be viable.

As *Escobar* did not address such other situations, it did not disturb prior law regarding them. Under the prior law in this Circuit and elsewhere, implied certification liability may be established where "the act of submitting a claim for reimbursement itself implies compliance" with a statute, regulation or contractual term, *Mikes*, 274 F.3d at 699 – the question that the Supreme Court determined it did not need to address in *Escobar*. *See also United States v. Bushwick United Hous. Dev. Fund Corp*., 977 F. Supp. 2d 235, 239 (E.D.N.Y. 2013) (Cogan, J.) ("An implied false certification, meanwhile, is premised on the notion that the very act of submitting a claim implies compliance with the governing rules that are a precondition to payment"); *Bishop I*, 117 F. Supp. 3d at 220 (quoting *United States ex rel. Colucci v. Beth Israel Med. Ctr*., 785 F. Supp. 2d 303, 311 (S.D.N.Y. 2011), *aff'd*, 531 F. App'x 118 (2d Cir. 2013)) ("an *implied* legally false certification occurs when 'the submission of the claim itself constitutes the certification of compliance'") (emphasis in original). Apart from the perceived importance of the distinction between conditions of payment and conditions of participation, which *Escobar* invalidated, these statements remain good law. As the Department of Justice stated in a recent amicus brief, in upholding the type of implied certification claim presented in *Escobar* the Supreme Court

> expressly declined to address whether implied certification liability can also exist without a misleading partial disclosure or half-truth in the claim. *See* 136 S. Ct. at 2000 ("We need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment.") Thus, prior case law recognizing the falsity of such claims remains intact.

Brief of the United States as *Amicus Curiae*, *United States ex rel. Marsteller v. Tilton*, No. 16-11997 (11th Cir.), at 13 n.6 (collecting cases) (Sabella Decl. Ex. 2).

In *United States ex rel. Wood v. Allergan, Inc*., 246 F. Supp. 3d 772 (S.D.N.Y. 2017), a

case against a pharmaceutical company alleging claims under the FCA based on violations of the Anti-Kickback Statute, Judge Furman recently held that an implied certification claim does not require a specific representation about the goods and services or a half-truth.  The defendant argued that since it had not made any representations as to compliance with the Anti-Kickback Statute, the *Escobar* requirements for an implied certification claim were absent.  The Court rejected that argument, noting that *Escobar* "endorsed the implied certification theory, but addressed only one type of such claims – namely, those involving fraudulent half-truths."  *Id*. at 811.  Judge Furman noted that "the *Escobar* Court expressly refrained from defining the outer limit of implied certification claims," *id*. at 816, and he "decline[d] to interpret *Escobar* as silently overruling a wide swath of cases holding that 'false' claims can include impliedly certified claims of the sort at issue here."  *Id*. at 811 n.24.  Rejecting the defendant's argument that implied certification claims without half-truths would expose defendants to liability for minor defects in eligibility, the Court stated that *Escobar*'s scienter and materiality requirements are sufficient to address such concerns.  *Id*. at 816.

Numerous other courts have reached the same result.  For example, in *Rose v. Stephens Inst*., 2016 WL 5076214 (N.D. Cal. Sept. 20, 2016), the Court carefully analyzed the *Escobar* decision and held:

> [Defendant] is incorrect as a matter of law that *Escobar* establishes a rigid "two-part test" for falsity that applies to every single implied false certification claim. The Supreme Court's statement that FCA liability attached "at least where two conditions are satisfied," *Escobar*, 136 S. Ct. at 2001, must be read in context. The Court explicitly prefaced its holding by making clear that "[w]e need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Id.* at 2000. The Supreme Court's use of "at least" indicated that it need not decide whether the implied false certification theory was viable in all cases, because the *particular* claim before it contained "specific representations" that were "misleading half-truths." *Id.* at 2001. The language in *Escobar* that [defendant] relies upon does not purport to set out, as an absolute

requirement, that implied false certification liability can attach *only* when these two conditions are met.

*Id.* at \*5 (emphasis in original); *accord United States ex rel. Laporte v. Premiere Educ. Grp., L.P.*, 2017 WL 3471163, at \*2 (D.N.J. Aug. 11, 2017) (quoting and agreeing with *Rose*); *United States ex rel. Panarello v. Kaplan Early Learning Co.*, 2016 U.S. Dist. LEXIS 158193, at \*12 (W.D.N.Y. Nov. 14, 2016) (agreeing that "*Escobar* cannot be read to impose the 'specific representations' requirement in every case").

In contrast to the detailed analysis of *Escobar* in which these courts engaged, in the cases cited by Defendants (Def. Br. at 31-32) the courts merely cited the language in *Escobar* concerning specific representations and half-truths, without even mentioning the caveat in *Escobar* that the Supreme Court was not purporting to define the only circumstances in which an implied certification claim can lie.[10]  Furthermore, in many of Defendants' cases, dismissal was based on materiality or other grounds, rendering anything said about the contours of an implied certification claim *dicta*.[11]

If the Court were to conclude that a "half-truth" is a prerequisite to implied certification liability, such requirement is satisfied here.  Defendants argue, and this Court previously held, that the misrepresentations that the Banks made to regulators (*see*, *e.g.*, ¶¶ 4-5, 65, 67, 175, 250), but not directly to the Federal Reserve bank, about the Banks' financial condition were not actionable under the FCA because § 9.1(g) of the Lending Agreement only obligates borrowers

---

[10] *See United States v. Sanford-Brown*, 840 F.3d 445 (7th Cir. 2016); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017); *New York ex rel. Khurana v. Spherion Corp.*, 2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016); *United States ex rel. Tessler v. City of New York*, 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016); *United States ex rel. Kolchinsky v. Moody's Corp.*, 2017 WL 825478 (S.D.N.Y. Mar. 2, 2017); *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276 (E.D.N.Y. 2017); *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, 2017 WL 2636037 (D. Conn. June 19, 2017); *United States ex rel. Hussain v. CDM Smith, Inc.*, 2017 WL 4326523, at \*7 (S.D.N.Y. Sept. 27, 2017).

[11] *See Kelly*; *Sanford-Brown*; *Kolchinsky*; *Lee* and *Ameti*.

not to lie in documents that they "furnish" to the Federal Reserve banks.  Def. Br. at 30; *Bishop I*, 117 F. Supp. 3d at 224-25.  If so, then by filing their applications for loans with the Federal Reserve and omitting to mention that they filed false financial information with other regulators rendering their CAMELS ratings improper and rendering them ineligible for the primary credit rate, the Banks are guilty of the sort of "half-truths" that gave rise to liability in *Escobar*.

## IV.    RELATORS' EXPRESS CERTIFICATION CLAIM IS BASED ON A PROPER INTERPRETATION OF SECTION 9.1(b)

### A.    SECTION 9.1(b) IS UNAMBIGUOUS

The plain and ordinary meaning of words in written instruments governs a contractual relationship unless the instrument is ambiguous.[12]  Courts uniformly construe the meaning of contract language on the basis of the clear, unambiguous, and express terms of the instrument.[13] Only where the language is ambiguous may a court consider extrinsic evidence, such as additional documents or a party's past practices.[14]  A party cannot manufacture ambiguity by offering an interpretation that stretches the ordinary meaning of the words.[15]  Section 9.1(b)

---

[12] *See, e.g., Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng.*, 136 F.3d 82, 86 (2d Cir. 1998); *see also Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000).

[13] Defendants maintain that California or Virginia contract interpretation principles apply because the Federal Reserve banks that issued credit to Defendants are located in San Francisco, California and Richmond, Virginia. Regardless of whether California, Virginia, or New York law applies, the governing principles are identical: the meaning of a contract must be determined on the basis of its clear, unambiguous, and express terms. California: *See, e.g., Cerritos Valley Bank v. Stirling*, 81 Cal. App. 4th 1108, 1115-16 (Cal. Ct. App. 2000); *Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman*, 65 Cal. App. 4th 1469, 1478 (Cal. Ct. App. 1998); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (Cal. Ct. App. 2008).   Virginia: *See, e.g., Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va. 1995) ("When contract terms are clear and unambiguous, a court must construe them according to their plain meaning."); *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 541 (Va. 2006).   New York: *See, e.g., Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms"); *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

[14] *See* authorities collected in note 13, *supra*.

