UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
UNITED STATES OF AMERICA ex rel.                            :
ROBERT KRAUS and PAUL BISHOP;                               :
                                                            :
                          Plaintiffs,    :  **MEMORANDUM**
                                                            :  **DECISION & ORDER**
                       - against -                  :
                                                            :  11 Civ. 5457 (BMC)
WELLS FARGO & COMPANY, WELLS                                :
FARGO BANK, N.A., and its and their                         :
subsidiaries and affiliates;                                :
                                                            :
                        Defendants.    :
                                                            :
----------------------------------------------------------- X

**COGAN,** District Judge.

      Before the Court is defendants' motion to dismiss the Fourth Amended Complaint. Relators Robert Kraus and Paul Bishop ("Relators") brought this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), alleging that defendants and their predecessors-in-interest presented false information to Federal Reserve Banks ("FRBs") in connection with their application for loans and advances. Defendants include Wells Fargo & Company (a bank holding company), Wells Fargo Bank, N.A., and their "subsidiaries and affiliates" (collectively, "Wells Fargo" or "defendants").[1] For the reasons below, defendants' motion to dismiss is granted.

## BACKGROUND

      A bank can borrow short-term funds from FRBs through a "Discount Window," and longer-term funds through a Term Auction Facility ("TAF"). Loans secured through the

---

[1] This case also, and to a large extent, concerns the activities of the former Wachovia Corporation and its subsidiaries, which merged into defendants' group of companies in 2008. The issues presented on this motion can be decided without distinguishing between the named defendant entities, their subsidiaries and affiliates, and their predecessors.

Discount Window are made at one of two interest rates: "primary," which carries a low interest rate; and "secondary," which carries a higher interest rate. Regulations governing the Discount Window provide that a bank is not eligible for primary credit unless it is in generally sound financial condition. A complex evaluative mechanism exists to ascertain a bank's financial condition. If a bank is not eligible for primary credit, it may receive secondary credit (contingent upon its satisfaction of further requirements) that carries a higher interest rate and a shorter term.

Relators allege that defendants owned many toxic, low-grade assets, which, by law, necessitated that they hold considerable capital against them. Instead of doing so, however, Relators claim that as early as 2001, defendants engaged in extensive accounting and control fraud that made them appear to be financially sound, sufficiently capitalized, and in compliance with applicable banking laws, when, in fact, none of that was the case. Relators allege that this fraud distorted defendants' supervisory ratings and capital ratios, and hid their serious undercapitalization. These distortions, Relators allege, made defendants eligible to participate in the Discount Window's lending program at the primary rate, as well as the TAF program.

As a result, "armed with a clean bill of health," defendants received from FRBs "billions of dollars of loans" at below-market primary rates for which they were not eligible.[2] Had defendants accurately represented their financial condition, Relators claim that the FRBs would have charged a higher rate, received more money for providing the loans, and (as explained below) deposited more money with the United States Treasury.

---

[2] Relators' bring their case under both an "implied certification" theory (to the extent that defendants allegedly fraudulently represented their eligibility for the loans), and an "express certification" theory (to the extent that the banks made explicit certifications that they were not violating any laws or regulations that could adversely affect their ability to perform their obligations in connection with the loans).

2

## DISCUSSION

**I.     Statutory Framework**

"The [FCA] imposes liability on any person who 'knowingly presents . . . a false or fraudulent claim for payment or approval,' 'to an officer or employee of the United States." Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. 1970, 1973 (2015) (internal quotations and citations omitted).  The FCA "may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 81 (2d Cir. 2017) (internal quotations omitted).

The FCA was adopted as a response to "sensational congressional investigations into the sale of provisions and munitions to the War Department" during the Civil War. United States v. McNinch, 356 U.S. 595 (1958).  However, it "was not designed to reach every kind of fraud practiced on the Government."  Id.  Instead, the FCA was intended "to stop [] plundering of the *public* treasury." Id. at 600 (emphasis added).  "Recognizing a cause of action under the FCA for fraud directed at private entities would threaten to transform the FCA into an all-purpose antifraud statute."  Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008).