[15] *See, e.g., Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("The language of a contract is not made ambiguous simply because the parties urge different interpretations.  Nor does ambiguity exist *(Cont'd)*

contains no ambiguity.

Section 9.1(b) requires a representation that a borrower is, *inter alia*, "not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement." According to these unambiguous, express terms, if a borrower is, in fact, in violation of any laws or regulations in a respect which could have some adverse effect upon *either* the validity, *or* the performance, *or* the enforceability of any of the terms in the Lending Agreement, that borrower will have made a false representation. A borrower violating a law or regulation at the time of borrowing in such a manner as to raise the possibility of an adverse effect on (1) the borrower's ability to form a valid Lending Agreement, *or* (2) the borrower's ability to perform its obligations under the Lending Agreement, *or* (3) the more general enforceability of any term in the Lending Agreement, would be making a false certification.

Relators have plausibly alleged that the Banks made false representations because they were, in fact, in violation of critical banking laws and regulations at the time of borrowing, adversely affecting their ability to perform their obligations under the Lending Agreement. As this Court acknowledged, the term "performance" was added "for a reason" in the 2006 revision to the Circular. *Bishop I*, 117 F. Supp. 3d at 221 n.4.[16] Regardless of whether the Court finds the operative language "obtuse," *id.*, it is unambiguous in requiring borrowers to represent that they are not currently in violation of laws or regulations in a way that adversely affects their

---

where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'") (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590 (N.Y. 1957)).

[16] While resort to extrinsic evidence is unnecessary and inappropriate, since there is no ambiguity, such evidence supplies the reason for the revision: Section 9 of the Circular was "revised to be more comprehensive." Williams Decl. Ex. H at 2; *see* ¶ 39.

ability to perform their obligations under the Lending Agreement.[17]

### B. DEFENDANTS' ATTEMPT TO MANUFACTURE AMBIGUITY BY MODIFYING SECTION 9.1(b)'S LANGUAGE FAILS

Contrary to the express terms of § 9.1(b), Defendants maintain that there is a silent qualifier buried beneath its clear and unambiguous text. Defendants argue, implausibly, that "validity, performance or enforceability" means not validity, performance, or enforceability, but *legal authority* to contract, to perform obligations, and to enter enforceable agreements. This argument fails.

First, the inclusion of "performance" clearly indicates that the representation encompasses the *factual*, as distinguished from the merely *legal*, ability to carry out the obligations in the Lending Agreement. Courts routinely recognize that, in a contract, the term "performance" signifies the factual doing or carrying-out of the subject-matter of the contract.[18]

Second, the relevant language contains no express reference to a borrower's *legal authority* to perform its obligations, rendering Defendants' proffered interpretation highly implausible. A contract may be ambiguous only if the competing constructions offered by the parties are both grounded in, and reasonably supported by, the actual, express terms of the contract, but a party may not simply manufacture ambiguity. *See*, *e.g.*, *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 462 (M.D.N.C. 2003). Defendants' argument is nothing more than an improper attempt to modify the language of § 9.1(b).

---

[17] The Court need not decide the precise scope of the representation required by § 9.1(b), but only whether the Defendants' non-disclosure of the alleged control fraud and violations of applicable laws and regulations constitutes a violation of § 9.1(b).

[18] For example, in *Facility Wizard Software, Inc. v. Southeastern Technical Servs. LLC*, 647 F. Supp. 2d 938 (N.D. Ill. 2009), the contract's choice-of-law provision applied Illinois law to the "construction, validity and performance" of the contract. *Id.* at 944. The Court determined that the provision compelled application of Illinois law to a tort claim arising out of a party's "(non)-performance under the contract," distinguishing cases in which choice-of-law provisions in underlying contracts failed to include the term "performance." *Id.*

Third, Defendants' interpretation renders parts of § 9.1(b) superfluous.  The Court must give effect to all terms in a contract.  *See*, *e.g.*, *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (App. Div. 2013).  Defendants do not – and cannot – explain how a borrower's lack of legal authority to perform its obligations differs in any sense from a borrower's lack of legal authority to make valid or enforceable obligations.   This further demonstrates that Defendants' interpretation simply runs § 9.1(b)'s terms together, rather than giving effect to each of them.

Fourth, the implausibility of Defendants' narrow (and textually baseless) interpretation is reinforced by the breadth of the language itself.  Section 9.1(b) states broadly that borrowers must not be in violation of *any* laws or regulations in *any* respect that *could* have *any adverse effect whatsoever* on the performance of *any* of the terms of the Lending Agreement.  Certainly, it makes no distinction between *legal authority* and *factual ability* to satisfy the terms of the Lending Agreement.  Instead, the text emphasizes the breadth of the required representation by using unlimited terms (*e.g.*, "in *any* respect," "*could* have *any* adverse effect *whatsoever*," "*any* of the terms").  Defendants' argument seeks to engraft a new, unwritten limitation on the scope of this plainly broad language.

Fifth, to bolster their faulty reading, Defendants go well beyond the four corners of the 2006 Circular and rely on the 1998 Circular's materially different language.  Defendants argue that the 1998 Circular's reference to "applicable laws and regulations legally authoriz[ing] the borrower to enter into and perform the various loan and collateral agreements" somehow impacts the text of the 2006 Circular.  It does not, and the fact that the 2006 Circular's language differs from the 1998 Circular's language supports Relators, not Defendants.  Among the changes in the 2006 Circular is the addition of the representation lacking in the 1998 Circular.

Incidentally, Defendants' argument reveals that their unanchored reading of § 9.1(b) in

the 2006 Circular is, in fact, a construction of an entirely different provision in an entirely different document.  Defendants' difficulties are compounded by the fact that, as they admit, the 1998 Circular contained no counterpart to what would later become §§ 9.1(g) or (i) and, accordingly, no representation similar to that required by § 9.1(b) was required under that previous Circular, regardless of its content.  Defendants virtually admit what they seek to obscure: that the Federal Reserve made significant changes, including adding new language and new provisions, to § 9 in the 2006 Circular to make it more comprehensive.  ¶ 39.

Sixth, the maxim *noscitur a sociis* does nothing for Defendants.  The principle – that a term is known by the company it keeps – simply has no application where a term lacks ambiguity.  *See*, *e.g*., *Zumbrun Law Firm v. Calif. Legislature*, 165 Cal. App. 4th 1603, 1618 (Ct. App. 2008) (the maxim does not apply where the subject language "is not ambiguous"); *Mental Hygiene Legal Serv. v. Sullivan*, 59 N.Y.S.3d 518, 520-21 (App. Div. 2017); *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003).  Moreover, while it may serve to inform the scope of enumerated items on a lengthy list, the Supreme Court has rejected its application to a short, three-item list, particularly where that list is not entirely harmonious.[19]

Seventh, Defendants' appeals to alleged past practices of the Federal Reserve banks is both unsubstantiated and an inappropriate attempt to introduce extrinsic evidence.[20]  Defendants argue that the Federal Reserve banks have administered the Discount Window "for decades"

---

[19] *Graham Cty. Soil & Water Cons. Dist. v. United States ex. rel. Wilson*, 559 U.S. 280, 288-89 (2010) ("We find [the lower Court's] use of *noscitur a sociis* unpersuasive.  A list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating. .… The substantive connection, or fit, between the terms 'congressional,' 'administrative,' and 'GAO' is not so tight or so self-evident as to demand that we 'rob' any one of them 'of its independent and ordinary significance.'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979)).