"The central question under the False Claims Act is whether the defendant actually presented a 'false or fraudulent claim' to the government." United States ex rel. Sasaki v. New York Univ. Med. Ctr., No. 05 CIV. 6163, 2012 WL 220219, at *6 (S.D.N.Y. Jan. 25, 2012), aff'd sub nom. ABC v. NYU Hosps. Ctr., 629 F. App'x 46 (2d Cir. 2015).  Under the FCA, a claim is

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that is

    (i)      presented to an officer, employee, or agent of the United States; or

    (ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

        I.      provides or has provided any portion of the money or property requested or demanded; or

        II.     will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C.A. § 3729(b)(2)(A).[3] Accordingly, the critical threshold questions on this motion are whether 1) FRBs should be characterized as the Government or its agents for purposes of the FCA; and 2) if the Government paid any portion of the loans defendants received, or reimbursed FRBs for issuing the loans. See Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1996 (2016). The Court concludes that FRBs do not act as the United States or its agents under the FCA and that the Government does not provide funds to or reimburse FRBs for the conduct relevant here.

## II. FRBs are not the Government

There is no authority on the issue of whether FRBs should be properly characterized as the United States under the FCA.[4] The Court must therefore first look to decisions analyzing how to determine if an entity is the "Government" for purposes of the FCA.

---

[3] This is the statutory language as amended in 2009. Differences between the pre and post-amendment versions of the statute are not relevant to this decision, and neither party contends that to be the case.

[4] In Grabcheski v. Am. Int'l Grp., Inc., 687 F. App'x 84, 86 (2d Cir. 2017), a non-precedential decision, the Second Circuit affirmed the dismissal of a claim brought by a relator alleging that a defendant had made misrepresentations in agreements with the Federal Reserve Bank of New York. The parties do not appear to have raised, nor did the Court consider, the question of whether FRBs constitute the Government or its agents under the FCA.

A. Rainwater/McNinch Factors

Two Supreme Court decisions suggest a non-exclusive list of factors to consider in deciding if an entity counts as the Government under the FCA. In Rainwater v. United States, 356 U.S. 590 (1958), the Supreme Court evaluated whether the Commodity Credit Corporation ("CCC") was part of the Government of the United States, and if, therefore, claims presented to it were subject to the FCA. The Supreme Court decided the question affirmatively, pointing to several considerations. First, the CCC's enabling statute expressly designated it as an agency of the United States, under the "general supervision and direction of the Secretary of Agriculture." Id. Second, Congress provided the CCC's capital, and the Treasury continued to fund the CCC, which returned profits to the Government. Id. Third, the CCC's officers and employees were employees of the Department of Agriculture, and paid according to federal law. Fourth, the CCC was "subject to the provisions of the Government Corporation Control Act . . . ." Id. The Supreme Court noted that the Government Corporation Control Act "provides such close budgetary, auditing and fiscal controls that little more than a corporate name remains to distinguish it from the ordinary government agency." Id. Finally, the Supreme Court noted the purpose and function of the CCC, which was "simply an administrative device established by Congress for the purpose of carrying out federal farm programs with public funds." Id.

In McNinch, a companion case, the Supreme Court held that the Federal Housing Administration (the "FHA") should be considered to be the United States Government under the FCA. In so deciding, the Supreme Court emphasized the FHA's designation "as an unincorporated agency in the Executive Department," the fact that its head was "appointed by the President with the Senate's consent," and that the FHA "operates with funds originally appropriated by Congress." 395 U.S. at 598. The McNinch Court also noted the FHA's purpose

and function – "the agency is responsible for the administration of a number of federal housing programs." Id.

Taken together, Rainwater and McNinch present several factors relevant to deciding if an entity is covered by the FCA: first, statutory language placing the entity in or out of Government; second, the source of its initial capital and whether the Government has continuing financial involvement; third, the manner of appointment and/or confirmation of its leadership; fourth, whether its employees count as federal employees; and finally, the Government's interest and involvement in the purpose and function of the entity. Consideration of these factors requires close reference to an entity's enabling statute. Accordingly, the Fifth Circuit has noted that in the context of the FCA, "[c]ourts differentiate between entities that are the Government and those that are not by looking at their statutes rather than the extent of Government supervision." U.S. ex rel. Shupe v. Cisco Sys., Inc., 759 F.3d 379, 385 (5th Cir. 2014).