[20] *See*, *e.g.*, *Millington v. Vill. of S. Glens Falls*, 915 N.Y.S.2d 432, 435 (Sup. Ct. 2010) ("[E]xtrinsic evidence, including past practices, may not be considered unless it is determined as a matter of law that the agreement is ambiguous.") (quotation omitted).

without requiring representations concerning the ability to perform under the Lending Agreement because the Federal Reserve banks, sitting in a regulatory capacity, already have access to banks' financial details.  Def. Br. at 23.  They further argue that, "historically," Federal Reserve banks have only required borrowers to state that they possess the *legal* authority to create and perform repayment and collateral agreements, and never notified banks that the new language means something different than the old language.  *Id*.  In addition to inappropriately injecting extrinsic evidence to modify the plain meaning of § 9.1(b), this misguided argument, again, conflates the 1998 Circular (which required no representations concerning any ability to perform) with the 2006 Circular (which did), by assuming, incorrectly, that the pertinent language in § 9 did not change.  The problem is that the language did change, and it is not appropriate to consider alleged "historical" practices – practices undertaken while the 1998 Circular, or another governing document, was in effect – in order to understand the plain meaning of the 2006 Circular.

Eighth, the maxim *contra proferentem* is inapplicable, as Defendants concede, absent ambiguity – which is lacking here, as shown above.  Moreover, where it applies, it does not mean that the non-drafting party is empowered to dictate the terms as Defendants suggest, such as by adding terms that do not appear on the surface of the text (*e.g.*, "legal authority").

### C.    IF SECTION 9.1(b) WERE AMBIGUOUS, INTERPRETING IT WOULD BE FOR THE TRIER OF THE FACTS

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts. .…  Resolution of the ambiguity is for the trier of fact."  *Nappy v. Nappy*, 836 N.Y.S.2d 256, 257 (App. Div. 2007) (internal quotation marks omitted); *see Coremetrics, Inc. v. AtomicPark.com*, 2005 WL 3310093, at *3 (N.D. Cal. Dec. 7, 2005).  Thus, even if § 9.1(b) were ambiguous – which it is not – the Court could not dismiss Relators' claims by adopting Defendants'

alternative reading of its purportedly "ambiguous" language.

## V.   RELATORS PLAUSIBLY ALLEGE THAT THE BANKS' SECTION 9.1(b) CERTIFICATIONS WERE FALSE

Defendants argue that even under Relators' interpretation, the § 9.1(b) claim fails because (i) Relators did not allege sufficient "facts to support a claim that the Banks violated the Applicable Laws and Regulations," as defined in ¶¶ 4 and 5 of the FAC, Def. Br. at 24-28; (ii) the FAC does not contain any allegations regarding the operations or accounting practices employed by any of the Banks after mid-2006, *id.* at 29-30; and (iii) the FAC does not contain sufficient factual allegations that any of the violations could adversely affect the Banks' ability to perform their obligations to the Federal Entities, *id.* at 30.  Each of these arguments fails.

### A.   THE FAC ADEQUATELY ALLEGES THAT DEFENDANTS' SECTION 9.1(b) CERTIFICATIONS WERE FALSE

Defendants' contention that Relators fail to plead facts to support a claim as to § 9.1(b) is belied by the well-pleaded allegations of the FAC.  Section 9.1(b) requires a borrower to certify that it is "not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement."  Thus, if a borrower is in violation of any laws or regulations in any respect that could have some adverse effect upon the performance of any of the terms in the Lending Agreement, that borrower has made a false representation.

Where, as here, a defendant made consistent misrepresentations or omissions over an extended period of time, plaintiffs are not required to list each and every instance of such misrepresentation or omission.  *See*, *e.g.*, *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) ("[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct.").  Indeed,

"Rule 9(b) does not impose a 'one size fits all' list of facts that must be included in every FCA complaint."  *Id.* at 337–38.  Rather, the critical inquiry that must be made is whether Relators pled "with a certain amount of precision" to afford Defendants the "opportunity to prepare a response," as well as "warrant further judicial process."  *Chorches*, 865 F.3d at 86-87 (internal quotation marks omitted).  They have.

Here, Relators plead with particularity widespread financial, regulatory, and accounting fraud by the Banks in connection with their receipt of payments in the form of loans and advances from the Federal Reserve.  The FAC sufficiently alleges that in the course of this systemic fraud, the Banks violated multiple core banking laws and regulations, including, *inter alia*, (i) safety and soundness regulations issued by federal banking regulatory agencies; (ii) financial statement certification requirements imposed by the Sarbanes-Oxley Act; (iii) statutory requirements imposed by 18 U.S.C. §§ 1001 and 1005; and (iv) uniform reporting requirements that must be made to federal agencies in compliance with GAAP.  ¶¶ 4-5.

The Banks' contention that the safety and soundness regulations issued by federal banking regulatory agencies may *only* be violated when a bank fails to submit a compliance plan (Def. Br. at 25) is illogical.  Assuming that the Interagency Guidelines are not meant to dictate "how institutions must be managed and operated," it is equally true that if an institution implements a scheme that contravenes the guidelines and the purposes of having them in the first instance, then such scheme would be in violation of the safety and soundness regulations.  That is precisely what has been alleged to have occurred here.

More specifically, Relators allege that, as part of the Banks' fraud and violations of the Applicable Laws and Regulations, they materially misstated their financial statements, their call reports, and their certifications concerning the adequacy of their financial reporting and internal

controls by, among other things:

- utilizing the Black Box vehicle to hold assets off-balance sheet, resulting in a $6 billion accounting fraud.  ¶¶ 81-98, 147;

- failing to grade the credit of the commercial real estate loans they held on-balance sheet, resulting in a $4.141 billion fraud.  ¶¶ 105-10;

- using the Repo SPV's to hold assets off-balance sheet, resulting in a $4–$6 billion accounting fraud.  ¶¶ 79-80, 99-104, 147;

- accounting for its Middle Market Loan portfolio, resulting in a $4–$6 billion accounting fraud.  ¶ 147;

- using an untested Trading Desk Model to materially fabricate financial results.  ¶¶ 111-17;

- leveraging off their fraud by extending more CRE loans of poorer credit quality, with the hope that it would dump these toxic CRE loans into securitization transactions.  ¶¶ 118-35; and

- engaging in an adjusted trading scheme to hide losses on retained CMBS risks.  ¶¶ 137-40).

These acts, individually and collectively, enabled the Banks to materially falsify their financial reports and statements to (i) concoct a fictional picture of "sound" financial health, ¶¶ 63-65, 88, 103, 113, 115, 158-64; (ii) falsely report higher returns on equity capital, ¶¶ 63-65, 77, 88, 103, 115); (iii) maintain lower reserves of balance sheet capital, ¶¶ 63-65, 88, 99, 103; and (iv) render their risk management, internal control and accounting processes ineffective and meaningless, ¶¶ 63-65, 77, 80, 88, 101, 103, 105, 110, 118, 144, 148-49, 165-66, 174.  Relators further allege that the Banks' control fraud had a material financial impact on their balance sheets, and would have required numerous financial disclosures to be made in accordance with the Applicable Laws and Regulations.  Yet no such disclosures were made by the Banks.  ¶¶ 63, 70, 81, 98, 102, 103, 110, 146-47, 158-61, 163, 174.  As a result, the FAC adequately alleges that the Banks violated core banking laws and regulations.

Wide of the mark is the Banks' argument that Relators fail to identify sections of financial statements alleged to be materially untrue.  Def. Br. at 26.  As a threshold matter,

Relators are not required to list every false statement by the Banks.  *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. at 333; *Chorches*, 865 F.3d at 86.  In any event, the FAC identifies specific material misstatements in Wachovia's financial reports.  *See* ¶¶ 84, 87-88, 91-92, 103-04, 139.