1. *FRBs' Relation to the Government*

The Federal Reserve Act (the "FRA"), 12 U.S.C. §§ 221 *et seq.,* created the Federal Reserve System in 1913. The FRA provided for the establishment of eight to twelve Federal Reserve districts, each with an FRB. Id. §§ 222, 224. The FRA also created the Board of Governors of the Federal Reserve System (the "Board"), consisting of seven members appointed by the President and confirmed by the Senate, to provide general policy and oversight.[5] See Id. §§ 241, 248.

In creating this dual-structure, "Congress divided the powers of the Federal Reserve System between the Board, which is a federal agency, and the [Federal Reserve Banks], which

---

[5] Additionally, the FRA created the Federal Open Market Committee ("FOMC"), 12 U.S.C. § 263, which is made up of the members of the Board and representatives of the FRBs. The FOMC determines whether to buy or sell government securities on the open market.

6

were established as regional banks . . . . The Federal Reserve [System] is structured to empower local institutions to lend, while permitting federal oversight." Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 158, 161 (2d Cir. 2010) (internal citation and quotation omitted); see Lewis v. United States, 680 F.2d 1239, 1241 (9th Cir. 1982) ("It is evident from the legislative history of the Federal Reserve Act that Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks.").

Congressional statements prior to enactment of the FRA confirm this intention. In introducing the bill that became the FRA, Congressman Glass – one of its drafters – stated:

> The fundamental idea of the bill . . . is the creation of a new class of banks to be known as Federal reserve banks . . . to be owned and operated by the stockholding banks of the [Federal Reserve] district[s] . . . . While subject to limited control by the Federal reserve board, the regional bank is given an independent status . . . .

50 Cong. Rec. H.4643 (Sept. 13, 1913). The House Committee Report introducing the FRA legislation lends further support to this point:

> It is proposed that the Government shall retain sufficient power over the reserve banks to enable it to exercise a direct authority when necessary to do so, but that it shall in no way attempt to carry on through its own mechanism the routine operations and banking which require detailed knowledge of local and individual credit and which determine the actual use of the funds of the community in any given instance. In other words, the reserve-bank plan retains to the Government power over the exercise of the broader banking functions, while it leaves to individuals and privately owned institutions the actual direction of routine.

H.R. Rep. No. 69, 63 Cong. 1st Sess. 18-19 (1913). The Committee also noted:

> The Federal reserve banks . . . would be in effect cooperative institutions, carried on for the benefit of the community and of the banks themselves by the banks acting as stockholders therein . . . . The committee . . . recommends that they shall be individually organized and individually controlled, each holding the fluid funds of the region in which it is organized and each ordinarily dependent upon no other part of the country for assistance. The only factor of centralization which has been provided in the Committee's plan is found in the Federal Reserve Board, which is to be a strictly Government organization created for the purpose of inspecting existing banking institutions and of regulating relationships between the Federal reserve banks and between them, and the Government itself.

7

Id. at 18. Indeed, "[f]ew issues in the history of this nation have been as thoroughly considered and debated as central banking and the regulation of the money supply, and private participation, or even control, have been hallmarks of what was from time to time prescribed by the Congress." Melcher v. Fed. Open Mkt. Comm., 644 F. Supp. 510, 524 (D.D.C. 1986), aff'd, 836 F.2d 561 (D.C. Cir. 1987).

The FRA nowhere designates FRBs as part of any executive department or agency. 12 U.S.C. §§ 222 *et seq.* Instead, they are privately owned, separate corporate bodies. Id. § 341; see Scott v. Fed. Reserve Bank of Kansas City, 406 F.3d 532, 535 (8th Cir. 2005) ("[each FRB] is considered a separate corporation owned solely by commercial banks within its district."). Furthermore, FRBs are not subject to the Government Corporation Control Act. See 31 U.S.C. § 9101; Lewis, 680 F.2d at 1241. Therefore, the first Rainwater/McNinch factor suggests that the FRA placed FRBs, as distinct from the Board, outside of the Government.[6]