The Banks' contention that dismissal is warranted because the alleged violations had no effect on their ability to repay the loans is simply wrong.  The Banks' fraudulent violations of Applicable Laws and Regulations enabled them to maintain inadequate equity capital and ineffective and meaningless risk management, internal control and accounting processes.  Inadequate equity capital and ineffective risk management processes *could* have an "adverse effect" on the Banks' ability to repay the loans.  These allegations are sufficient to allege a violation of the "adverse effect" prong of § 9.1(b).  Furthermore, whether the Banks ultimately repaid the loans is irrelevant in determining whether their § 9.1(b) certifications were false when made.  *See Tijani v. Holder*, 628 F.3d 1071, 1076 (9th Cir. 2010) ("The same benevolent interpretation could be extended to a borrower misrepresenting his credit-worthiness to a bank to get a loan: 'I'll get rich and pay it all back, the bank will benefit by my chicanery.'  No court would accept such a defense.").[21]

Further, the Banks' contention that the FAC "does not contain any allegations regarding the operations or accounting practices employed by any of the Banks after mid-2006" (Def. Br. at 29) is specious.  The FAC describes in detail the various roles of the Banks.  For instance, the

---

[21] The intent to repay eventually is irrelevant to the question of guilt for fraud.  *See United States v. Painter*, 314 F.2d 939, 942-43 (4th Cir. 1963) ("[N]o amount of honest belief that his corporate enterprise would eventually succeed can excuse the willful misrepresentations by which the investors' funds were obtained.  An investor may be defrauded if his reliance is induced by deliberately false statements of fact, and the defendant's optimism as to the future is no defense.") (footnotes omitted); *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank").

FAC alleges that "Wachovia ... brazenly violated the Applicable Laws and Regulations from at least 2001 to on or around the Wachovia-Wells Merger Date in 2008 and beyond in order to satisfy Wachovia's senior management's unrestrained pursuit of short-term profitability...." ¶ 63.  The FAC also alleges that at no time did "Wachovia (or, post-merger, Wells Fargo) ... [c]ome clean to the United States about this massive unconscionable fraud.  Rather, it was business as usual as Wachovia and, post-merger, Wells Fargo took the money provided to it under false and fraudulent pretenses by the United States taxpayer and stayed silent about their egregious financial misdeeds."  ¶ 69; *see also* ¶ 158 ("Wells Fargo's silence post-merger about the extensive fraud that took place at Wachovia makes it complicit in the fraud and, accordingly, liable to the United States for receiving payments post-merger from the Federal Entities....").

In sum, the FAC alleges the "who, what, where, when, and how" of the Banks' violative conduct and, in particular, the Banks' false statements concerning their § 9.1(b) certifications.  More importantly, the FAC satisfies Rule 9(b) by (i) providing the Bank with sufficient notice to prepare a defense, (ii) demonstrating Relators' significant prior knowledge about the Banks' wrongful conduct, and (iii) demonstrating that Relators have not brought baseless claims against the Banks.  *Chorches*, 865 F.3d at 87-89.  Nothing more is required.

### B.    THE BANKS' ARGUMENT THAT THEY CANNOT BE HELD TO VIOLATE 18 U.S.C. § 1005 RUNS AFOUL OF THE PLAIN LANGUAGE OF THE STATUTE

The Banks argue that they cannot violate the relevant provision of 18 U.S.C. § 1005 because it *only* applies to "bank insiders," and not the Banks.  Def. Br. at 26.  That is wrong.  18 U.S.C. § 1005, which prohibits false entries in any book, report, or statement of the Banks, provides, in relevant part:

[1]    Whoever, being an officer, director, agent or employee of any Federal Reserve bank, member bank, depository institution holding company, national bank, insured bank, branch or agency of a foreign bank, or organization operating under section 25 or section 25(a) of the Federal Reserve Act, without authority

from the directors of such bank, branch, agency, or organization or company, issues or puts in circulation any notes of such bank, branch, agency, or organization or company; or

\*       \*       \*

[3]      Whoever makes any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to injure or defraud such bank, company, branch, agency, or organization, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System....

18 U.S.C. § 1005.

The starting point for interpretation of a statute is always its plain language, which governs unless a clearly expressed legislative intent is to the contrary, or unless such plain meaning would lead to absurd results.  *Nat. Resources Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001); *see Local Union 36, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 631 F.3d 23, 27 (2d Cir. 2010).  To determine the meaning of the plain language, courts consider the language itself, the specific context in which the language is used, and the broader context of the statute as a whole.  *Muszynski*, 268 F.3d at 98.  This "whole statute" doctrine provides that "a subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter."   2A Norman J. Singer, SUTHERLAND STAT. CONSTR. § 46:5 (7th ed. 2017).

Applying these principles to 18 U.S.C. § 1005, it is clear that Congress chose not to limit the classification of offenders who are subject to the statute.  The third paragraph provides that *"[w]hoever* makes any false entry in any book, report, or statement of such bank" may be charged.  18 U.S.C. § 1005.  General principles "[i]n determining the meaning of any Act of Congress" are set forth in 1 U.S.C. § 1, which states that "the words 'person' and '*whoever*' *include corporations*, companies, associations, firms, partnerships, societies, and joint stock

companies, as well as individuals[.]" Because the word "whoever" includes a corporation, banking institutions are included within the class of defendants who may be charged under the third paragraph of 18 U.S.C. § 1005. *See United States v. A & P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958) (explaining that the word "'whoever' is to be liberally interpreted"). In stark contrast, the first paragraph of § 1005 explicitly limits its application to only officers, directors, agents, or employees of a bank: "*Whoever, being an officer, director, agent or employee* of any Federal Reserve bank, members bank. . . ."[22]

Defendants dismiss these fundamental statutory canons and, instead, simply argue that "[c]ourts have consistently held that the third paragraph of 18 U.S.C. § 1005 only applies to 'bank insiders.'" Def. Br. at 26-27. They fail to mention, however, that in *United States v. Edick*, 432 F.2d 350 (4th Cir. 1970), the Fourth Circuit rejected the argument that the third paragraph of § 1005 should only apply to insiders of the bank. 432 F.2d at 352–53.

In addition, the Third Circuit's decision in *United States v. Barel*, 939 F.2d 26 (3d Cir. 1991), on which the Banks rely, involved unique facts not applicable here. In *Barel*, the Third Circuit considered the applicability of the third paragraph of § 1005 in a case involving a bank customer who had opened an account using the identity and Social Security number of a third party to frustrate his ex-wife in collecting alimony payments. The Court framed the issue as "whether § 1005 can be directly applied to bank customers, when they are acting in an individual capacity, absent assistance from or cooperation with any bank employees." *Barel*, 939 F.2d at 39. The Court rejected the government's argument that § 1005 could be applied to bank

---

[22] This interpretation finds further support in other statutory provisions of the Federal Reserve Act. Specifically, 12 U.S.C. § 324 makes clear that a bank that files false call reports may be subject to prosecution under § 1005 for falsifying its books and records, stating: "*Such banks* and the officers, agents, and employees thereof *shall also be subject to the provisions of and to the penalties prescribed by sections 334, 656, and 1005 of Title 18, and shall be required to make reports of condition and of the payment of dividends to the Federal Reserve bank of which they become a member*...."

customers, finding that, despite the statute's literal application to the defendant, a narrower interpretation was necessary to preclude the government from using the statute to prosecute "for tax avoidance, social security abuse and other related criminal offenses already specifically prohibited by other sections of the United States Code." *Id.* at 41.

Indeed, the Banks' argument was recently rejected in *United States v. Wilmington Trust Corp.*, No. 15-cr-23 (D. Del.). There, citing the same authorities as the Banks do here, Wilmington Trust moved to dismiss certain counts from an indictment for violation of 18 U.S.C. § 1005, arguing that financial institutions cannot be convicted of violating the third paragraph of that statute. In denying Wilmington Trust's motion, the Court held that "bank defendants are bank insiders, and when the victim is an outsider such as the Federal Reserve, it makes perfect sense to me, and consistent with normal principles of statutory interpretation. And I don't think inconsistent with [*Barel*], that the bank be charged as a defendant." Sabella Decl. Ex. 3 at 131.