2. *Ownership and Funding*

As described above, under the FRA, each FRB is a private corporation, owned by private stockholders made up of national banks. See 12 U.S.C. § 341; Scott, 406 F.3d at 535; Lewis, 680 F.2d at 1241. Other courts have noted the importance of private ownership in FCA analysis. See Cisco, 759 F.3d at 387 (finding that the FCA did not apply to an entity created by Congress and the Federal Communications Commission, and over which the Commission still exercised some oversight and regulation, in part because the subject entity was explicitly a "private corporation owned by an industry trade group."). National banks are required to buy stock in their local FRB, 12 U.S.C. § 222, and state banks may choose to do so. Id. § 321. Each member

---

[6] Defendants, of course, presented their requests for loans to FRBs, not the Board.

bank of a local FRB is entitled to receive annual dividend payments from its earnings. Id. § 289. Furthermore, each member bank is liable for the contracts and debts of the FRB. Id. § 502.

FRBs do not receive government appropriations to operate.[7] See Scott, 406 F.3d at 537; Denkler v. United States, 782 F.2d 1003, 1005 (Fed. Cir. 1986). Instead, FRBs generate their own income. This comes primarily from interest earned on government securities acquired in the course of FRB monetary policy actions and interest on loans to depository institutions. See Texas State Bank v. United States, 423 F.3d 1370, 1373 (Fed. Cir. 2005) ("The income generated by the sterile deposits and vault cash is used to pay the expenses of the Federal Reserve . . . ."); Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys., 649 F. Supp. 2d 262, 266 (S.D.N.Y. 2009), aff'd, 601 F.3d 143 (2d Cir. 2010) (noting that FRBs do not receive appropriated funds but instead generate income from stock issuances to member banks.). Although the Board can levy assessments on FRBs, the FRA expressly provides that "funds derived from such assessments shall not be construed to be Government funds or appropriated moneys." 12 U.S.C. § 244.

A handful of provisions in the FRA do create a financial connection between FRBs and the Government. Section 289 provides that surplus funds beyond a set level in each FRB are to be annually transferred to the Board and then deposited in the general fund of the Treasury. Section 290 specifies the limited ways in which these transferred funds may be used (such as, "to supplement the gold reserve held against outstanding United States notes," or "applied to the reduction of the outstanding bonded indebtedness of the United States."). That same section also

---

[7] Section 391 of the FRA appropriates "such sums as may be necessary to reimburse [FRBs] in their capacity as depositaries and fiscal agents for the United States." This payment for specific services is distinct from general funding, and, indeed, is suggestive of a "business" relationship between the Government and an independent entity.

provides that if an FRB is "dissolved or go[es] into liquidation, any surplus remaining . . . shall be paid to and become the property of the United States and shall be similarly applied." Id.

Relators claim that given section 289, "any claim submitted to an [FRB] will reduce funds on hand and hence reduce amounts available to be remitted back to the Treasury." In other words, Relators argue that because defendants allegedly did not pay as much for loans as they should have, the FRBs that issued those loans in turn had less money to send to the Treasury at the end of each year, and the Government was therefore deprived of money to which it was entitled.

This is too tenuous of a connection, and one that taken to its extreme would render *any* fraud that reduced a party's liability to the Government actionable under the FCA. By this reasoning, a party would be subject to FCA liability if, for example, it fraudulently elicited payment from another in a way that reduced the latter's tax exposure, because that would have the effect of depriving the Government of money it was otherwise owed.[8]

Putting aside for a moment the tenuousness of this theory, Relators run into another problem: the deposit by FRBs of residuary money into the Treasury is conceptually distinct from the Government's provision of funds towards a claim (either directly or through reimbursement). The Government receiving less than it could have is fundamentally not the same as its improperly paying out money. Perhaps recognizing this, Relators have sensibly not plead a "reverse" false claim under 31 U.S.C. § 3729(a)(1)(G), which bars parties from avoiding a pre-existing obligation to pay money to the Government. To do so, they would have had to contend that *defendants* – not FRBs – had an obligation to deposit money in the Treasury, which they

---

[8] Under 26 U.S.C. § 165, an individual can list gambling losses (up to the extent of gambling gains) as a deduction on his tax return. Under Relators' theory, a casino could therefore be liable to the Government for reducing a (losing) gambler's tax exposure.

cannot, and have not, done. Nevertheless, it appears that they are trying to rely subtly on the logic of such a claim to establish a connection between FRBs and the Government.