## VI.    RELATORS PLAUSIBLY ALLEGE CLAIMS BASED ON SECTIONS 9.1(g) AND 9.1(i)

Defendants argue that the claim as to § 9.1(g) fails because it requires an allegation that Defendants submitted "falsified documents or information" to secure credit from the Federal Reserve, which Relators purportedly do not allege, and that Relators cannot show a violation of § 9.1(i) because the FAC fails to establish predicate violations of §§ 9.1(b) or (g). Both of these arguments fail.

### A.    RELATORS ALLEGE THAT DEFENDANTS SUPPLIED FALSE FINANCIAL INFORMATION TO THE FEDERAL RESERVE IN CONNECTION WITH LENDING AGREEMENTS

Section 9.1(g) requires a borrower to certify that all information provided by it or on its behalf is true and complete: "no statement or information contained in the [loan agreement] or any other document, certificate, or statement furnished by [it] to the Bank or any other Reserve

Bank for use in connection with the transactions contemplated by the [loan agreement], on and as of the date when furnished, is untrue as to any material fact or omits any material fact necessary to make the same not misleading, and the representations and warranties in the [loan agreement] are true and correct in all material respects."  Defendants state in perfunctory fashion that the FAC does not differ from its predecessor in this regard.  They are wrong.

As a threshold matter, the phrase "in connection with" must be construed broadly to mean "pertaining to," "associated with," or "related."  *See, e.g.*, *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 1980 WL 1146, at *5 (S.D.N.Y. 1980) ("in connection with" requirement of Rule 10b-5 requires only a "*de mimimis*" touching between the misrepresentations and the investment decision); *Hurley v. Comm'r*, 2005 WL 2077778, at *3-4 (T.C. Aug. 16, 2005) (courts apply "a broad interpretation of the phrase 'in connection with'" as "pertaining to"); *Snow v. Comm'r*, 416 U.S. 500, 503-04 (1974) (construing "in connection with" broadly).  To allege a violation of § 9.1(g), Relators are not required to plead that the Banks furnished false financials to the Federal Reserve when seeking credit under the Discount Window or TAF *strictly for the purpose* of securing credit.  Instead, this broad "in connection with" language captures any provision by Defendants to the Federal Reserve of false financials, so long as the Federal Reserve would use those financials in a manner relating, in any way, to the loan agreement.[23]

Contrary to Defendants' assertion, the FAC alleges – where its predecessor did not – that Defendants' false financials were "presented to" the Federal Reserve.  *See, e.g.*, ¶ 222 ("These

---

[23] Such a construction is consistent with this Court's finding in *Bishop I* that, if the Third Amended Complaint had alleged that borrowers had to provide financial information "as a prerequisite to participation in the primary credit program," then Defendants' alleged accounting manipulations and control fraud would support an FCA claim as to § 9.1(g) violations.  *Bishop I*, 117 F. Supp. 3d at 225.  The Court's finding imposes no requirement as to the particular reasons or uses for which the financials are submitted by Defendants to the Federal Reserve, which is consistent with the broad construction of "in connection with" advanced by Relators.

misrepresentations were made in order to fundamentally misrepresent [Wachovia's] financial standing (including but not limited to its risk based capital to assets ratio and its total capital to assets ratios) and creditworthiness in Call Reports, financial statements and other documents presented to its regulators (including but not limited to the Federal Reserve).").   Absent discovery, Relators cannot allege that the Federal Reserve specifically reviewed Defendants' financials in deciding whether to issue credit on any particular occasion, but such an allegation is unnecessary: Section 9.1(g) is violated as soon as the false financials are "furnished," or made available, to the Federal Reserve.

Moreover, Defendants' provision of false financials to the Federal Reserve banks with regulatory oversight of Defendants is necessarily a "furnish[ing]" of false information in violation of § 9.1(g) because, under Federal Reserve eligibility criteria, those Federal Reserve banks must rely on Defendants' financial statements to certify Defendants' financial soundness, on an ongoing basis, in order to make Defendants eligible to participate in the federal programs. For this further reason, Relators have plausibly pleaded claims arising out of Defendants' violations of § 9.1(g).

Moreover, under the Discount Window eligibility rules, Federal Reserve banks must determine whether the borrower is "adequately capitalized" and in "sound financial condition," based on their "ongoing" review of the borrower's financial condition.   *See* ¶ 188.  As Relators allege, the Banks were not "adequately capitalized" or in "sound financial condition," because they engaged in a widespread, systemic financial and control fraud, concealed with accounting manipulations and off-balance sheet vehicles.  Because Federal Reserve banks are charged with assessing the soundness of borrowers' financial conditions on an "ongoing" basis, relying directly or indirectly on the financial statements furnished by borrowers, any material falsity in

those statements constitutes a misrepresentation in a document furnished to the Federal Reserve for use in connection with the transactions contemplated by the loan agreement, in violation of § 9.1(g).  Indeed, it is for this reason that § 9.1(g) expressly extends to information furnished by borrowers "to the Bank *or any other Reserve Bank*."  Such information is necessarily "use[d] in connection with the transactions contemplated by the Lending Agreement."

### B.    RELATORS PLAUSIBLY ALLEGE VIOLATIONS OF SECTION 9.1(i)

Finally, Defendants' § 9.1(i) argument fails because Relators have plausibly alleged violations of §§ 9.1(b) and (g).  Defendants acknowledge that Relators' claim as to § 9.1(i) survives if Relators state a claim as to *either* § 9.1(b) *or* (g), as either circumstance would constitute an Event of Default.  As shown above, Relators have adequately alleged violations of both provisions.  Accordingly, Relators have also adequately alleged violations of § 9.1(i).

## VII.   RELATORS' CLAIMS FURTHER THE FEDERAL RESERVE SYSTEM'S MISSION AND THE POLICIES UNDERLYING THE FALSE CLAIMS ACT

The Court should not be misled by Defendants' argument that permitting Relators to proceed with their claims would discourage innocent banks from using the Federal Reserve's Discount Window, thus interfering with the institution's mission of "ensur[ing] the stability of the nation's monetary and financial system."  Def. Br. at 35.

First, Defendants ignore the strong public policy underlying vigorous enforcement and application of the False Claims Act.  "The statute is a remedial one[;] it is intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly."  *United States ex rel. Taylor v. Gabelli*, 2005 WL 2978921, at *12 (S.D.N.Y. Nov. 4, 2005) (internal quotation marks omitted).  "[T]he Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co*., 390 U.S. 228, 232 (1968).  "Defendants' policy arguments"

regarding the reach of the False Claims Act "should be addressed to Congress, not the court." *United States ex rel. Costa v. Baker & Taylor, Inc.*, 1998 WL 230979, at *8 (N.D. Cal. Mar. 20, 1998).

Second, far from frustrating any Government policy regarding the Federal Reserve, Relators' claims protect the Federal Reserve's mission by exposing a massive and pervasive accounting fraud perpetrated by the Banks, which (1) disabled banking regulators from properly assessing the Banks' financial condition, (2) facially qualified the Banks for low interest loans for which they otherwise would not have been eligible, and (3) impermissibly shifted huge amounts of risk onto the Federal Reserve.[24]   Simply put, Banks that do not operate in such a fraudulent manner have nothing to fear under current False Claims Act jurisprudence.