Finally, these provisions do not fundamentally upend the overall structure of FRBs as financially independent from the Government and owned by their constituent member banks. Significantly, the Government does not fund FRBs on either an original or ongoing basis. Particularly relevant here, the Government had no direct financial (or other) involvement in paying out the loans received by defendants. Consideration of the second Rainwater/McNinch factor therefore also suggests that FRBs are private corporations with a financial existence largely separate from the Government.

### 3. *Leadership and Employees*

The third and fourth Rainwater/McNinch factors – regarding leadership and employment – compel the same conclusion. As to governance, each FRB has a nine-member board of directors, with six – a controlling majority – elected by member banks, leaving the Board to appoint only the remaining three. Id. § 222. As the directors are charged with supervising and controlling the day-to-day operations of the FRB (discussed more below), this ensures local control of each FRB independent of the Government. Id. § 301. Furthermore, the directors of each FRB select all of each bank's other officers and employees. Id. § 341. "In sum, [FRBs] [are] private, independent entit[ies] run by [their] own board of directors." Scott, 406 F.3d at 535.

FRB employees are not Government employees; instead, they are at-will employees. See Scott, 406 F.3d at 536; James v. Fed. Reserve Bank of New York, 471 F. Supp. 2d 226, 233 (E.D.N.Y. 2007) ("The FRA . . . appears to express the intent of Congress to grant the [FRBs] significant latitude in employment decision-making. It provides that 'a federal reserve bank shall

have the power to dismiss at pleasure its officers and employees.'") (internal quotations and alterations excluded). FRB employees do not participate in the Civil Service Retirement System and are covered by worker's compensation insurance procured by individual FRBs, not by the Federal Employees Compensation Act. See Scott, 406 F.3d at 536.

   4. *Functioning*

The powers and functioning of each FRB also suggest that they are distinct from the Government. Beginning with fundamentals, each FRB has the power to adopt and use a corporate seal, make contracts, sue and be sued, appoint its own employees, and "exercise all powers necessary to carry on the business of banking." 12 U.S.C. § 341.

The Board only "provides broad, general policy supervision" of the FRBs. Scott, 406 F.3d at 536; see Lewis, 680 F.2d at 1241 ("The [Board] regulates the [FRBs], but direct supervision and control of each [FRB] is exercised by its board of directors."). "The directors enact by-laws regulating the manner of conducting general Bank business . . . and appoint officers to implement and supervise daily [FRB] activities." Lewis, 680 F.2d at 1241. As is particularly relevant here, "[t]hese activities include collecting and clearing checks, *making advances to private and commercial entities*, holding reserves for member banks, discounting the notes of member banks, and buying and selling securities on the open market." Id. (citing 12 U.S.C. §§ 341-361) (emphasis added). Congress granted to FRBs direct authority to determine whether to make Discount Window advances, and to whom. See 12 U.S.C. § 347; Fox News Network, 601 F.3d at 161 ("The power to make loans is explicitly granted by statute only to the Federal Reserve Banks themselves.") (citing 12 U.S.C. § 347b(a)). "Each [FRB] is statutorily empowered to conduct these activities without day to day direction from the federal government. Thus, for example, the interest rates on advances to member banks, individuals, partnerships, and

corporations are set by each [FRB] . . . ." Lewis, 680 F.2d at 1241; see Fox News Network, 601 F.3d at 161.[9]

On the other hand, FRBs' powers are also limited in a notable way that distinguishes them from the Government: they do not have the authority to promulgate regulations having the force and effect of law. See 12 U.S.C. § 248(k). The Board, on the other hand, does have such power, and cannot delegate it to FRBs. Id. The absence of a law or rule making function inclines against considering FRBs as part of Government.

The picture that emerges, therefore, is of FRBs operating independently from the Board – and the Government – without lawmaking authority; in other words, as non-Governmental actors. See Scott, 406 F.3d at 537 ("Accordingly, although the Bank may play a role in the implementation of federal fiscal policy, it does so independently of any substantial government involvement."). Their situation is a far cry from that of the CCC in Rainwater ("simply an administrative device") or the FHA in McNinch (specifically tasked with the administration of federal programs).