As the Supreme Court explained in *Escobar*, the False Claims Act already sufficiently protects innocent parties from unfounded claims; there is no need for any further government policy carve-out Defendants appear to advocate.  *See Escobar*, 136 S. Ct. at 2002 (holding that any "concerns about fair notice and open-ended liability 'can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements'") (citation omitted).[25] Tellingly, to make their argument that Relators' claims would somehow put innocent banks at risk and threaten government policy goals, Defendants mischaracterize the FAC as centering on

---

[24] Defendants' argument concerning banking regulators' "complicated judgments" and the Federal Reserves' purported "no questions asked" policy of providing short-term loans to "qualified depository institutions," Def. Br. at 35, turns this case on its head.  The point of Relators' claims is that the Banks – through massive fraud – tricked the Federal Reserve banks into approving loans that they otherwise would not have.  Further, to the extent Defendants' rest their arguments on the Federal Reserve's purported policies, such arguments rely on materials not properly considered on a motion to dismiss.  *See* Point I, *supra*.

[25] The two cases from which Defendants selectively quote are not to the contrary; unlike the case at bar, in those cases neither relator cleared the *Escobar* materiality bar.  *See United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008) (rejecting Medicaid *qui tam* action against former employer, SRHC, where relator "fundamentally contend[ed] that *any* failure by SRHC to comply with *any* underlying Medicare statute or regulation during the provision of *any* Medicare-reimbursable services renders this certification false, and the resulting payment fraudulent"); *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) (rejecting *qui tam* claim grounded in allegation that the fraudulent representations "could have" influenced the FDA to approve Onyx).

violations of "any law or regulation that 'could have any effect whatsoever' on the [Banks] ability to perform financially." Def. Br. at 35. That is simply not what the FAC does. Instead, the FAC fits squarely within *Escobar*'s paradigm. As more fully addressed in Point V, *supra*, far from alleging mere trivial violations of tangentially relevant statutes and regulations, the FAC describes in painstaking detail the massive, pervasive and material control fraud the Banks perpetuated so that they could paint a rosy but false picture of their financial health, violating a slew of critically important banking laws and regulations in the process. No more is required.[26]

## VIII.  THE FAC ADEQUATELY PLEADS SCIENTER

Defendants argue that the FAC fails adequately to allege that Defendants acted with the requisite scienter. First, Defendants argue that they reasonably believed that § 9.1(b) of the Lending Agreement involved only a certification of legal authority to perform the Agreement, and that Defendants therefore did not knowingly submit false claims. This argument relates only to Relators' express certification claims and is irrelevant to Relators' implied certification claims. Second, Defendants argue that the FAC does not sufficiently identify specific bad actors at the Banks and thus impermissibly rests on "collective knowledge." Defendants' arguments are meritless.

As initial matter, state of mind may be averred generally. *See* FED. R. CIV. P. 9(b). Indeed, under the False Claims Act, a defendant acts "knowingly" if the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31

---

[26] Defendants also complain that banks engaging in fraud might still face the risk of prosecution "even if they repaid window advances fully on time with interest." Def. Br. at 35. The issue as to damages is not presented on this motion. At the appropriate juncture, Relators will demonstrate that the Government incurred significant losses due to the Banks' fraud. Moreover, while the Government suffered significant losses in this case, "[p]roof of damage to the government is not required" to impose liability under the False Claims Act. *See United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1173 (9th Cir. 2016).

U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required.  *Id*. § 3729(b)(1)(B).

Further, determination of intent is a fact-intensive inquiry generally reserved for the ultimate trier

of fact and thus largely inappropriate for adjudication on a motion to dismiss.  *See United States*

*ex rel. Feldman v. Van Gorp*, 674 F. Supp. 2d 475, 481 (S.D.N.Y. 2009) (declining "to supplant

the ultimate trier of fact" on issue of scienter in false claims action, noting that "the Court of

Appeals has been lenient in allowing scienter issues to withstand summary judgment based on

fairly tenuous inferences, because such issues are 'appropriate for resolution by the trier of fact'")

(internal citations and quotation marks omitted).  Dismissal grounded in purportedly deficient

scienter allegations is certainly not warranted here.

### A. DEFENDANTS' INTERPRETATION OF SECTION 9.1(b) IS NOT "OBJECTIVELY REASONABLE" AND CANNOT SHIELD THEM FROM LIABILITY IN THIS CASE

In the face of the express terms of § 9.1(b), which require any bank accessing the

Discount Window to certify that it is "not in violation of any laws or regulations in any respect

which could have any adverse effect whatsoever upon the ... performance ... of any of the terms"

of the Lending Agreement (¶ 34), Defendants argue that a lending bank is only certifying that it

has the "legal authority to enter into or perform its obligation to the FRB making the loans."

Def. Br. at 21.  Based on this faulty interpretation of § 9.1(b), Defendants then contend that the

FAC does not sufficiently allege that Defendants acted with the requisite scienter to incur

liability under the False Claims Act.  *Id*. at 36-37.  Defendants' interpretation is simply not

"objectively reasonable."

As more fully set forth in Point IV, *supra*, § 9.1(b) clearly, expressly, and unambiguously

requires the Banks to certify that they are not in violation of any laws or regulations, the

violation of which could adversely affect their ability to perform any of the terms of the Lending

Agreement.  *See also* ¶ 34.  Nowhere does § 9.1(b) limit the required certification to a simple

affirmation that the lending bank has the legal authority to enter into or perform under loan agreements. In fact, § 9.1(b) is two-pronged, requiring <u>first</u> a certification that the lending bank is "duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization" and <u>second</u> the certification that is at issue in this case. It is not reasonable, as Defendants suggest by reference to the inapplicable interpretive principle *noscitur a sociis*, to simply collapse these two certifications into one. *See* Def. Br. at 22. Instead, and as is axiomatic, all terms to a contract must be given effect and none may be rendered superfluous. *See*, *e.g.*, *Givati*, 960 N.Y.S.2d at 198. And so, as is clear from the plain language of the 2006 Circular, the borrower must certify both that it has the legal authority to act as a bank (being "duly organized, validly existing and in good standing") *and* that it is not in violation of laws and regulations that may adversely affect its ability to perform under the Lending Agreement – such as engaging in rampant accounting fraud to mask its deteriorating financial condition. Defendants cannot hide behind their unreasonable interpretation to the contrary.[27]

Even if the Court were to find that Defendants' textually unsupported interpretation of § 9.1(b) might be "reasonable" – which it is not – "reasonableness[] is for the trier of fact to determine." *United States v. 121 Allen Place*, 75 F.3d 118, 123 (2d Cir. 1996); *see Lumet v. SMH (U.S.), Inc.*, 1992 WL 380004, at *7 (S.D.N.Y. Dec. 4, 1992) ("An inquiry into defendant's 'reasonableness' is appropriate for the trier of fact."). Furthermore, the reasonableness of a defendant's conduct is an issue calling for discovery. *See Salahuddin v. Coughlin*, 993 F.2d 306, 310 (2d Cir. 1993); *Kautz v. Sugarman*, 2011 WL 1330676, at *7 (S.D.N.Y. Mar. 31, 2011);

---

[27] Defendants again characterize Relators' claims as based on any miniscule historical infraction of peripheral laws, thus trying to paint Relators' view of § 9.1(b) as defying "common sense." Def. Br. at 37-38. But, consistent with *Escobar*, Relators do not claim that every violation will implicate False Claims Act liability. Relators rest their claims on serious and material violations of important banking laws that helped mask the Banks' true financial position and that plainly could significantly adversely affect the Banks' ability to perform under the Lending Agreements.

*Auto Sport Motors, Inc. v. Bruno Auto Dealers, Inc.*, 721 F. Supp. 63, 66 (S.D.N.Y. 1989).  At a minimum, Relators are entitled to discovery as to Defendants' supposed understanding and expectations with respect to § 9.1(b).[28]

Defendants cite a handful of cases dismissing False Claims Act claims because of insufficient scienter allegations.  Unlike here, however, those cases involve contracts or regulations that would not have been violated even if relators' allegations were true.[29]  In this case, however, the language of § 9.1(b) by its plain terms requires the borrower's certification that it is not in any violation of laws and regulations that may adversely affect its ability to perform its obligations under the Lending Agreement.  Defendants' patently unreasonable interpretation of § 9.1(b)'s clear, express, and unambiguous terms cannot shield them from liability.