Taken together, the Rainwater/McNinch factors suggest that FRBs are not the Government for purposes of the FCA.

The conclusion of this statutory analysis comports with recent holdings by two other Courts that considered whether different entities were the Government for purposes of the FCA. In United States ex rel. Adams v. Aurora Loan Servs., Inc., 813 F.3d 1259, 1260 (9th Cir. 2016), the Ninth Circuit held that Fannie Mae and Freddie Mac were not the Government; in United

---

[9] As is particularly relevant here, "[w]hile the Board regulates [discount window] lending, see 12 U.S.C. § 347b, the Board has no input or involvement in the administration of specific [discount window] loan requests." Bloomberg, 649 F. Supp. 2d 262, 266 (S.D.N.Y. 2009).

13

States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 491-92 (D.C. Cir. 2004), the D.C. Circuit reached the same conclusion as to Amtrak.

In Aurora, 813 F.3d at 1260, the Ninth Circuit "held that a claim presented to Fannie Mae or Freddie Mac is not presented to an 'officer, employee or agent' of the United States." In reaching its decision, the Court noted that although Fannie Mae and Freddie Mac were "sponsored or chartered by the federal government," they were "private companies"; "Fannie Mae is a Government-sponsored private corporation" and "Freddie Mac is a body corporate under the direction of a Board of Directors elected annually by the voting common stockholders." Id. at 1260-61 (internal citations and quotations omitted). FRBs are similarly chartered by the Government, and are, like Freddie Mac, run under the direction of a board, the majority of which is elected by independent member banks, and not the Government (or the Federal Reserve Board).

In Bombardier, 380 F.3d at 491, the D.C. Circuit held that Amtrak was not the Government for purposes of the FCA, pointing to the fact that its "organic statute has flatly stated that the company is not a department, agency, or instrumentality of the United States Government." (internal quotations omitted). There, the Court rejected the relator's attempt to analogize the situation of the CCC as discussed in Rainwater to Amtrak. The Bombardier court noted that unlike Amtrak's enabling statute, the CCC's enabling statute "expressly provided that the [CCC] was 'an agency and instrumentality' of the United States." Id. Although the FRA does not go so far as Amtrak's authorizing statute in explicitly putting FRBs outside of the Government, its silence to that point is significant, especially in light of Congress's demonstrated ability to state, when it intends to (as in Rainwater), that an entity is part of the Government.

14

The Eighth Circuit recently undertook an extensive analysis of whether FRBs are Government agencies in a different context (Federal Rule of Civil Procedure 4). See Scott, 406 F.3d 532. However, the analysis is so thorough that it is relevant to the question here. Reviewing many of the same considerations above – while acknowledging the central role that FRBs play in the national fiscal system – the Scott Court held that FRBs were not agencies of the Government. In reaching its conclusion, the Court relied on the following considerations, all of which bear significantly on the instant case: 1) FRBs play a limited role in carrying out Government policy and do so without law-making authority; 2) the Government is minimally involved in running FRBs, 3) FRBs are not Government-financed; 4) FRBs are owned by commercial member banks; 5) no statute designates FRBs as federal agencies; and 6) when courts have decided that FRBs *are* a part of the Government, they have largely done so in the context of adjudicating the tax-exempt status of FRBs. As Scott noted however, Congress provided FRBs' tax exemption in 12 U.S.C. § 531, and did so without stating that FRBs are federal agencies. See Scott, 406 F.3d at 536-38.

### III. FRBs are not Agents of the Government

In addition to not being properly characterized as the Government for purposes of the FCA, there is no support for Relators' contention that FRBs act as agents of the Government. Nothing in the text of the statute labels FRBs as agents of the Government, and nothing describes them acting as such.

In a handful of places, the FRA refers to FRBs as "fiscal agents" for specified roles. For instance, 12 U.S.C. § 391 provides that "when required by the Secretary of the Treasury, [FRBs] shall act as fiscal agents of the United States; and the revenues of the Government or any part thereof may be deposited in such banks, and disbursements may be made by checks drawn

15

against such deposits." Sections 393, 394 and 395 of the statute also authorize FRBs to act as fiscal agents for the Farm Credit System, the Home Owners' Loan Corporation, and the CCC, respectively. Additionally, 31 C.F.R. § 210.7 provides that FRBs serve as fiscal agents "of the Treasury in carrying out its duties as the Federal Government's [automated clearing house] Operator . . . ."