## B. DEFENDANTS' "COLLECTIVE KNOWLEDGE" ARGUMENT FAILS

Defendants claim that the FAC relies only on "collective knowledge" at the Banks to establish scienter, seeking dismissal because Relators have purportedly not yet identified which

---

[28] Notably, the cases on which Defendants principally rely were all decided on summary judgment or following trial upon review of significant record evidence extrinsic to the respective contracts.  *See United States ex rel. Yannacopoulos v. Gen. Dynamics Corp.*, 652 F.3d 818, 836-37 (7th Cir. 2011); *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008); *United States v. Basin Elec. Power Co-op.*, 248 F.3d 781, 804-805 (8th Cir. 2001).

[29] *See United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 831-832 (8th Cir. 2013) (finding that Medicare regulations and ancillary materials do not require written reports for each claim for relevant services, so relators allegations do not set forth an FCA violation); *United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*, 2011 WL 976482, at *8 (D. Neb. Mar. 15, 2011) (finding that, while "fraudulent loan applications to the federal government may qualify as claims under the FCA," relator failed to allege a false claim because loan applications contained, at most, faulty calculations or alternative accounting methodologies under GAAP), *aff'd*, 690 F.3d 951 (8th Cir. 2012).  Defendants also rely on *United States ex rel. Grupp v. DHL Exp. (USA), Inc.*, which dismissed a FCA case against DHL based on allegations that DHL fraudulently imposed jet fuel surcharges on next day and second day shipments that did not travel by air.  47 F. Supp. 3d 171, 176 (W.D.N.Y. 2014).  The case appears to be an outlier.  Despite acknowledging that the contract under review contained an ambiguity, the Court gave no weight to the relators' interpretation and dismissed the case in light of defendant's "commonsense reading of the pertinent documents."  *Id.* at 178.  No other case has followed *Grupp* on this basis.  In any event, no ambiguity exists in this case and Defendants' interpretation of § 9.1(b) is simply untenable, as shown in Point IV.  Moreover, Relators have plausibly alleged a widespread fraud at the Banks.  Such fraud was meant to shield the Banks' true financial condition from view, which substantiates that the Banks acted with ill intent.

individuals requested advances from the various Federal Reserve banks and whether those persons knew of the Banks' control fraud.  *See* Def. Br. at 38.  In support, Defendants cite a single case, *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010), decided on appeal from a jury verdict, after discovery had been completed and all record evidence had been presented to the ultimate trier of fact.[30]  The Court should reject Defendants' request.

The FAC lays out in great detail the pervasive control fraud rampant at the Banks.  That fraud was perpetrated by and under the close supervision of the Banks' senior management, who are specifically identified in the FAC.  *See*, *e.g*., ¶¶ 71, 93, 114, 124, 142-50, 152, 156.  That fraud was further perpetrated for the purpose of masking the Banks' true financial condition, including taking advantage of low-interest loans for which the Banks were not eligible.  *See, e.g.*, ¶¶ 64-71, 86, 95, 113, 116-117, 124, 131, 143-145.  Indeed, Relator Kraus alerted Wachovia's legal and compliance departments about the fraud, ¶ 152, and also informed Wachovia CEO Steele and Wells CEO Stumpf.  ¶ 156.  It strains credulity to think that such senior management had no idea that the Banks were accessing the Discount Window, especially since Wachovia's borrowing at the Discount Window was reported in the press.  *See* Sabella Decl. Ex. 4.[31]

---

[30] In *Science Applications*, the Court held that it was error to instruct the jury that it could find scienter based on the "collective knowledge" of the subject companies' employees.  *See* 626 F.3d at 1274.  Nowhere did the Court even so much as intimate that relators should be precluded from proceeding to discovery if their complaint pleads scienter based on "collective knowledge."   At least one District Court reviewing an FCA claim has commented that "[k]nowledge, with respect to a corporation, is determined from the aggregate of its employees' knowledge." *United States ex rel. Kholi v. Gen. Atomics*, 2003 WL 21536816, at *4 (S.D. Cal. June 12, 2003).

[31] *Cf. Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc*., 531 F.3d 190, 195-96 (2d Cir. 2008) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)):

> [I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.  Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

44

Drawing all inferences in favor of Relators, as is required on this motion, these allegations plausibly establish that the Banks' acted with the requisite scienter.

Of course, much of the information necessary to eventually try this case to the trier of fact rests with Defendants, and there has been no discovery.  But that alone, particularly in light of the significant allegations Relators have been able to make, cannot justify slamming shut the courthouse doors to Relators at the pleadings stage.  Indeed, when, as here, the fraudulent scheme alleged is complex or extensive and when certain information is uniquely in the possession of the defendants, courts generally relax Rule 9(b).  *See generally DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (holding that plaintiffs were permitted to proceed on securities fraud claims although "with respect to the federal claims, derelictions are pleaded against the defendants generally, with little or no specification as to individual roles").  Relators have alleged enough to proceed.

## IX.   THE COMPLAINT SATISFIES THE MATERIALITY REQUIREMENT

### A.   DEFENDANTS' FALSE CERTIFICATIONS WENT TO THE VERY ESSENCE OF THE BARGAIN WITH THE GOVERNMENT

In *Escobar*, in explaining the materiality requirement for FCA cases, the Supreme Court quoted with approval the formulation set forth in *Neder v. United States*, 527 U.S. 1, 16 (1999): "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Escobar*, 136 S. Ct. at 2002; *see* 31 U.S.C. § 3729(b)(4).  The Court also quoted with approval the formulation set forth in *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. 1931), that a misrepresentation is material if it "went to the very essence of the bargain."  *Escobar*, 136 S. Ct. at 2003 n.5.  Application of this teaching leads inexorably to the conclusion that the Banks' false express and implied certifications were material.

The Discount Window and TAF programs are structured so as to correlate the interest rate charged to a bank with the risk being assumed by the taxpayers, and to deny credit entirely in highly risky situations.  Defendants' fraud subverted this structure by misleading the Federal Reserve banks to extend credit to the Banks on unduly favorable terms, at significant risk and cost to U.S. taxpayers.  As such, the false express and implied certifications went to the "very essence of the bargain."  Defendants ask this Court to suspend reality and pretend that, when a bank seeks to borrow billions of dollars from a Federal Reserve bank at a highly subsidized, below-market interest rate, the Federal Reserve would not even be influenced by the fact that the bank is severely undercapitalized or has repeatedly lied about its financial health in documents submitted to bank regulators.  To the contrary, had the Federal Reserve banks known that the Banks were not adequately capitalized and not in generally sound financial condition, that the Banks' financial statements were fraudulent, that the Banks were not eligible under applicable regulations for the loans they were receiving, and that the Banks had violated laws and regulations that seriously jeopardized their performance under the terms of the Lending Agreement, the Federal Reserve banks would not have made any advances to the Banks at all, and most certainly would not have made advances to the Banks under the primary credit program or TAF.  *See*, *e.g.*, ¶¶ 45-46, 58-59, 189-90, 194, 216, 217-18.[32]

Indeed, federal law requires Federal Reserve banks to take into consideration the financial condition of borrowing banks before advancing funds:

---

[32] Defendants' argument that Relators' materiality allegations improperly conflate causation with materiality, Def. Br. at 42, lacks merit.  The FAC alleges that Defendants' misrepresentations and false express and implied certifications concerning their ability to perform the Lending Agreement and their eligibility to access the primary credit program and TAF went to the very essence of their bargain with the Government and had a tendency to influence, and did influence, the Government's payment decisions.  This is precisely what the *Escobar* materiality test requires.