"[T]he term "fiscal agent" is not defined in the United States Code, but the dictionary defines the term as 'a bank or other financial institution that collects and disburses money and services as a depository of private and public funds on another's behalf.'" Mun. Ass'n of S.C. v. USAA Gen. Indem. Co., 709 F.3d 276, 285 (4th Cir. 2013) (citing Black's Law Dictionary 73 (9th ed.2009)) (internal alterations omitted). In other contexts, courts have distinguished between "fiscal agents" and "general agents." See Hogan v. Fid. Nat. Prop. & Cas. Ins. Co., No. 3:13-CV-9, 2015 WL 2114267, at *3 (N.D.N.Y. May 6, 2015) ("WYO companies, thus, act as 'fiscal agents of the United States'. . . but they are not general agents and therefore must strictly enforce the provisions set out in the regulations, varying the terms of a policy only with FEMA's express written consent.") (internal quotations omitted).[10]

Given the lack of any express statement of an agency relationship between the Government and FRBs, and the limited mentions of a narrow fiscal agent relationship with the Government in which FRBs carry out only discrete tasks, the Court concludes that these select provisions do not give rise to an agency relationship sufficient to sweep FRBs into the FCA.

## IV. Instrumentality Analysis is not Dispositive

Many cases, including some to which Relators cite, have held that FRBs carry out important governmental functions and are instrumentalities of the Government. See e.g., Starr

---

[10] Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis, 583 F.3d 1371, 1379 (Fed. Cir. 2009), raised the issue but did not decide whether FRBs' status as "fiscal agents" transforms them into "agents."

Int'l Co. v. Fed. Reserve Bank of New York, 906 F. Supp. 2d 202, 232 (S.D.N.Y. 2012), aff'd, 742 F.3d 37 (2d Cir. 2014) ("[FRBs carry out the general fiscal duties of the United States . . . They are the foundation for the federal reserve system and are intimate parts of the Government's fiscal structure.") (internal citations and quotations omitted). There can be no dispute that FRBs occupy an integral role in the national fiscal system, whether or not they are described as an "instrumentality," and nothing in the above analysis suggests otherwise. However, their status as an instrumentality and observations about their general importance are fundamentally distinct from whether they should be characterized as the United States (or its agents) for purposes of the FCA, and as discussed above, the FRA does not suggest that to be the case. Entities such as FRBs can be involved with the execution of critical Government policy without constituting action by the Government itself. See U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co., 275 U.S. 415, 425-26 (1928) ("Instrumentalities like the national banks or the federal reserve banks, in which there are private interests, are not departments of the government. They are private corporations in which the government has an interest."); Scott, 406 F.3d at 535; Aurora, 813 F.3d at 1261 ("[J]ust because an entity is considered a federal instrumentality for one purpose does not mean that the same entity is a federal instrumentality for another purpose.").

Based on the above analysis of the FRA, the Court concludes that FRBs are not the Government or its agents for purposes of the FCA, and that defendants did not, therefore, present a claim, as defined in 31 U.S.C. § 3729(b)(2)(A)(i), to the Government.

**V.     Defendants did not Seek Reimbursement from the Government**

The Court also holds that defendants' loan requests do not give rise to liability under 31 U.S.C. § 3729(b)(2)(A)(ii), which creates FCA liability for claims that the Government either

17

funds directly or are submitted to a third party that is then reimbursed for the claims by the Government. To do so, Relators would have to allege that the Government either provided any portion of the money loaned to defendants, or reimbursed FRBs for making the loans. They can do neither. As the above discussion makes clear, the Government has a considerably limited financial connection with FRBs, and that connection does not extend to funding or reimbursing FRBs for the individual loans at issue here.

## CONCLUSION

Defendants' motion to dismiss [88] is granted, and Relators' Fourth Amended Complaint is dismissed. The Clerk is directed to enter judgment.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       May 9, 2018