> Each Federal reserve bank shall keep itself informed of the general character and amount of the loans and investments of its member banks with a view to ascertaining whether undue use is being made of bank credit for the speculative carrying of or trading in securities, real estate, or commodities, or for any other purpose inconsistent with the maintenance of sound credit condition; and, *in determining whether to grant or refuse advances, rediscounts or other credit accommodations, the Federal reserve bank shall give consideration to such information.*

12 U.S.C. § 301.

Defendants' argument that the Complaint includes only conclusory assertions as to materiality blithely ignores the actual allegations of the Complaint. The Complaint contains extensive analysis as to how the CAMELS ratings are calculated, providing substantial basis for Relators' allegation that if the truth had been disclosed the Banks would have received the lowest rating possible. *See*, *e.g*., ¶¶ 190-216. Similarly, the Complaint contains detailed allegations as to the enormous impact of Wachovia's frauds on its reported capitalization. *See*, *e.g*., ¶¶ 220-21, 225-27. These analyses and calculations are the antithesis of conclusory allegations and must be taken as true on this motion.

The circumstances here bear no resemblance to the example of immateriality given by the Supreme Court in *Escobar*, in which the use of foreign staplers might technically violate a contractual requirement but clearly would not be material. *Escobar*, 136 S. Ct. at 2004. What could be more material to a loan program than the borrower's creditworthiness, the riskiness of the loan, and the interest rate to which the borrower is entitled?

### B. THE FACT THAT FEDERAL RESERVE BANKS CONTINUED TO MAKE LOANS TO THE BANKS AFTER RELATORS MADE CERTAIN DISCLOSURES TO THE SEC AND FBI DOES NOT DISPROVE MATERIALITY AS A MATTER OF LAW

In *Escobar*, the Supreme Court stated that if the Government pays claims "despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003-04. Seizing on this statement,

Defendants argue that their fraud was immaterial as a matter of law because Federal Reserve banks continued to make loans to Wells Fargo after Relators made certain disclosures to certain Government agencies.  Def. Br. at 43-47.  There is no merit to this position.

The Complaint states that Relator Kraus made disclosures to the SEC and the FBI, ¶ 155, and that Relator Bishop made disclosures to the SEC.  ¶ 185.  The Complaint does not allege that either Relator made any disclosures to the Federal Reserve banks, or that the SEC and/or the FBI relayed Relators' concerns to the Federal Reserve banks.  But this is crucial.  The issue under *Escobar* is whether the Federal Reserve banks making the loans had "actual knowledge," and it is settled law that the "actual knowledge of one United States government agency generally is not imputed to other agencies."  *United States v. Compian-Torres*, 712 F.3d 203, 208 (5th Cir. 2013); *see United States v. Harms*, 442 F.3d 367, 377 (5th Cir. 206) (same); *United States Small Bus. Admin. v. Bridges*, 894 F.2d 108, 112 (5th Cir. 1990) (same); *Barrie v. United States*, 615 F.2d 829, 830 (9th Cir. 1980) ("The imputation of knowledge of one government agency to another is impermissible."); *Jo-Dim Inv. Trust S.A. v. U.S. Dep't of Transp.*, 2001 WL 1033429, at *5 (S.D.N.Y. Sept. 7, 2001) ("[K]nowledge of an Assistant United States Attorney cannot, as a general proposition, be imputed to the particular agency to which a debt is owing").  Since the Complaint does not allege that any of Relators' disclosures were provided to the Federal Reserve banks, there is no basis on a motion to dismiss to find that the Federal Reserve banks made loans to the Banks with "actual knowledge" of anything Relators may have said to the FBI or SEC.[33]

Obviously cognizant of this fatal flaw in their position, Defendants include in their motion papers evidentiary material that they argue shows that the Federal Reserve knew that the

---

[33] In the cases cited by Defendants (Def. Br. at 43-44), there was no doubt that the agency making the payments was aware of exactly what the relators were alleging.  Here, nothing on the face of the Complaint suggests that that was true regarding Relators' allegations.

Banks had liquidity issues and a weakened financial condition. *See* Def. Br. at 45-47. But on a Rule 12 motion where no discovery has occurred, such evidentiary materials must be disregarded. *See* Point I, *supra*. When the case is in discovery, the parties will be able to learn exactly what the Federal Reserve banks knew and when they knew it. Issues as to "actual knowledge that certain requirements were violated … are matters of proof, not legal grounds to dismiss relators' complaint." *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 907 (9th Cir. 2017).

Furthermore, the materials on which Defendants rely (Williams Decl. Exs. Y and Z) do not show that the Federal Reserve banks had actual knowledge that the Banks were engaged in fraud, that their certifications were false, that Wachovia was not adequately capitalized, and that the Banks were not eligible to borrow at the Discount Window. As Defendants concede, the FCIC report (Ex. Y) "did not point to any internal fraud within Wachovia," Def. Br. at 45 n.23, and the Board of Governors Statement on the acquisition of Wachovia by Wells Fargo (Ex. Z) indicates that the Board believed that Wachovia was "well-capitalized." *Id*. at 47. Thus, those documents do not reflect any actual knowledge of the allegations in the Complaint that Wachovia had engaged in fraud and was not adequately capitalized. Indeed, neither document even mentions the word "fraud" or refers to either of the Relators.[34]

At most, the documents show awareness that the Banks had "liquidity challenges" and a "weakened" financial condition. Def. Br. at 45-47. But *Escobar* requires "actual knowledge that

---

[34] To the extent Defendants submit these documents in an effort to refute the allegations of the Complaint that the Banks engaged in fraud and were not adequately capitalized or in sound financial condition, the submission is plainly improper. On a motion to dismiss, the Court must assume the truthfulness of the well-pleaded allegations of the Complaint. *See*, *e.g*., *Friedman v. Bloomberg L.P*., 871 F.3d 185, 194 (2d Cir. 2017). "The Second Circuit has never condoned considering material outside the pleadings on a motion to dismiss if such material amplifies or refutes allegations in the complaint." *Telesca v. L.I. Hous. P'ship*, 443 F. Supp. 2d 397, 402 (E.D.N.Y. 2006) (citing *Glob. Network Commc'ns,* 458 F.3d at 156).

certain requirements were violated" before a lack of materiality can be found. 136 S. Ct. at 2003-04. Knowledge is "a state of mind in which a person has no substantial doubt about the existence of a fact." BLACK'S LAW DICTIONARY 950 (9th ed. 2009). "'[A]ctual knowledge' implies a high level of certainty and absence of any substantial doubt regarding the existence of a fact." *Picard v. Merkin*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014). The documents that Defendants improperly submit do not demonstrate that the Federal Reserve banks had actual knowledge that the Banks' certifications were false and that the Banks were not eligible to borrow at the Discount Window, and yet continued to make loans to the Banks. Indeed, as noted above, they show just the opposite.

## CONCLUSION

Defendants' motion to dismiss should be denied.[35]

Dated: New York, New York
      January 11, 2018

Respectfully submitted

**GRANT & EISENHOFER P.A.**

By:    /s/ James J. Sabella
Jay W. Eisenhofer
James J. Sabella
485 Lexington Avenue
New York, New York 10017
Telephone: (646) 722-8500

**GRANT & EISENHOFER P.A.**
Kyle J. McGee
Jon T. Pearson
Viola Vetter
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000

---

[35] Relators consent to dismissal of Count III of the FAC, the Conspiracy claim.

**THE LAW OFFICES OF**
  **SHARAD A. SAMY LLC**
Sharad A. Samy
32 Old Oak Road
Darien, CT 06820
Telephone: (917) 673-0804

**GOLDSTEIN & RUSSELL, P.C.**
Tejinder Singh
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636

Of Counsel:

**PORT & SAVA**
George S. Sava
Gary Port
734 Franklin Ave., #574
Garden City, NY 11530
Telephone: (516) 352-2999

*Attorneys for Plaintiffs-Relators Robert Kraus and Paul Bishop*